

October 3, 2006

Emily Waters
c/o Law Office of Ian Mattoch
Suite 1835, Pacific Guardian Center
737 Bishop Street
Honolulu, Hawaii  96813

**Re: Powell, Laughlin, et al. vs. City and County of Honolulu**

Dear Ms. Waters:

As you requested, I have reviewed the file material your office provided me concerning the drownings of Eric Powell and James Laughlin (i.e. referred to herein as the Powell/Laughlin incident) wherein both men drowned while snorkeling at Hanauma Bay.  In addition, I also visited the site of the Powell/Laughlin incident wherein I made a number of observations concerning the Hanauma Bay area and beach including Witch's Brew, the area within Hanauma Bay where Mr. Powell and Mr. Laughlin drowned.  It should be noted that I was familiar with Hanauma Bay prior to my inspection for the purposes of this matter in that I had snorkeled there on several occasions in the past.  Based on this information, my training, experience, and expertise I conducted a Risk Management Analysis of the Hanauma Bay operations as it pertains to the Powell/Laughlin incident.  My findings and conclusions are summarized below.

I base my findings and opinions on:  my training, experience, and expertise in the field of Human Factors Engineering, the observations made at the time of my site inspection, as well as previous visits to Hanauma Bay, and the various file material pertaining to this case that your office provided.  The material I reviewed and/or investigations undertaken that were specific to the facts of this case included:

1. Miscellaneous photographs taken by the Powells/Laughlin;
2. Map of Hanauma Bay;
3. Time Line;
4. Sun and Moon Data for July 19, 2002;
5. Weather History for July 19, 2002;
6. Surf Data for July 19, 2002;
7. Fire Department Incident Report;
8. Police Department Incident Report;
9. Autopsy Report for Mr. Powell;

10. Autopsy Report for Mr. Laughlin;
11. Miscellaneous Newspaper Articles;
12. Miscellaneous TV News Clips;
13. Video Tape of Hanauma Bay shot on 10/9/03;
14. Miscellaneous photographs of Hanauma Bay taken on 10/9/03;
15. Queen's Medical Center Records;
16. City and County of Honolulu's Response to Plaintiff's First Request for Production of Documents;
17. City and County of Honolulu's Response to Plaintiff's First Interrogatories;
18. City and County of Honolulu's Supplemental Response to Plaintiff's First Request for Production of Documents;
19. Ocean Safety and Lifeguard Service Division Supervisor's Report;
20. Deposition of Mrs. Powell;
21. Deposition of Mr. Bregman;
22. Deposition of Mr. Goodwin;
23. Deposition of Mr. Dorr;
24. Deposition of Mr. Moses;
25. Deposition of Mr. Neves;
26. Discussions with Dr. Lukas;
27. Discussion with Mr. Ebro;
28. Prior personal experience with Hanauma Bay;
29. Visitation/inspection of Hanauma Bay.

This report is based on the information that is available to date. It is my understanding that discovery is continuing in this matter, thus I reserve the right to further expand and/or amend my opinions and their bases if additional information relevant to my area of expertise becomes available.

Attached as an exhibit to this report is a copy of my CV that highlights my training, experience, and expertise as it pertains to safety and risk management, along with a list of my publications. Also attached is a listing of my sworn testimony for the past 5 years. Please note that my fees for work on this matter, including trial, is $300/hour plus expenses; deposition fees are $350/hour, unless paid in advance, with a minimum charge of $1,000. Commercial travel time is billed at half-rate.

I have a Ph.D. in Mechanical Engineering – Human Factors Option; I have 30 years of experience in Human Factors with my emphasis being in safety and risk management. I have done theoretical work in the area of safety and specifically warnings, as well as provided consulting services to private industry and businesses in the field of safety and risk management. Also, as noted in my CV, I am board certified in Human Factors.

## RISK MANAGEMENT ANALYSIS

**Overview**

In order to ensure the safety of visitors, the general public, and employees alike, a governmental agency such as the City and County of Honolulu must employ some type of basic safety or risk management program. To be effective at minimizing the potential

harm to people, any risk management program must be comprised of five basic components: Hazard Analysis, Plan Development, Plan Implementation, Plan Evaluation, and Documentation. Each of the steps and how they relate to Powell/Laughlin incident are discussed in the following sections.

**Hazard Analysis**

A hazard analysis is a process whereby the various foreseeable tasks performed by the user (i.e. the manner in which the person interacts with the facility or system) are analyzed to identify potential hazards under the varying environmental conditions that exist where these tasks are accomplished. In the case of the Powell/Laughlin incident, the relevant tasks would be those associated with visitors that are swimming/snorkeling in the bay. In particular is the concern for drowning, particularly given that a vast majority of the visitors to Hanauma Bay are tourists with limited knowledge of ocean hazards, most of whom have limited, if any, snorkeling experience.

A hazard analysis is comprised of two key components: an a priori analysis (i.e. one that is performed before there is an accident or near miss) and a post hoc analysis (i.e. one that is performed after there is an accident or near miss). It is not the intent of this report to delve into the details of a comprehensive hazard analysis, not would it be particularly fruitful to do so. Notwithstanding, the relevant issues as they pertain to the Powell/Laughlin incident for each type of analysis are:

*A Priori*

1. The initial view visitors have of Hanauma Bay is from high above the bay; from that distance the ocean, particularly in the bay area where people are swimming/snorkeling, the water/bay appears tranquil and peaceful. This reinforces a preexisting schema (i.e. mental model or expectation) that this is a public beach that should be safe for swimming/snorkeling.

2. As visitors descend to the beach area this schema is reinforced by several factors such as the large number of people who are swimming/snorkeling, the wide range of ages of people (i.e. from infants to the elderly) and the presence of lifeguards, including lifeguard towers.

3. The water in the immediate area of the beach is relatively calm and tranquil compared to the outer reef and areas such as Witch's Brew; however, unbeknownst to most visitors (i.e. mostly tourists) this is due to a number of factors such as the direction/magnitude of the winds, currents, and swells, as well as the protection afforded by the outer reef.

4. The presence of the lifeguard towers and lifeguards create a false sense of security.

5. When the water is choppy and rough such as the day of the Powell/Laughlin incident, the lifeguards cannot continuously observe swimmer/snorkelers as they are bobbing up and down in the water.

6. The significant number of prior drownings at Hanauma Bay put the City and County of Honolulu on notice of the hazardous conditions that were not being effectively mitigated. For example, in the 4 months prior to the Powell/Laughlin incident, there were 7 drownings in Hanauma Bay. To put that in perspective, there were a total of 7 drownings in all of Oahu's beaches staffed with lifeguards, less Hanauma Bay, in all of 2002.

7. Lifeguarding in Hanauma Bay is particularly challenging in that the most people are there to snorkel, an activity in which they lay face down in the water for extended periods of time and remain relatively motionless.

8. The large expanse of the bay both longitudinally (i.e. parallel to the beach) and particularly in depth (i.e. distance off the beach) contribute to the attraction to snorkel on the outer reef and sense of protection created by having shores on both sides.

9. Ms. Powell testified that she did not perceive any dangers or hazards associated with Hanauma Bay; this reinforces the fact that the hazards associated with Hanauma Bay are effectively hidden from the novice user.

10. Captain Soo acknowledged that visitors are attracted to Witch's Brew.

11. Acting Captain Khrone noted that the Witch's Brew area has strong currents and is dangerous.

12. Via Dr. Lukas' analysis:
    a. Once a swimmer/snorkeler gets into the Witch's Brew area, there are no good options for escape.
    b. Even as an expert diver, he found it challenging to get back out of the Witch's Brew area.
    c. Even on a surfboard he was afraid to venture into the end of Witch's Brew given the waves and current were so strong and erratic.
    d. The hazard associated with Witch's Brew is not apparent.

13. Lifeguard Bregman testified that:
    a. Hanauma Bay is a very challenging area to be a lifeguard.
    b. Tourists are encouraged to go to Hanauma Bay and many are told they need not know how to swim.
    c. Witch's Brew is dangerous if the trades are blowing or if there is a northeast swell (i.e. such as the day of the Powell/Laughlin incident).

14. Lifeguard Goodwin testified that:
    a. Lifeguarding at Hanauma Bay is challenging as there are a lot of inexperienced people who are there to snorkel.
    b. When the water is rough (i.e. such as the day of the Powell/Laughlin incident) the outer reef is closed because it is too hazardous. But as

4

discussed below, it is clear that the City and County of Honolulu failed to do so on the date of the Powell/Laughlin incident.

15. Lifeguard Dorr testified that:
    a. Hanauma Bay is difficult to lifeguard because it is crowded and all the swimmers are face down in the water.
    b. If the swimmer/snorkelers remain motionless for 30 seconds then a rescue is initiated.

