**LAW OFFICES OF IAN L. MATTOCH**

IAN L. MATTOCH          898-0
EMILY KAWASHIMA WATERS   6498-0
Suite 1835, Pacific Guardian Center
737 Bishop Street
Honolulu, Hawaii 96813
Telephone:  (808) 523-2451

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| THE ESTATE OF ERIK A. POWELL, THROUGH PERSONAL REPRESENTATIVE MARY K. POWELL; THE ESTATE OF JAMES D. LAUGHLIN, THROUGH PERSONAL REPRESENTATIVE RAGINAE C. LAUGHLIN; MARY K. POWELL, INDIVIDUALLY; RAGINAE C. LAUGHLIN, INDIVIDUALLY; CHLOE LAUGHLIN, A MINOR, THROUGH HER NEXT FRIEND, RAGINAE C. LAUGHLIN, | CIVIL NO. CV04-00428 LEK<br><br>AMENDMENT TO PLAINTIFFS' EXPERT THOMAS EBRO'S PRELIMINARY REPORT DATED NOVEMBER 20, 2006; CERTIFICATE OF SERVICE |
| Plaintiffs, | |
| vs. | **TRIAL:**   April 3, 2007 |
| CITY AND COUNTY OF HONOLULU, | |
| Defendant. | |
| and | |

| | |
|---|---|
| CITY AND COUNTY OF HONOLULU, | ) ) ) |
| Third-Party Plaintiff, | ) ) |
| vs. | ) ) |
| UNIVERSITY OF HAWAII, a body corporate; JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS and DOE ENTITIES, | ) ) ) ) ) |
| Third-Party Defendants. | ) ) ) ) |

## AMENDMENT TO PLAINTIFFS' EXPERT THOMAS EBRO'S PRELIMINARY REPORT DATED NOVEMBER 20, 2006

Plaintiffs above-named, by and through their attorneys, the Law

Offices of Ian L. Mattoch, hereby submit the attached Amended Preliminary

Report of expert Thomas Ebro dated November 22, 2006.

DATED:  Honolulu, Hawai`i, _____ DEC - 7 2006 _____.


_____
IAN L. MATTOCH
EMILY KAWASHIMA WATERS
Attorneys for Plaintiffs

-2-

AMENDED **PRELIMINARY EXPERT REPORT**
Re:  Powell & Laughlin v. City and County of Honolulu

**Prepared for:**
**Ian L. Mattoch**
**Attorney at Law**
**of**
**LAW OFFICES OF IAN MATTOCH**
**Honolulu, Hawaii**

**Case No:  0463 (Plaintiff)**

**November 20, 2006**

November 20, 2006

Ian L. Mattoch
LAW OFFICES OF IAN MATTOCH
Pacific Guardian Center
737 Bishop Street, Suite 1835
Honolulu, Hawaii 96813

Re: <u>Powell & Laughlin v. City and County of Honolulu</u>

Dear Mr. Mattoch:

This amended expert report corrects several errors that were contained in my preliminary expert report that I originally submitted on September 29, 2006. Based on my re-measurement of the beachfront, it turned out to be 1,000-feet wider than I previously reported. My original notes reflected 850-feet, which was incorrect. The beach actually measured 1,854-feet in width. This amended report contains subsequent corrections that are presented with a conspicuous blue color. The actual changes herein appear on pages 2, 4, 15, 18 and 25.

This preliminary expert report of my findings concerning the above captioned case is based on my review of the facts contained in the discovery documents that you furnished and my on-site inspection. You had asked me to render my expert opinions regarding the underlying proximate causal factors and relational liabilities that produced this double ocean drowning incident. The opinions I am rendering to you herein are based upon a reasonable degree of accepted industry wide certainty and founded upon my professional education, training and work experience in aquatic risk management and water safety consulting. My opinions are subject to change should additional information become available.

My name is Thomas C. Ebro. My private firm's business address is Aquatic Risk Management, 19207 Pristine Boulevard, Lutz, Florida 33558-9044. I am a consulting specialist in the field of water safety and aquatic risk management regarding public recreation in the water. I graduated from the University of Oregon in 1965 with a Bachelor of Science degree in Aquatic Recreation.

I possess over forty years of comprehensive professional aquatics experience that includes public service in Parks and Recreation, operation of diverse aquatic facilities, administration of

1

water safety programs, including performing aquatic accident investigation and consulting as an expert witness. I am a past certified instructor in water safety, CPR, first aid, recreational boating, waterskiing, scuba diving and aquatic risk management. I helped produce the American National Red Cross' original training films/videos concerning preventive lifeguarding, rescue techniques and aquatic facility operations. As a Senior Aquatic Specialist for the Los Angeles County Parks and Recreation Department, I was in charge of administering all its public water safety education programs. Moreover, as a trained Deputy Coroner of the Los Angeles County Medical Examiner Department, I was charged with investigating all water related aquatic fatalities with the Sheriff Department's emergency responder team. I am board certified as a Diplomate of the American College of Forensic Examiners and have instructed technical aquatic courses to law enforcement officers, water safety specialists, aquatic facility managers, waterfront recreation staff, swimming and diving coaches, aquatic leadership (instructors/lifeguards) and boat captains. I have planned, developed and operated various public and private aquatic facilities – plus, over the course of the past 21 years, I have had my own professional practice and, as an expert witness, been consulted on more than 1,320 aquatic accident cases. **(See Appendix C – Appendix D** for the last 4 years)

I am particularly knowledgeable about and possess specific expertise in the specialty area of public beach waterfront operations, including what constitutes the proper surveillance standard for lifeguards on duty. For nearly a decade, as Los Angeles County's Senior Aquatic Specialist, I had responsibility for organizing public aquatic safety training programs and recreational events at more than 50 regional public swimming pools, plus varied lake waterfronts and ocean beaches. Thereafter, for many years, I operated beachfront resorts in the Cayman Islands and The Bahamas wherein I recruited, trained and supervised aquatic staffs (Scuba Divemasters and Boat Captains). I presided over Southern California Public Pool Operators Association and currently participate on key national committees engaged in revision of outdated aquatic safety standards. I frequently appear as a featured guest-expert on such national television broadcasts as "20/20," "Court TV," "NBC Dateline," Inside Edition," and "The Discovery Channel." The beach waterfront accident cases I have worked on total 198. **(See Appendix C)**

My retention by your firm, concerning this case, occurred on December 28, 2004. I was asked to review the circumstances of this June 19, 2002 double drowning involving two males who were snorkeling at Hanauma Bay Park and to render to you my opinions regarding causal responsibility for same. I am submitting this expert report based upon my personal knowledge to date and I understand that it is to be used in the above captioned lawsuit. In rendering these opinions, I have reviewed and relied upon the discovery materials (23 documents) that were furnished to me. **(See Appendix A)** On April 27, 2006 (including subsequently on October 9, 2006) I conducted a total of 2 personal on-site inspection at Hanauma Bay Park to acquire measurements (including re-measurements) plus documentation (photos/videotape) of the distance and line-of-sight from the elevated lifeguard tower to the incident location at Witches Brew. **(See Appendix E)** I also conducted independent research in my aquatic library regarding the operational standard of care at ocean beach waterfronts in 2002, particularly proper lifeguard surveillance, timely detection and deterrence of unsafe activity, plus skillful emergency response and management. A listing of the specific reference resources I consulted are listed at the end of

2

this report. **(See Appendix B)**

The factual information that I relied upon to form my preliminary expert opinions included the following: On Friday, July 19, 2002, two men visiting from Chicago (39-year old James Laughlin and 34-year old Eric Powell) both drowned while snorkeling outside the reef at Hanauma Bay within a dangerous area known as "Witches Brew." Both were good swimmers and experienced snorkelers. Conditions on that day were windy and choppy. They were enticed to snorkel outside of the reef because they had heard *"it was cool, including turtles"* beyond the Cable Channel and alongside "Witches Brew." After approximately 1 ½ hours, Mary Powell (wife to Eric and sister to James) observed lifeguards running along a cliff ledge, transporting a victim's body to the back of a pickup truck, and administering CPR. Because she saw only a single victim, it never occurred to her that it could be either James or Eric who were diving together. She grew worried and told a lifeguard that the pair had not yet returned from their dive. At some point thereafter, it dawned on her that the victim being worked on in the back of the truck was her brother James. Simultaneously, she also observed that lifeguards on a Jet Ski were transporting yet another victim to shore – her husband Eric. Both men were later pronounced dead at the hospital, due to drowning.

