IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| THE ESTATE OF ERIC A. POWELL, THROUGH PERSONAL REPRESENTATIVE MARY K. POWELL; THE ESTATE OF JAMES D. LAUGHLIN, THROUGH PERSONAL REPRESENTATIVE RAGINAE C. LAUGHLIN; MARY K. POWELL, INDIVIDUALLY; REGINAE C. LAUGHLIN, INDIVIDUALLY; CHLOE LAUGHLIN, A MINOR, THROUGH HER NEXT FRIEND, REGINAE C. LAUGHLIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| CITY AND COUNTY OF HONOLULU, | ) ) ) |
| Defendant. | ) ) |
| and | ) ) |
| CITY AND COUNTY OF HONOLULU, | ) ) ) |
| Third-Party Plaintiff, | ) ) |
| vs | ) ) |
| UNIVERSITY OF HAWAII, a body corporate; JOHN DOES 1-10, JANE | ) ) |

Civil No. CV04 00428 LEK

MEMORANDUM IN SUPPORT OF MOTION

DOES 1-10, DOE                    )
CORPORATIONS and DOE              )
ENTITIES,                         )
                                  )
        Third-Party Defendants.   )
_____   )

## MEMORANDUM IN SUPPORT OF MOTION

Defendant City and County of Honolulu, (hereafter "City"), by and through its attorneys, Carrie K.S. Okinaga, Corporation Counsel, and Derek T. Mayeshiro, Deputy Corporation Counsel, herein submits this Memorandum in Support of its Motion for Partial Summary Judgment.

I.    INTRODUCTION

Plaintiffs allege in their Complaint (Exhibit "A") that the City is responsible for the deaths of Decedent Erik Powell and Decedent James Laughlin.  However, the City denies any wrongdoing.

On July 19, 2002, Water Safety Officer Clarence Moses ("WSO Moses") saw a swimmer coming around Witches Brew Point.  The swimmer was doing fine until he attempted to climb onto the side of the bay and fell into the water.  WSO Moses sent his partner, WSO Daniel Neves to assist the swimmer.  WSO Neves grabbed his equipment and took off.  By the time WSO Neves reached the end of the beach, the swimmer, who was hanging onto the ledge, fell back into the water.  Then, WSO Moses called

the supervisor informing him of a possible rescue. Exhibit "B", Pg. 28, Line 23 – Pg. 29, Line 25.

WSO Neves ran to the ledge near to the swimmer and jumped into the water with his rescue tube.  He reached the swimmer and started mouth-to-mouth resuscitation.  Exhibit "C", Pg. 54, Line 22 – Pg. 55, Line 16.

WSO Moses ran with toward the ledge with his equipment, oxygen and first aid kit.  Exhibit "B", Pg. 30, Lines 1-4; Pg. 33, Lines 7-8.  The acting supervisor, Ron Bregman drove past WSO Moses with his truck heading toward the swimmer.  When WSO Moses reached the ledge, WSO Neves brought the swimmer to the ledge.  Id. at Pg. 33, Line 22 – Pg. 34, Line 8.  The swimmer was lifted out the water and the lifeguards performed CPR.  Id. at Pg. 34, Lines 15-17.

As they performed CPR, the swimmer began to vomit.  Exhibit "C", Pg. 58, Lines 1-8.  The lifeguards had difficulty providing resuscitation because of the amount of vomit from the swimmer.  Id. at Pg. 58, Line 25 – Pg. 59, Line 14.  But, they continued their efforts until the ambulance arrived.  Exhibit "B", Pg. 37, Lines 17-23.

After the ambulance left, the lifeguards tried to determine who the swimmer was.  When they described the swimmer to the bay patrons, it

3

was determined that he may not have been alone. Exhibit "B", Pg. 38, Line 18 – Pg. 39, Line 12. Thereafter, the lifeguards called for the mobile rescue team who operate the jet ski. Id. at Pg. 39, Lines 13-21.

WSO Billy Goodwin was operating the jet ski that day, Exhibit "D", Pg. 11, Lines 22-24, and his partner was WSO Rob Dorr. Id. at Pg. 22, Lines 5-10. They were at Sandy Beach when they received the call of a missing swimmer at Hanauma Bay. They drove to the Bay and as they came down WSO Moses was going up to get a better visual of the bay. When WSO Moses spotted the missing swimmer, WSOs Goodwin and Dorr launched the jet ski and picked up the missing swimmer and performed CPR. Id. at Pg. 22, Line 11 – Pg. 23, Line 5.

