POWELL, etc., et al., vs. CITY AND COUNTY OF HONOLULU

MARY K. POWELL
April 28, 2005

SHEET 1  PAGE 1

```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF HAWAII

THE ESTATE OF ERIC A.        ) CIVIL NO. CV04 00428 DAE-LEK
POWELL, THROUGH PERSONAL     )
REPRESENTATIVE MARY K.       )
POWELL; THE ESTATE OF        )
JAMES D. LAUGHLIN, THROUGH   )
PERSONAL REPRESENTATIVE      )
RAGINAE C. LAUGHLIN; MARY    )
K. POWELL, INDIVIDUALLY;     )
RAGINAE C. LAUGHLIN,         )
INDIVIDUALLY; CHLOE          )
LAUGHLIN, A MINOR, THROUGH   )
HER NEXT FRIEND, RAGINAE     )
C. LAUGHLIN,                 )
                             )
              Plaintiffs,    )
                             )
        vs.                  )
                             )
CITY AND COUNTY OF           )
HONOLULU,                    )
                             )
              Defendant.     )
_____)

              DEPOSITION OF MARY K. POWELL

  Taken on behalf of Defendant at the Offices of
  Corporation Counsel, City and County of Honolulu,
  Honolulu Hale (City Hall), 530 South King Street,
  Room 110, Honolulu, Hawaii, commencing at 9:30
  a.m., on Thursday, April 28, 2005, pursuant to
  Federal Rules of Civil Procedure.
  BEFORE:   PHYLLIS K. KUSHINER, CSR NO. 147
            Notary Public, State of Hawaii
```

PAGE 2

```
HONOLULU  REPORTING  SERVICES
       1000 Bishop Street, Suite 401
          Honolulu, Hawaii 96813

          PHONE (808) 524-6288




APPEARANCES:

For Plaintiffs:    IAN L. MATTOCH, ESQ. and
                   EMILY KAWASHIMA WATERS, ESQ.
                   Law Offices of Ian L. Mattoch
                   Suite 1835, Mauka Tower
                   Pacific Guardian Center
                   737 Bishop Street
                   Honolulu, Hawaii  96813



For Defendant:     DEREK T. MAYESHIRO, ESQ.
                   Deputy Corporation Counsel
                   City and County of Honolulu
                   Honolulu Hale, Suite 110
                   530 South King Street
                   Honolulu, Hawaii  96813


Also Present:      John Laughlin
```

PAGE 3

```
                         I N D E X
EXAMINATION BY:                                 PAGE
Mr. Mayeshiro                                     4









EXHIBITS MARKED FOR IDENTIFICATION:
Defendant's 1                                    28
Defendant's 2                                    81
```

PAGE 4

```
          (The Reporter's Disclosure Statement was
 made available to all counsel prior to the
 commencement of the following proceedings.)
          MARY K. POWELL,
 called as a witness on behalf of the Defendant,
 having been first duly sworn, was examined and
 testified as follows:
          EXAMINATION
 BY MR. MAYESHIRO:
 Q.    Would you please state your name for the
 record?
 A.    My name is Mary Kathryn Powell,
 K-a-t-h-r-y-n, Powell.
 Q.    Do you go by Mary or by Kathryn?
 A.    I go by Katie.
 Q.    Katie?
 A.    Yeah.
 Q.    Have you ever been to a deposition before?
 A.    I have not.
 Q.    Let me just go through some ground rules.
 Although this is an informal setting, everything
 you say today carries the same weight as if you
 were testifying in court.  Do you understand that?
 A.    Yes.
 Q.    And if for some reason you are unable to
```

