THE ESTATE OF ERIC A. POWELL, etc., et al. vs. CITY AND COUNTY OF HONOLULU, et al.
THOMAS C. EBRO
December 15, 2006

---

**SHEET 1 PAGE 1**

```
                                                              1
 1         IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF HAWAII
 3
 4  THE ESTATE OF ERIC A.        ) CIVIL NO. CV04 00428 LEK
    POWELL, THROUGH PERSONAL     )
 5  REPRESENTATIVE MARY K.       )
    POWELL; THE ESTATE OF        )  DEPOSITION OF
 6  JAMES D. LAUGHLIN, THROUGH   )
    PERSONAL REPRESENTATIVE      )  THOMAS C. EBRO
 7  RAGINAE C. LAUGHLIN; MARY    )
    K. POWELL, INDIVIDUALLY;     )
 8  RAGINAE C. LAUGHLIN,         )
    INDIVIDUALLY; CHLOE          )
 9  LAUGHLIN, A MINOR, THROUGH   )
    HER NEXT FRIEND, RAGINAE     )
10  C. LAUGHLIN,                 )
                                 )
11            Plaintiffs,        )
                                 )
12       vs.                     )
                                 )
13  CITY AND COUNTY OF           )
    HONOLULU,                    )
14                               )
              Defendant,         )
15                               )
         and                     )
16                               )
    CITY AND COUNTY OF           )
17  HONOLULU,                    )
                                 )
18            Third-Party        )
              Plaintiff,         )
19                               )
         vs.                     )
20                               )
    UNIVERSITY OF HAWAII, a      )
21  body corporate; JOHN DOES    )
    1-10, JANE DOES 1-10, DOE    )
22  CORPORATIONS AND DOE         )
    ENTITIES,                    )
23                               )
              Third-Party        )
24            Defendants.        )
25
```

**PAGE 2**

```
                                                              2
 1          DEPOSITION OF THOMAS C. EBRO
 2  Taken via teleconferencing on behalf of Defendant
 3  at the Law Offices of Ian L. Mattoch, Suite 1835,
 4  Pacific Guardian Center, 737 Bishop Street,
 5  Honolulu, Hawaii, commencing at 8:04 a.m., on
 6  Friday, December 15, 2006, pursuant to Federal
 7  Rules of Civil Procedure.
 8  BEFORE:  PHYLLIS K. KUSHINER, CSR NO. 147
              Notary Public, State of Hawaii
 9
10  H O N O L U L U   R E P O R T I N G   S E R V I C E S
11            1000 Bishop Street, Suite 401
                Honolulu, Hawaii 96813
12
              PHONE (808) 524-6288
13
14
15  APPEARANCES:
16  For Plaintiffs:    EMILY KAWASHIMA WATERS, ESQ.
                       Law Offices of Ian L. Mattoch
17                     Suite 1835, Mauka Tower
                       Pacific Guardian Center
18                     737 Bishop Street
                       Honolulu, Hawaii  96813
19
20
21  For Defendant:     DEREK T. MAYESHIRO, ESQ.
                       Deputy Corporation Counsel
22                     City and County of Honolulu
                       Honolulu Hale, Suite 110
23                     530 South King Street
                       Honolulu, Hawaii  96813
24
25
```

**PAGE 3**

```
                                                              3
 1                    I N D E X
 2  EXAMINATION BY:                                PAGE
 3  Mr. Mayeshiro                                    4
 4  Ms. Waters                                      96
 5
 6
 7
 8
 9  FURTHER EXAMINATION BY:
10  Mr. Mayeshiro                                  101
11  Ms. Waters                                     112
12
13
14
15
16
17
18
19
20  EXHIBITS MARKED FOR IDENTIFICATION:
21  Defendant's 1 through 11                        13
22  Defendant's 12                                 113
23
24
25
```

**PAGE 4**

```
                                                              4
 1       (The Reporter's Disclosure Statement was
 2  made available to all counsel prior to the
 3  commencement of the following proceedings.)
 4             THOMAS C. EBRO,
 5  called as a witness on behalf of the Defendant,
 6  having been first duly sworn was examined and
 7  testified by video-conference and telephone as
 8  follows:
 9             EXAMINATION
10  BY MR. MAYESHIRO:
11  Q.   Can you state your name and business --
12  A.   I don't --
13  Q.   -- address for the record?
14  A.   Counsel, I don't think -- counsel, I don't think I
15  see you. I will tell you what I see on my screen, and you
16  have the control on your end. I see, I think I see Ms.
17  Waters on the left lower screen and a gentleman with a
18  blue shirt lower right with the screen showing mostly top,
19  mostly ceiling. Is there a way you can drop it down so I
20  can see who it is I'm speaking with?
21  Q.   Is that --
22  A.   In fact, it's a frozen screen I think right now.
23       MS. WATERS: Is that better?
24       THE WITNESS: Maybe I should get somebody. No, it
25  is a still frozen scene.
```

