

## WATER SAFETY CONSULTANTS

**Thomas C. Ebro**

19207 Pristine Place • Lutz, FL 33558-9044 • 813.792.9000 • FAX 813.792.9090 • tomebro@tomebro.com • www.tomebro.com

January 12, 2007

Ian L. Mattoch
LAW OFFICES OF IAN MATTOCH
Pacific Guardian Center
737 Bishop Street, Suite 1835
Honolulu, Hawaii 96813

# SUPPLEMENTARY EXPERT REPORT

Re. <u>Powell & Laughlin v. City and County of Honolulu</u>

Dear Mr. Mattoch:

This supplementary rebuttal report focuses exclusively on the expert opinions presented by the opposing expert, Major Vic Maceo.

## Issue **One**
Expert Maceo takes issue with whether or not the Plaintiffs were directed by a visitor's center employee or agent to swim to the southern most edge of the bay.

### *Opinion on Issue One*
Fact is, the discovery documents reveal that Mrs. Powell and her brother were directed to "the slot" and thus were enticed to venture out beyond the reef to view marine turtles. Witches Brew is located in that outside area along the crater's southern edge. The Water Safety Officers were able to observe the zone in-between "the slot" and Witches Brew. They knew that Witches Brew was prohibited territory for tourists.

## Issue **Two**
Expert Maceo makes the point that Decedent Powell drowned in an area that was not in view of Tower 3-A and not considered a guarded area.

### *Opinion on Issue Two*

Fact is, the Water Safety Officers were obligated to: (1) observe Decedents Powell and Laughlin; (2) detect that both were leaving the guarded area and were approaching danger; and (3) execute proper precautionary enforcement action. Water Safety Officers should have halted Decedents Powell and Laughlin from proceeding toward Witches Brew instead of allowing them to disappear from view.

# EXHIBIT "4"

1

**Issue Three**
Expert Maceo elaborates on the sophisticated operation that the City and County of
Honolulu has, claiming that it met or exceeded the 2002 USLA minimum standard of
care regarding the number of lifeguards on duty at Hanauma Bay at the time of the
incident. He asserts, *"you do the best with what you have been given"* and, *"you simply
cannot pull a guard leaving another area unguarded."* He also contends that proper
equipment was used in the rescue efforts.

*Opinion on Issue Three*
Fact is, concerning proper lifeguarding surveillance, at the time this incident occurred
Hanauma Bay was being operated neither in accordance with the City and County of
Honolulu's own requirements nor with the United States Lifesaving Association's
prescribed industry standards. Accident prevention through vigilant patron surveillance is
claimed to be all lifeguards' foremost priority. It didn't happen. Water Safety Officers
failed to notice Decedents Powell and Laughlin leaving the guarded area and failed to
halt their progress toward Witches Brew. Regarding sufficiency of lifeguards assigned to
Hanauma Bay, it is indisputable that attendance was typically always very high and, at
the time of this incident, water conditions were deemed to be challenging (currents were
strong and surface was rough). According to customary industry practice, it is absolutely
logical and correct to move lifeguards from one location to another whenever conditions
warrant it. Though Hanauma Bay increasingly was experiencing an excessive number of
drownings, Chief Howe and Mr. Goto continued merely to evaluate the situation. Ralph
Goto admitted during his deposition that he <u>did</u> have the authority to move people
around, however, he inexplicably asserted, *"I don't do that."* It wasn't until <u>after</u>
Decedents Powell and Laughlin drowned at Hanauma Bay that additional lifeguards were
finally assigned there.

Clearly, on the day of this incident, one lifeguard on a rescue board should have remained
continually patrolling outside of the reef area. Moreover, use of the rescue board would
have been wholly appropriate during the emergency responses and rescue operations.
Had a wireless public address loudspeaker equipment been properly installed on land at
Witches Brew, the Decedents could have been forewarned to turn around and stay away
from the dangerous area.

