Estate of Powell v. CCH  Daniel Neves
Case 1:04-cv-00428-LEK   Document 116-28   Filed 01/18/2007   Page 1 of 3
March 24, 2006

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

THE ESTATE OF ERIK A. POWELL,       ) Civil No.
THROUGH PERSONAL REPRESENTATIVE     ) CV04-00428LEK
MARY K. POWELL; THE ESTATE OF       )
JAMES D. LAUGHLIN, THROUGH PERSONAL )
REPRESENTATIVE RAGINAE C. LAUGHLIN; )
MARY K. POWELL, INDIVIDUALLY;       )
RAGINAE C. LAUGHLIN, INDIVIDUALLY;  )
CHLOE LAUGHLIN, A MINOR, THROUGH    )
HER NEXT FRIEND, RAGINAE C.         )
LAUGHLIN,                           )
                                    )
           Plaintiffs,              )
                                    )
       vs.                          )
                                    )
CITY AND COUNTY OF HONOLULU,        )
                                    )
           Defendant,               )
                                    )
       and                          )
                                    )
CITY AND COUNTY OF HONOLULU,        )
                                    )
           Third-Party Plaintiff,   )
                                    )
       vs.                          )
                                    )
UNIVERSITY OF HAWAII, a body        )
corporate; JOHN DOES 1-10, JANE     )
DOES 1-10; DOE CORPORATIONS and     )
DOE ENTITIES,                       )
                                    )
           Third-Party Defendants.  )
_____)

DEPOSITION OF DANIEL NEVES
Taken on behalf of Plaintiffs at the Law Offices
of Ian L. Mattoch, 737 Bishop Street, Suite 1835,
Honolulu Hawaii, commencing at 2:00 p.m. on March
24, 2006, pursuant to Notice.

Before:   WILLIAM T. BARTON, RPR, CSR NO. 391

EXHIBIT "26"

POWERS & ASSOCIATES (808)536-2001

Page 106

1  wrapped the tube around the patient, and then you
2  were talking to him.
3       Do you remember that testimony?
4    A. Correct, yes.
5    Q. Did he give any type of response?
6    A. No.
7    Q. Could you tell whether or not his eyes
8  were opened?
9    A. No. It was closed.
10   Q. You also testified that you were giving
11 him mouth-to-mouth, correct?
12   A. Correct.
13   Q. That would have been because he wasn't
14 breathing, correct?
15   A. That's correct.
16      MR. MAYESHIRO: Okay. I don't have any
17 other questions. Thank you.
18      EXAMINATION
19 BY MS. WATERS:
20   Q. I have a follow-up question.
21      Do you have any understanding or
22 personal opinion as to whether the current
23 full-time lifeguards who are involved with this
24 incident can freely discuss the problems that they
25 encountered as lifeguards?

Page 107

1      MR. MAYESHIRO: Lacks foundation. Calls
2  for speculation.
3    A. I can't speak for them. But as I was a
4  contract, and if I spoke anything of what I said,
5  then I would be fired.
6       But for them, they do have a Union rep.
7  But I'm not sure what kind of, you know -- what
8  they can say and can't say.
9       I wouldn't know, honestly. I couldn't
10 tell you.
11   Q. Would you agree that due to the drastic
12 understaffing at Hanauma Bay, it was impossible
13 for the lifeguards to do their job as well as they
14 could?
15      MR. MAYESHIRO: Objection. Lacks
16 foundation. Calls for speculation. Misstates
17 testimony as to the term "drastic." Vague and
18 ambiguous.
19 BY MS. WATERS:
20   Q. If you remember the question.
21   A. Well, I'm just listening to him. Well,
22 like I said before, two eyes are way better than
23 one. And if we would have had a lot of things at
24 that bay, there would have been more lives saved.
25   Q. And among those other things, would you

Page 108

1  include more lifeguards?
2    A. Correct.
3    Q. And a jet ski on site?
4    A. Correct.
5    Q. And --
6    A. And a jet ski operator.
7    Q. And a jet ski operator on site?
8    A. Yes.
9    Q. And a patrolling lifeguard?
10   A. Correct.
11   Q. And anything else? How about better
12 signage?
13      MR. MAYESHIRO: Vague and ambiguous as
14 to "better."
15 BY MS. WATERS:
16   Q. Or more signage?
17   A. Well, the thing with our signs, only
18 thing we put up is like "Strong current" and
19 "Ledges closed" or whatever, and that was it.
20 Everything else was upstairs. They put the signs
21 up, they did the video, or whatever.
22   Q. Do you know who "they" is?
23   A. I think parks and rec., the people that
24 managed it, that did the accusations against me.
25   Q. With regard to the jet ski, did you, at