*Post Hoc*

1. If a post hoc analysis is to be effective in improving safety it is absolutely mandatory that any and all accidents and/or near misses be thoroughly and properly investigated by trained and knowledgeable investigators. The investigations must be properly documented, including photographs and interviews of the victim(s), any/all potential witnesses, and in incidents such as drownings on a public beach there should be in-depth interviews of the lifeguards and rescue personnel. Lastly, the accident reports must be analyzed individually and then reviewed as a group to identify commonalities and potential patterns, by trained professionals to determine the root cause(s) of the accident(s).

2. It is absolutely critical that the underlying root cause(s) be identified so that corrective action can be implemented; falsely attributing the failure mode ensures that needless similar accidents will be repeated over and over. It should also be noted that this is a serial process from being to end; compromise any single step of the process and the overall process will fail. In this case, the evidence is irrefutable that City and County of Honolulu's risk management program failed at the very beginning. That is, in their answers to interrogatories, the City and County of Honolulu acknowledged that there was no post hoc investigation, not even an interview of any of the lifeguards that were on duty at the time of the Powell/Laughlin incident. The failure of City and County of Honolulu to have essentially no post hoc investigation/analysis program is a willful disregard for visitor safety. In effect, such a failure essentially constitutes a conscious and willful decision to repeatedly expose visitors to a known hidden hazard, knowing full well that some of them will become seriously injured and/or drown.

**Plan Development**

The goal of this step is to develop a plan or method for eliminating or at least minimizing the hazard. When generating or creating a plan, the safety and human factors profession uses a three-level hierarchical process, referred to as the Fundamental Principle of Safety.

The first tier or the best alternative is "Safety by Design". In short, this calls for alternative designs such that either the hazardous condition is eliminated or the user is removed/prohibited from the vicinity of the hazard (i.e. such as prohibiting visitors from venturing outside the inner reef, or swimming/snorkeling any closer than the approach to Witch's Brew). This is the first level of the hierarchical process because it is by far the most effective way of ensuring safety.

If for some reason Safety by Design is not possible or feasible, the second best alternative is "Guarding" or providing a barrier between the user and the potential hazard (i.e. such as the fence on the ledge that restricts access to Witch's Brew by land). However, it must be recognized that this second tier should only be employed when Safety by Design is not a viable alternative because it is not nearly as effective (i.e. the hazard still exists, guards are not fool proof).

The final tier is "Persuasion Control", using warnings, training, or other types of human intervention so as to "persuade" people to behave in a certain manner to ensure user safety. It is noted that for Persuasion Control to be effective it requires, first and foremost active participation on behalf of those who are in control of the hazard (i.e. in this case the City and County of Honolulu), as well as that of the user who is exposed to the hazard (i.e. the visitor to Hanauma Bay). Persuasion Control is the last tier of the hierarchical process because it is known to be limited in its effectiveness.

In this case it is not feasible to have removed the hazard associated with Witch's Brew; thus, the most effective plan would have focused on removing the user or Hanauma Bay visitor from the vicinity of the hazard. In this instance that would mean developing a protocol that would prevent people from accessing Witch's Brew either by land or water. If the City and County of Honolulu determines that this is not a viable option, then in accordance with the Fundamental Principle of Safety, Guarding must be employed (i.e. such as a fence along the ledge to restrict access by land).

If neither Safety by Design or Guarding is implemented, it becomes absolutely mandatory that the City and County of Honolulu develop a scientifically sound Persuasion Control system. Given the known limitation of any such system it is critical that trained professionals take a lead role not only in the development and implementation of such a system, but in its ongoing evaluation and refinements over time. In this instance, the City and County of Honolulu did take steps to implement Guarding with respect to access by land; however, when it came to access by water, only Persuasion Control was implemented and even then the plan was fundamentally flawed in several ways (i.e. see discussions below).

It is not the intent of this report to delve into an exhaustive discussion of all the relevant issues of developing a proper plan to control the hazard as it pertains to the Powell/Laughlin incident. Notwithstanding some of the more salient items include:

1. The key to effective lifeguarding is prevention first, rescue second. Effective prevention includes:
   a. Site specific training, which was lacking.
   b. Training regarding site specific hazards, which was lacking.
   c. Emphasis on hazards that are hidden to the user, which was lacking.
   d. The 10 second identification and 30 second response time rule (i.e. anyone in distress should be identified and a rescuer should be at their aid within 30 seconds) which was not met, particularly for swimmer/snorkelers in the area of the outer reef, much less Witch's Brew.

2. A lifeguard could have been "stationed" (i.e. on a surfboard, ocean kayak, jet ski, etc.) just outside the reef. Not only would this allow the City and County of Honolulu to have implemented Safety by Design (i.e. prevent access to the hazard), it would have also allowed for quicker response times to individuals needing emergency assistance, particularly those in the more dangerous areas of Hanauma Bay.

3. A powered megaphone/loudspeaker could have been installed to allow for effective and timelier communications/warnings between the lifeguards and swimmer/snorkelers; particularly those in the area of the outer reef and/or in transit to Witch's Brew.

4. Warning signs could have and should have been posted along the ledge at Witch's Brew, not only the land based approach, warning swimmer/snorkelers to stay clear of the hazardous ledge. This is critically important in that it is undeniable that some visitors will approach the area by water without having been afforded the opportunity to see the warning signs such as the ones posted on the fence on shore several hundred yards away that prohibit access by land.

5. Buoys could have been installed to mark dangerous areas and to restrict/warn swimmer/snorkelers from leaving the immediate area of the outer reef and traversing the water towards Witch's Brew.

6. Lifeguard Bregman testified that:
   a. The lifeguards tell visitors how far they can swim based on conditions; yet, there was no infrastructure/protocol in place to do so.
   b. If there was a strong current they would tell people not to go beyond the inner reef; however, this was done by posting a sign(s) that said nothing more than "Strong Current". Clearly the typical visitor/tourist would not know that this means that some arbitrary areas within the bay are dangerous and hence closed.
   c. In 2002 there were only 4 lifeguards on duty, 2 for each tower; but as discussed below, this was a woefully inadequate and defective plan.
   d. Each tower was assigned a specific area to monitor so as to reduce the workload for a given tower; yet as noted below this was not carried out.
   e. The towers did not have visual access to the all of the water/shoreline within Witch's Brew.

7. Lifeguard Goodwin testified that:
   a. They try to warn visitors as they can, but there are just too many and hence the lifeguards cannot warn everyone.
   b. Tower 3A was assigned to monitor Witch's Brew, but it was approximately 400-500 yards away "as the crow flies" and 500-600 yards away by land (i.e. over ¼ mile). Clearly this is a defective plan, particularly given the 10 second/30 second rule.
   c. The towers did not have visual access to the all of the water/shoreline within Witch's Brew.

8. Lifeguard Dorr testified that:
   a. If a swimmer/snorkeler remains motionless for 30 seconds, then a rescue is initiated. Clearly, given the extremely large ratio of swimmer/snorkelers to lifeguards (i.e. as high as 1 lifeguard for every 500 swimmer/snorkelers), this is an impossible criteria to meet; more importantly, it violates the 10 second/30 second rule discussed above.
   b. There was no plan nor did they post any warning signs on the beach if an area such as the outer reef or Witch's Brew was closed.

9. Lifeguard Moses testified that:
   a. As the senior lifeguard at Hanauma Bay he did not believe that having only 4 lifeguards was enough; he noted that the US Lifeguarding Association recommends 1 lifeguard per 50 people.
   b. Even though the current number of lifeguards on duty has been increased to 6, he still does not believe that is sufficient to safely monitor Hanauma Bay.
   c. The towers were not assigned specific areas of the bay; when he was on duty in a tower, he would monitor the entire bay. It should be noted that this is contradictory to the testimony by Lifeguard Bregman discussed above. The point to be made is there was a breakdown in the implementation phase that compromised visitor safety.

10. Lifeguard Neves testified that from the towers it is not possible to see the water side of Witch's Brew point.

**Implementation**
Once the plan is developed, the next step is to communicate the required plan to all relevant employees from the highest supervisory level, all the way down to the employee performing the specific task or duty. Steps must be taken to ensure that the plan is implemented and enforced. Without active enforcement even the best plan becomes ineffective. For example, imagine the chaos that would ensue if there were not enforcement of traffic laws.

Here again, it is not the intent of this report to delve into an exhaustive discussion of all the relevant issues of the implementation phase as it pertains to Powell/Laughlin incident. The more salient items include:

1. The Powell Incident notes that the ocean condition was "rough" at the time of the drowning; thus according to Hanauma Bay protocol, the outer reef area and Witch's Brew should have been closed and no swimmer/snorkelers permitted in the area.

2. Lifeguard Bregman's statement form indicated that the ocean conditions were "rough"; he reiterated this in his deposition, testifying that he told visitors to stay inside the reef.