According to Clarenece Moses, the lifeguard stationed atop the nearest elevated lifeguard tower (3-A), he initially noticed a snorkeler (not a pair) swimming around the Witches Brew point *("off the corner of my eye, I seen somebody swimming around Witches Brew Point – when I seen him swimming around the point, he looked fine to me – he swam a little past the point – to me, he was swimming fine – he knew how to swim").* Thereafter, according to lifeguard Moses, the snorkeler repeatedly attempted to climb out onto the ledge and each time was unsuccessful. *("I seen him try to climb out to the side of the ledge, grab on and climb out. But when he grabbed on, he was hanging and he just dropped. He just let go, because I guess he was too weak or whatever. It struck me as kind of wrong").* David Neves, the companion lifeguard not in the tower at the time, was immediately sent running to Witches Brew to handle the emergency. Lifeguard Moses, thereafter continued observing with his binoculars *("I watched the guy, he tried to climb up again, wait a little while, he was hanging a little bit, and he dropped again. I was waiting for him to swim – and I didn't see no swimming – I waited 30 seconds, and I didn't see anything. I kind of knew that he wasn't going to be swimming again – so I took off running with the equipment").* During his deposition, Moses was asked: "why did the first sighting catch your eye?" and he replied, *"anybody who swims with a high arm, you can kind of see the arm. Looked like he was swimming regular to me. It didn't really catch – give me any kind of warning until he tried to climb up the side. And then he – when he let go, I knew something – usually people can hang on for a long while, at least swim back. But he just dropped straight down. He only dropped two times – I was watching, hoping he would be floating, slapping his arms maybe, trying to stay afloat. Neves didn't get there in time. I waited – was still watching – I didn't see no arms – I didn't see anything at all – nothing floating, whatever".* Lifeguard Neves vividly recalls, *"I ran past the nylon gate – and before I got to the nylon gate, I could see exactly where he was. He was holding on to the Brew, just getting smashed up against it (the ledge)."* James Laughlin had drifted 30-feet outward from the jagged foamy ledge. Large waves crashing into the

rocks at Witches Brew created significant surface fluctuations and cascaded water high into the air. Moses testified during his deposition, *"it's always hard to bring the guy out, because of the terrain. It's not easy. We had to find a spot to bring him out. He was pretty heavy. It took at least three of us. We had a hard time, just three of us, alone."* James Laughlin was floating unconscious, his face submerged, mask off with a single fin still on, plus head and arms badly bruised. Neves had provided mouth-to-mouth (two breaths) while still in deep water. Thereafter, Neves and Moses successfully pulled the victim out onto the cliff-ledge and began administering CPR. Neves stated during his deposition, *"I was blowing air in his stomach – it was obstruction everywhere – it was nasty."* After the third lifeguard (Bregman) arrived, the victim was rapidly carried along the ledge to the waiting truck and CPR was resumed for 25-minutes, including oxygen and defibrillator use, before ambulance personnel arrived and took James Laughlin to the Queen's Hospital. During this period, both lifeguard towers were left unmanned and the bathers were left abandoned without any surveillance protection.

Meanwhile, Eric Powell's wife (Mary) had approached a lifeguard who was on the beach making repeated announcements with a bull-horn, asking the public *"if anybody was missing from anyone's party?"* Mary had urgently conveyed to lifeguard Moses, *"that sounds like my brother-in-law – he was with my husband,"* that her brother and husband had been out snorkeling a long time and had not returned. The lifeguard reassuringly told her not to worry, they are together, that the unaccompanied victim they had retrieved was by himself and not paired up. On the contrary, Lifeguard Moses suddenly realized that a pair of snorkelers could indeed have become separated when they both experienced trouble at Witches Brew and one could still be out there unaccounted for. Lifeguard Moses immediately called for Jet Ski assistance and got a Park Ranger to drive him atop the volcano-cliff's crest from where he could look down inside Witches Brew. From there he saw Eric Powell's body floating in the middle. Two lifeguards (Robert Dorr and Billy Goodwin) arrived at Hanauma Bay, unloaded their Jet Ski (with attached rescue sled) and quickly rushed to the scene. Lifeguard Bergman was already at Witches Brew swimming toward the floating victim. It was unclear whether or not Eric had a mask and snorkel on. Eric's body was put onto the attached sled and, with lifeguard Dorr straddled atop him, the Jet Ski shot back to the beach. Lifeguards waiting ashore with equipment then grabbed the victim and proceeded with CPR. It was estimated that a time-duration of approximately 30 – 45 minutes separated the two rescue incidents.

Attendance at Hanauma Bay ranks as the 2nd highest overall compared to other beaches on Oahu (only Waikiki Beach draws more people). The total number of rescues made by lifeguards at Hanauma Bay significantly exceeds the quantity of saves performed at all the other locations. In 2002, Hanauma Bay became the most dangerous beach on Oahu with 12 drownings; a 500 per-cent increase over the year before and more than the previous seven years combined. All the victims were tourists. Chief of Lifeguard Operations, Jim Howe, has admitted, *"Lifeguarding at Hanauma Bay is a difficult task. Though the waters are not generally considered dangerous, monitoring hundreds of swimmers, many of them novices – face down and barely moving because most are snorkeling – is a challenge."* More than 1,000 people were at Hanauma Bay at the time when this incident took place (typical attendance is 3,000 every day).

There were two lifeguard towers, both situated at the left half of the beach. There were four lifeguards working, two were supposed to be on-duty at each tower. According to lifeguard Moses, the facility was understaffed. Previous requests for additional lifeguards had repeatedly been denied. Moses, unaccompanied in tower 3-A at the time of this incident, was providing surveillance from the middle of the beach over the entire right side of Hanauma Bay. From his 8-foot elevation and 45-feet from the water, Cable Channel was situated almost directly in front of his tower. Witches Brew was 1,218-feet away, and beyond the reef's outer edge at the Bay's far right (39.5-degree line-of-sight angle from the tower). During my on-site inspection, I personally observed and documented (with videotape and photos) that tower 3-A indeed afforded a clear and unobstructed view of Cable Channel's length, Witches Brew's frontage and the snorkeling path's entirety in-between. Binoculars allowed close-up examination of precise detail. "Witches Brew" and "Toilet Bowl" were regarded as hazardous areas for visitors and both were made inaccessible (from land) with tall fencing and secured gates. Access to Witches Brew from the beach necessitated swimming in a swift current through Cable Channel. There were no signs anywhere that specifically prohibited snorkelers in the water from approaching Toilet Bowl and Witches Brew, nor were any such warnings issued during the orientation video. Only "Strong Current" and "Ledges Closed" signs were made available to the lifeguards when the water was rough. According to lifeguard Moses, *"we are just limited with the signs that we have – yeah, we do talk to the supervisors, saying we need signs – it takes time for them to get the signs – you never know when you're going to get them."* There were no Water Safety Rules signs posted anywhere, nor did the beach rental concession furnish an informative diagram pointing out any dangerous restricted areas that were prohibited to snorkelers.