The first swimmer was later identified as Decedent Laughlin and the second swimmer was later identified as Decedent Powell. See Declaration of Ralph Goto, Par. 10.

## II.    STATEMENT OF UNDISPUTED FACTS

1.    Hanauma Bay Nature Preserve ("Hanauma Bay") is a beach park. See Declaration of Ralph Goto, Par. 4. Witches Brew is an area of ocean water within Hanauma Bay. Id. At the time this incident occurred, warning signs that specified strong current were posted at Hanauma Bay pursuant to Act 190. Id. at Par. 5. At the time of the incident, the design

and placement of the Act 190 signs at Hanauma Bay were approved by the chairperson of the board of land and natural resources. Id. at Par. 6. At the time of the incident, the Act 190 signs at Hanauma Bay were not vandalized, removed, or illegible. Id. at Par. 7. Attached as Exhibit "E" are true and correct color copies of photographs that depict the Act 190 warning signs at Hanauma Bay on the date of the incident. Id. at Par. 8.

2.    No one witnessed what happened to the decedents after they swam past the coral reef and until a lifeguard observed one of the swimmers coming around Witches Brew Point. Exhibit "F", Pg. 93, Line 19 – Pg. 94, Line 10; Exhibit "G", Pg. 47, Lines 14-17; Declaration of Ralph Goto at Par. 11.

3.    Plaintiffs' experts believe that strong currents led the decedents to the Witches Brew area. Exhibit "G", Pg. 49, Lines 20-25; and Pg. 50, Lines 8-10.

4.    Plaintiffs have not plead that the City lifeguards were grossly negligent or acted wantonly. Exhibit "A", Par. 15.

5.    Plaintiffs' water safety expert has no information that City lifeguards were grossly negligent for not seeing the decedents swim toward Witches Brew. Exhibit "G", Pg. 40, Lines 5-15.

6.      The alleged Hanauma Bay visitor center employee referenced in Count II of the Complaint is not a City employee or agent.  See Declaration of Alan Hong, Par. 5.

7.      Even if the alleged visitor center employee was a City employee, she did not "direct the decedents to swim at the southern edge of the bay" as alleged in Par. 20 of the Complaint attached as Exhibit "A". Exhibit "F", Pg. 40, Lines 3-23; Exhibit "F", Pg. 56, Line 22 – Pg. 57, Line 19.

III.     RELIEF REQUESTED

The City requests that this Honorable Court grant summary judgment in its favor as to all claims pertaining to the death of Erik Powell.  In addition, the City seeks summary judgment as to Plaintiffs' claims as alleged in Paragraphs 15 and 16 of Count I of the Complaint and Plaintiffs' claims as alleged in Count II of the Complaint.

IV.     APPLICABLE LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56.  In determining whether a genuine issue of material fact exists, the

evidence is to be taken in the light most favorable to the non-moving party.

        To prevail on a motion for summary judgment, the moving party must

show an absence of evidence to support the non-moving party's position.

The burden then shifts to the non-moving party to establish the existence of

an issue of fact that could affect the outcome of the litigation and from

which a reasonable jury could find for the plaintiff.  It is settled that the non-

movant may not rest upon mere allegations, but must adduce specific,

provable facts demonstrating that there is a triable issue.  *See Holland v.*

*O'Bryant*, 964 F.Supp. 4, 6 (D.D.C. 1997).

        In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548,

2552-53, 91 L.Ed.2d 265 (1986), the United States Supreme Court stated

that:

> [T]he plain language of Rule 56(c) (Fed. R. Civ. P.)
> mandates the entry of summary judgment, after adequate
> time for discovery and upon motion, against the party who
> fails to make a showing sufficient to establish the
> existence of an element essential to the party's case, and
> on which that party will bear the burden of proof at trial.
> In such a situation, there can be no genuine issue as to
> any material fact, since a complete failure of proof
> concerning an essential element of the non-moving
> party's case necessarily renders all other facts immaterial
> . . .