POWELL, etc., et al., vs. CITY AND COUNTY OF HONOLULU

MARY K. POWELL
April 28, 2005

SHEET 10  PAGE 37

**PAGE 37**

1  Q.  And during that half an hour period where
2  the three of you were snorkeling, did you cover
3  this entire area that you had circled, if you
4  recall?
5  A.  Probably. You float around a lot. You are
6  not always as conscious about how much area you
7  are covering.
8  Q.  And how many other people, if you know,
9  approximately were swimming in the area that you
10 circled and identified as number two?
11 A.  Fifteen.
12 Q.  On July 19, '02, can you tell me what the
13 weather was like when you arrived at the park?
14 A.  It was sunny. It was windy, a little
15 windy. In the morning it wasn't quite so windy.
16 It was a beautiful day.
17 Q.  And can you describe what type of ocean
18 conditions there were or what the surface was like
19 when the three of you were in the water in area
20 two?
21 A.  It was choppy.
22 Q.  And just so we are clear, when you say
23 choppy, what is your understanding of that term?
24 A.  There were waves. You can see the
25 choppiness in the photograph.

**PAGE 38**

1  Q.  Okay. Did you have any difficulty
2  snorkeling in area two?
3  A.  No, I did not.
4  Q.  Did you notice either Eric or Jim having
5  any type of difficulty snorkeling in area two?
6  A.  No, I did not.
7  Q.  When the three of you were snorkeling in
8  this area, approximately how far away was Eric
9  from you?
10 A.  We stayed close.
11 Q.  How close?
12 A.  Usually we would always touch when we
13 snorkeled together.
14 Q.  And what about Jim?
15 A.  He was close to us, too, but he probably
16 didn't want to touch us.
17 Q.  Did you ever observe either Jim or Eric go
18 beneath the surface?
19 A.  No.
20 Q.  What types of things did you see?
21 A.  I saw an eel and some smaller fish.
22 Q.  Approximately how deep is the area that you
23 circled and identified as number two, if you know?
24 A.  I don't know. It's hard to tell when you
25 are over coral.

**PAGE 39**

1  Q.  Do you think that if you were to stand up
2  that your head would be above the water?
3  A.  In some areas probably.
4  Q.  During the half an hour that the three of
5  you were snorkeling in area two, did the ocean
6  conditions stay the same? Or --
7  A.  Yes.
8  Q.  And then the three of you exited the water
9  to eat lunch at 10:00 o'clock, right?
10 A.  Yes.
11 Q.  How long were you folks eating lunch?
12 A.  Well, we had to go back up to the top of
13 the mountain or cliff to buy lunch and then bring
14 it back down. Probably spent 15 minutes eating
15 lunch.
16 Q.  And did you all eat lunch together?
17 A.  Yes.
18 Q.  And what happened when you were finished?
19 A.  Then Eric and Jimmy decided to go back out.
20 They wanted to go back out together.
21 Q.  Was there any reason why you did not want
22 to go back into the water?
23 A.  No. I thought it was best to just be in
24 pairs, and it is kind of a rule of thumb in
25 snorkeling. And with three of us, it was, it is

**PAGE 40**

1  hard to be together so we were just going to go
2  out in pairs from that point forward.
3  Q.  When Jim -- well, strike that. How long
4  after finishing lunch did Jim and Eric go back
5  into the water?
6  A.  Five minutes later.
7  Q.  And during lunch, did you hear them
8  discussing where in the bay they wanted to go
9  snorkeling next?
10 A.  Yes.
11 Q.  Okay. And where did they want to go
12 snorkeling as you understood it?
13 A.  They wanted to go out past this initial
14 coral reef.
15 Q.  Did they say why?
16 A.  Because they had heard it was cool.
17 Q.  When you say cool, did you have an
18 understanding of what they meant?
19 A.  They had heard there were turtles and that
20 there were neat things to see out there.
21 Q.  Do you know who conveyed that information
22 to them?
23 A.  No, I don't.
24 Q.  Sorry. Just for the record, the area that
25 you circled and identified as number one, was that