Case 1:04-cv-00428-LEK    Document 119-8    Filed 12/29/2006    Page 2 of 8

THE ESTATE OF ERIC A. POWELL, etc., et al. vs. CITY AND COUNTY OF HONOLULU, et al.
THOMAS C. EBRO
December 15, 2006

SHEET 6  PAGE 21

**21**

1  feature in more than just aquatic settings.
2  Q.  Okay. And have you ever utilized a system like
3  that personally?
4  A.  I have utilized public address systems, yes.
5  Q.  Okay. So the type of system that you are
6  describing, it would specifically consist of what type of
7  components? There would be some type of a speaker system
8  set up at Witches Brew? Is that what you are saying?
9  A.  Well --
10 Q.  And then some type of control switch and microphone
11 at a lifeguard station?
12 A.  That's correct. And we have two lifeguard
13 stations. In this case, both would have had the
14 capability of switching or pushing the button to activate
15 this zone and then being able to activate that loudspeaker
16 with a microphone.
17 Q.  Okay. A system like that that you described would
18 presuppose that the lifeguards are able to see the
19 swimmers or snorkelers swimming towards Witches Brew; is
20 that correct?
21 A.  That's correct. They have the duty to do so. That
22 is their inherent responsibility is to have a constant
23 monitoring and ability to view all the swimmers in the
24 area.
25 Q.  Okay. Well, I'm just trying to understand because

PAGE 22

**22**

1  I have never seen a system like that. So I want to be
2  sure the system or the speaker warning that would come out
3  over the loudspeaker would not be somehow automated based
4  on some type of motion sensor or some other type of
5  device.
6       But the manner in which you describe it, it would
7  be activated because a lifeguard sees a swimmer or a
8  snorkeler approaching an area that has been restricted or
9  warned about, and then the lifeguard speaks into the
10 microphone. And whatever the lifeguard says is
11 transmitted to the speaker system, and it is broadcasted
12 that way, correct?
13 A.  That's correct.
14 Q.  And another component you mentioned as far as
15 aquatic risk management safeguards was warning signs,
16 correct?
17 A.  Yes.
18 Q.  And what specifically would you have the warning
19 signs say?
20 A.  Well, there's two areas. Warning signs need to,
21 needed to be, needed to emphasize water safety rules, and
22 in this instance, it should have emphasized the need for a
23 buddy system, that all snorkeling needs to take place with
24 a buddy. A buddy is a built-in alarm system. Something
25 happens to one, the other is in position to call

PAGE 23

**23**

1  attention, and a diagram normally helps by depicting a
2  person, you know, erect and with a hand up, making himself
3  more visible.
4       In addition on those water safety rules should have
5  been diagrams that depict the area of Witches -- of
6  Hanauma Bay with those danger areas from which you -- at
7  which people were prohibited from venturing to needed to
8  be marked conspicuously and marked as keep away areas,
9  danger areas.
10 Q.  Okay. First of all, in response to those two items
11 that you just mentioned, the buddy system, the water
12 safety rules that you mentioned, that really wouldn't be
13 applicable here because Mr. Powell and Mr. Laughlin were
14 actually swimming together using that buddy system you
15 just described as far as you know, correct?
16 A.  I don't understand the question when you asked why
17 that would not have been applicable. They eventually
18 ended up swimming or snorkeling as a buddy pair. They at
19 one point parked their car. They entered the theater
20 area, paid their ticket. They entered the theater, had an
21 opportunity there to have that information conveyed. It
22 should have been included in the video, should have been
23 signs there so that that reinforcement of those danger
24 areas and what is down below would have been a multiple or
25 a repeated process.