**Issue Four**
Expert Maceo, in his report maintains that, *"Lifeguards, more than any other providers of
public safety, have an ongoing responsibility for accident prevention"* and that, *"the City
and County of Honolulu OSLSD practiced, and continue to practice, principles of
lifeguarding based on preventative actions."* Moreover, this Expert underscores, *"a basic
responsibility of lifeguards is to watch over water areas in order to locate persons in
distress. Effective water observation is a critical skill for lifeguards. They must observe,
evaluate, and respond to emergency situations efficiently and effectively. Visual scanning
is, and was in 2002, the most effective tool a lifeguard has. As a lifeguard sweeps an area
from side to side with their eyes, they are quickly checking on each swimmer or group.
Binoculars are a valuable tool for assessing possible distress over a distance."*

2

### _Opinion on Issue Four_

So, what happened? Why weren't Decedents Powell and Laughlin properly observed and halted before they reached Witches Brew? Why wasn't their emergency situation noticed promptly at the onset? By the time Water Safety Officer Moses saw Decedent Laughlin in serious trouble struggling unsuccessfully to climb the ledge, Decedent Powell had long already drifted down-current and out of sight.

Expert Maceo praised Water Safety Officer Moses for spotting Decedent Laughlin at over 1,000 yards away, claiming _"Moses was practicing acute surveillance skills on July 19, 2002."_ Hardly, given that the pair wasn't ever seen or halted as they conspicuously progressed toward Witches Brew and given that by the time Decedent Laughlin was spotted, Decedent Powell had already long floated out of sight. Clearly, in sharp contrast to Expert Maceo's elaborate description of a lifeguard's most important proactive priority and responsibility, effective surveillance of each swimmer or group was grossly violated in this instance.

Expert Maceo misses the point. Preventive lifeguarding means detecting all foreseeable problems in a timely manner and resolving them with prompt intervention before they can turn into emergencies. Expert Maceo's report deceivingly seems to suggest that lifeguards only, _"watch over water areas in order to locate persons in distress."_ Fact is, preventing accidents in the first place constitutes the most important underlying function for responsible lifeguards. This double drowning was preventable. It resulted because the lifeguards were inattentive and not providing vigilant preventive surveillance. They failed to observe and halt Decedents Powell and Laughlin from snorkeling to Witches Brew. They failed to detect and respond in a timely manner to an "accident-waiting-to-happen" pre-condition (snorkelers unknowingly heading toward imminent danger). Had lifeguards detected and halted the snorkelers at the onset, the subsequent needless double drowning would have been prevented. It was inexcusable that the lifeguards failed to immediately search for a second victim. It is commonplace for snorkelers to dive paired-up in "buddy-teams," however, it didn't dawn on the lifeguards to search simultaneously for Decedent Laughlin's buddy. It evidences their improper surveillance and deficient training. When the lifeguards finally responded, it was too late to save the snorkelers.

### Issue Five

Expert Maceo feels that Decedents Powell and Laughlin were adequately warned that Witches Brew was dangerous and that snorkeling there was expressly prohibited. Also, he personally feels that signs are not the best tools in preventing accidents. Lifeguards had closed ledge access to both Witches Brew and Toilet Bowl, but no deterrent existed for snorkelers approaching from the water. He admitted that Water Safety Officers had earlier been patrolling the entrance to "the slot" on a paddleboard, however, no lifeguard was there at preventing snorkelers from proceeding out beyond the reef into the rough conditions immediately before this incident. Expert Maceo attempts to convey the impression that Decedents Powell and Laughlin never used "the slot" to gain access to Witches Brew. He feels that the existing signs conveying warnings about strong currents, in combination with orange marker buoys at "the slot" plus waves breaking over the

3

ledge, somehow communicated to Decedents Powell and Laughlin that snorkeling at Witches Brew was prohibited. He stated in his report, *"I really cannot see what other warnings were needed."*