Page 109

1  the time of these drownings, was it your opinion
2  that the roaming jet ski, which I understand
3  covered from Kailua Beach, Waimanalo, Makapuu,
4  Sandys and Hanauma Bay, do you think that one jet
5  ski was sufficient to cover all these areas?
6    A. No way.
7       MR. MAYESHIRO: Lacks foundation. Calls
8  for speculation.
9  BY MS. WATERS:
10   Q. Is it your belief that if there was a
11 jet ski on site that day, that the chances of
12 saving one or both of these victims would have
13 been better?
14      MR. MAYESHIRO: Same objections.
15   A. Yes.
16   Q. From the time that you saw the first
17 victim's eyes above water, swimming, to the time
18 he went under water, do you know how long that
19 was?
20   A. I would honestly say 30 seconds to a
21 minute.
22   Q. That he was above water?
23   A. When the last time I seen him. Because
24 it felt like I was just there. I mean, it felt
25 like by the time I got to the lava rocks and to

Page 110

1  him, it felt like an instant.
2      I was flying. I was running as fast as
3  I could. I knew I could save him. That's why it
4  really hurt so bad, because I knew I had him.
5    Q. If there were a jet ski on site in a
6  different scenario, would that jet ski have met
7  you?
8    A. He would have been there already. He
9  would have had the guy, you know. He would have
10 been saved. And maybe the second guy would have
11 lived, you know.
12   Q. And also, you mentioned earlier if there
13 were a jet ski that would patrol the area on the
14 water --
15   A. Yeah. But then the only thing is like,
16 there's people swimming around. And there's so
17 many people. And, you know, to have a jet ski
18 running around 20 miles an hour, you know, is a
19 liability also waiting to happen. I think that's
20 another reason why they didn't want it.
21   Q. As far as having it in the water?
22   A. Yeah.
23   Q. And finally, from the tower, either
24 3 Alpha or 3 Bravo, can you see on the ocean side
25 of the Witches Brew Point?

Page 111

1   A. No.
2      MS. WATERS: Thank you.
3      EXAMINATION
4  BY MR. MAYESHIRO:
5    Q. I have a couple follow-up questions real
6  quick.
7      As I understand your testimony today,
8  Mr. Neves, you were having problems providing
9  mouth-to-mouth and CPR with the first victim?
10   A. Not mouth-to-mouth.
11   Q. Wait. Let me finish the question.
12     I understand that there was a lot of
13 vomit?
14   A. Correct.
15   Q. That kept coming out of the first
16 victim?
17   A. Correct.
18   Q. Because of that, you had to turn him
19 over and whatnot and somehow aspirate or clear his
20 airway?
21   A. Correct.
22   Q. Did that interfere with your progress of
23 providing mouth-to-mouth?
24   A. I was actually -- not mouth-to-mouth in
25 the water. It did not. When I got on to the BVM

Page 112

1  mask, then it did cause a problem, because it was
2  puking, you know -- there's one way in, and then
3  there's no way out; the mask itself. So there was
4  a lot of puke, and there was a lot of -- it was
5  just obstruction -- obstructed airway.
6      It was a constant turn over, swiping, an
7  AED that wouldn't go off, you know -- you can't
8  get an AED to work if the patient has drowned.
9  That's the thing.
10     They cannot be in the water. They have
11 to be cleaned. They have to be dried off in order
12 for it to work. People misunderstand what an AED
13 is. They think it will work any time. But it
14 wouldn't.
15     MS. WATERS: What is AED?
16   A. Defibrillator. When your heart goes
17 into infarction.
18 BY MR. MAYESHIRO:
19   Q. Mr. Neves, about how many times do you
20 believe that you had to clear the first patient's
21 airways because of the vomit?
22   A. I'd say at least six to ten times.
23   Q. And when he would vomit, was there a
24 significant amount of vomit that he expelled?
25   A. He had just went to a buffet.

Page 113

1    Q. I take that as a yes, then?
2    A. Yes.
3    Q. And AED that you mentioned, you're
4  familiar with that device?
5    A. Very familiar.
6    Q. At the time that you were performing CPR
7  on the first patient, do you know whether or not
8  the AED was on site?
9    A. Yes, it was.
10   Q. And when I say "on site," I mean at the
11 location where you were performing CPR?
12   A. Yes, it was.
13   Q. That was because somebody brought it to
14 that location correct?
15   A. Correct. C-Mo.
16   Q. And as I understand that device, it's
17 automatic, correct?
18   A. Correct.
19   Q. In other words, you need to hook the
20 patient up, and the machine will tell you whether
21 or not a shock is appropriate, correct?
22   A. Correct.
23   Q. Do you recall whether or not that
24 machine ever indicated that a shock was
25 appropriate?