3. Lifeguard Neves testified that ocean conditions were "rough" on the day of the Powell/Laughlin incident (i.e. the outer reef area should have been closed) and that white water was washing over the ledge at Witch's Brew.

4. Lifeguard Dorr testified that the ocean was rough on the day of the Powell/Laughlin incident.

5. Ms. Powell testified that:
   a. During the time she was there at Hanauma Bay there were numerous people snorkeling outside the reef.
   b. On the way to get lunch at Hanauma Bay, she asked an employee how to swim out to the outer reef.

6. Captain Soo stated that on days when the ledge is fenced off (i.e. Witch's Brew is closed), such as the day of the Powell/Laughlin incident, the only way to access the area is by water.   Yet, from the general area of the main beach (i.e. such as where Mr. Powell and Mr. Laughlin accessed the water), the fence and signs on the ledge that prohibit access to the Witch's Brew area are not visible/readable.  Thus, visitors such as Mr. Powell and Mr. Laughlin would have no way of knowing the area is closed, particularly since there were no warning signs posted in the immediate area of Witch's Brew (i.e. the location of the hazard).

7. Lifeguard Bregman testified that buoys were supposed to be used to mark rough dangerous areas, but they were not up on the day of the Powell/Laughlin incident.

8. Lifeguard Goodwin testified that:
   a. If he saw swimmer/snorkelers going to the outer reef when it was closed he would warn them with a megaphone and/or go after them on a board; yet this was not done on the day of the Powell/Laughlin incident.
   b. If an area was closed (i.e. such as on the day of the Powell/Laughlin incident) a sign would be posted at snorkel rental shop.  Not only is there no evidence that this was done on the day of the Powell/Laughlin incident, but this is inherently defective because many visitors bring their own equipment, hence they would never have the opportunity to see such a warning.

9. Lifeguard Moses testified that:
   a. There was no protocol to post any warning or closed signs at the kiosk or snorkel rental shop if an area was closed.
   b. He saw either Mr. Powell or Mr. Laughlin swim around Witch's Brew point yet he took no actions to intervene.  It is noted that this is particularly disturbing since not only was Witch's Brew closed, the entire outer reef was closed.  Clearly, Lifeguard Moses, the senior lifeguard on duty at the time, failed in the performance of his duties by not taking immediate action to protect Mr. Powell/Mr. Laughlin from the eminent danger towards which they were swimming.

c. The buoys that were installed for visitor safety did not last and they were not replaced in a timely manner.

**Evaluation**

The purpose of this step is to determine the effectiveness of the chosen plan for controlling the identified hazard. In short, "audits" or safety reviews are performed to verify the plan is being properly implemented and enforced. The evaluation process is essential to ensure that the chosen plan is effectively controlling potential hazards and is not introducing any new hazards.

Once again, it is not the intent of this report to delve into an exhaustive discussion of all the relevant issues of the evaluation phase as it pertains to the Powell/Laughlin incident, but the more salient items include:

1. Acting Captain Khrone, who acknowledged that the Witch's Brew area is dangerous, noted that people are advised not to swim there; however there was no infrastructure/protocol to provide such warnings given the large number of daily visitors (i.e. 1500 to 2000) with only 4 lifeguards.

2. Having only four lifeguards on duty was particularly unsafe given:
   a. The lifeguards need to take rest breaks, lunch breaks, bathroom breaks and so forth.
   b. Via the position description for the tower lifeguards, only 42% of their time is spent monitoring the water.

3. Dr. Lukas noted that there are no natural flows or currents from the reef area of Hanauma Bay to directly in front of Witch's Brew. As such, it would have taken a significant amount of time for Mr. Powell and Mr. Laughlin to swim from the inner reef area, out to the outer reef (i.e. which was allegedly closed on the date of the Powell/Laughlin incident), and then all the way over to Witch's Brew point. This is particularly noteworthy in that the on duty lifeguards should have had ample opportunity to have observed Mr. Powell and Mr. Laughlin swimming in a dangerous area (i.e. the outer reef) and swimming towards a more dangerous area (i.e. Witch's Brew) and then intervened.

4. Lifeguard Neves testified that:
   a. Lifeguard Moses made many suggestions to improve visitor safety and none of them were implemented.
   b. It was suggested prior to the Powell/Laughlin incident that more lifeguard towers be added to improve visitor safety.
   c. Even with the current increase to 6 lifeguards, Hanauma Bay is still understaffed.

**Documentation**

The final step in an effective risk management program is to document the safety process, including the plan, its implementation, and evaluation. Documentation is mandatory to

provide the infrastructure for controlling risks. It is also essential to ensure that there is accountability for the implementation and enforcement of the plan.

Again, it is not the intent of this report to delve into an exhaustive discussion of all the relevant issues of the documentation phase as it pertains to the Powell/Laughlin incident. Some examples where documentation is lacking include:

1. No formalized evaluation of the risks and hazards associated with Hanauma Bay.

2. No documentation of site specific training for the Hanauma Bay lifeguards.

3. No documentation regarding strategies/protocols to be followed by the lifeguards with respect to monitoring the swimmer/snorkelers in Hanauma Bay.

4. No documentation of the protocol to be followed when various ocean/environmental conditions occur and warrant specific proactive safety precautions such as closing the outer reef, Witch's Brew, and so forth.

5. No documentation of what if any signs were posted, where they would be posted, who would post them, and so forth.

6. No documentation regarding post hoc investigations.

## CONCLUSIONS

In summary, it is clear that the City and County of Honolulu needlessly exposed Mr. Powell and Mr. Laughlin, as well as any other reasonably prudent patron/visitor to a hazard that was known and preventable to the City and County of Honolulu, but likely hidden from the typical visitor to Hanauma Bay. At the very least, had the City and County of Honolulu had a rudimentary risk management program in effect, the needless and unreasonably dangerous conditions that led to the drowning deaths of both Mr. Powell and Mr. Laughlin would have been mitigated so as to have prevented these needless deaths.

It is particularly noteworthy that the City and County of Honolulu was on notice that Hanauma Bay represented a series drowning hazard to patrons of the park. As discussed above, there had been 7 other drownings in Hanauma Bay in the first half of 2002 prior to the Powell/Laughlin incident; it is unequivocal that the City and County of Honolulu should have developed additional safety measures (i.e. above and beyond those in effect in the first of half of 2002) to control such a deadly hidden hazard. Equally disturbing is the fact that had the City and County of Honolulu's lifeguards on duty on the day of the Powell/Laughlin incident properly implemented the existing safety protocol (i.e. the closing of the outer reef and Witch's Brew) Mr. Powell and Mr. Laughlin would not have drowned. The failure of the City and County of Honolulu to provide a reasonably safe facility was the root cause of Mr. Powell's and Mr. Laughlin's deaths.

It is clear that neither Mr. Powell nor Mr. Laughlin did anything to negligently contribute to their deaths.  They were both experienced swimmers and experienced snorkelers, in good health and physical condition.  There is no reason to believe that either of them should not have been snorkeling that day; nor is there any reason to believe that either of them knowingly engaged in risky behavior or an unsafe act.  Neither of them committed an error of omission nor an error of commission.  In short, neither the actions/inactions of Mr. Powell and/or Mr. Laughlin were a contributing factor in their deaths.


Please let me know if you have any questions or if I can be of any further assistance. I look forward to working with you on this matter.


Sincerely,


Richard Gill, Ph.D., CHFP, CXLT
President and Chief Scientist

Richard Thomas Gill
2104 West Riverside
Spokane, WA 99201
Phone/Fax: (509) 624-3714
Email: RickGill.ACS@Verizon.Net

**LICENSE:**

Certified Human Factors Professional, 1994-present
  By the Board of Certification in Professional Ergonomics
  License Number  0526, 1994

Certified XL Tribometrist, 2002-present
  By the International Safety Academy
  License Number  A2002-0272

**EDUCATION:**

University of Illinois
  Ph.D. in Mechanical Engineering, 1982
  Area of Specialization: Human Factors

Wright State University, 1978
  M.S. in Systems Engineering
  Area of Specialization: Human Factors

Massachusetts Institute of Technology
  1 year Graduate Study in Electrical Engineering, 1973

Wright State University
  B.S. in Systems Engineering, 1972

**ACADEMIC EXPERIENCE:**

*Professor of Mechanical Engineering at the University of Idaho (1995-2002):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

*Associate Professor of Mechanical Engineering at the University of Idaho (1990-1995):* Teaching responsibilities include human factors, math modeling, mechanics, and statistics. Additional responsibilities include appointment as an adjunct professor in the Department of Psychology and Director of Idaho Space Grant Consortium.

## ACADEMIC EXPERIENCE: (Continued)

*Assistant Dean for the College of Engineering at the University of Idaho (1989-1990):* Administrative responsibilities included the overall administration of the Engineering Science curriculum, coordinating statewide off-campus programs, managing engineering cooperative education programs, and recruiting new students. Position also included teaching and research responsibilities.