Lifeguard Moses was never taught how quickly a water emergency needed to be detected and how rapidly a lifeguard must respond to the emergency. He had never heard of the "10/20 Second Protection Rule" and he was completely unaware that requisite time standards governed lifeguards' water surveillance alertness and rescue responsiveness. He had never been subjected to surveillance audits, unannounced mock-emergency response drills or timed rescue procedure evaluations. According to Moses, the lifeguards were not prohibited from bringing their cell-phones into the lifeguard towers. He acknowledged the dilemma associated with trying to watch 100 snorkelers all floating around, barely moving once every five minutes. According to lifeguard Neves, no formal in-service training was ever provided to the lifeguards at Hanauma Bay beyond than what Clarence Moses offered informally. Evidently, due to some administrative disagreement with Ralph Goto, lifeguard Moses had stopped providing his staff any performance evaluations.

In analyzing the above facts and comparing them against fundamental water safety principles, particularly the prevailing operational standards governing public beaches as they apply to proper lifeguarding conduct *(taking precautionary action beforehand, ensuring timely victim detection and executing prompt rescue responsiveness)*, in my generating this preliminary expert report the following observations become evident:

The prevailing shared consensus universally accepted and followed throughout the

5

aquatic industry among water safety professionals, is the underlying lifeguarding standard of care that requires all lifeguards to regard as their highest priority the prevention of aquatic accidents before they occur. This "preventive lifeguarding" doctrine mandates that all lifeguards (supervisory levels included) must be safety-mindedly "proactive", not merely "reactive". This most essential and underlying standard first requires that all exposure to risk is eliminated and/or minimized prior to allowing the public to arrive on the premises. It entails searching out areas that are hazardous, but not necessarily obvious to the public (like Toilet Bowl and Witches Brew) and making those areas inaccessible. Cautioning snorkelers to stay away from dangerous areas requires conspicuous posting of Water Safety Rules, illustrative diagrams, prohibitive warning signs and verbal/physical enforcement. At Hanauma Bay, there existed the opportunity to include such safety information within the orientation video presented at the park's entrance up on top. People expect to be given safety rules to follow, particularly if hazards are not readily apparent or are hidden. In providing protection to the public, lifeguards are expected to enforce safety rules.

Concomitantly, accident prevention also demands from each lifeguard uninterrupted visual scanning of his/her surveillance zones and constant accountability for everyone in the water. Spotting an emergency before it happens is the primary objective. Lifeguards should have spotted two snorkelers being swept out by the swift current through Cable Channel. Moreover, conditions were very rough and the lifeguards had ample time (approximately 6 minutes) to observe and halt the buddy pair as they snorkeled from Cable Channel's outer buoys out toward Witches Brew. Proper intervention should have taken place long before James Laughlin and Eric Powell ever reached the prohibited Witches Brew area. In this instance, these two snorkelers had no idea that Witches Brew posed a potential problem. If lifeguards recognize a potential problem early and either issue audible warnings or execute a physical intervention response, it eliminates the need for an otherwise actual rescue. Lifeguards must never wait and allow a full blown emergency to develop. Because of the suddenness and deceptive subtlety of aquatic emergencies, the "USLA Open Water Lifesaving Manual" stresses that all assigned zones must be completely and thoroughly scanned at least every 30 seconds, incorporating use of binoculars if necessary. In emergency medicine there is often reference to a golden hour – the period of time after a traumatic injury during which effective medical intervention is essential to the saving of life. In open water lifesaving, such a time frame is an unheard of luxury. Lifeguards measure the opportunity for successful intervention not in minutes, but in moments. To prevent injuries and successfully intervene before a drowning occurs, the primary skill a lifeguard must employ is effective observation. Effective observation is not simply a question of vigilance. Accurate assessment and recognition of all potential drowning victims is a skill which requires training, experience, extensive concentration, and good judgment. Experienced lifeguards can sometimes actually predict which persons at their beach will need assistance long before an emergency arises. They do so by using visual clues and knowing exactly what to look for. Unquestionably, the key is to recognize and respond to problems in the water before they grow into extreme emergencies. Unfortunately, the lead-up to this emergency wasn't seen by the lifeguard until after it was too late.

Hanauma Bay is a hugely popular underwater park/preserve visited by massive numbers

of visitors, mostly comprised of snorkelers. Lifeguarding at this location is considerably more difficult because, unlike regular swimmers who tend to be easily visible at the surface, snorkelers lack such conspicuity. Snorkelers either float motionless on the surface or move with their heads submerged gazing at marine attractions below. Occasionally, if snorkelers unexpectedly inhale water through the snorkel, their resulting distress is often very difficult to detect. In this instance, the turbulent wave action near Witches Brew could very easily have triggered such unintentional inhalation by either James Laughlin or Eric Powell. Likewise, unsuccessful attempts to climb out onto the cliff ledge in the rough water could also have caused water to be inhaled unintentionally through the snorkel. During such choking episodes, even experienced snorkelers tend to bite instinctively on the mouthpiece and thus re-inhale additional water. Such clenched coughing through the snorkel is not uncommon, and is very foreseeable, with a known potential for abruptly incapacitating both inexperienced and veteran snorkelers inconspicuously. It results in the unexpected closure of the victim's windpipe (laryngospasm) thereupon rendering the victim suddenly helpless and unable to breathe or call for help. If the lifeguard fails to detect this silent emergency condition within 30 to 60 seconds, the victim loses consciousness, suffers lack of oxygen to the brain (hypoxia) and then drowns. Cardiopulmonary resuscitation (CPR) must be administered within 4 minutes, or brain damage rapidly increases until the point of irreversible death is reached (normally 8 – 10 minutes following the emergency's onset). This is precisely why lifeguarding at Hanauma Bay requires risk assessment and mitigation beforehand, followed by vigilant surveillance and proactive intervention by in-service trained lifeguards. Unlike at the other bathing beaches throughout Oahu, snorkeling emergencies at Hanauma Bay can be very deceptive with resulting drownings very inconspicuous, it is for that reason that meaningful safety precautions are so urgently warranted there. Ordinary bathers at the other locations who accidentally gag and choke in the water, tend to be much more conspicuous to the lifeguards – positioned upright, thrashing visibly, with mouth open and head up. Curious snorkelers at Hanauma Bay are apt to venture unknowingly into dangerous situations if not properly warned beforehand and if not spotted and halted in a timely fashion by lifeguards.

The United States Lifesaving Association's Manual of Open Water Lifesaving instructs lifeguards specifically that, *"it is not always obvious when a person is in distress in the water. Certainly many people in trouble become terrified and may yell for assistance, but often sounds from sources such as surf or other people playing will obscure any cry of distress. While some victims will wave for help in a classic manner, more are too busy trying to stay afloat to take the time to signal for assistance. Some victims simply submerge with no prior sign of a struggle whatsoever. Therefore, lifeguards must be adept at anticipating problems, recognizing when a person is in distress without hearing a yell for help, and understanding the subtle ways that persons in distress may telegraph their panic."* USLA also specifically teaches that a Sudden Drowning Syndrome, *"refers to sudden death caused by illness, physical conditions, or injuries that take place in the water but may not be related to classic drowning scenarios. For example, the shock to a victim who accidentally falls into cold water may trigger a cardiac arrest. Sudden drowning syndrome may take place when a person in the water is rendered unconscious, disabled, or dead due to situations that may include heart attacks, cardio-vascular accidents (strokes), epileptic seizure, head or neck injury, severe trauma, alcohol or drug overdose, and*

7

*other conditions. Sudden drowning syndrome is particularly difficult to prevent because it may occur with no sign of struggle whatsoever. The victim may have shown no prior indication of problems and be in a water area with no obvious hazards. It can be extremely difficult for a lifeguard with a large beach crowd under observation to spot a victim of sudden drowning syndrome who, for example, suffers an epileptic seizure and immediately sinks below the surface of the water with no apparent struggle. "* This accurately describes the known foreseeable danger at Hanauma Bay where snorkelers are susceptible to unexpected debilitation from accidentally inhaling water through their snorkels.