A party moving for summary judgment bears the initial burden of demonstrating the absence of evidence to create a genuine issue of fact as to his opponent's claims. Id. The burden is satisfied by pointing out the insufficiency of evidence to support an opponent's claims, and does not necessitate the proffer of evidence which negates these claims. Id.

In order to overcome a motion for summary judgment, a responding party must then come forward with "specific facts showing that there is a genuine issue for trial" by affidavits or otherwise, and may "not rest upon the mere allegations or denials of his pleading." Fed. R. Civ. P. 56(e).

V.     DISCUSSION

A.     There is No Evidence that the City Caused the Death of Decedent Erik Powell.

After the decedents swam pass the coral reef, no one witnessed what happened to them until WSO Clarence Moses noticed Decedent Laughlin swimming near Witches Brew Point. See Declaration of Ralph Goto at Par. 11. Plaintiff Mary Powell did not witness what happened to the decedents after they swam past the coral reef. She testified as follows:

> Q.     Just so I'm clear, when Eric and Jim left you to go back into the water snorkeling again, I know that you were flipping through a magazine or laying out. Did you keep track of them as they walked along the shore?
>
> A.     Uh-huh.

Q.    Okay.  And did you see them actually enter the water?

A.    Yes.

Q.    And did you seek them make their way out past the reef?

A.    I saw them, yeah, along that buoy, that buoy line.

Q.    Right.

A.    And then once they were out past that reef, there were other people, and then I kind of lost them.

Exhibit "F", Pg. 93, Line 19 – Pg. 94, Line 10.

Furthermore, Plaintiffs' expert also concedes that the events that led

to Decedent Powell's death were not witnessed.  He testified:

Q.    Mr. Ebro, isn't it true that we don't know exactly what happened to Mr. Powell as to what caused him to get in trouble?  Is that fair to say?

A.    That's correct.

Exhibit "G", Pg. 47, Lines 14-17

*    *    *    *    *

Q.    Okay.  And isn't it true that Mrs. Powell testified in her deposition that her husband, Mr. Powell, and her brother, Mr. Laughlin, were snorkeling together?

A.    That's correct.

Q.    And as far as you know, there is nothing to indicate that they were not swimming together until the point where a lifeguard sees one of the swimmers coming around Witches Brew point, correct?

9

A.    Their snorkeling was not witnessed until that time, that's correct.

Exhibit "G", Pg. 24, Lines 14-23.

As there were no witnesses and no other evidence as to what led to Decedent Powell's death, Plaintiffs are unable to demonstrate the City's alleged negligence was the proximate cause of his death.  In <u>Mitchell vs. Branch & Hardy</u>, 45 Haw. 128, 363 P.2d 969 (1961), the Hawaii Supreme Court defined proximate or legal cause as follows:

> The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in brining about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

<u>Id.</u>, 45 Haw. at 132, 363 P.2d at 973

The Court further explained this definition in <u>McKenna vs. Volkswagenwerk</u>, 57 Haw. 460, 558 P.2d 1018 (1977).  The Court stated in relevant part:

> The first arm of the test contemplates a factual determination that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of. . . The inquiry under the first arm of the Mitchell test if essentially whether the act of the defendant was a cause in fact of the plaintiff's injury. *A finding of factual causation is essential to the imposition of liability, yet the inquiry must not stop with this factual determination. . .*

<u>Id.</u>, 57 Haw. at 465, 558 P.2d at 1022; (Internal citations omitted; Emphasis added)

10

Here, there is no evidence that the City's alleged negligence was a substantial factor in bringing about the death of Erik Powell because no one knows what caused him to drown.  Thus, Plaintiffs cannot maintain a prima facie case against the City for Erik Powell's death because they cannot prove causation.   In light of the void of any evidence that the City proximately caused the death of Erik Powell, the City is entitled to summary judgment in its favor for all claims related to the death of Erik Powell.

B.    The City's Warning Signs Are Presumed to be Legally Adequate.

Assuming that this Court allows Plaintiffs' claims pertaining to Decedent Powell to continue, and assuming that Decedent Powell's death was related to an ocean related danger, the City's warning signs are presumed legally adequate.  In their Complaint, Plaintiffs allege in part as follows:

> 16.    Defendant City acted in a careless and negligent manner in that it failed to adequately and properly warn Decedent Powell and Laughlin of dangerous ocean conditions generally, and failed to warn of the particular ocean conditions on the south side of the bay.