POWELL, etc., et al., vs. CITY AND COUNTY OF HONOLULU

MARY K. POWELL
April 28, 2005

### SHEET 14  PAGE 53

```
 1   information?  Were you in the ambulance, or were
 2   you already at Queen's?
 3   A.     I was at Queen's.
 4   Q.     And this is after the doctor had spoke to
 5   you about Eric?
 6   A.     It was, I believe it was before the doctor
 7   had come out from being with Eric.
 8   Q.     Were you ever informed by any medical
 9   professional as to whether or not Eric or Jim ever
10   regained consciousness?
11   A.     No.
12   Q.     After you went in to see Eric, what did you
13   do next?
14   A.     I called my mom, and then I called Eric's
15   mom.  And then I talked to the social worker, and
16   I met with another woman because Eric was an organ
17   donor.  So I had to pretty much give my permission
18   for -- they have a whole checklist of things.
19   Q.     And you gave your permission?
20   A.     I gave my permission.
21   Q.     Did you know that that was Eric's wish, to
22   be an organ donor?
23   A.     Yes.
24   Q.     Was that something you had discussed with
25   him?
```

### PAGE 54

```
 1   A.     Yes.  We had renewed our licenses together,
 2   and you can check whether or not you want to be an
 3   organ donor.  And we had discussed it.
 4   Q.     Off the record for a second.
 5                 (Discussion was held
 6                  off the record.)
 7        MR. MAYESHIRO:  Back on the record.
 8   Q.     Do you know where the organs went from your
 9   husband?
10   A.     Well, he, he had -- he was deceased so they
11   couldn't take major organs at that point, but we
12   had donated his eyes and his, his veins and bone
13   marrow.  We have had one recipient write us.  She
14   was a woman in California, a grandmother who had
15   gotten his --
16   Q.     Corneas?
17   A.     Corneas.  And she had written us a great
18   letter that she was now able to see her
19   grandchildren clearly.
20   Q.     About how long after this incident did you
21   receive that letter?
22   A.     Probably a year later.
23   Q.     Did you ever hear from any of the other
24   recipients?
25   A.     No.
```

### PAGE 55

```
 1   Q.     I am going to have to ask you additional
 2   questions of stuff that we have already gone over
 3   so I can get a more detailed time line and a
 4   better description of locations and personnel that
 5   we have been speaking of in general categories.
 6   A.     Okay.
 7   Q.     During the hour or so that Eric and Jim
 8   were swimming or snorkeling on their own, were you
 9   able to notice whether or not there was a change
10   in any of the ocean conditions?
11   A.     No.
12   Q.     Just for clarity, are you saying that you
13   did not observe any change or that there was no
14   change?
15   A.     I did not observe any change.
16   Q.     Did you ever -- I'm sorry.  Strike that.
17          The man with the bullhorn, can you describe
18   what he looked like?
19   A.     I think he had one of those safari hats on.
20   It was like a khaki hat, I think.  I think he had
21   a beard.  He was older, in his fifties maybe.
22   Q.     Other than the hat, did you notice any
23   other items of clothing he was wearing?
24   A.     Not really.
25   Q.     Do you know what ethnic background he was?
```

### PAGE 56

```
 1   Caucasian, Asian?
 2   A.     He was Caucasian.
 3   Q.     And did you ever talk to the man who was
 4   riding the jet ski?
 5   A.     No.
 6   Q.     Do you recall what that person looked like?
 7   A.     No.
 8   Q.     Now my understanding based on what you have
 9   said so far is that about an hour had gone by
10   where Eric and Jim were swimming, and then in a
11   general sense, you noticed something was going on,
12   correct?
13   A.     Well, I started to look at my watch and
14   feel they were out too long.
15   Q.     Did they indicate to you how long they
16   intended to go snorkeling beyond the reef?
17   A.     No.  No.
18   Q.     While the three of you were eating lunch,
19   was there any discussion as to what time you would
20   be leaving the park?
21   A.     No.
22   Q.     Do you remember what the three of you were
23   talking about while you ate lunch?
24   A.     Well, we had, we had asked the information
25   desk how to get out there, and we were talking
```