PAGE 24

**24**

1       I'm now referring to warning signs, and I'm talking
2  about depicting the danger area so that a person looking
3  from top down would have a kind of comparative diagram to
4  a real scene. And it would be further reinforced once the
5  person got on the bottom and prior to undertaking
6  snorkeling. It would be embedded in the snorkeler's mind
7  already from those prohibitions and diagrams having been
8  presented.
9  Q.  Mr. Ebro, I know you reviewed a number of documents
10 in preparation for or to arrive at your conclusions. Was
11 one of those documents the deposition transcript of
12 Mrs. Powell?
13 A.  Yes, it was.
14 Q.  Okay. And isn't it true that Mrs. Powell testified
15 in her deposition that her husband, Mr. Powell, and her
16 brother, Mr. Laughlin, were snorkeling together?
17 A.  That's correct.
18 Q.  And as far as you know, there is nothing to
19 indicate that they were not swimming together until the
20 point where a lifeguard sees one of the swimmers coming
21 around Witches Brew point, correct?
22 A.  Their snorkeling was not witnessed until that time,
23 that's correct.
24 Q.  So based upon what we do know, it appears that
25 Mr. Powell and Mr. Laughlin were snorkeling together, and

THE ESTATE OF ERIC A. POWELL, etc., et al. vs. CITY AND COUNTY OF HONOLULU, et al.

THOMAS C. EBRO
December 15, 2006

SHEET 10  PAGE 37

**37**

1  different organizations create as a detection response or
2  a detection intervention standard or requirement. If a
3  lifeguard does that, complies, the person lives versus if
4  that time frame is not met, detection does not, is not in
5  that confined period and a response is later than that
6  confined period, then the person either suffers brain
7  damage or he is not going to survive.
8      And lifeguards are really lifesavers whose
9  intention is to fulfill their job given their environment
10  within a given time in a pool, that is, 10/20 second rule
11  because pools are supposed to be so equipped and there are
12  features there that are lacking in an open environment.
13  So therefore the time frame can be shortened as stated,
14  the beach lifeguards and Bruster, as described on these
15  pages, the time period for which you must equip yourself
16  both manpower-wise and equipment-wise in terms of
17  transport of the victim.
18  Q.    Okay. Mr. Ebro, turning to the lifeguards' gross
19  inattentiveness that you reference in the first paragraph
20  on page 18, which lifeguards are you speaking of
21  specifically?
22  A.    I was speaking about the lifeguards that were
23  required to be attentive in Tower 3-A, the center tower,
24  namely, WSO Moses and WSO Neves.
25  Q.    Okay. What specifically do you base your

PAGE 38

**38**

1  conclusion that they were grossly inattentive?
2  A.    Well, their testimony reveals that the, that their
3  awareness of the snorkelers in the vicinity of the
4  Witches' Brew danger was the first -- in fact, it was just
5  one person, and it occurred when they were adjacent to it
6  or in close proximity evidencing that their, their drift
7  and their snorkeling, their approach went unnoticed.
8      And that is what the lifeguards were, you know,
9  improper about. They were required to as they testified
10  in deposition to halt people on that day from passing
11  through and continuing past the slot into the area beyond
12  the reef, and in this case, they just didn't materialize
13  out there. They obviously from what Mrs. Powell said
14  entered that area, and from the time they seen and
15  evidenced that, they were able to make progress to that
16  area.
17      But the reason it is so gross and so improper is
18  that by the time they were seen, there was an opportunity
19  not only to manifest the emergency, but they had by now
20  already separated with one being smashed on the rocks and
21  with the other already drifted out of sight. So the
22  failure to see and halt their progress toward Witches Brew
23  is what made their conduct so unreasonable egregious.
24  Q.    Let me ask you this, Mr. Ebro. Did you review any
25  document or do you have any information that indicates

PAGE 39

**39**

1  lifeguard Clarence Moses was talking on his cell phone at
2  the time of this incident?
3  A.    No, I have not received -- I have not read any such
4  document.
5  Q.    Do you have any information or review any document
6  that indicated Clarence Moses was sleeping at the time
7  this incident occurred?
8  A.    No. To the first answer, I was taken back by, by
9  some material I read indicating that cell phones were
10  permitted or allowed into the towers. That is not a good
11  idea for what to us is an obvious awareness and
12  understanding, but no, I did not have any evidence of
13  their either talking -- him talking on the phone or that
14  he was sleeping.
15  Q.    Okay. And, in fact, there is nothing to indicate
16  whether or not Mr. Moses had his cell phone in the tower,
17  there is nothing to indicate that that distracted him in
18  any way; isn't that true?
19  A.    Well, his actions were not notified. His
20  deposition is the only access I have to what went on, and
21  what was glaringly evident was what didn't go on, namely,
22  his -- that long omission of his attentiveness, namely,
23  his failure to detect and bring about a halting process
24  towards the two snorkelers who were not only going into an
25  area that had been disallowed for people to be in that day