### *Opinion on Issue Five*
Fact is, warning signage at aquatic facilities has long remained an integral and necessary part of communication with the general public concerning water safety. Signage, in order to be effective, must attract attention and convey essential information clearly; describing the danger, stating what's prohibited and alerting what the consequences are should the warning be ignored. Large conspicuous visual diagrams of Hanauma Bay should have clearly illustrated exactly where Toilet Bowl and Witches Brew were located, with strong warning issued to snorkelers not to approach those dangerous areas. Both locations should have displayed permanent "Keep Away" signs to warn away approaching snorkelers. Regarding Expert Maceo's admission that Water Safety Officers had earlier been patrolling the entrance to "the slot" on a paddleboard, such practice should not have been discontinued. Moreover, his speculation that Decedents Powell and Laughlin never even used "the slot" misses the point. Had proper lifeguard surveillance existed, all snorkelers in the proximate vicinity approaching Witches Brew should have been spotted beforehand and duly prevented from proceeding there. Bottom line is, lifeguards should have been trained to keep snorkelers away from Toilet Bowl and Witches Brew. Strict enforcement should have included them paddling out with a rescue-surfboard whenever necessary. Permanent loudspeakers should have been installed at both locations, enabling the lifeguards to verbally warn approaching snorkelers away. In my opinion, this dual drowning incident would have been avoided had proper warning signs been installed and had the lifeguards been properly vigilant and enforced safety rules.

### Issue Six
Expert Maceo feels that the lifeguards were adequately trained, citing their recertification instruction and mock emergency scenarios. He points out, however, that mock rescues are not attempted during regular hours on guards in the towers. Moreover, he asserts that *"the lifeguards were practicing proper scanning techniques as per recommendations made by the USLA."*

### *Opinion on Issue Six*
Fact is, the lifeguards failed in their duty to detect Decedents Powell and Laughlin as they snorkeled toward Witches Brew. They failed to spot and react to this emergency until long after it was already too late. In my opinion, that clearly evidences the lifeguards' training inadequacy and their supervision deficiency. In my opinion, if executing full-blown mock rescues was deemed too interruptive, then only unannounced mock visual detection drills should have been routinely administered. Lifeguarding means being proactive, not merely reactive. Lifeguarding skill is centered on early potential problem detection, recognizing and defusing troubling situations before they can ever have opportunities to escalate into full-blown emergencies. No, in my opinion, the lifeguards were definitely not practicing proper scanning techniques.

### Summation

4

Expert Maceo, in his summation, notes that Hanauma Bay experienced a 500% increase in drownings from the prior year. He states that the largest area of responsibility in guarding Hanauma Bay is found in Zone 1, as this is where the majority of people swim. Expert Maceo feels that lifeguards have the most responsibility for the swimmers that are closest and that Tower 3-A's first priority is "the slot" and, according to WSO Bregman, *"it is not standard to go after people headed toward the inside of the point at Witches Brew."* Expert Maceo also expressed the notion that *"with rough surf, choppy conditions, and waves it would have been extremely difficult to visually follow two snorkelers through "the slot."*

### *Opinion on Summation*

It is unconscionable that the City and County of Honolulu, specifically Ralph Goto, failed to enact remedial safety changes sooner. Each drowning, as they occurred in succession in 2002, should have triggered serious evaluations and constructive safety improvements. Instead, Chief Howe and Mr. Goto continued to merely to evaluate the situation without taking any remedial action. Ralph Goto did have the authority to move people around, however, his inexplicable attitude was, *"I don't do that."* In my opinion, concentrations of lifeguards should have been moved around accordingly, as dictated by the increasing frequency of drowning incidents at Hanauma Bay. Expert Maceo could not have been serious in his suggestion that lifeguard responsibility varies according to location. Fact is, all areas within a lifeguard's zone require the utmost in surveillance attention. Regardless where people get into trouble (not only close to the tower and "the slot"), everyone in the water has a reasonable expectation that lifeguards will spot their distress and rescue them in a timely manner. I was stunned in reading WSO Bregman's assertion that *"it is not standard to go after people headed toward the inside of the point at Witches Brew."* Just the opposite is true. Snorkelers who are headed toward Witches Brew should be halted long before ever arriving inside of the point and out of view. And, regarding the claim that *"with rough surf, choppy conditions, and waves it would have been extremely difficult to visually follow two snorkelers through "the slot,"* that's sheer nonsense. That is what proper use of binoculars by lifeguards is all about.

This completes my review and commentary regarding Expert Maceo's report. Should you have any questions, please don't hesitate to call me.

AQUATIC RISK MANAGEMENT

Thomas C. Ebro
Water Safety Specialist

5