*Assistant Professor of Mechanical Engineering at the University of Idaho (1987-1988):* This tenure track appointment was 65% Mechanical Engineering and 35% Engineering Sciences. Teaching responsibilities included math modeling, mechanics, statistics, and course development in human factors. Additional responsibilities included a position as an adjunct professor in the Department of Psychology to assist in the development of an interdisciplinary research laboratory and graduate program in human factors.

*Assistant Professor of Engineering Science at the University of Idaho (1984-1987):* This tenure track appointment was 50% in the Engineering Science Department and 50% in the Mathematics and Applied Statistics Department. Teaching responsibilities included courses in engineering mechanics, applied probability and statistics, and developing a course in human factors in engineering design. Additional responsibilities included helping staff the Statistical Consulting Center.

*Assistant Professor of Engineering at Wright State University (1980-1984):* Served as Program Director for the Human Factors Engineering Program. Teaching responsibilities included engineering statics, engineering dynamics, human factors engineering, senior seminar, and systems approach to human factors. Also held a joint appointment with the WSU School of Professional Psychology where the primary responsibility was to assist in the development of a Doctor of Psychology degree in Human Factors.

*Tutor for the State of Ohio (1978):* Worked as a personal tutor for individual college students being rehabilitated from mental illnesses.

*Student Tutor (1969-1972):* Worked as a tutor for Wright University, Dean of Students Office. Tutored courses in Mathematics and Physics.

## PROFESSIONAL EXPERIENCE:

*Engineering Consultant for Applied Cognitive Sciences (1983-Present):* I have worked as an expert witness, for both the plaintiff and defense, on over 1000 legal cases nationwide. I have been qualified as an expert in human factors, accident reconstruction, mechanical engineering, safety engineering, and risk management. Work has also included contracts from U.S. government agencies (USAF Aeromedical Research Laboratory and Idaho National Engineering Laboratory) as well as private industry (Arvin Industries, The Vendo Corporation, Key Tronic Corporation, Port Townsend Paper, and Hewlett Packard).

**PROFESSIONAL EXPERIENCE: (Continued)**

*Research Scientist for the USAF Office of Scientific Research (1983):* This was an appointment at the USAF Aeromedical Research Laboratory. The work focused on assessing the relationship between acceleration-stress and pilot workload. In addition, I also worked on a project concerning the effects of high-onset rates of acceleration on pilot performance.

*Graduate Research Assistant at the University of Illinois (1978-1981):* Responsibilities included the conception and formulation of various research projects in the fields of Engineering Psychology and Mechanical Engineering.

*Human Factors Engineer for the United States Air Force Human Resources Laboratory (1976-1978):* Worked concurrently in two major fields: (1) visual simulation and (2) motion and force simulation. This included conducting in-house research as well as serving as program manager for externally conducted research.

*Electronics Engineer for the United States Air Force Foreign Technology Division (1974-1976):* Position required a Top Secret security clearance. The work involved the selection and analysis of intelligence data to predict foreign military trends and capabilities.

*Process Control Engineer for Industrial Nucleonics Corporation (1973-1974):* Worked on the development of an infra-red moisture gauge to allow real-time computer control for tobacco dryers. Responsibilities included the development of a calibration technique and system installation at an operational site.

*Computer Operator for Synergy, Inc. (1970-1972):* Operated a CDC 6600 Computer at Wright Patterson Air Force Base while attending undergraduate school.

**HONORS AND AWARDS:**

University of Idaho College of Engineering Outstanding Academic Advisor, 1998.

University of Idaho College of Engineering Outstanding Senior Faculty, 1996.

University of Idaho Alumni Award for Excellence, 1994.

American Society for Engineering Education Centennial Certificate Awardee, 1993.

Best Paper Award from American Society for Engineering Education Regional Conference, 1991.

ASUI Outstanding Faculty Award, 1991.

University of Idaho Alumni Award for Excellence, 1988.

**HONORS AND AWARDS: (Continued)**

Recipient of the New Engineering Educator Excellence Award from American Society for Engineering Education, 1987.

Recipient of the Dow Outstanding Young Faculty Award from the American Society for Engineering Education, 1986.

Selected as an S.C.E.E.E. fellow for the Air Force Office of Scientific Research Summer Faculty Research Program, 1983.

Graduated first in class at the University of Illinois (GPA 5.0 out of 5.0), 1981.

Member of Tau Beta Pi National Engineering Honor Society, 1979.

Recipient of the "Science and Engineering Career Motivation Award" which is given annually by the Dayton Board of Education, 1978.

Graduated first in class at Wright State University (GPA 4.0 out of 4.0), 1978.

Awarded National Science Foundation Traineeship to Massachusetts Institute of Technology, 1972.

Graduated first in class at Wright State University, summa cum laude (GPA 3.9 out of 4.0), 1972.

W.S.U. Foundation Scholarship, 1972.

W.S.U. Foundation Scholarship, 1971.

Golding Award (Outstanding Junior Engineer) at Wright State University, 1971.


**PUBLICATIONS:**

Gill, R., and Gordon, S.  Cognitive Task Analysis.  In C. Zsambok and G.  Kline (Eds.), Naturalistic Decision Making, pp. 131-140, Lawrence Erlbaum Associates, 1997.

Gill, R.  Towards Protection from Cumulative Trauma Disorder Litigation.  Advances in Industrial Ergonomics and Safety VII, Taylor and Francis, Ltd., 1996.

Gill, R., Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the computer Keyboard. In Human Factors Perspectives on Human-Computer Interaction: Selections from Human Factors and Ergonomics Society Annual Meeting Proceedings, 1983-1994, Human Factors Society, 1995.

Gill, R., Gordon, S., and Babbitt, B.  Embedding Intelligent Tutoring into Real Time Simulation.  Proceedings of the Eighth Symposium on Aviation Psychology, 1995.

**PUBLICATIONS: (Continued)**

Babbitt, B., Bell, H., Crane, P., Sorensen, H., Gordon, S., and Gill, R. Intelligent Tutoring System: F-16 Flight Simulation.  Proceedings of the 1994 American Institute of Aeronautics and Astronautics (AIAA) Computing in Aerospace Conference, 1994.

Gill, R.  A Comprehensive Evaluation of Warning Label Design.  In K. Laughery, M. Wogalter, and S. Young (Eds.), Human Factors Perspectives on Warnings, pp. 50-52, Human Factors and Ergonomics Society, 1994.

Gill, R., and Gordon, S. Conceptual Graph Analysis: A Tool for Curriculum Development, Instructional Design, and Trainee Evaluation. Proceedings of the 1993 Interservice/Industry Training Systems and Education Conference, pp. 861-870.

Gordon, S. E., Schmierer, K. A., and Gill, R. T. Conceptual Graph Analysis: Knowledge Acquisition for Instructional System Design. Human Factors, 35, pp. 459-482, 1993.

Gordon, S. E., and Gill, R.T. Knowledge Acquisition with Question Probes and Conceptual Graph Structures. In T. Lauer, E. Peacock, and A. Graesser (Eds.), Questions and Information Systems, pp. 29-46. Hillsdale, N J: Lawrence Erlbaum Associates, 1992.

Gill, R, Gordon, S., McGehee, D., and Dean, S. Integrating Cursor Control into the Computer Keyboard. Proceedings of the Human Factors Society's 35th Annual Meeting, Vol. 1, pp. 256-260, 1991.

Gill, R., Dingus, T. Human Factors and Engineering Design High School Summer Workshop. Proceedings of the Human Factors Society's 34 Annual Meeting, Vol. 1, pp. 522-524, 1990.

Dingus, T., Gordon, S., and Gill, R. A New Program for the Remote Training of Human Factors Professionals. Proceedings of the Human Factors Society's 34 Annual Meeting, Vol. 1, pp. 534-536, 1990.

Gill, R., and Stauffer, L. Developing Appropriate Evaluation Criteria for Assessing the Value Added by Mechanical Engineering Education Programs. Proceedings of the 1989 American Society for Engineering Education Annual Conference, Vol. 3, pp. 1263-1265, 1989.

Gordon, S., and Gill, R. Question Probes: A Structured Method for Eliciting Declarative Knowledge. AI Applications in Natural Resource Management, Vol. 3, pp. 13-20, 1989.

Gill, R. Mail-order Errors: The Role of Human Factors. Dickinson's PSAO, Vol. 3, No. 12, pp. 6-7, Dec. 1988.

Christensen, J., Topmiller, D. and Gill, R. Human Factors Definitions Revisited. Human Factors Bulletin, pp. 7-8, Oct. 1988.

**PUBLICATIONS: (Continued)**

Dingus, T., Hyde, R., Hyde, T., Frame, M. and Gill, R. The Speed and Accuracy of a Spatial Communication Task as a Function of Operator Location. Proceedings of the 21 st Annual Meeting of the Human Factors Association of Canada.