There was ample opportunity to prevent this double drowning from ever happening. James Laughlin and Eric Powell snorkeled together as a buddy pair through Cable Channel enroute to Witches Brew. Both snorkelers remained clearly observable, in close-up detail if binoculars were used. The lifeguards had approximately 6-minutes of accident prevention opportunity – that is approximately how long it takes snorkelers to swim from Cable Channel to Witches Brew. The lifeguards should have kept the snorkelers in constant view and alerted them to come back inside of the reef where it was safe. Alternatively, a lifeguard should have paddled out with a rescue-surfboard and instructed both divers to return. It was inexcusable on the part of the lifeguards not to have ever spotted them at all. Eric Powell's drowning was unwitnessed, therefore it remains unclear what exactly triggered his debilitation and drowning. An inadvertent inhalation through the snorkel is a reasonable and logical postulation. Similarly, it remains unknown what assistance James Laughlin may have attempted to offer his diving buddy during the emergency. Regrettably, by the time lifeguard Moses spotted James Laughlin trying to climb onto the rocks, it proved too late to make a difference. Eric Powell's body had already drifted away and James Laughlin was being smashed into the rocks and becoming seriously injured. It was absolutely inexcusable for lifeguard Moses to have been so inattentive – oblivious that there were two snorkelers desperately in need of rescue – and that one had already disappeared unseen.

Both men drowned. Technically, they suffocated in the water for a period in excess of 8-minutes. Because no vital signs whatsoever were obtained during initial resuscitation attempts by the responding lifeguards, it evidences that James Laughlin's brain had already been deprived of oxygen for more than 8-minutes. Likewise, Eric Powell's body wasn't recovered until after 45-minutes or more. Industry standards require that an acceptable lifeguarding emergency response system must be exactingly prearranged and routinely rehearsed so that CPR can be administered before 4-minutes have elapsed. Inasmuch that CPR requires solid ground (beach, cliff-ledge, boat deck, etc.), it means that victims at Hanauma Bay must be spotted and transported to a solid surface <u>before</u> 4-minutes have elapsed. Following a submersion emergency, the heart continues to beat for 3 minutes before blood circulation stops, thus allowing only 4 minutes for intervention from the incident's onset. The brain begins to deteriorate rapidly after 4 minutes. If resuscitation is started between 4 – 8 minutes, the victim will be left increasingly brain damaged. Chances for survival, even in a vegetable state, are considered unlikely after 8 minutes. That is why, at ocean beachfronts, the USLA surveillance standard emphasizes, *"there is a brief two minute window of enhanced opportunity for successful recovery of a submerged victim"*. During the initial two minutes, responding lifeguards are expected to make quick dives at the last seen point, bring the

8

victim to the surface, perform initial (two breaths) in-water resuscitation, and retrieve the victim to shore for further medical assistance. The two-minute window provides the potential for retrieving the victim to shore within four to six minutes of the submersion for successful CPR administration. It was inexcusable for the emergency of these 2 victims to go unnoticed by the lifeguards.

On the date of this incident, this defendant (City and County of Honolulu) deviated from its own published safety standards. There occurred clear violations of its operating policy, duties prescribed for Ocean Safety Officers, including the contents of its own Lifeguard Manual that the Ocean Safety and Lifeguard Services Division promulgated, but failed to enforce. These written violations included the following:

**NOTE – The Defendant's discovery documents I was sent (and have cited herein) are considerably outdated. I know from my previous other work in Hawaii, that new up-to-date publications <u>do</u> exist (reflecting similar principles) and I would have preferred to list those updated references instead.**

- <u>Rules and Regulations for Ocean Safety Officers</u>
  - ✓ *Ocean Safety Officers shall be responsible for the safety and welfare of the public in their assigned areas. Beach users must be carefully watched and properly advised ...*
  - ✓ *Ocean Safety Officers shall become familiar with their assigned areas. Special hazards shall be noted in log and appropriate signage placed in that area.*
  - ✓ *Each Ocean Safety Officer shall perform a risk assessment of their work area at the beginning of each day. Supervisors must immediately be informed of any unusual hazards of unusually hazardous conditions found at the work site. Appropriate risk reduction measures must be implemented by the assigned officers, appropriate to the conditions.*
  - ✓ *Ocean Safety Officers shall remain at their assigned stations until they have completed their scheduled tour of duty or longer if the supervisor requires their services for safety reasons or for effecting a search and rescue.*

- <u>All Water Safety Supervisors & Employees – Memo from Ralph S. Goto (May 17, 1993)</u>
  - ✓ *Provide training in the performance of work.*
  - ✓ *Providing instructions on safety and accident prevention in enforcing safety rules.*
  - ✓ *Reviewing the work of subordinates, discussing the work with subordinates and recognizing and acknowledging good work performed by employees.*

- <u>Position Description – Water Safety Officer II, SR-11</u>
  - ✓ *Mans lifeguard tower ... and keeps alert of all beach activities.*
  - ✓ *Performs preventive measures to reduce rescues and serious medical emergencies and ensures the general safety of all beach goers.*
  - ✓ *Supervises and controls beach activities through ensuring of ocean safety policies, rules and regulations ...*

- Lifeguard Manual – Parks and Recreation; City and County of Honolulu (1965)
  - ✓ *Good water safety practice demands that alert lifeguards anticipate trouble before it happens.*
  - ✓ *Lifeguards should bear in mind that they are always directly responsible for the safety and welfare of the entire public in their area.*
  - ✓ *Lifeguards will remain in their posts until they have completed their scheduled tour of duty, until relieved, or longer if the supervisor requires his services for safety reasons or for effecting a rescue or search.*
  - ✓ *Be alert for anything that may happen.*
  - ✓ *Use binoculars in spotting distant rescues, checking doubtful swimmers ... checking all objects not clearly visible to the naked eye.*
  - ✓ *The lifeguard's primary responsibility is water safety and nothing shall interfere with that duty.*
  - ✓ *Lifeguards shall be responsible for the safety and welfare of the public in their assigned areas.*

- Chapter 663-10.5(b), Hawaii Revised Statutes – Exemption from liability for county lifeguard services.
  - ✓ *"This exemption from liability, however, shall not apply when the claim for civil damages results from a county lifeguard's gross negligence or wanton act or omission."*

In addition to the above listed breaches and deviations from its own published documents, the City and County of Honolulu also violated the USLA Open Water Lifeguarding standards. Its own Ocean Safety and Lifeguarding Services Division had long ago officially adopted the United States Lifesaving Association's prescribed open water lifeguarding standards at beach operations on Oahu. On the day of this dual-drowning incident, included among the breaches and deviations from USLA's universally accepted standards were the following:

- The United States Lifesaving Association Manual Of Open Water Lifesaving (Excerpted standards from this training manual are quoted:
  - ✓ *While beach lifeguards also have a major responsibility for responding to emergencies, a lifeguard's primary role is prevention. This is a critical role because the worst outcome of water emergencies is death by drowning, and the drowning process can proceed very quickly.*
  - ✓ *Lifeguards, more than any other providers of public safety, have an ongoing responsibility for accident prevention.*
  - ✓ *Along with posting rules and regulations, many lifeguard agencies post signs informing beach visitors of particular hazards which may exist. Signs posted at entrance points can be extremely valuable, particularly in warning about unusual hazards which would not be evident to the average person.*
  - ✓ *Lifeguards hold the lives of the people they watch over in their hands. A momentary distraction may mean that a person in a lifeguard's care will die, so constant vigilance is imperative.*