> See Exhibit "A"

At the time of the subject incident, the City had posted warning signs pursuant to Act 190[1].  Act 190, entitled "A Bill for an Act Relating to Public Land Liability Immunity," was enacted in 1996.  1996 Haw. Sess. L. Act 190, at 434-37.

In enacting this law, the Hawaii legislature recognized the unlimited liability that the State and counties face for ocean related accidents.  The legislature prefaced this law by stating:

> *The legislature finds that counties need protection from liability arising from dangerous natural conditions in the ocean adjacent to public beach parks.*  The legislature finds that it is necessary to strike an equitable balance between the privilege of residents and visitors alike to enjoy public beaches in a responsible manner and the duty of the government to take reasonable measures to protect citizens from harm by providing adequate warning.  *Accordingly, the purpose of this Act is to establish a process in which the State and counties can provide both meaningful and legally adequate warnings to the public regarding extremely dangerous natural conditions in the ocean adjacent to public beach parks.*  Specifically, this Act establishes a process by which public entities are provided protection from liability when they have provided adequate warning to the public through the design and placement of warning signs in our beach parks.  *The legislature believes that this Act will provide a process by which a legally adequate warning system can be developed at public beach parks which will increase public safety, reduce ocean-related accidents, and protect the State and counties from the unlimited liability they*

---

[1]     Act 190 took effect on July 1, 1996, and was to be repealed on June 30, 1999.  Id., § 7 at 434.  The repeal date was later extended from June 30, 1999, to June 30, 2007.  See 1999 Haw. Sess. L. Act 101, § 2 at 370; 2002 Haw. Sess. L. Act 170, § 2 at 610.

*face with regard to activities in the ocean and at public beaches.*

Id., § 1 at 434-5; Emphasis added.

Section 2 of Act 190 protects the City as follows:

(a) The State or county operating a public beach park shall have a duty to warn the public specifically of dangerous shorebreak or strong current in the ocean adjacent to a public beach park if these conditions are extremely dangerous, typical for the specific beach, and if they pose a risk of serious injury or death.

(b)  A sign or signs warning of dangerous shorebreak or strong current shall be conclusively presumed to be legally adequate to warn of these dangerous conditions, if the State or county posts a sign or signs warning of the dangerous shorebreak or strong current and the design and placement of the warning sign or signs has been approved by the chairperson of the board of land and natural resources.

(f) Neither the State nor any county shall have a duty to warn of dangerous natural conditions in the ocean other than as provided in this section.

1996 Haw. Sess. L. Act 190, § 2(a), (b), and (f) at 435.

In reviewing this provision, the Hawaii Supreme Court stated,

"Section 2 of Act 190 specifically limits the State's and County's duty to

warn.  Because Act 190 is in derogation of common law tort principles, it

must be strictly construed."  Lansdell v. County of Kauai, 110 Haw. 189,

201, 130 P.3d 1054, 1066 (2006).

The Court went on to say:

Hence, based on the plain language of act 190, it appears that
the legislature intended to restrict the State and counties' duty
to warn of dangerous shorebreak or strong currents . . . if these
conditions are extremely dangerous. . . and if they pose a risk
of serious injury or death.

Id. (footnote and citation omitted.)

The Court anchored its interpretation in the legislative history.  The

Court highlighted it as follows:

This bill would establish the duty of the State and counties to
warn of *dangerous shorebreaks or strong current if the
conditions are extremely dangerous, typical for the beach, and
if they pose a risk of serious injury or death. ... The bill does not
require warning to be given of other extremely dangerous
conditions, but permits the State and counties to obtain the
same legal presumptions for those conditions if the State or
county responsible for the beach posts approved warning signs.*

Lansdell, 110 Haw. at 201, 130 P.3d at 1067 citing Sen. Conf. Comm.

Rep. No. 98, in 1996 Senate Journal, at 787. (Emphasis in original text)

In this case, Hanauma Bay Nature Preserve is a beach park and

Witches Brew is an area of water adjacent to Hanauma Bay.  See

Declaration of Ralph Goto, Par. 4.  In addition, at the time of this incident,

signs were posted that warned of strong currents.  Id. at Par. 5.