POWELL, etc., et al., vs. CITY AND COUNTY OF HONOLULU

MARY K. POWELL
April 28, 2005

SHEET 15   PAGE 57

**57**

```
 1   about where the pole line was and where the buoys
 2   were. We were -- Jim and I were showing Eric,
 3   pointing. I don't remember anything else
 4   conversation-wise over lunch.
 5   Q.   Did the person at the information desk tell
 6   you where to swim?
 7   A.   What do you mean? I'm sorry.
 8   Q.   Well, you mentioned that somebody at the
 9   information desk was I guess explaining to the
10   three of you how to get beyond the reef; is that
11   correct?
12   A.   No, actually it was just Jim and I. We
13   were on our way up to get sandwiches, and we
14   stopped there. And we had asked "How do you get
15   out past this coral reef," and she had pointed to
16   where the buoys were and said that that is a pull
17   line. And that was it. We walked up to get the
18   sandwiches because they are at the top there, and
19   we actually looked for the buoys halfway up.
20   Q.   Where was Eric when you and Jim were
21   talking to the information desk?
22   A.   Laying out on the towel.
23   Q.   And other than this person in the
24   information desk, did you talk to any other
25   personnel at Hanauma Bay --
```

PAGE 58

**58**

```
 1   A.   No.
 2   Q.   -- other than the people that we have
 3   mentioned so far?
 4   A.   No.
 5   Q.   The person at the information desk, can you
 6   tell me what that person looked like?
 7   A.   She had looked to be -- she was Caucasian.
 8   She looked to be 18 or 19. She, her hair was in a
 9   ponytail.
10   Q.   Do you remember what color her hair was?
11   A.   I think it was sandy brown.
12   Q.   And do you recall the length?
13   A.   It was in a ponytail so somewhat long, I
14   guess.
15   Q.   Height?
16   A.   Probably five five.
17   Q.   Build?
18   A.   Medium.
19   Q.   Do you know if the person had on any
20   particular clothing?
21   A.   Not that I recall.
22   Q.   Glasses?
23   A.   No.
24   Q.   Is there anything that you can think about
25   this woman that stands out in your mind other than
```

PAGE 59

**59**

```
 1   what you have mentioned?
 2   A.   She seemed young.
 3   Q.   And did she say anything else?
 4   A.   No.
 5   Q.   And did you say anything to her after she I
 6   guess explained the pull line in?
 7   A.   No.
 8   Q.   Have you ever heard the term Witches' Brew?
 9   A.   No.
10        MR. MATTOCH: I'm sorry. Counsel, did
11   you say "Have you ever heard the term"?
12        MR. MAYESHIRO: Yes.
13        MR. MATTOCH: Or are you saying "Had you
14   ever heard the term"?
15        MR. MAYESHIRO: Have.
16        THE WITNESS: Have? Well, I know what
17   it is now, yes.
18   Q.   (By Mr. Mayeshiro) What is your
19   understanding of what Witches' Brew refers to?
20   A.   An area in Hanauma Bay.
21   Q.   And is that area significant in your mind
22   for any reason?
23   A.   Prior to the events?
24   Q.   Yes.
25   A.   I had -- prior, no.
```

PAGE 60

**60**

```
 1   Q.   But now?
 2   A.   Today?
 3   Q.   Yes.
 4   A.   Well, the name in itself doesn't confer --
 5   I'm sorry. Can you start over on that question?
 6   Q.   Sure. What significance, if any -- does
 7   Witches' Brew, either the name or the location,
 8   have any significance in your mind?
 9        MR. MATTOCH: As she sits here today?
10        MR. MAYESHIRO: As she sits here today.
11        THE WITNESS: It is where my husband and
12   brother died.
13   Q.   (By Mr. Mayeshiro) And prior to July 19,
14   2002, you had not heard this term or location
15   before?
16   A.   No, I had not.
17   Q.   When did you first hear of this location?
18   A.   After they died.
19   Q.   Do you know approximately how long after?
20   A.   In the newspaper, I think, maybe. I can't
21   recall exactly when after I heard that term.
22   Q.   When you say newspaper, do you mean the
23   newspaper here in Hawaii?
24   A.   Yes.
25   Q.   How long after July 19th did you stay in
```