PAGE 40

**40**

1  but were progressing for an ample lengthy time and managed
2  to have their emergency and for that matter their
3  separation, and it all went undetected till it was too
4  late.
5  Q.    Mr. Ebro, other than the fact that Mr. Moses did
6  not see Mr. Powell and Mr. Laughlin in the Witches Brew
7  area, other than that fact, do you have any other
8  information that indicates Mr. Moses was not properly
9  scanning?
10  A.    No, I don't, sir. I don't need it. For me, his
11  duty is clear. He needs to see these things. He didn't
12  see them. His duty is to not, not just see them but to
13  take proper action in a preventive sense. He failed to do
14  that. This all goes to found or ground the, the confident
15  conclusion that he was inattentive.
16  Q.    Okay.
17  A.    His purpose and his mission was that this is what
18  he was doing, but the evidence is that people were able
19  to, you know, to arrive and to end up in a place, and
20  their approach to that place, what was dangerous, went
21  unseen. That evidences his inattention.
22  Q.    Okay. Mr. Ebro, if you know, how long would it
23  take a snorkeler to swim from the slot to the Witches Brew
24  area where Mr. Powell's body was found, if you know?
25  A.    Well, in my report I mentioned that I estimated or

Case 1:04-cv-00428-LEK   Document 119-8   Filed 12/29/2006   Page 4 of 8

THE ESTATE OF ERIC A. POWELL, etc., et al. vs. CITY AND COUNTY OF HONOLULU, et al.
THOMAS C. EBRO
December 15, 2006

SHEET 12   PAGE 45

**Page 45**

1 where a missing swimmer announcements and search occurred
2 and where I ultimately suited up and conducted the
3 underwater search and made a recovery beneath the dock.
4     And from investigation it turned out that the young
5 man had avoided detection by a lifeguard by sneaking and
6 diving underneath and seeking to breathe air that he
7 thought was under the dock and injured himself, became
8 disoriented, and in the process drowned.
9 Q.   Were you the only lifeguard on duty on that
10 occasion?
11 A.   I wasn't on duty. I was not on a stand. I was
12 directing the operation. There were lifeguards on duty
13 that were responsible and assigned by me and supervised by
14 me, and so my on-duty status was in a capacity different
15 than a scanning lifeguard.
16 Q.   The other body recovery that you mentioned, were
17 you supervising the recovery, or were you one of the
18 lifeguards that was monitoring the area at the time?
19 A.   Neither. The second one was on the opposite end of
20 the lake. There was a commotion. Boats had collided, and
21 there was some commotion and we responded in a patrol boat
22 with others and made the dive to recover a victim that,
23 that along with others had been involved in that accident.
24 It was too late to save the victim that was on the bottom.
25 Q.   Mr. Ebro, we are going to take a short break.

**Page 46**

1 Let's go off the record.
2     (Recess was taken.)
3 Q.   (By Mr. Mayeshiro) Mr. Ebro, are you ready to
4 begin?
5 A.   Yes. Well, that was a quick ten minutes. Of
6 course, I'm ready.
7 Q.   Okay. We are trying to get you out of here as soon
8 as possible.
9 A.   Oh, no, you're fine. Take all the time you like.
10 Q.   You mentioned something earlier, Mr. Ebro, that
11 snorkelers don't always move, that sometimes they are just
12 floating on the surface of the water. Do you remember
13 mentioning that?
14 A.   Yes. Yes, I did.
15 Q.   And this would be true especially at Hanauma Bay
16 where the snorkelers who are in the bay with their snorkel
17 equipment are floating face down and looking at the
18 various underwater activity or scenes, correct?
19 A.   Yes. Both Director Goto and Chief Howe admitted to
20 the -- to Hanauma Bay warranting that additional concern
21 and emphasis on lifeguard coverage because of that unique
22 phenomenon of snorkelers that are made inconspicuous by
23 that passive head in the water, motionless type of
24 conduct. It takes more eyes to detect those individuals.
25     I'm not sure that that is the case that we are

**Page 47**

1 talking about here, however. While that is a predominant
2 thing that may pose challenges to lifeguarding, certainly
3 two, as in this case, two snorkelers being in an area that
4 they weren't supposed to be, being in an area of the slot
5 that just earlier they had had a lifeguard out there,
6 Neves, chasing people back, turning them back, but yet
7 being allowed to conspicuously pass through that area and
8 then advance towards the dangerous area of Witches Brew,
9 to have that event and that long duration go unnoticed
10 was, was egregious only because we are not talking about
11 passive snorkelers. We are talking about snorkelers who
12 are actively moving and therefore conspicuous versus
13 nonconspicuous.
14 Q.   Mr. Ebro, isn't it that we don't know exactly what
15 happened to Mr. Powell as to what caused him to get in
16 trouble? Is that fair to say?
17 A.   That's correct.
18 Q.   Okay. And --
19 A.   We don't know, but, you know, I am here appearing
20 as a person who has had experience, an extensive
21 experience, in this sport of scuba diving and aquatics in
22 general for most of my life. So I'm answering not that we
23 don't know, but from the standpoint of this experience
24 that I have had with this case of estimating, and I have
25 covered in my report the things that reliably lifeguards