Gill, R., Gordon, S., Moore, J. and Barbera, C. The Role of Knowledge Structures in Problem Solving. Proceedings of the 1988 American Society for Engineering Education Annual Conference, Vol. 2, pp. 583-90, 1988.

Junker, A., Levison, B. and Gill, R. A Systems Engineering Based Methodology for Analyzing Human Electrocortical Responses. AFAMRL Technical Report AAMRL-TR-87-030, May 1987.

Gill, R., Barbera, C. and Precht, T. A Comparative Evaluation of Warning Label Designs. Proceedings of the Human Factors Society's 31 st Annual Meeting, Vol. 1, pp. 476-78, 1987.

Gordon, S., Gill, R., and Dingus, T. Designing for the User: The Role of Human Factors in Expert System Development. Artificial Intelligence Applications in Natural Resource Management, Vol. 1, No. 1, pp. 35-46, 1987.

Gill, R. The Need for Human Factors in the Design of Expert Systems. Proceedings of the 1987 Frontiers in Education Conference, 1987.

Gill, R., and Dingus, T. A Structural Approach to Teaching Relative Motion. Proceedings of the 1987 American Society for Engineering Education Annual Conference, Vol. 4, pp. 1806-08, 1987.

Barbera, C. and Gill, R. Human Factors in Warning Label Design. Proceedings of Interface 1987.

Gill, R., Kenner, K. and Junker, A. Steady State EEG as A Measure of Peripheral Light Loss. Proceedings of the Human Factors Society's 30th Annual Meeting, Vol. 2, pp. 1249-52, 1986.

Kenner, K, Junker, A. and Gill, R. Visual Evoked Response in the Periphery, The Beginnings of an Objective Measure of G-Induced PLL. Proceedings of the National Aerospace and Electronics Conference, Vol. 3, pp. 909-12, May 1986.

Gill, R., and Albery, W. The Effects of Acceleration Stress on Human Workload and Manual Control. Proceedings of the 21st Annual NASA Conference on Manual Control, 1985.

Albery, W., Ward, S. and Gill, R. Effects of Acceleration Stress on Human Workload. AFAMRL Technical Report AAMRL-TR-85-039, 1985.

**PUBLICATIONS: (Continued)**

Gill, R., and Gordon, S. The Effectiveness of Group Projects in Teaching Engineering Mechanics. <u>Proceedings of the 1984 American Society for Engineering Education</u>, 5(5), pp. 27-33, 1984.

Gill, R., Obleski, M. Gordon, S. and Albery, W. The Effects of Acceleration on Cognitive Processing. <u>Proceedings of Mid-Central Ergonomics/Human Factors Conference</u>, April 1984.

Gill, R. Pilot Workload and G-Stress: A Potential Interaction? USAF Summer Faculty Research Program - Final Reports. Published by Southeastern Center for Electrical Engineering Education, December 1983.

Pierce, B., Obleski, M. and Gill, R. Human Factors in Aerospace: A Student Chapter Project. <u>Human Factors Bulletin</u>, April 1983.

Gill, R., and Wickens, C. Operator Workload as a Function of the System State. <u>Proceedings of the 18th Annual NASA Conference on Manual Control</u>, 1982.

Gill, R., Wickens, C., Reid, R. and Donchin, E. Pseudo-Quickening: A New Display Technique for Manual Control of Higher Order Systems. <u>Proceedings of the Human Factors Society's 26th Annual Meeting</u>, 1982.

Gill, R., Wickens, C., Donchin, E. and Reid, R. The Internal Model as a Means of Analyzing Human Performance. <u>Proceedings of the 1982 I.EE.E. International Conference on Systems, Man and Cybernetics</u>, 1982.

Hull, J., Gill, R. and Roscoe, S. Locus of Stimulus to Visual Accommodation: Where in the World, or Where in the Eye? <u>Human Factors</u>, 24, pp. 311-19, 1982.

Wickens, D., Gill, R., Kramer, A., Ross, W. and Donchin, E. The Cognitive Demands of Second Order Manual Control: Applications of the Event-Related Brain Potential. <u>Proceedings of the 17th Annual NASA Conference on Manual Control</u>, NASA TM, 1981.

Ritchie, M., Gill, R. and Jankowski, R. The Education and Placement of Human Factors Engineers. <u>Proceedings of the North Central Section, American Society for Engineering Education</u>, Dayton, OH, pp. 82-87,  April 1981.

Albery, W., and Gill, R. Development and Validation of Drive Concepts for an Advanced G-Cueing System. <u>Proceedings of the 1978 American Institute of Aeronautics and Astronautics</u>, 1978.

**PRESENTATIONS:**

Gill, R. Electronic Billboards: Safety and Social Issues.  Invited presentation to the Snohomish City Council Meeting, May 2005.

Gill, R. Human Factors in Accident Reconstruction.  Invited address to the 20th Annual Special Problems in Traffic Crash Reconstruction at IPTM, Jacksonville, Florida, April, 2002.

Gill, R.  Human Factors Expert Witness. American Board of Trial Advocates Meeting, Waikiki, Hawaii, November 2000.

Gill, R.  Industrial Funding Support for K-12 Programs.  Panel discussant for the Annual Meeting of Space Grant Directors, April 1997.

Gill, R.  Human Factors in Forensic Investigations.  Invited address at Society of Forensic Engineers and Scientists Meeting, August 1996.

Barnes, T., Hodge, J., and Gill, R.  Design and Fabrication of an Integrated Cystic Fibrosis Treatment System.  Presented at the 1996 Idaho Academy of Science Meeting.

Gill, R.  Technology and Its Impact on Society.  Invited address at the Fourteenth Annual International Exchange Conference, Lewis-Clark State College, October 1994.

Gill, R., and Lewis, V. Towards Improved College Teaching: A Preliminary Report. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Elger, D., and Gill, Modeling the Problem Solving Process Used by an Expert. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1992.

Gill, R. High School Summer Workshops: An Effective Recruitment Technique. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Elger, D., and Gill, R. A Goal for Engineering Education: The Ideal Engineer. Presented at the American Society for Engineering Education Pacific Northwest Section Annual Regional Meeting, April 1991.

Carson, B., and Gill, R. The Human Factors Element in Engineering Design. Presented at the 1989 Idaho Academy of Science.

Simon, A., Imthurn, J., Polillo, S. and Gill, R. The Role of Human Factors in Engineering Design: A Case Study of an Industrial Paper Winder. Presented at the 1987 Idaho Academy of Science.

## PRESENTATIONS: (Continued)

Gill, R. The Role of Human Factors in Operator Workstation Design. Invited Presentation at the 1986 PCAPPA.

Gill, R., and Mau, C. The Feasibility of Using EEG to Measure Peripheral Light Loss. Presented at the Annual Western Psychological Association Meeting, 1986.

Gill, R., Ward, S. and Albery, W. The Comparison of Subjective and Objective Workload Measures for Humans Under Acceleration Stress. Presented at the 1984 National Aerospace and Electronics Conference, May 1984.

Gordon, S., & Gill, R. A New Technique for Assessing Cognitive Processing Capabilities. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Richard, M., Rice, S. and Gill, R. The Improvement of a Ballistics Test Range Control Panel Via Human Factors Engineering. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Peters, R., Gill, D., Pasquini, L. and Gill, R. Human Factors Critique and Redesign of a Jet Engine Control Panel. Presented at the Annual Meeting of the Ohio Academy of Science, April 1984.

Gill, R. Improved Quickened Displays. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Julien, J., Click, A., Sanders, S., Scandura, L. and Gill, R. Human Factors Critique and Design of a Hydraulic Systems Test Stand. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Ingle, D., Dabney, G., Scherty, K. Beckett, T. and Gill, R. A Human Factors Critique of an Industrial Sewer Cleaner. Presented at the Annual Meeting of the Ohio Academy of Science, April 1983.

Gill, R. The Role of Human Factors at Three Mile Island. Invited presentation by the Southern Ohio Chapter of the Human Factors Society, October 1982.

Gill, R. Human Factors in Education. Invited presentation by the Dayton Chapter of the I.E.E.E., October 1980.

Gill, R., Ross, T. and Albery, W. An Advanced Acceleration Simulation Device for the Flight Simulators. Presented at the Dayton-Cincinnati AIAA  Mini-Symposium, 1978.

## PROFESSIONAL ACTIVITIES:

Member of Human Factors and Ergonomics Society
Member of American Society for Testing and Materials
Member of American Academy of Forensic Sciences

## GRANTS AND CONTRACTS:

Evaluation and Development of Warning Information for Portable Fire Shelters, Anchor Industries, Co-investigator, 2006.

Safety Analysis of Electronic Billboards, City of Snohomish, Principle Investigator, 2005.

Evaluation of Warning Label Designs, American Fun Kart Association, Principle Investigator 2002.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2001.