10

✓ *Americans have come to expect professional lifeguards on their beaches just as they have come to expect professional police, fire, and emergency medical services in their communities.*

✓ *United States Lifesaving Association recognizes certain ethical principles. Lifeguards will – maintain an unwavering dedication to the safety of those they are assigned to protect; – make every reasonable effort to prevent accidents before they occur – avoid any undue distraction which may deter them from their primary responsibility.*

✓ *To prevent injuries, or successfully intervene before a drowning occurs, the primary skill a lifeguard must employ is effective observation. Effective observation is not simply a question of vigilance. Accurate assessment and recognition of drowning victims is a skill which requires training, experience, extensive concentration, and good judgment. Experienced lifeguards can sometimes actually predict which persons at their beach will need assistance long before an emergency arises. They do so by using visual clues.*

✓ *While some victims will wave for help in a classic manner, most are too busy trying to stay afloat to take the time to signal for assistance. Some victims simply submerge with no prior sign of a struggle whatsoever. Therefore, lifeguards must be adept at anticipating problems, recognizing when a person is in distress without hearing a yell for help, and understanding the subtle ways that persons in distress may telegraph their panic.*

✓ *Firefighters, police, and lifeguards are all expected to respond quickly and efficiently once an emergency arises. A basic responsibility of lifeguards is to watch over water areas in order to locate persons in distress. They must be able to observe, evaluate, and respond to emergency situations efficiently and effectively.*

✓ *Visual Scanning – Observation of a swimming area is accomplished through visual scanning. The lifeguard sweeps the area from side to side with the eyes, checking quickly on each swimmer or group of swimmers. If a sign of distress is noted, further assessment of the person in apparent distress should take place. When a distress clue that is less than conclusive is noted, the lifeguard should occasionally scan the rest of the area quickly and return to evaluate the signs of distress further. It is important that the lifeguard not forget to keep watching the remainder of the swimming crowd while making this evaluation.*

✓ *If two or more lifeguards are working together at a station, one lifeguard may alert another guard to a distress sign and study that person or group while the other guard continues scanning. Scanning of the water should continue at all times that a lifeguard is on duty.*

✓ *When a potential problem is observed through visual scanning, lifeguards are encouraged to use binoculars to study the situation more closely. Lifeguards should scan with their eyes and use binoculars only when a distress clue warrants further investigation.*

✓ *Once the overall area of responsibility has been defined, priority zones should also be defined. "Primary Zone – The primary zone for each lifeguard station is the water area for which the lifeguard is personally responsible. On beaches with several towers, the primary water zone generally extends to the next staffed lifeguard station on either side.*

11

*This zone automatically extends when lifeguards in adjacent stations are on a response or the adjacent station is closed. "Secondary Zone" – This usually includes adjacent water areas (including primary zones of other lifeguards), the beach, immediately adjacent park areas, the sky, and the water to the horizon. Less frequent scanning of this zone is required, but the lifeguard checks this zone regularly.*

✓ *Once lifeguard protection begins using established hours, protection must continue uninterrupted. While some lifeguard services may reduce coverage due to lower than expected crowd conditions, coverage should not be completely eliminated for routine breaks or meal periods. Instead, backup coverage should be provided for this purpose.*

✓ *USLA believes that in open water, there is a brief two minute window of enhanced opportunity for successful recovery of a submerged victim. During the initial two minutes, responding lifeguards may be able to make quick dives at the last seen point, bring the victim to the surface, perform initial in-water resuscitation, and retrieve the victim to shore for further medical assistance. The two minute window provides the potential for retrieving the victim to shore within four to six minutes of submersion for administration of CPR.*

✓ *Liability Protection – Ultimately, the best protection from liability is to perform all duties effectively, within the guidelines provided by the hiring agency. A lifeguard who stays alert, responds expeditiously as needed, and provides aid that meets a reasonable standard of care should have few worries. After all, the issue of liability arises only when errors are made that reasonably could have been prevented by prudent action. By avoiding those errors in the first place, civil liability itself becomes a moot issue.*

In addition to the USLA, there also exist other lifeguard training organizations recognized throughout the aquatics safety industry, each with water safety principles, ethics expectations and professional standards similar to those listed above. The City and County of Honolulu's Ocean Safety and Lifeguard Services Division did not comply with the following industry standards that the other lifeguard training organizations all practice and enforce.

- The American National Red Cross lifeguarding standards. Excerpted standards from its training manuals, "Lifeguard Training (1984)" and "Lifeguarding Today (1995)" are quoted:

✓ *Primary responsibilities: To prevent accidents and minimize or eliminate hazardous situations. To respond quickly to all emergency situations in the water. Using the proper procedures and techniques, the lifeguard must be able to assist anyone in distress or rescue anyone in a drowning situation. The lifeguard must constantly scan the assigned area and be able to recognize patrons who are in need of assistance.*

✓ *The most important responsibility will always be to prevent accidents in, on, and around water. Lifeguards must be aware of what is going on at all times in their assigned area of responsibility.*

✓ *Uninterrupted and proper supervision of the facility and the patrons is required at all times. The lifeguard should continually scan back and forth over the water. This should be done slowly enough to be able to see what each swimmer is doing. Each sweep must*

*cover the total area of responsibility. If a swimmer goes underwater, the lifeguard watches to see that the swimmer surfaces before continuing the sweep of the area.*

✓ *Risk management involves identifying and reducing dangerous conditions that can cause injuries and financial loss. As a lifeguard, you are an important part of your facility's risk management program. While emergency rescues are certainly a part of lifeguarding, you will spend far more time and energy in preventive lifeguarding – trying to make sure emergencies do not happen in the first place.*

✓ *There is no more important responsibility for a lifeguard than patron surveillance – maintaining a close watch over the people using your facility. Indeed, the greatest portion of a lifeguard's time is spent on patron surveillance. To do this effectively, you must be alert and attentive at all times, supervising patrons continuously. Your surveillance is the key to recognizing conditions or situations that may lead to life-threatening emergencies, such as drowning and spinal injury.*

✓ *Effective surveillance has four elements: (1) Recognizing how distressed swimmers and drowning persons behave; (2) Using appropriate scanning techniques to identify patrons in trouble in the water; (3) Proper stationing of lifeguards; (4) Knowing your area of responsibility.*

✓ *Effective surveillance is necessary for fast victim recognition and rescue. Drowning occurs when a person suffocates in the water. Active drowning victims remain at the surface for less than a minute; some struggle for as little as 20-seconds!*

✓ *Keep your eyes on your area of responsibility at all times. Maintain constant surveillance of the patrons in your area. Your primary responsibilities involve ensuring patrons' safety and protecting lives. These primary responsibilities include: Preventing injuries by minimizing or eliminating hazardous situations or behaviors; Recognizing and responding effectively in all emergencies; Unlike other professional rescuers, lifeguards are at the scene of potential injuries before they happen and can act to prevent them.*

- <u>YMCA of the USA lifeguarding standards</u>. Excerpted standards from its training manual, "On The Guard II – The YMCA Lifeguard Manual (1994)" are quoted:

  ✓ *Lifeguards should strive to cover their assigned scan zone every 10 seconds and respond within 10 seconds to distress situations.*