Furthermore, at the time of this incident, the design of these signs along

with their placement was approved by the chairperson of the board of land

and natural resources.  Id. at Par. 6.  Finally, these signs were not

vandalized, removed, or illegible.  Id. at Par. 7.

Plaintiffs' water safety expert, Thomas Ebro, does not have any

information that contracts Plaintiffs' oceanography expert, Roger Lucas,

Ph.D.  Dr. Lukas stated that *currents* on that day would bring the two

individuals into the stronger wave action.  Mr. Ebro testified about this

opinion as follows:

> Q.    And on Page four of Dr. Lukas's report, he states that
> "During the time of the incident, currents were generally moving
> toward the south wall of the bay, eventually bringing the victims
> into the strong and chaotic wave action in the area of Witches
> Brew."
>     Do you see that?

Exhibit "G", Pg. 49, Lines 20-25.

*      *      *      *      *

> Q.    And do you have any information that contradicts this
> opinion by Dr. Lukas?

> A.    No.

Exhibit "G", Pg. 50, Lines 8-10.

Assuming that this Court allows Plaintiff to proceed with their

prosecution of Decedent Powell's claims despite the lack of information as

to what happened to him while he was snorkeling to cause his death,

Plaintiffs' own experts admit that the *strong current* would have led them to

strong and chaotic wave action in Witches Brew.

Again, assuming that the current led the decedents to Witches Brew, Mr. Ebro speculates that Decedent Powell inadvertently inhaled some water because the waves were rough and choppy in the area of Witches Brew.  Exhibit "G", Pg. 48, Lines 10-25.

Thus, assuming that the currents pushed the decedents to Witches Brew and assuming that Decedent Powell accidentally inhaled some water because of the rough and chaotic waves in Witches Brew, and assuming it was this accidental inhalation of water that caused Decedent Powell to drown, then the City must be afforded the protections under Act 190.  This Court must find that the "Strong Current" warning signs approved by the chair of the board of land and natural resources were legally adequate to warn of the dangers in the Witches Brew area.  The City followed the procedure outlined in Act 190 and the design and placement of the "Strong Current" warning signs at Hanauma Bay were approved by the chair of the board of land and natural resources.  Thus, the City's signs must be determined to be legally adequate.

Furthermore, Act 190 (f) states that the City shall not have a duty to warn of dangerous natural conditions in the ocean other than as provided in this section.  Therefore, the City had no legal duty to warn of any other dangerous ocean condition presuming that a dangerous ocean condition

16

caused the decedents to drown.  Summary judgment in favor for the City is appropriate for any claims pertaining inadequate warnings.

    C.    The City Lifeguards Are Not Liable for the Accidental Deaths of Erik Powell and James Laughlin.

Despite the Plaintiffs' claims of foul play, the City lifeguards are not liable for the accidental deaths of the decedents.  First, in Hawaii, plaintiffs must prove county lifeguards acted with gross negligence or wanton conduct.  Here, the Plaintiffs have not even alleged such conduct against the lifeguards.  Second, even if their Complaint could be construed in some manner to plead this level of culpability, there is no evidence that the City lifeguards acted grossly negligent.

    1.    Plaintiffs have not plead gross negligence.

With respect to the City's lifeguard rescue services, Plaintiffs specifically allege as follows:

> 15.   Defendant City acted in a careless and negligent manner in that its employees and agents negligently performed water safety and lifeguard duties and failed to keep a proper lookout for swimmers in distress, including Decedent Powell and Laughlin.

See Exhibit "A" at Par. 15.

But, in Hawaii, county lifeguards are immune from simple negligence. Rather, Plaintiffs must plead and prove that county lifeguards were grossly

negligent or acted wantonly.  Act 170 of the 2002 Regular Session states in

relevant part:

> (b)  Notwithstanding any other law to the contrary, a county lifeguard, the employing county, and the State shall not be liable for any civil damages resulting from any act or omission of the lifeguard while providing rescue, resuscitative, or other lifeguard services on the beach or in the ocean in the scope of their employment as a county lifeguard.  This exception from liability, however, shall not apply when the claim for civil damages results from a county lifeguard's gross negligence or wanton act or omission.

2002 Haw. Sess. L. Act 170, § Section 1(b)

Hawaii courts have defined gross negligence as follows:

> Indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amounts of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct.