POWELL, etc., et al., vs. CITY AND COUNTY OF HONOLULU

MARY K. POWELL
April 28, 2005

SHEET 24   PAGE 93

**Page 93**

1  Q.   Turning your attention back to the date of
2  the incident, during that one hour or so when you
3  were beginning to be concerned about Jim and Eric,
4  did you talk to any lifeguards?
5  A.   Within that hour, no.
6  Q.   Right before you saw the pickup truck?
7  A.   Before I saw the pickup truck, no.
8  Q.   Do you know how far away the nearest
9  lifeguard was from where you were situated?
10 A.   I knew it was a ways down the beach.
11 Q.   Are you talking about the lifeguard or
12 lifeguard stand?
13 A.   The lifeguard stand.
14 Q.   And during this one hour or so, did you
15 walk along the beach to try to look for Eric and
16 Jim?
17 A.   No. I didn't want to leave our things plus
18 I thought I was just being paranoid.
19 Q.   Just so I'm clear, when Eric and Jim left
20 you to go back into the water snorkeling again, I
21 know that you were flipping through a magazine or
22 laying out. Did you keep track of them as they
23 walked along the shore?
24 A.   Uh-huh.
25 Q.   Okay. And did you see them actually enter

**Page 94**

1  the water?
2  A.   Yes.
3  Q.   And did you see them make their way out
4  past the reef?
5  A.   I saw them, yeah, along that buoy, that
6  buoy line.
7  Q.   Right.
8  A.   And then once they were out past that reef,
9  there were other people, and then I kind of lost
10 them.
11 Q.   Do you know approximately how far that was
12 from where you were situated to where you
13 eventually lost them beyond the reef or lost sight
14 of them, I should say?
15 A.   Are you speaking distance?
16 Q.   Yes.
17 A.   Gosh, I'm not a good read. Yeah, I can't
18 accurately.
19 Q.   No, that is fine. Once you lost track of
20 them when they went beyond the reef, did you ever
21 see them again in the water or think you may have
22 seen them?
23 A.   No. I thought I might have, but it was
24 hard to tell because it is out a ways. And there
25 are other people swimming, and you are, when you

**Page 95**

1  are snorkeling, you are flat on the water. So it
2  is hard. It was hard to tell.
3  Q.   Okay. What makes you think that you saw
4  them after they went beyond the reef?
5  A.   Because I saw two people that looked to be
6  guys swimming together.
7  Q.   Was their snorkel a different color, or was
8  it unusual in any fashion?
9  A.   No.
10 Q.   That moment when you think you may have
11 seen them, at what part of this one-hour period
12 was that?
13 A.   Early on.
14 Q.   Within the first 20 minutes or so?
15 A.   Yes.
16 Q.   And thereafter you don't believe you saw
17 them after that?
18 A.   No, I don't. I, I mean I wasn't sure, but
19 I wasn't, I wasn't worried at that point. I
20 wasn't actively looking.
21 Q.   Did you ever learn later on what might have
22 happened to Eric and Jim?
23 A.   I, I know that they drowned.
24 Q.   Right. I mean other than that, did you
25 receive any other type of information from anyone

**Page 96**

1  as to what might have caused them to drown?
2  A.   Well, they were pretty banged up. I know
3  from the coroner's report, Eric was knocked
4  unconscious, severe injuries to his head and his
5  neck. I haven't seen that information from my
6  brother, but I can assume that a similar
7  occurrence happened to him.
8       MR. MATTOCH:   We don't want you to
9  assume.
10      THE WITNESS:   I won't asssume.
11      MR. MATTOCH:   We are getting far afield.
12      THE WITNESS:   Okay.
13 Q.   (By Mr. Mayeshiro) When you were waiting
14 for Eric and Jim for that one-hour period and then
15 you testified that you saw the truck go by?
16 A.   Uh-huh.
17 Q.   And then a lifeguard exited the truck and
18 was running along the side of the cliff area?
19 A.   Uh-huh.
20 Q.   To the location where Witches' Brew is, and
21 then I think, I believe you testified you also
22 went in that area, correct?
23 A.   Yes.
24 Q.   You walked along. Did you walk or did you
25 run?