**Page 48**

1 know and we in aquatics know make, you know, make for
2 peril or that snorkelers are susceptible to.
3     I spoke at length about the inhalation, the
4 inadvertent inhalation syndrome, and in choppy water that
5 is very, very likely. That certainly is one of those
6 given that -- you know, that is certainly very likely in
7 light of the fact that they were competent swimmers and
8 snorkelers, but there was no eyewitness. Both
9 eyewitnesses to each other succumbed.
10 Q.   Right. So basically what I'm hearing you testify
11 to, Mr. Ebro, is that we don't know what happened to
12 Mr. Powell, but based upon your experience, the likely
13 cause in your mind or the likely thing that happened to
14 Mr. Powell in your mind is that he inadvertently inhaled
15 some water; is that correct?
16 A.   Correct.
17 Q.   Okay. And you said that that was likely because of
18 the choppiness of the waves, correct?
19 A.   That's correct. In choppy water, that is much more
20 likely than in smooth water, and the area they were
21 traveling in towards Witches Brew would have presented
22 them with challenging choppy conditions. It was a rough
23 day that day and so that the inadvertent inhalation is a
24 very common occurrence even amongst practiced and skillful
25 snorkelers.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| THE ESTATE OF ERIC A. POWELL, THROUGH PERSONAL REPRESENTATIVE MARY K. POWELL; THE ESTATE OF JAMES D. LAUGHLIN, THROUGH PERSONAL REPRESENTATIVE RAGINAE C. LAUGHLIN; MARY K. POWELL, INDIVIDUALLY; REGINAE C. LAUGHLIN, INDIVIDUALLY; CHLOE LAUGHLIN, A MINOR, THROUGH HER NEXT FRIEND, REGINAE C. LAUGHLIN,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>Defendant.<br><br>and<br><br>CITY AND COUNTY OF HONOLULU,<br><br>Third-Party Plaintiff,<br><br>vs<br><br>UNIVERSITY OF HAWAII, a body corporate; JOHN DOES 1-10, JANE DOES 1-10, DOE | Civil No. CV04 00428 LEK<br><br>DECLARATION OF RALPH GOTO |

```
CORPORATIONS and DOE        )
ENTITIES,                   )
                            )
                            )
         Third-Party Defendants. )
                            )
_____)
```

### DECLARATION OF RALPH S. GOTO

I, RALPH S. GOTO, hereby declare as follows:

1. I am the Administrator of the Ocean Safety and Lifeguard Services Division, Honolulu Emergency Services Department, City & County of Honolulu, and have served in this capacity since 1981.

2. As the Division Administrator, I am responsible for the oversight of the City & County of Honolulu's ocean lifeguard service, which employs over 200 professional open water lifeguards and responds to aquatic emergencies that occur along the 198 miles of Oahu shoreline.

3. I have personal knowledge of and am competent to testify to the following:

4. Hanauma Bay Nature Preserve ("Hanauma Bay") is a beach park and Witches Brew is an area of water adjacent to Hanauma Bay beach park.

5. On July 19, 2002 ("Incident Date"), three warning signs that specified strong current were posted at Hanauma Bay pursuant to Act 190.

6. On Incident Date, the design of these warning signs along with their placement was approved by the chairperson of the board of land and natural resources pursuant to Act 190.

7. On the Incident Date, the Act 190 signs at Hanauma Bay were not vandalized, removed or illegible.

8. Attached as Exhibit E are true and correct color copies of the three Act 190 strong current warning signs as they existed on July 9, 2002.

9. I have reviewed the reports by the Ocean Safety and Lifeguard Services Division, Honolulu Emergency Services Department, City & County of Honolulu regarding the deaths of Erik Powell and James Laughlin.

10. From these documents, I am able to represent that the first swimmer that City lifeguards responded to was James Laughlin and the second swimmer that the lifeguards responded to was Erik Powell.

11. From these documents, I am able to represent that after the decedents swam pass the coral reef, no one witnessed what happened to the decedents until WSO Clarence Moses noticed Decedent Laughlin swimming near Witches Brew Point.

I, RALPH S. GOTO, declare under penalty of law that the foregoing is true and correct.

Dated: Honolulu, Hawaii, December 29, 2006.

_____
Ralph S. Goto