Idaho Space Grant Consortium, NASA, $260,000, Assistant Director, 2000.

Transforming Engineering Consulting into Engineering Case Studies, University of Idaho, $35,000, Sabbatical, 1999-2000.

Idaho Space Grant Consortium, NASA, $256,500, Director, 1999.

NASA Experimental Program to Stimulate Competitive Research, $225,000, State-wide Director, 1999.

Idaho Space Grant Consortium, NASA, $256,000, Director, 1998.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1998.

Idaho Total Engineering Challenge, Lockheed Martin Aerospace Corporation, $5,000, Principal investigator, 1997.

Idaho Space Grant Consortium, NASA, $255,000, Director, 1997.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1996.

Summer Institute for Engineering Educators on Curriculum Design and Implementation for Interactive Teaching/Learning, University of Idaho Office of Teaching Enhancement, $2,500, Co-principal investigator, 1995.

Idaho Space Grant Consortium, NASA, $230,000, Director, 1995.

Evaluation of an F-16 Intelligent Tutoring System, Northrop Corporation, $37,600, Co-principal investigator, 1994.

JETS Workshop, US Department of Energy, $1,400, Co-principal investigator, 1993.

Workstation and Hand Tool Design for Disk Drive Assembly, Hewlett Packard, $5,000, Co-principal investigator, 1993.

**GRANTS AND CONTRACTS: (Continued)**

Analysis of a Disk Drive Arm Assembly Line Process, Hewlett Packard, $2,000, Co-principal investigator, 1992.

Multimedia for Enhanced Undergraduate Education, University of Idaho Office of Academic Affairs and IBM, $81,000, Co-principal investigator, 1991.

JETS Summer Workshop, US Department of Energy, $9,000, Co-investigator, 1991.

Analysis of a Paper Winder Safety Gate, Port Townsend Paper, $2,500, Co-principal investigator, 1991.

Keymouse Configuration and Design, Key Tronic Corporation, $6,700, Co-principal investigator, 1990.

Keymouse Usability, Key Tronic Corporation, $18,900, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $9,000, Principal investigator, 1990.

Mapping Knowledge in Declarative and Procedural Structures, Idaho State Board of Education, $35,000, Co-principal investigator, 1990.

JETS Summer Workshop, US Department of Energy, $22,000, Principal investigator, 1990.

A Program to Test and Evaluate Equipment for the Disabled, University of Idaho Research Office, $7,000, Co-principal investigator, 1989.

Research Experience for Undergraduates, National Science Foundation, $4,000, Co-principal investigator, 1989.

Stressor Interaction Assessment, Boeing Military Aircraft Corporation, $21,600, Co-principal investigator, 1989.

Design and Evaluation of a Vending Machine Retrofit System, The Vendo Company, $20,400, Principal investigator, 1988.

A Structural Technique for Evaluating Design Tools, National Science Foundation, $60,000, Co-author and consultant, 1988.

Formations and Use of Conceptual Structures in Problem Solving Domains, Air Force Office of Scientific Research, $79,200, Co-principal investigator, 1988.

Software Interface Design for Asynchronous Computer Conferencing, EG&G of Idaho, $12,800, Co-principal investigator, 1987.

**GRANTS AND CONTRACTS: (Continued)**

Techniques for Augmenting the Communication of Spatial Information, Boeing Military Aircraft Company, $15,000, Co-principal investigator, 1987.

Evaluation of Warning Label Effectiveness, Arvin Industries, $1,400, principal investigator, 1986.

A Structured Approach for Developing an Effective Teaching Methodology for Problem Solving: A Case Study, American Society for Engineering Education, $1,500, principal investigator, 1986.

The Development of an Innovative Technique for Using Personal Computers to Aid in Teaching Deaf People to Speak, University of Idaho Seed Grant, $3,300, principal investigator, 1986.

The Development of a Steady State EEG Measure of Acceleration Induced Peripheral Light Loss, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $7,100, principal investigator, 1985.

The Feasibility of Using Electroencephalograms to Measure Acceleration Stress, United States Air Force Aerospace Medical Research Laboratory, Human Engineering Division, $14,000, principal investigator, 1984.

The Effects of Acceleration Stress on Cognitive Workload, United States Air Force Aerospace Medical Research Laboratory, Biomechanics Division, $35,000, principal investigator, 1984.



**Applied Cognitive Sciences**

Human Factors
Engineering

A CONSULTING GROUP

**Sworn Testimony for Richard Gill, Ph.D., CHFP, CXLT**
**As of September 8, 2006**

**2006:**
Trials:
1. Hokland vs. City and County of Honolulu; Honolulu, Hawaii,
    via Preservation Deposition (State)
2. Papadopoulos vs. Fred Meyer Stores; Seattle, Washington,
    via Preservation Deposition (Federal)
3. Thornton vs. Spooner Farms; Seattle, Washington,
    Via Preservation Deposition (State)
4. Camanse vs. Padre; Honolulu Hawaii
    Via Preservation Deposition (State)
5. State vs. Elder; Honolulu, Hawaii (State)

Depositions:
1. Romero vs. Lowe, et al; Kailua, Hawaii
2. Sanchez vs. Tsunami's; Waianae, Hawaii
3. Sisneros vs. UPRR; Hana, Wyoming
4. Pelzel vs. Pacific County et al.; Gray's Harbor, Washington
5. Bocatija vs. Cabras Marine; Hagåtña, Guam
6. Boos et al. vs. Chicago Pneumatic; Seattle, Washington
7. Lee vs. Royal Orchid et al.; Hagåtña, Guam
8. Lindall vs. Hawaiian Waters Adventure Park; Honolulu, Hawaii
9. Stankewich vs. City and County of Honolulu; Honolulu, Hawaii (Arbitration)
10. Remmick vs. Daisy; Billings, Montana
11. Brooks vs. City of Washougal, et al.; Washougal, Washington
12. Boltron vs. St. Francis Medical Center; Honolulu, Hawaii
13. Scrimshaw vs. Stewart; Kona, Hawaii (Arbitration)
14. Nolan vs. Kaanapali Beach Hotel; Kaanapali, Maui (Arbitration)
15. Bright vs. Brown; Spokane, Washington
16. Caldetera vs. Accu-Cut, et al.; Honolulu, Hawaii
17. Teranishi vs. New Casino; Honolulu, Hawaii

18. Heydon vs. City and County of Honolulu; Honolulu, Hawaii
19. Lonczak vs. County of Maui; Wailuku, Maui (Records Deposition)
20. Keehu vs. Players, et al.; Honolulu, Hawaii (Records Deposition)
21. Paglinawan vs. Schuler Homes, et al.; Honolulu, Hawaii
22. Le vs. Kealani, et al.; Wailea, Maui
23. Robins vs. Wayne Engineering, et al.; Lexington, Kentucky
24. Espinoza vs. Risenmay Farms, et al.; Rexburg, Idaho
25. Dickman vs. Budget Rent A Car; Spokane, Washington
26. Sewell vs. Viper Motors; Spokane, Washington
27. Yogi vs. Stearns Airport Equipment, et al.; Honolulu, Hawaii
28. Lewis vs. Mossholders Furniture; Casper, Wyoming
29. Baccus vs. Ameripride; Idaho Falls, Idaho
30. Kelley vs. Foodland; Honolulu, Hawaii
31. Bishop vs. Marriott; Wailuku, Hawaii (Records Deposition)
32. Babayan vs. Wal-Mart; Wailuku, Hawaii (Records Deposition)

**2005:**
Trials:
1. Juarez vs. Frias; San Francisco, California via Preservation Deposition (State)
2. State of Idaho vs. Marek; Sandpoint, Idaho (State)
3. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui (State)
4. Rukavina, et al. vs. Crane Plumbing, et al; Challis, Idaho (State)
5. Rabissa vs. Costco; Kona, Hawaii (State)
6. Haggard vs. Parma Furniture; Nampa, Idaho (State)

Depositions:
1. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume 1)
2. Cormier vs. Gold's Gym, et al., Boise, Idaho
3. Cross vs. Takenaka Landscaping, et al.; Makakilo, Oahu
4. Li and Wang vs. Sea Life Park; Honolulu, Hawaii
5. Rabissa vs. Costco; Kona, Hawaii (Volume II)
6. Erickson vs. Badger Building Center; Bonners Ferry, Idaho
7. Kim vs. Savard, et al.; St. Johnsbury, Vermont (Volume II)
8. Harris vs. Union Pacific Railroad; Seattle, Washington
9. Juarez vs. Frias; San Francisco, California
10. Horsley vs. Hilton Hotel Corp; Seattle, Washington
11. Dubac-Tyler vs. Hyatt Corp; Kaanapali, Maui
12. Bacani vs. State of Hawaii, et al.; Honolulu, Hawaii
13. Kanei vs. Daiei; Honolulu, Hawaii
14. Stevens vs. Robert Bosch Tool Corporation; Twin Falls, Idaho
15. Young vs. Holiday Inn; Hagåtña, Guam
16. Anthony vs. Alexander & Baldwin, Inc., et al; Kahalui, Maui (Records)
17. Anthony vs. Alexander & Baldwin, Inc., et al; Kahalui, Maui
18. Baker vs. Flying J; Casper, Wyoming
19. Abiley vs. State of Hawaii; (Arbitration); Honolulu, Hawaii
20. Sales vs. Self-Help Housing; Honolulu, Hawaii
21. Rukavina, et al. vs. Crane Plumbing, et al; Challis, Idaho