  ✓ *Your primary responsibility as a lifeguard is to protect the safety of all swimmers in your area: first by preventing accidents and second by responding to an emergency quickly and efficiently to minimize the danger to those involved. When you accept the responsibility of being a lifeguard, you also accept the legal and moral consequences of your actions and decisions. This is not a responsibility to be taken lightly. When you agree to protect the public's safety, you are accountable for your knowledge and your actions.*

- <u>Ellis & Associates / National Safety Council / National Recreation & Parks Association lifeguarding standards</u>. Excerpted standards from its training manual, "National Pool & Waterpark Lifeguard Training" are quoted:

13

✓ *The 10 Second / 3 Minute Rule is applied with the same principles as the pool and waterpark 10/20 Protection Rule. The size of the designated open-water area should reflect the ability of each of the staff on duty to scan his or her assigned area every 10 seconds, and reach and recover a victim within a maximum time of 3 minutes.*

✓ *As a professional lifeguard you will have 2 primary responsibilities: to prevent drownings/accidents, and to provide rescue and emergency care. As a lifeguard, you help prevent accidents by: Scanning swimmers for distress signs; Covering assigned zone systematically; Responding according to the 10/20 second rule; etc.*

✓ *Scan every portion of your area every 10 seconds: The 10/20 rule necessitates that each lifeguard scan every portion of his or her area every ten seconds or less. You must spot the victim in ten seconds and initiate rescue within the following 20 seconds, then you must be able to look at every portion of your territory every 10 seconds. To do this: 1) The areas to be scanned cannot be larger than the lifeguard can effectively scan every 10 seconds; 2) The lifeguard cannot be distracted for even a couple of seconds or some part of the area will not be scanned; 3) The areas to be scanned cannot be larger than the lifeguard can effectively get to within 20 seconds.*

✓ *Do not become distracted. The lifeguard must constantly guard against distractions.*

- The Royal Life Saving Society Canada (RLSSC) standards. Excerpted standards from its training manual, "Alert – Lifeguarding In Action (1993)" are quoted:

✓ *The lifeguard's primary function is accident prevention. When prevention fails, the lifeguard is ready to respond as a rescue expert.*

✓ *To provide vigilant, attentive, and alert supervision of the patrons of the facility, lifeguards must master a variety of skills and techniques. These important supervision skills and knowledge include: Positioning; Scanning; Victim recognition ....*

✓ *Recognition of an emergency. The ability to recognize trouble (even before it becomes life-threatening) is the foundation of effective lifeguarding.*

✓ *Safety supervision – Positioning of lifeguards. The objective in making decisions about where and how lifeguards are positioned is to ensure effective supervision of the entire facility. Consider the following factors: The ability of the lifeguards to see patrons, danger areas, other guards; The size and shape of the facility being supervised; The desire to have as many perspectives as possible on any given zone or area.*

✓ *Scanning is the systematic visual observation of the facility, its patrons, and their activities. Effective scanning must be considered the foundation of the lifeguard surveillance system.*

✓ *The lifeguard must detect the surface struggling of the drowning non-swimmer within seconds to keep a routine rescue from becoming serious or fatal. The consequence of inattention can be catastrophic.*

✓ *Lifeguards need to cultivate a heightened awareness of what is going on in their facility, and become skilled in recognizing and interpreting individual and group activities, behaviours, and patterns.*

There is no question, in my opinion, that had proper aquatic risk management safeguards

14

existed before June 19, 2002, James Laughlin's and Eric Powell's drownings would have been prevented. Preventive lifeguarding constitutes the most underlying, first and foremost, priority in lifeguarding. It entails employing appropriate precautions beforehand, so that the likelihood of water related accidents is eliminated or minimized in the first place. In this case, key information concerning snorkeling safety essentials should have been included in the video that is shown to the public at the Educational Center prior to their entry to Hanauma Bay. Prominently displayed "Water Safety Rules" signs should have been posted at the beach, requiring snorkelers to dive in pairs and educating them to immediately alert lifeguards in case any problem arises. Conspicuous visual diagrams of Hanauma Bay should have clearly illustrated exactly where Toilet Bowl and Witches Brew were located, with a strong warning to snorkelers not to approach these dangerous areas. Both of these areas should have had prominent "Stay Away" signs installed, conspicuous to approaching snorkelers. Strict enforcement by the lifeguards should have been deemed critical, including necessary paddling out with a rescue-surfboard, because timely rescue from such great distance would not be realistic. In 2002, technology was readily available for permanent wireless loudspeakers to be installed at Toilet Bowl and Witches Brew, thus enabling lifeguards to audibly warn snorkelers to stay away from the hazardous areas. Unquestionably, a sufficient number of lifeguards (6 – 8) should have been allocated at Hanauma Bay to provide necessary safety surveillance over its 1,854-foot wide beachfront with 3,000 daily visitors). There also should have been four lifeguard towers installed instead of only two, for more proportioned coverage over the entire Bay. According to industry standards, *"at least one lifeguard shall be stationed in an elevated chair for every 200 feet (or a fraction thereof) of protected beach with additional personnel on foot or stationed in boats as deemed necessary."* On the day of this dual-drowning incident, the right half of the beach (where Witches Brew was located) lacked elevated lifeguard towers. Unfortunately, none of these lifeguarding safeguards (preventive lifeguarding and aquatic risk management essentials) existed that day.

There is no question, in my opinion, that had the lifeguards been conscientiously alert and vigilantly scanned the entirety of their assigned water surveillance areas on June 19, 2002, James Laughlin's and Eric Powell's drownings would not have occurred. Lifeguarding's second highest requisite priority (after prevention) calls for all water emergencies (impending and happening) to be spotted at their onset by the lifeguards on duty. Continuous sweeping surveillance of everyone in the water is an absolute necessity at lifeguarded facilities – it <u>must</u> occur without fail. Instead, in this case, lifeguard Moses wasn't even aware that two snorkelers had ventured out beyond the reef and that they were experiencing an emergency. It was too late by the time he finally noticed James Laughlin *"off the corner of my eye – seen him swimming – with a high arm – swimming regular."* Eric Powell's body had already drifted out of sight and James Laughlin had already lost his mask and snorkel. James Laughlin was clearly evidencing desperate panic and struggling, because snorkelers don't swim *"with a high arm."* He was repeatedly seen *"holding on to the Brew, just getting smashed up against it (the cliff ledge)"* and by the time lifeguard Neves retrieved him, James' brain had been deprived of oxygen for more than 8 minutes. Failure to observe two snorkelers approaching a dangerous area, experiencing distress, one drifting motionless and the other flailing his arms in panic prior to sustaining trauma from being smashed against the rocks in rough water, translates into egregious lifeguard inattention. The USLA's

15

surveillance standard required lifeguard Moses to detect the snorkelers and to issue them warnings within 30-seconds. The USLA's surveillance standard emphasizes, *"there is a brief two minute window of enhanced opportunity for successful recovery of a submerged victim".* During the brief initial two minutes, responding lifeguards are required to retrieve the victim to shore and perform initial (two breaths) in-water ventilation. The administration of CPR on the beach within 2-minutes of the emergency's onset results in either a successful revival or, alternatively, the victim's transport to the hospital in a viable (as opposed to a brain damaged) state with opportunity to receive advanced care there. In this instance, the fact that the onset of two drownings occurred undetected evidences unreasonably unacceptable delay in the lifeguards' emergency response. Lifeguard Moses didn't have a clue that lifeguarding surveillance is clearly spelled out within most lifeguarding textbooks and that it is governed by a strict time standard for detection and response. When asked, he didn't know what the "10/20 Second Protection Rule" was. It begs the question, just what kind of in-service training had he (or the other lifeguards) received, if any?