*Iddings v. Mee-Lee*, 82 Hawai'i 1, 23, 919 P.2d 263, 285 (1996)

The Court went on to define wanton conduct as follows:

> Wilful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another.

18

Id., 82 Hawai'i at 24, 919 P.2d at 286.

As demonstrated above, Plaintiffs failed to plead gross negligence with respect to the lifeguards' water rescue services.  Instead, Plaintiffs only plead simple negligence as evidenced by Paragraph 15 of their Complaint attached as Exhibit "A".  There is nothing in Paragraph 15 that pleads or could be construed as pleading actions and/or omissions of gross negligence or wanton conduct.  For this reason alone, Plaintiffs' claims that county lifeguards acted carelessly and/or negligently must be dismissed.

 2. There is no evidence that the City's lifeguards were grossly negligent for not observing the decedents in Witches Brew.

Plaintiffs' water safety expert, Thomas Ebro, opines that City lifeguards were grossly inattentive because they did not see the decedents swim toward Witches Brew.  Exhibit "G", Pg. 37, line 18 – Pg. 38, Line 23.  However, Mr. Ebro has no evidence that the City lifeguards were grossly negligent other than the fact that they did not see the decedents swim toward Witches Brew.  He testified as follows:

 Q. Mr. Ebro, other than the fact that Mr. Moses did not see Mr. Powell and Mr. Laughlin in the Witches Brew area, other than that fact, do you have any other information that indicates that Mr. Moses was not properly scanning?

 A. No, I don't sir.  I don't need it.  For me, his duty is clear. He needs to see these things.  He didn't see them.  His duty is to not, not just see them but to take proper action in a

preventative sense.  He failed to do that.  This all goes to found or ground the, the confident conclusion that he was inattentive.

Exhibit "G", Pg. 40, Lines 5-15.

Despite his convictions, this circular reasoning does not amount to evidence of gross negligence.  Mr. Ebro basically opines that the City lifeguards were grossly negligent for not seeing the decedents because they did not see the decedents.  He has no evidence that the lifeguards failed to observe the decedents in the Witches Brew area because of their indifference and/or utter forgetfulness of their duties.  Nor, does Mr. Ebro have any information that they acted in a heedless and palpable violation of their duties.

For Mr. Ebro to render an expert opinion, he must base his conclusion upon sufficient facts.  Rule 702 of the FRE states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) *the testimony is based upon sufficient facts or data*, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702, Emphasis added.

Likewise, the Ninth Circuit stated, "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law . . . it cannot

20

support a jury's verdict." <u>Silberkraus vs. The Seeley Company,</u> 336 F.3d

864, 871 (9th Cir. 2003); Citations omitted.

Moreover, as previously stated, in opposing a motion for summary

judgment, it is settled that the non-movant may not rest upon mere

allegations, but must adduce specific, provable facts demonstrating that

there is a triable issue. *See* <u>Holland v. O'Bryant</u>, 964 F.Supp. 4, 6 (D.D.C.

1997).

Consequently, Mr. Ebro's unsupported position cannot be used in this

case to support Plaintiffs' claims of negligence for not observing the

decedents in Witches Brew. He must have facts to support his

conclusions, but he does not. As such, Plaintiffs cannot demonstrate gross

negligence.

D.     No City Employee or Agent Acted Grossly Negligent by
       <u>Directing the Decedents to Swim at Witches Brew.</u>

In addition to their other claims, Plaintiffs also allege that a City

employee or agent directed the decedents to swim at the southern edge of

the bay where it was very dangerous on the day of the incident. See

Exhibit "A", Par. 20.

First, the individuals who staff the Hanauma Bay Nature Preserves

visitor center are volunteers with the University of Hawaii. They are not

21

City employees or agents of the City. See Declaration of Alan Hong.

Consequently, the City is not liable for her conduct.

Second, the person that Plaintiffs claim was a City employee did not

tell the decedents to swim at Witches Brew or the southern edge of the

bay. Rather, Plaintiff Mary Powell testified that this individual only

answered specific questions as to how to swim past the reef and that the

decedents were already informed by an unknown person where to swim.