POWELL, etc., et al., vs. CITY AND COUNTY OF HONOLULU

MARY K. POWELL
April 28, 2005

SHEET 27  PAGE 105

105

1  choppy.
2       THE WITNESS: Did I believe it was
3  dangerous is your question?
4       MR. MAYESHIRO: Yes.
5       THE WITNESS: No, I did not.
6  Q.  (By Mr. Mayeshiro) When you observed Eric
7  and Jim making their way back into the water, I
8  know you testified that you observed them up until
9  the point where they kind of passed the reef right
10 from the buoy line?
11 A.  Uh-huh.
12 Q.  Did you notice them having any difficulties
13 as they proceeded in that area?
14 A.  No.
15 Q.  At any point during that day when you were
16 able to observe them, did you ever notice them
17 having difficulties either snorkeling or swimming?
18 A.  No.
19 Q.  Did you ever hear them complain of any type
20 of injuries or medical conditions that they had
21 during that day?
22 A.  No.
23 Q.  The day that you were -- I'm sorry. Strike
24 that. On July 19, 2002, did you observe any other
25 visitor at Hanauma Bay who was having difficulty

PAGE 106

106

1  in the water?
2  A.  No.
3  Q.  While you were at Hanauma Bay, did you see
4  the lifeguards go in to rescue or assist any other
5  tourist or swimmer on the beach?
6  A.  No.
7  Q.  The area that you now know to be Witches'
8  Brew, did Eric or Jim ever discuss swimming in
9  that location before they went back into the
10 water?
11 A.  No.
12      MR. MAYESHIRO: Thank you. I am done.
13      MR. MATTOCH: Okay. Thank you.
14      (The deposition concluded at 12:31 p.m.)
15                --o0o--
16
17
18
19
20
21
22
23
24
25

PAGE 107

107

1
2       I, MARY K. POWELL, do hereby
3  certify that I have read the foregoing pages
4  1 through 106, inclusive, and corrections,
5  if any, were noted by me and that same is now a
6  true and correct transcript of my testimony.
7       Dated _____
8
9            _____
10                MARY K. POWELL
11
12
13 Signed before me this _____
14 day of _____, 2005.
15
16
17       _____
18
19
20
21
22
23
24
25

PAGE 108

108

1  STATE OF HAWAII  )
                    ) SS.
2                   )
3       I, PHYLLIS K. KUSHINER, CSR, a Notary
4  Public in and for the State of Hawaii, do hereby
   certify:
5       That on Thursday, April 28, 2005 at 9:30
6  a.m. appeared before me MARY K. POWELL, the
   witness whose testimony is contained herein; that
7  prior to being examined, the witness was by me
   duly sworn or affirmed; that the proceedings were
8  taken in machine shorthand by me and were
   thereafter reduced to typewriting under my
9  supervision; that the foregoing represents to the
   best of my ability a correct transcript of the
10 proceedings had in the foregoing matter.
11      That, if applicable, the witness was
   notified through counsel by mail or by telephone
12 to appear and sign; that if transcription is not
   signed, either the reading and signing were waived
13 by the witness and all parties, or the witness has
   failed to appear, and the original is therefore
14 kept on file without signature pursuant to Court
   rules.
15      I further certify that I am not counsel
16 for any of the parties hereto nor in any way
   interested in the outcome of the cause named in
17 the caption.
18      DATED: May 11, 2005
19
20
21
22      _____
        PHYLLIS K. KUSHINER, CSR NO. 147
23      Notary Public, State of Hawaii
        My commission expires 4/24/07
24
25