22. Hart vs. Hoist, et al.; Bonners Ferry, Idaho
23. LeMaster vs. BNSF; Billings, Montana
24. Dunivent vs. UPRR; Cheyenne, Wyoming
25. Glaberson vs. A & B Properties; Kahului, Hawaii (Records Depo)
26. Newman vs. Milacron, et al; Bozeman, Montana (Volumes 1 and 2)
27. Glaberson vs. A & B Properties; Kahului, Hawaii
28. McKay vs. Smith; Spokane, Washington; (Arbitration)
29. Schultz vs. Ellensburg Cement Products, et al.; Seattle, Washington
30. Scholz vs. Zip Truck Lines, et al.; Spokane, Washington
31. Nyquist vs. Farmers et al.; Great Falls, Montana (Arbitration)
32. Hernadez vs. Lematic; Honolulu, Hawaii
33. Abiley vs. State of Hawaii; Honolulu, Hawaii
34. Dison vs. Vaagen Brothers Lumber; Colville, Washington
35. Harvey vs. Payne Properties; Spokane, Washington
36. Mallot vs. Marriott; Ko'Olina, Oahu (Records Deposition)
37. Stewart vs. Violich et al.; Kailua, Hawaii
38. Hytrek vs. Albertsons; Casper, Wyoming
39. Hedge vs. Redmond Heavy Hauling; Tacoma, Washington

**2004:**
Trials:
1. Twenge vs. Fred Meyers, et al.; Portland, Oregon (State)
2. Tyler vs. Petsmart et al.; Spokane, Washington (State)
3. Lewis vs. Tribune Publishing Company, et al.; Colfax Washington (State)
4. Fowler vs. Fred Meyers; Portland, Oregon (State)
5. Richardson vs. State of Montana; Butte, Montana (State)
6. Wendt vs. USA; Honolulu, Hawaii (Federal)
7. Parris vs. State of Washington, et al.; Spokane, Washington (State)
8. Miller vs. Ostler; Moses Lake, Washington (State)
9. Kelley vs. County of Maui, et al.; Wailuku, Maui (State)

Depositions:
1. Robinson vs. State of Montana; Butte, Montana
2. Lewis vs. Colfax Masonic Corp.; Colfax, Washington
3. Rabisa vs. Costco; Kona, Hawaii
4. Kitchens vs. Outrigger, et al.; Waikiki, Hawaii
5. Ishii vs. Island Colony Condominiums; Waikiki, Hawaii
6. Cadman vs. City and County of Honolulu; Honolulu, Hawaii
7. Castillo vs. A & A Electric; Honolulu, Hawaii
8. Lyons vs. Smith's Food and Drug; Casper, Wyoming
9. Johnson vs. Manco et al.; Modesto, California
10. Benoy vs. Jacobson; Coeur d'Alene, Idaho
11. Rabisa vs. Costco; Kona, Hawaii (Arbitration)
12. Lawlor vs. Naeole et al.; Honolulu, Hawaii
13. Carter vs. City of Spokane; Spokane, Washington
14. Kahikina vs. Hilo Terrace Apartments AOAO et al.; Hilo, Hawaii
15. Moniz vs. Barland et al.; Honolulu, Hawaii

16. Zelinski vs. BNSF; Portland, Oregon
17. Hopkin vs. BNSF; Greybull, Wyoming
18. Schroder vs. Arby's; Spokane, Washington
19. Vuittonet vs. Hayes Lemmerz International, et al.; Boise, Idaho
20. Gapero vs. Pacific Shores AOAO, et al; Kihe, Maui
21. Ibara vs. Aloha Tower Management Company, et al.; Honolulu, Hawaii
22. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii
23. Jenner vs. Bargain Giant; Spokane, Washington
24. Milward vs. Vandervert; Spokane, Washington
25. Baker vs. Totally Titanium Inc.; Waikiki, Hawaii (Arbitration)
26. Frahm vs. Alamo Rental Car; Las Vegas, Nevada
27. Mathews vs. Harrington; Spokane, Washington
28. Cuthbert vs. JB's Family Restaurant; Coeur d'Alene, Idaho
29. Kelley vs. County of Maui et al.; Wailuku, Maui
30. Kappel vs. Kea Lani et al.; Wailea, Maui
31. Cross vs. Takanaka Landscaping, et al.; Makakilo, Hawaii (Arbitration)
32. Sharp vs. Best; Cheney, Washington
33. Meador vs. Chipman & Taylor, et al.; Pullman, Washington
34. Miyamoto vs. Hawaiian Electric Company, et al; Honolulu, Hawaii (Vol 1 & 2)
35. Hayes vs. Union Pacific Railroad, et al.; Rupert, Idaho
36. Reaves vs. Rowe; Kennewick, Washington

**2003:**

Trials:

1. George vs. Diamond Parking, Inc., et al.; Honolulu Hawaii (State)
2. Slack vs. Kelleher; Caldwell, Idaho (State)
3. Sinclair vs. BNSF; Great Falls, Montana (State)
4. Barnedo vs. Dominguez; Honolulu, Hawaii (State)
5. Lewis vs. State of Hawaii; Honolulu, Hawaii (State)
6. Gouveia vs. 24 Hour Fitness; Honolulu, Hawaii (State)
7. Fenwick vs. Watabe et al.; Hagåtña, Guam
8. Gipson vs. Yoke's Pac & Save; Spokane, Washington (State)
9. England vs. Swinerton; San Francisco, California (State)

Depositions:

1. Vuillemot vs. Wailuna Recreation Association; Honolulu, Hawaii (Arbitration)
2. King vs. Cottrell; Spokane, Washington
3. Lewis vs. State of Hawaii; Honolulu, Hawaii
4. Easterday vs. Leeward Auto Recycling; Honolulu, Hawaii
5. Weathers vs. 24 Hour Fitness; Boise, Idaho
6. Prior vs. Columbus McKinnon Corporation; Lewiston, Idaho
7. Pettit et al. vs. Friendly Ford et al.; Las Vegas, Nevada
8. Sinclair vs. BNSF; Billings, Montana
9. Burkey vs. Premier Chemicals et al; Pocatello, Idaho
10. Figaroa vs. State of Hawaii; Lihue, Hawaii
11. Sherwood et al vs. Williams & Asscociates et al; Honolulu, Hawaii (Vol 1-2)

12. Borges vs. County of Hawaii; Hilo, Hawaii (Arbitration)
13. Johnson vs. K.C. Charles, et al.; Spokane, Washington (Volume 1-2)
14. Bishop vs. Union Pacific Railroad; Cheyenne, Wyoming (Volume 1-2)
15. Van Dinter vs. Nason; Spokane, Washington
16. Olson vs. Johnson; Post Falls, Idaho
17. Schmit vs. Vandouris; Spokane, Washington
18. Martin vs. State of Hawaii et al; Waimanalo, Hawaii
19. Himmelmann vs. Taroc; Honolulu, Hawaii
20. Olson vs. BNSF; Cheyenne, Wyoming
21. Gomez et al vs. IBM et al; San Jose, California (Volumes 1-6)
22. Kubinski vs. UPRR; Salt Lake City, Utah (Volume 1-2)
23. Broadfoot vs. Watco; Colfax, Washington
24. Berry vs. Hotel of Marianas; Hagåtña, Guam  96910
25. Ganley vs. Harbor Square; Honolulu, Hawaii (Deposition)
26. Ganley vs. Harbor Square; Honolulu, Hawaii (Arbitration)
27. Ferger vs. Spokane Valley Four Square Church; Spokane, Washington
28. Tyler vs. Petsmart et al.; Spokane, Washington
29. Paulson vs. Ru-mar Club; Twin Falls, Idaho
30. O'Donnell vs. Taylor Construction; Bozeman, Montana
31. England vs. Swinerton et al.; San Francisco, California
32. Fenwick vs. Watabe et al.; Hagåtña, Guam
33. Pinkley vs. BNSF; Spokane, Washington
34. Harrison vs. Hilton Hawaii Village; Waikiki, Hawaii
35. Clark vs. BNSF; Gillette, Wyoming
36. Zygutis vs. Beech; Waipio Valley, Hawaii
37. Retford vs. Snow King et al.; Jackson Hole, Wyoming
38. Westlake vs. Ryobi et al; Pocatello, Idaho
39. Mecurio vs. Brownlee et al; Missoula, Montana
40. Nordstrom vs. Bodkin Enterprises; Hayden Lake, Idaho
41. Houser vs. Resort Quest et al.; Lahaina, Maui
42. Benson vs. Magic Valley Partners et al; Twin Falls, Idaho