There is no question, in my opinion, that had the lifeguards been routinely subjected to proper in-service training, consisting of unannounced in-service attentiveness drills and timed victim recognition audits to ensure their alertness, James Laughlin and Eric Powell would have been kept away altogether from Witches Brew and they would still be alive today. The City and County of Honolulu's Ocean Safety and Lifeguard Services Division failed to allocate a sufficient number of lifeguards (6 – 8) to Hanauma Bay. Lifeguard Moses' repeated requests for more lifeguards and additional safety signage were ignored. Moreover, lifeguards were not furnished appropriate in-service training and supervision. Published claims of Ocean Safety and Lifeguard Services Division (Ralph S. Goto) proudly state, *"ongoing in-service training activities for all full-time personnel include advanced techniques utilizing rescue craft and updates on patient airway management and resuscitation techniques."* In sharp contrast, lifeguard Moses testified during his deposition that he was never subjected to any surveillance audits, unannounced mock-emergency response drills, or timed rescue procedure evaluations. Such in-service training and lifeguard supervision methods have long constituted the norm throughout the water safety community and been emphasized among lifeguard certification organizations as absolutely essential for maintaining lifeguard alertness and updating knowledge. At Hanauma Bay, typical unannounced mock emergency exercises should have included sending two unrecognized supervisors snorkeling toward Toilet Bowl and Witches Brew, testing how long it takes for the lifeguards to implement corrective action. Each time, the overall objective would be to accurately time and evaluate the detection, emergency response, transportation to shore and resuscitation appropriateness – to ensure that CPR was started within 2 minutes. It was astonishing to learn, from reviewing discovery materials, that the Chief of Lifeguard Operations (Jim Howe) was fully aware of the extraordinary difficulty that snorkeling activity at Hanauma Bay posed. He candidly admitted, *"Lifeguarding at Hanauma Bay is a difficult task. Though the waters are not generally considered dangerous, monitoring hundreds of swimmers, many of them novices – face down and barely moving because most are snorkeling – is a challenge."* Lifeguard Moses, too, expressed similar awareness and, in a prior drowning case, had blamed lifeguard insufficiency for his own failure to detect a snorkeler in distress. It evidences that both

16

management and staff knew beforehand that snorkeling activity represented a higher exposure to risk and therefore warranted additional staff along with other safeguarding measures. Yet, in spite of such evident awareness, nothing whatsoever was ever remedially done.

At public swimming facilities everywhere – municipal pools, commercial waterparks, inland waterfront camps, etc., it is nowadays exceedingly normal to see an ample profusion of lifeguards paying very close attention to people in the water. Facility operators recognize that, *"the more eyes on the water, the lesser chance of missing someone in trouble."* There now exists fierce competition among the various advocated scanning methods, with each claiming unrivaled surveillance vigilance results. Typical scanning techniques include, "10/20 Second Protection Rule" wherein the lifeguard is required to detect the onset of an emergency within 10 seconds and to accomplish successful recovery before 20 seconds has elapsed; also "10/10 Second Rule" wherein, after detection, the victim's recovery must occur within only 10 seconds; there is also a "10 second – 3 minute rule" requiring the victim's detection within 10 seconds and starting the resuscitation before 3 minutes. USLA's Open Water Lifesaving Manual states, *"swimming areas should be scanned completely at least every 30 seconds – there is a brief two minute window of enhanced opportunity for successful recovery of a submerged victim. During the initial two minutes, responding lifeguards may be able to make quick dives at the last seen point, bring the victim to the surface, perform initial in-water resuscitation, and retrieve the victim to shore for further medical assistance. The two minute window provides the potential for retrieving the victim to shore within four to six minutes of submersion for administration of CPR."* Likewise, it has long remained the accepted lifeguard in-service supervision norm to subject lifeguards to unannounced vigilance evaluation drills and timed mock-victim rescue scenarios. In my opinion, had such in-service alertness-timing drills and unannounced mock-emergency simulation practices existed at Hanauma Bay, James Laughlin and Eric Powell would have been disallowed to approach Witches Brew. Their emergency condition would have been promptly detected plus corrective intervention would have been executed by the lifeguards in a timely fashion. Regretfully, such safeguards had not been put into practice prior to June 19, 2002, the date of this dual-drowning.

In conclusion, based on all the foregoing reviewed facts plus analysis, including a reliance on my more than 42-years of experience as a professional in diverse water safety and aquatic risk management (including originating the Preventive Lifeguarding standard with American National Red Cross in 1972), it is my opinion, to a reasonable degree of certainty, that James Laughlin's and Eric Powell's drownings were preventable. Both men had a reasonable right to expect that Hanauma Bay would be professionally risk-managed and safely operated. They had every right to expect that there would be a sufficient number of lifeguards vigilantly scanning the water. Most understandably, given that they both had paid a fee to snorkel in a marine sanctuary protected by lifeguards, they clearly expected to be noticed and promptly rescued if they experienced trouble in the water. Indeed, they rightly anticipated that they would be given proper safety-instructions and danger-warnings beforehand. Regretfully, James Laughlin's and Eric Powell' reasonable expectations failed to materialize on July 19, 2002.

17

In my opinion, these drownings resulted because of aquatic risk management safeguards' inadequacy, insufficient number of staff assigned on duty, the lifeguards' gross inattentiveness, absence of unannounced in-service attentiveness drills and lack of timed victim recognition audits which ensure the lifeguards' optimum alertness and performance. In summary:

1. Snorkeling should have been regarded an increased risk to participants, because of the deceptive subtlety victims manifest during drowning distress. Lifeguards were insufficiently trained to discriminate and accurately spot snorkelers who were experiencing trouble. Snorkelers whose drowning emergencies are triggered by inadvertent inhalation of water pose unique and difficult-to-discriminate victim recognition problems that, if not properly overcome, result in delayed rescue with unavoidable drowning death.

2. Visitors to Hanauma Bay should have received key information concerning snorkeling safety essentials. The video that was shown to everyone by Hanauma Bay's Educational Center prior to entering the park should have instructed all snorkelers to dive in pairs (Buddy System) and educated them to instantly alert the lifeguards should either diver experience any difficulty. Warnings regarding Toilet Bowl and Witches Brew, specifically to stay away from those dangerous areas, should have been strongly emphasized.

3. Prominently displayed "Water Safety Rules" signs should have been posted at the beach, requiring snorkelers to dive in pairs and instructing them concerning shared safety responsibilities. Large conspicuous visual diagrams of Hanauma Bay should have clearly illustrated exactly where Toilet Bowl and Witches Brew were located, with strong warning issued to snorkelers not to approach those dangerous areas. Both locations should have displayed permanent "Keep Away" signs to warn away approaching snorkelers.

4. Lifeguards should have been trained to keep snorkelers away from Toilet Bowl and Witches Brew. Strict enforcement should have included them paddling out with a rescue-surfboard whenever necessary. Permanent loudspeakers should have been  installed at both locations, enabling the lifeguards to verbally warn approaching snorkelers away.

5. Enough guards (6 - 8 minimum) should have been assigned on-duty to watch all snorkelers within Hanauma Bay's huge 1,854-feet wide expanse (over 6 football fields, end to end). With its daily attendance averaging 3,000 visitors, two additional lifeguard towers should have been installed (four instead of only two) for evenly proportioned coverage over the entire Bay. With both towers situated at the left half of the beach, lifeguard coverage was insufficient over the right half of the beach where Witches Brew was located.

6. Lifeguard Moses was inattentive. He failed to ever notice that James Laughlin and Eric Powell were approaching Witches Brew, plus he failed to detect the onset of their drowning emergency. By the time he saw James Laughlin flailing his arms in distress (he misperceived his movements and believed he was swimming fine with a high arm stroke) it was too late to successfully rescue him. He was smashed into the rocks repeatedly and was ultimately

knocked unconscious by the large waves. He was no longer resuscitatable by the time lifeguards Neves and Moses gave him CPR on the cliff ledge.