Plaintiff Mary Powell testified at her deposition as follows:

Q.    When Jim – well, strike that. How long after finishing
lunch did Jim and Eric go back into the water?

A.    Five minutes later.

Q.    And during lunch, did you hear them discussing where in
the bay they wanted to go snorkeling next?

A.    Yes.

Q.    Okay. And where did they want to go snorkeling as you
understood it?

A.    They wanted to go out past this intial coral reef.

Q.    Did they say why?

A.    Because they heard it was cool.

Q.    When you say cool, did you have an understanding of
what they meant?

A.    They had heard there were turtles and that there were
neat things to see out there.

22

Q.    Do you know who conveyed that information to them?

A.    No, I don't.

Exhibit "F", Pg. 40, Lines 3-23

She further testified as follows:

Q.    Do you remember what the three of you were talking about while you ate lunch?

A.    Well, we had, we had asked the information desk how to get out there, and we were talking about where the pole line was and where the buoys were.  We were – Jim and I were showing Eric, pointing.  I don't remember anything else conversation-wise over lunch.

Q.    Did the person at the information desk tell you where to swim?

A.    What do you mean?  I'm sorry.

Q.    Well, you mentioned that somebody at the information desk was I guess explaining to the three of you how to get beyond the reef; is that correct?

A.    No, actually it was just Jim and I.  We were on our way up to get sandwiches, and we stopped there.  And we had asked "How do you get out past this coral reef," and she had pointed to where the buoys were and said that there is a pull line.  And that was it.  We walked up to get the sandwiches because they are at the top there, and we actually looked for the buoys halfway up.

Exhibit "F", Pg. 56, Line 22 – Pg. 57, Line 19.

Plaintiff further testified as follows:

Q.    And did she say anything else?

A.    No.

Exhibit "F", Pg. 59, Lines 3-4.

Finally, she testified that the decedents did not discuss swimming at Witches Brew before they went into the water.  She testified:

> Q.    The area that you now know to be Witches Brew, did Eric or Jim ever discuss swimming in that location before they went back in the water?
>
> A.    No.

Exhibit "F", Pg. 106, Lines 7-11.

As demonstrated above, this person who spoke to Plaintiff Mary Powell and her brother did not direct the decedents to swim at Witches Brew.  In fact, this person did not direct them to swim anywhere.  Rather, the decedents heard from some unknown person that it would be "cool" to swim beyond the coral reef.  The alleged City employee simply told them where to swim past the reef, but this individual did not tell them to swim at any particular location, including Witches Brew.

Accordingly, the City did not act grossly negligent even if this person was a City employee.  For these reasons, Count II must be dismissed.

E.    Plaintiffs Are Barred from an Award of Punitive Damages.

In Paragraph 21 of Plaintiffs' Complaint, they assert a claim for punitive damages against the City. However, Hawaii law does not allow this type of recovery.

In Lauer vs. YMCA of Honolulu, 57 Haw. 390, 557 P.2d 1334 (1976), the Hawaii Supreme Court held that the City and County of Honolulu could not be held liable for punitive damages. The Court was persuaded by the City's policy argument, that the deterrence and retributive consequences of punitive damages are ineffective against a municipal corporation. The Court stated, "The innocent taxpayers, the intended beneficiary from the public example which the punishment makes of the wrongdoer, should not be made to suffer." Id. at 402, 557 P.2d at 1342. Thus, the Hawaii Supreme Court has eliminated claims for punitive damages against governmental agencies, including the City and County of Honolulu.

Consequently, as there is no authority in Hawaii to contradict the voice of the Hawaii Supreme Court on this matter, Plaintiffs' claims for punitive damages against the City must be dismissed with prejudice.

VI.    CONCLUSION

Based upon the foregoing, Defendant City and County of Honolulu respectfully requests that this Honorable Court grant summary judgment in

its favor for the following: (1) All claims pertaining to the death of Erik

Powell; (2) Plaintiffs' claims as alleged in Paragraphs 15 and 16 of Count I

of the Complaint; and (3) Plaintiffs' claims as alleged in Count II of the

Complaint.

DATED:  Honolulu, Hawaii, December 29, 2006.

CARRIE K.S. OKINAGA
Corporation Counsel


By: _____
DEREK T. MAYESHIRO
Corporation Counsel
Attorney for Defendant
CITY AND COUNTY OF HONOLULU