**2002:**
Trials:
1. Wright vs. Chanel; Honolulu, Hawaii (State)
2. Dexheimer vs. Guthrie; Spokane, Washington (State)
3. Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho (State)
4. Weissinger vs. Lewis & Clark College; Portland, Oregon (State)

Depositions:
1. Hotel Corporation of the Pacific vs. Group 70; Kauai, Hawaii
2. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Volume 2)
3. Requelman vs. Pacific Transportation Services; Hilo, Hawaii
4. Eades vs. Lisandra, Inc.; Kihei, Hawaii (Arbitration)
5. Parlin vs. Miller; Spokane, Washington
6. Gaspero vs. Pacific Shores; Kihei, Hawaii (Records Deposition)
7. Bowkett vs. Texton; Boise, Idaho

8. Guerrero vs. Cabjaun et al; Honolulu, Hawaii
9. Fenzke vs. Naniloa Hotel; Hilo, Hawaii (Arbitration)
10. Harshmans vs. Jackson Hole Mountain Resort et al.; Jackson, Wyoming
11. Gibson vs. BNSF; Albuquerque, New Mexico
12. Colburn vs. Amtrack; Salt Lake City, Utah
13. Wells vs. Wolf Lodge; Coeur d'Alene, Idaho
14. Ley vs. Stockman Financial Corporation; Billings, Montana
15. Becker vs. Oliver Family Limited Partnership; Coeur d'Alene, Idaho
16. Britton vs. Shearer; Spokane, Washington
17. Keller, et al. vs. Jones, et al.; New Orleans, Louisiana
18. Kinery vs. Mathieu; Jackson Hole, Wyoming
19. Zalopany vs. Keller; Honolulu, Hawaii
20. Williams vs. LRG Real Estate LP et al.; Kona, Hawaii
21. Rehkopf vs. Kahana Falls et al.; Lahaina, Maui
22. Evans vs. England; Springdale, Washington
23. Idaho Department of Labor vs. Sunset Marts et al.; Orofino, Idaho
24. Karlsson et al. vs. Savage et al.; Los Angeles, California
25. O'Neil vs. Ho; Honolulu, Hawaii (Records Deposition)
26. Ng vs. Hwa et al.; San Francisco, California
27. Tracy vs. Bock et al.; Spokane, Washington
28. Hart Machine vs. Clapp; Minneapolis, Minnesota
29. Parrish et al. vs. Minidoka County Highway Department; Pocatello, Idaho
30. Radke vs. Pacific Hawaiian Holidays, et al.; Honolulu, Hawaii (Arbitration)
31. Oie vs. Himuro; Waikiki, Hawaii
32. Kailieha vs. PRN 'Ekolu dba Scoozies'; Waikiki, Hawaii
33. Keating vs. Fox and Hound; Waikiki, Hawaii
34. Hirukawa vs. Structures International; Honolulu, Hawaii
35. Firestone vs. Milford; Spokane, Washington
36. Oschner vs. BNSF; Laramie, Wyoming
37. Hippler vs. Dittman; Elk, Washington
38. Collins vs. Union Pacific Railroad; Laramie, Wyoming
39. Milford vs. Firestone; Spokane, Washington (Mediation)
40. Zygutis vs. Beech; Waipio Valley, Hawaii (Arbitration)
41. Nazar vs. Amsbury; Spokane, Washington (Mediation)
42. Ejercito vs. Baywatch Production, et al.; Honolulu, Hawaii (Arbitration)
43. Jackson vs. Larson; Moscow, Idaho
44. Bumgraber vs. Safeway; Spokane, Washington
45. George vs. Diamond Parking; Waikiki, Hawaii
46. Koenig vs. Riemer et al.; Kihei, Maui
47. Piggee vs. Chrysler et al.; San Francisco, California

**2001:**
Trials:
1. Plain vs. Murphy Family Farms; Oklahoma City, Oklahoma (Federal)
2. Howard vs. State of Hawaii; Honolulu, Hawaii (State)
3. Wright vs. Chanel; Honolulu, Hawaii (State)
4. Tess vs. Roberts; Spokane, Washington (State)

5. Clyne vs. St. Maries Logging; St. Maries, Idaho (State)
6. Burnham vs. Garber; Spokane, Washington (State)
7. Hilbert vs. Sampson et al.; Reno, Nevada (State)
8. Woodington et al. vs. State of Hawaii; Honolulu, Hawaii (State)
9. B & T Mail Services vs. D & D Transport; Gooding, Idaho (State)

Depositions:
1. Grimes vs. Monterey; Salinas, California
2. Plain vs. Murphy Family Farms; Stillwater, Oklahoma
3. Whittet vs. Four Seasons Resort Hualalai; Kona, Hawaii (Arbitration)
4. Weidler vs. Spring Swing, et al.; Portland, Oregon
5. Champlin vs. Partel; Cody, Wyoming
6. Gardai vs. John Green, et al.; Moscow, Idaho
7. Grant vs. Queen Kapiolani; Waikiki, Hawaii (Arbitration)
8. Giesbrecht vs. Double L; American Falls, Idaho
9. Grogen vs. Huggos; Kona, Hawaii
10. Kong vs. Fletcher Pacific Construction; Kona, Hawaii
11. Diego vs. Cumming et al.; Maui, Hawaii
12. Revai vs. Langdon Tool and Bolt; Twin Falls, Idaho
13. Tess vs. Roberts; Spokane, Washington
14. Tivenan vs. Ilikai Hotel; Waikiki, Hawaii (Arbitration)
15. Colin vs. USA; Santa Rosa, California (Volume 1)
16. Bell vs. Ala Moana Shopping Center; Waikiki, Hawaii
17. Slack vs. Kelleher; Caldwell, Idaho
18. Carmona vs. Guillermo; Honolulu, Hawaii
19. Woodington et al. vs. State of Hawaii; Honolulu, Hawaii
20. Diego vs. Cummings et al.; Wailuku, Maui
21. Wolcott vs. Brooks; Spokane, Washington
22. Anderson vs. Borders; Lihue, Hawaii
23. Montero vs. Sam Will, Inc.; Las Vegas, Nevada (Arbitration)
24. Grogen vs. Huggos; Kona, Hawaii (Arbitration)
25. Delys vs. Sears, Roebuck and Company; Spokane, Washington
26. Hilbert vs. Sampson et al.; Reno, Nevada
27. Waterman vs. Singleton; Spokane, Washington (Arbitration)
28. Dawson vs. JRB Incorporated et al; Boise, Idaho
29. Evans vs. Dunkin Donuts et al.; Baltimore, Maryland
30. Edwards vs. Foster Services; St. Louis Missouri
31. Eades vs. Lisandra, Inc.; Kihei, Hawaii
32. Hurley vs. Nationwide Insurance; Denver, Colorado (Mediation)
33. Saltsman vs. City of Metaline Falls; Spokane, Washington



**Applied** *Cognitive Sciences*

Human Factors
Engineering

A CONSULTING GROUP

# FAX MEMO

DATE    **July 21, 2006**    PAGES INCLUDING COVER    **1**

FROM    **Rick Gill**    FAX #    **509-624-3714**
**Applied Cognitive Sciences**

☐ FYI    ☐ Draft
☒ As per your request    ☐ Please comment
☐ Please sign and return    ☐ Original to be mailed

MESSAGE:

The following transmittal is a summary of Dr. Gill's fees that you had requested.

Dr. Gill's rates are $300/hour, with commercial travel time billed at half-rate, plus expenses. All charges are portal to portal. Unless paid in advance, sworn testimony is billed at $350 per hour plus expenses, with a minimum charge of $1,000, including preparation of any requested materials by opposing counsel. We do request a $500 retainer and bill bi-monthly; checks should be made payable to Applied Cognitive Sciences, Inc., Tax # 20-1883699.

In an attempt to hold down costs, we try to cost share travel time and expenses from/to the mainland; a flat fee of $500 per trip is charged, as long as the trip can be arranged at Dr. Gill's convenience (i.e. where the trip can be combined with work on several other cases). However, if the trip is mandated on a specific date (i.e. such as a trial), then 100% of the travel time and expenses will be billed, less any cost sharing that can be arranged from other case work while on the islands.

Please let me know if you need any additional information or if I can be of any assistance. We look forward to the opportunity to work with you.

Sincerely,

Neeley Hall
Office Manager

---

2104 West Riverside • Spokane, WA 99201 • 509-624-3714 telephone/fax