7. The lifeguards should have been routinely subjected to unannounced in-service attentiveness drills and timed victim recognition audits to ensure their alertness.
Various foreseeable emergency scenarios should have been timed and practiced, including promptly halting approaching snorkelers and rescuing them in a timely manner at prohibited areas like Toilet Bowl and Witches Brew – the two-minute requisite objective serving as the "time-to-beat" criterion. Actual manikins should have been used for practicing administration of CPR, AED and oxygen. It was disturbing to read lifeguard Neves' deposition, *"I was blowing air in his stomach – it was obstruction everywhere – it was nasty."* It indicated an improper head position and a wrongful assumption that the airway was blocked.

8. It wasn't until after more snorkelers drowned later that same year, in 2002, that constructive attention was finally initiated toward mitigating the dramatically escalating number of fatalities at Hanauma Bay. In my opinion, failure to address this problem sooner was unacceptable and neglectful on the part of City and County of Honolulu's Ocean Safety and Lifeguard Services Division. Long prior to this dual-drowning incident, it should have duly conformed with the prevailing lifeguarding safety standards being practiced throughout the whole aquatics safety industry. Water safety and aquatic risk management call for being proactive (not simply reactive), seeking out and recognizing unsafe conditions beforehand, plus correcting unsafe conditions <u>before</u> accidents can happen.

So, in my final summary opinion, had James Laughlin and Eric Powell both been properly halted from ever approaching Witches Brew in the first place, they would still be alive today. Likewise, there is absolutely no reason <u>not</u> to believe, had the onset of their emergency been detected by the lifeguards in a timely manner, with immediate rescue and proper resuscitation accomplished in under 2 minutes, that it would have yielded anything but a successful outcome. The lifeguard's ultimate duty-of-care is avoiding a drowning – in this instance, prevention of both snorkelers' suffocation in the water. That is what beachgoers have a reasonable right to expect from the lifeguards on duty at public beach facilities – and, likewise, these were James Laughlin's and Eric Powell's reasonable expectations from the City and County of Honolulu's Ocean Safety and Lifeguard Services Division. In my opinion, it amounted to gross negligence. By failing to meet the prevailing lifeguarding standard of care and by willfully tolerating the aforementioned safety deficiencies, the defendants named in this lawsuit (City and County of Honolulu's Ocean Safety and Lifeguard Services Division, including its lifeguards at Hanauma Bay) betrayed a sacred public trust that our aquatic profession has worked hard to earn.

I have enclosed a copy of my Curriculum Vitae **(See Appendix C)**. The expert opinions described herein are subject to change should additional information be made available to me. Should you have any questions concerning either this subject matter or my report, please do not hesitate to contact me.

19

AQUATIC RISK MANAGEMENT

Thomas C. Ebro
Water Safety Specialist

**Appendix E**

Photographs and Videotape (DVD-disk) from my on-site inspection – April 27, 2006

Photographs from my on-site inspection – October 9, 2006

# AQUATIC RISK
TOM EBRO
# MANAGEMENT
WATER SAFETY CONSULTANTS

**Thomas C. Ebro**

5525 Reflections Boulevard • Lutz, FL 33558-9017 • 813.792.9000 • FAX 813.792.9090 • tomebro@tomebro.com • www.tomebro.com

## CONSULTING FEE SCHEDULE

**A.**   **RETAINER FEE**          $2,000.00
          (Nonrefundable)        **(TAX I.D. #59-2628858; CHECKS PAYABLE TO TOM EBRO, INC.)**

To be paid in advance, upon retention of professional services. This fee will be deducted from the initial statement. No refund will be made should the services rendered and expenses total less than the $2,000.00 retainer fee.

**B.**   **PROFESSIONAL SERVICES**

Preparation Time          $250.00 per hour, including attorney phone conferences, reading depositions, library research, travel time, on-site investigations, conducting tests, report preparation, etc.

Deposition          $1,000.00 for half-day sessions, defined as four hours or less. Additional half-day sessions, if necessary, at $1,000.00 each. Charges or travel time and expenses (not included) shall be billed at $250.00/hour with incurred costs.

Consistent with the Code of Civil Procedures, a prepayment of the deposition fee will be required for a half-day (four-hour) session.

Cancellation 24 hours prior to deposition time – no charge. The full initial fee will be charged if cancellation occurs 24 hours or less before deposition.

The retaining attorney shall be responsible for notifying the attorney requesting the deposition of these policies. If payment is not received prior to deposition, the deposition will be considered canceled.

Trial          $1,000.00 for half-day appearance, $2,000.00 for full day, not including travel time, pre- or post-trial conferences, etc. Cancellation fee schedule is same as noted above.

**C.**   **TRAVEL**

All travel time shall be "portal-to portal" chargeable working time. Reimbursement (at actual cost) is required for travel, lodging and subsistence expenses.

**D.**   **BILLING TERMS**

Full payment is due upon receipt of statement. Thereafter, a 1.5% monthly finance charge, or 18% yearly.

**Above rates will remain effective until end of the current calendar year (2004), but are subject to revision thereafter.**

CD OF PLAINTIFFS' EXPERT THOMAS EBRO'S

COLOR PHOTOS TO EXPERT REPORT AND

AMENDED PRELIMINARY EXPERT REPORT

(3 SETS OF 2 CDs)

**SUBMITTED TO THE CLERK'S OFFICE**

**FOR FILING**

DVD OF PLAINTIFFS' EXPERT THOMAS EBRO'S INSPECTION

OF ACCIDENT SCENE, APRIL 27, 2006

(3 SETS OF 1 DVD)

**SUBMITTED TO THE CLERK'S OFFICE**

**FOR FILING**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

THE ESTATE OF ERIK A. POWELL, )
THROUGH PERSONAL )
REPRESENTATIVE MARY K. )
POWELL; THE ESTATE OF JAMES )
D. LAUGHLIN, THROUGH )
PERSONAL REPRESENTATIVE )
RAGINAE C. LAUGHLIN; MARY K. )
POWELL, INDIVIDUALLY; )
RAGINAE C. LAUGHLIN, )
INDIVIDUALLY; CHLOE )
LAUGHLIN, A MINOR, THROUGH )
HER NEXT FRIEND, RAGINAE C. )
LAUGHLIN, )
                             )
          Plaintiffs, )
                             )
     vs. )
                             )
CITY AND COUNTY OF )
HONOLULU, )
                             )
          Defendant. )
                             )
     and )
                             )
CITY AND COUNTY OF )
HONOLULU, )
                             )
          Third-Party Plaintiff, )
                             )
     vs. )
                             )
                             )
                             )

CIVIL NO. CV04-00428 LEK

CERTIFICATE OF SERVICE

**TRIAL**:   April 3, 2007

UNIVERSITY OF HAWAII, a body )
corporate; JOHN DOES 1-10, JANE )
DOES 1-10, DOE CORPORATIONS )
and DOE ENTITIES, )
)
        Third-Party )
        Defendants. )
_____ )

## CERTIFICATE OF SERVICE

I hereby certify that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF and Hand Delivery:

                                                            <u>DATE:</u>

Derek T. Mayeshiro, Esq.     <u>dmayeshiro@honolulu.gov</u>    December 7, 2006

Attorney for Defendant CITY AND COUNTY OF HONOLULU

DATED:  Honolulu, Hawai`i,  DEC - 7 2006 .

IAN L. MATTOCH
EMILY KAWASHIMA WATERS
Attorneys for Plaintiffs