LAW OFFICES OF IAN L. MATTOCH

IAN L. MATTOCH                    898-0
EMILY KAWASHIMA WATERS      6498-0
Suite 1835, Pacific Guardian Center
737 Bishop Street
Honolulu, Hawai`i  96813
Telephone:  (808) 523-2451

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | | |
|---|---|---|
| THE ESTATE OF ERIK A. POWELL, THROUGH PERSONAL REPRESENTATIVE MARY K. POWELL; THE ESTATE OF JAMES D. LAUGHLIN, THROUGH PERSONAL REPRESENTATIVE RAGINAE C. LAUGHLIN; MARY K. POWELL, INDIVIDUALLY; RAGINAE C. LAUGHLIN, INDIVIDUALLY; CHLOE LAUGHLIN, A MINOR, THROUGH HER NEXT FRIEND, RAGINAE C. LAUGHLIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. CV04-00428 LEK<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR PARTIAL SUMMARY JUDGMENT, FILED DECEMBER 29, 2006; CERTIFICATE OF SERVICE<br><br>Date:  February 8, 2007<br>Time:  10:00 a.m.<br>Judge: Hon. Leslie E. Kobayashi |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | TRIAL:    April 3, 2007 |
| CITY AND COUNTY OF HONOLULU, | ) ) ) | |
| Defendant. | ) ) ) | |
| and | ) ) | |

CITY AND COUNTY OF HONOLULU,                          )
                                                      )
                                                      )
                              Third-Party Plaintiff,  )
                                                      )
              vs.                                     )
                                                      )
UNIVERSITY OF HAWAII, a body                          )
corporate; JOHN DOES 1-10, JANE                       )
DOES 1-10, DOE CORPORATIONS                           )
and DOE ENTITIES,                                     )
                                                      )
                              Third-Party             )
                              Defendants.             )
_____                       )


PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION
FOR PARTIAL SUMMARY JUDGMENT, FILED DECEMBER 29, 2006

<u>INDEX</u>

<u>Page</u>

TABLE OF CASES AND AUTHORITIES ...........................................................ii

I.    INTRODUCTION .........................................................................................2

II.   FACTUAL BACKGROUND.........................................................................3

III.  ARGUMENT.................................................................................................8

     A.    Genuine Issues of Fact Exist Regarding the
          Causation of Erik Powell's Death......................................................8
          1.    Rough Conditions ...................................................................10
          2.    Understaffing ..........................................................................11
          3.    Buoys Sent Conflicting Signal to
              Swimmers.................................................................................13

     B.    Warning Signs Are Inadequate .........................................................16
          1.    Act 190 Does Not Apply to Hanauma Bay..............................16
          2.    No Admissible Evidence..........................................................18

     C.    Lifeguards Are Liable for Deaths of Both
          Decedents ..........................................................................................20
          1.    Gross Negligence Was Adequately
              Pleaded ....................................................................................20
          2.    The City's Gross Negligence Is an Issue
              of Fact......................................................................................22

     D.    City Employee Failed to Warn Plaintiffs
          Regarding the Outer Reef..................................................................25

     E.    Punitive Damages...............................................................................27

IV.   CONCLUSION.............................................................................................27

## TABLE OF CASES AND AUTHORITIES

CASES                                                              Page(s)

Abdul-Jabbar v. Gen. Motors Corp.,
    85 F.3d 407, 410 (9th Cir.1996) ....................................................8

Conley v. Gibson,
    355 U.S. 41, 47-48 (1957) ...........................................................21

DePinto v. Provident Security Life Ins. Co.,
    374 F.3d 50, 55 (9th Cir.1967) ....................................................19

Doe Parents No. 1 v. State, Dept. of Educ.,
    100 Hawai'i 34, 85, 58 P.3d 545, 596, (Haw. 2002) ....................................15

Geremia v. State,
    58 Haw. 502, 573 P.2d 107 (1977)...............................................25

Iddings v. Mee-Lee,
    82 Haw. 1, 919 P.2d 263 (1996).............................................22,23

Haft v. Lone Palm Hotel,
    3 Cal.3d 756, 772, 91 Cal.Rptr. 745, 478 P.2d 465..................................9,10

Kaczmarczyk v. City & County of Honolulu,
    65 Haw. 617, 617, 656 P.2d 89, 93 (1982)....................................24

Lauer v. YMCA of Honolulu,
    57 Haw. 390, 557 P.2d 1334 (1976)............................................27

Mayflower Restaurant Co. v. Griego,
    741 P.2d 1106 (Wyo.1987).........................................................22

Montalvo v. Lapez,
    77 Hawai'i 282, 884 P.2d 345 (Haw. 1994) ....................................9

Olsen v. Idaho State Bd. of Med.,
    363 F.3d 916, 922 (9th Cir.2004) ................................................8

Pancakes of Hawaii, Inc. v. Pomare Properties Corp.,
    85 Hawai'i 286, 291, 944 P.2d 83, 88 (Haw. App., 1997) ...........................23

Snead v. Metro. Prop. & Cas. Ins. Co.,
    237 F.3d 1080, 1090 (9th Cir.2001) ...............................................................8

Taylor-Rice v. State,
    91 Hawai'i 60, 74, 979 P.2d 1086, 1100 (Haw. 1999)..................................15

Wagatsuma v. Patch,
    10 Haw.App. 547, 580, 879 P.2d 572, 589, (Haw. App., 1994) ....................9

RULES

Federal Rule of Civil Procedure
    Rule 8(a) ......................................................................................................22
    Rule 56..........................................................................................................16
    Rule 56(c) .......................................................................................................8
    Rule 56(e) ......................................................................................................19

Federal Rules of Evidence
    Rule 602........................................................................................................19
    Rule 801(c) ...................................................................................................19
    Rule 802........................................................................................................19

STATUTES

Hawai`i Revised Statutes
    §520-1*et seq.*...............................................................................................24

MISCELLANEOUS

Hawaii Session Laws,
    Act 190....................................................................................16,17,18,19,20
    Act 190 §2...........................................................................................16,17

2002 Session Law Act 170 ....................................................................................20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| THE ESTATE OF ERIK A. POWELL, THROUGH PERSONAL REPRESENTATIVE MARY K. POWELL; THE ESTATE OF JAMES D. LAUGHLIN, THROUGH PERSONAL REPRESENTATIVE RAGINAE C. LAUGHLIN; MARY K. POWELL, INDIVIDUALLY; RAGINAE C. LAUGHLIN, INDIVIDUALLY; CHLOE LAUGHLIN, A MINOR, THROUGH HER NEXT FRIEND, RAGINAE C. LAUGHLIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. CV04-00428 LEK<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR PARTIAL SUMMARY JUDGMENT, FILED DECEMBER 29, 2006 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| CITY AND COUNTY OF HONOLULU, | ) ) ) | |
| Defendant. | ) ) | |
| and | ) ) | |
| CITY AND COUNTY OF HONOLULU, | ) ) ) | |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| UNIVERSITY OF HAWAII, a body corporate; JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS and DOE ENTITIES, | ) ) ) ) | |

```
                                        )
        Third-Party                     )
        Defendants.                     )
_____     )
```

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION
<u>FOR PARTIAL SUMMARY JUDGMENT, FILED DECEMBER 29, 2006</u>

I.        <u>INTRODUCTION</u>

On December 29, 2006, Defendant City and County of Honolulu (hereinafter "City") filed a motion for partial summary judgment against Plaintiffs The Estate of Erik A. Powell, through Personal Representative Mary K. Powell; The Estate of James D. Laughlin, through Personal Representative Raginae C. Laughlin; Mary K. Powell, Individually; Raginae C. Laughlin, Individually; Chloe Laughlin, a Minor, through Her Next Friend, Raginae C. Laughlin, (hereinafter collectively "Plaintiffs").  The City claims that it is not liable for the wrongful deaths of decedents Erik Powell and James Laughlin.  The arguments are unsupported by the facts and the law as discussed, *infra*.

Numerous issues of material fact have been raised that must be adjudicated by the trier of fact and the City is therefore not entitled to judgment as a matter of law.  Plaintiffs hereby submit their Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment requesting that the Court deny the motion.

2

## II.          **FACTUAL BACKGROUND**

The background of this case is essential in setting the stage for the gross negligence exercised by the City.  The year 2002 was declared a "crisis" for the City due to the unusually high number of deaths at the City's most popular tourist attraction, Hanauma Bay.  As of July 2002, there had already been seven drownings at the Bay.  In a Honolulu Star Bulletin article entitled "A Drowning Season," Ocean Safety Operations Chief James Howe commented whether they should start looking at other ways to save lives.[1]

Hanauma Bay is the City's most popular tourist attraction.  As many as 4,000 visitors come to the Bay each day to snorkel and swim with the marine wildlife.  Despite this high visitor count, the City staffed the Bay with only four lifeguards at the Bay.[2]  These lifeguards were stationed at the only two lifeguard towers, 3A and 3B.[3]  As lifeguard Daniel Neves described, at times there would only be two guards on duty due to lunch breaks and other breaks.  All of the lifeguards deposed agreed that Hanauma Bay was particularly challenging to monitor due to the swimmers being face down most of the time.[4]  Water safety officers (lifeguards) Clarence Moses and Daniel Neves were stationed at tower 3A, which was the tower closest to the cable channel and Witches Brew.

---

[1] Exhibit "1":  "A Drowning Season," Star Bulletin, Honolulu, HI, July 6, 2002.
[2] The number of lifeguards was increased after 2002.  Exhibit "2":  Depo of James Howe, pg. 30, li. 9-22.
[3] Map of Bay indicating tower location.  Exhibit "3": Depo of Ronald Bregman, Photo Exhibit.
[4] Exhibit "4":  Depo of James Howe, pg. 36, li. 20-22.

On July 19, 2002, mainland residents Mary "Katie" Powell, her husband Erik Powell and her brother James "Jim" Laughlin visited Hanauma Bay. At approximately 8:30 am,[5] Katie Powell recalls arriving at Hanauma Bay.[6] After finding a place to sit under a tree, she and Jim went to get sandwiches. She recalls on their way to get sandwiches, they stopped at an information desk, and asked a park attendant how to get past the coral reef[7] since someone had told them about turtles and "neat things to see out there."[8]

The "pull line" and "buoys" that were set up were pointed out as the channel through the reef to get to the open area of the bay.[9] Katie recalls that she and Jim had stopped about half-way up the walk to the parking lot to actually look for the buoys identified by the attendant.[10] By the time Katie and Jim got back down to the beach and ate their sandwiches, it was approximately 10:00 a.m.[11] Katie, Jim and Erik then entered the water and started snorkeling in the inner area of the bay. Jim and Erik decided that they wanted to explore outside the reef. Katie stayed back and watched them swim to the buoys that led to the cable channel.[12]

---

[5] Exhibit "5": Depo of Katie Powell, pg. 27, li. 3.
[6] Exhibit "6": Id., pg. 30, li. 19-21.
[7] Exhibit "7": Id., pg. 56, li.24-25; pg. 57, li. 1-19.
[8] Exhibit "8": Id., pg. 49, li. 19-23.
[9] Exhibit "9": Id., pg. 57, li. 1-2; Exhibit "3", indicating channel and buoys.
[10] Exhibit "9": Id., pg. 57, li. 12-19.
[11] Exhibit "6": Id., pg. 30, li. 10.
[12] Exhibit "10": Photo showing channel. Depo of Daniel Neves, Photo Exhibit 12.

On that particular day, Lifeguard Ronald Bregman stated that it was an average day; there were approximately 3,700 people in attendance at the park.[13] Lifeguard Daniel Neves testified in his deposition of March 24, 2006, that on July 19, 2002, there was "a lot of wake.  There was a lot of wind…. it was just really hard to see that time.  The glare, just everything… The whitewater was going over the ledge."[14]  "We had the Toilet Bowl closed and the Witches Brew closed."[15]

Lifeguard Clarence Moses testified in his deposition of March 17, 2006, that he recalls:

> …sitting in the tower looking out.  And off the corner of my eye, I seen somebody swimming around Witches Brew Point.  He swam a little bit past the point.  Well, to me, he was swimming fine.  He knew how to swim.  And then I seen him try to climb out to the side of the ledge, grab on and climb out.  But when he grabbed on, he was hanging and he just dropped.  He just let go, because I guess he was too weak or whatever.  But as soon as I seen them, it struck me as kind of wrong.  That day it was Daniel Neves was my partner.  He was at the bottom.  I told him, Go.  Usually, I tell the guys about scenarios, in case of drownings, just go.  Get your stuff.  When I say go, just go.  He took off.  Got all his gear, and he took off, running.  When he was running, I watched the guy; he tried to climb up again.  Wait a little while, he was hanging a little bit, and he dropped again.  At this time, when I looked across, Neves had reached the end of the beach.[16]

> I went back to the guy.  I was watching and waiting for him to swim.  And I didn't see no swimming.  But before all of that happened, I did

---

[13] Exhibit "11":  Depo of Ronald Bregman, pg. 72, li. 2-10; Exhibit "37": C&C Resp. to Plaintiffs' 2nd Req. for Answers to Interrogatories No. 2.
[14] Exhibit "12":  Depo of Daniel Neves, pg. 42, li. 4-10, 11-18.
[15] Exhibit "13": Id., pg. 40, li. 20-24.
[16] Exhibit "14":  Depo of Clarence Moses, pg. 29, li. 1-19.

call the supervisor that there was a possible rescue enroute.  So he came across.[17]

The distance between tower 3A, where Moses and Neves were stationed, and the area where Jim was seen at the ledge, was approximately 1,200 yards away.[18]  Lifeguard Clarence Moses noted that on Jim's second "drop" off the Witches Brew ledge back into the water, Daniel Neves had just reached the end of the beach.  [Neves] still had to run down to the ledge.[19]

> I was watching, hoping [Jim] would be floating, slapping his arms maybe, trying to stay afloat.  Neves didn't get there in time.  I waited and Neves – he was almost there.  I was still watching.  I didn't see no arms.  I didn't see anything at all.  Nothing floating, whatever.  When [Neves] got there, he was looking around, and I kind of knew, so I dropped my stuff, grabbed my equipment and took off running.[20]

Lifeguard Daniel Neves stated that as he ran past the nylon gate, he could see Jim "holding on to the Brew, just getting smashed up against it…"[21]

> …on the point side of the ledge – not on the back side.  And I could see that [Jim] was going to go down like instantly, because you could tell he was hyperventilating.  He had his mask off.  I mean, right away, a sign is when they throw the mask off, that means they can't take it because they either – the mask is fogging up or the water is going into their snorkel, so they have to rip it up to keep – they feel like they need to, to keep their head above water, but what they are actually doing is killing themselves.[22]  I could see his eyes…  [I could see in Jim's eyes that he was] Scared.  Frightened.[23]

---

[17] Exhibit "14":  Depo of Clarence Moses, pg. 29, li. 21-25; photo of Witches Brew and ledge, Photo Exhibit "4".
[18] Exhibit "14":  Id., pg 25, li. 10-15.
[19] Exhibit "15":  Id., pg. 31, li. 1-12.
[20] Exhibit "15":  Id., pg. 32, li. 18-25, pg. 33, li. 1-8.
[21] Exhibit "16":  Depo of Daniel Neves, pg. 53, li. 2-5.
[22] SEE Exhibit "16":  Id., pg. 53, li. 7-19.
[23] SEE Exhibit "17":  Id., pg. 54, li. 11-13.

By the time that Lifeguard Clarence Moses reached the end of the beach, he stated that Lifeguard Daniel Neves had jumped into the water and located an area to bring Jim out of the water.  By that time, Lifeguards Ron Bregman and Moses had reached the ledge.  Moses recalled that it took all three lifeguards to pull Jim's body out of the water.[24]

Lifeguard Neves testified that about a half an hour after Jim had been pulled out of the water, Lifeguard Moses spotted Erik's body.  It was after Jim's body was recovered that the lifeguards discovered that there was another body missing. Moses and a park attendant drove to a lookout area above the Bay when they spotted Erik Powell's body floating in Witches Brew.  As all lifeguards testified, Witches Brew was not visible from either lifeguard tower.[25]

Neves stated that "was when hell broke loose."[26]  He saw the jet ski taking off while he was showering.  Once Neves got back to the beach, he started CPR on Erik.  Park Attendant Jeff Kim noted that EMS transported the "second body" with Katie Powell.[27]  Both Erik Powell and Jim Laughlin were pronounced dead at p.m. at The Queen's Medical Center and Straub, respectively.  Both autopsies revealed deaths by drowning.[28]

---

[24] Exhibit "18":  Depo of Clarence Moses, pg. 34, li. 14-25.
[25] Exhibit "14":  Id., pg. 24, li. 22-24.
[26] Exhibit "19":  Depo of Daniel Neves, pg. 64, li. 2-13.
[27] Exhibit "20":  Park Attendant Jeff Kim Report, 7/19/02.
[28] Exhibit "21":  Certificates of Death:  James Laughlin and Erik Powell.

III.          **ARGUMENT**

        Under Federal Rule of Civil Procedure 56(c), the deciding Court

"must determine, viewing the evidence in the light most favorable to ... the non-

moving party, whether there are any genuine issues of material fact" and apply the

appropriate substantive law.  Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 922

(9th Cir.2004) (citation omitted).  The Court does not need to "weigh the evidence

or determine the truth of the matter, but … determine[s] whether there is a genuine

issue for trial."  Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 410 (9th

Cir.1996) (citation omitted).   As this is a diversity case, Hawai`i law controls the

substantive issues.  See Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080,

1090 (9th Cir.2001) (noting that federal courts apply state substantive law in

diversity actions).

    A.    **Genuine Issues of Fact Exist Regarding the Causation of Erik
          Powell's Death**

        Defendant argues that it in entitled to summary judgment on the issue

of causation with regard to the death of Erik Powell simply because there were no

witnesses to the actual drowning of Erik Powell prior to his death.  This argument

lacks any persuasiveness.

        The Hawaii Supreme Court has held that the best definition and the

most workable test of proximate or legal cause is: "The actor's negligent conduct is

a legal cause of harm to another if (a) his conduct is a substantial factor in bringing

8

about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." <u>Montalvo v. Lapez</u>, 77 Hawai'i 282, 884 P.2d 345 (Haw. 1994). This component can be determined through circumstantial evidence and the lack of a witness does not entitle the City to summary judgment. It is clear from the evidence, that but for the gross negligence of the City's lifeguards and their practices, Erik Powell would not have drowned. At the very least, there are issues that a trier of fact should resolve.

"It is particularly appropriate that the jury be allowed to determine the inference to be drawn when the evidence indicates that a safety device, designed to prevent the very injury that occurred, was not present." <u>Wagatsuma v. Patch</u>, 10 Haw.App. 547, 580, 879 P.2d 572, 589, (Haw. App., 1994). Plaintiffs' case centers on evidence that the City failed to implement safety procedures that would have prevented Erik Powell's death.

In <u>Haft v. Lone Palm Hotel</u>, 3 Cal.3d 756, 772, 91 Cal.Rptr. 745, 478 P.2d 465, a father and son drowned in a hotel swimming pool. That court held that once the plaintiffs proved that the defendants were negligent, and that a competent lifeguard probably would have prevented the deaths, the burden of proof on the issue of causation shifted to the defendants. "To require plaintiffs to establish 'proximate causation' to a greater certainty than they have in the instant case, would permit defendants to gain the advantage of the lack of proof inherent in the

lifeguardless situation which they have created." Id. at 772.  In this case, several

factors contributed to the proximate causation of Erik Powell's death.

      1.    <u>Rough Conditions</u>

      Ron Bregman testified that 80-90% of the rescues occurred in "the

Slot" (cable channel) or in the outer reef.  He noted that the people who are not

able to swim through the current, or are in the current get sucked in the undertow.[29]

      Given the conditions of the ocean on the date of the incident, the outer

reef was closed.  Yet Erik Powell and Jim Laughlin were able to swim through the

channel undetected and were gone for at least an hour.  Had the procedures been

such that there was adequate monitoring or warnings either on the water or from

land, they would not have entered that dangerous current area.

      The conditions on July 19, 2002 were particularly rough.  Daniel

Neves said that there was a lot of wake and wind and that it was difficult to see

anything because of the glare off of the water.  Neves recalls that the conditions

were rough enough to warrant closing of the Toilet Bowl and Witches Brew.  He

also said that he would not have gone out in the water that day.[30]

      Given these conditions, the City and their employees should have

been focusing more on the swimmers who were proceeding to the outer reef area.

But for their failure to take all of these measures into consideration, Erik Powell

---

[29] Exhibit "22":  Depo of Ronald Bregman, pg. 40, li. 20-25; pg. 41, li. 1-11.
[30] Exhibit "12":  Depo of Daniel Neves, pg. 42, li. 4-10.

and Jim Laughlin would not have been in the situation they were in.  Erik and Jim

should have been prevented from entering the channel or "the slot" and had this

happened, as lifeguard Neves said, "we would have two live people."[31]

### 2. Understaffing

It is undisputed that the Bay was grossly understaffed.

> Q:     From your experience at Hanauma Bay, do you
>         think that four lifeguards were adequate to watch
>         the entire bay?
> A.     … Well, for me personally, I would say no.  But
>         that's – people we can schedule, we work with who
>         they give us.  Or sometimes if you're not lucky,
>         you work there by yourself.
> Q:     What do you mean, "by yourself"?
> A:     Meaning a lot of guys call in sick or off or can't
>         find nobody.  You're there solo.[32]

Lifeguard Moses agreed that additional lifeguards would have made a

difference and summed it up as follows, "If you can't see them, you can't get

them."[33]

According to Lifeguard Neves, prior to the subject incident that "you

only had one person, or sometimes two in the tower, because of breaks and so

forth… we get an hour break for exercise.  We get an hour break for eating.  That's

---

[31] Exhibit "25": Depo of Daniel Nevers, pg. 92.
[32] Exhibit "23": Depo of Clarence Moses, pg. 62, li. 8-18.
[33] Exhibit "23": Id. at pg. 63, li. 11-12.

four hours right there, half a day from just two people.  So half the time, you're in the tower by yourself."[34]

> Q:    Is it your opinion that the bay was understaffed as
>        of that date of these drownings?
> A:    The bay is still understaffed.  …  If we had a patrol
>        guy that was at least patrolling the areas.  …  We
>        would have two live people.[35]

The City was equipped with a jet ski for emergency rescues.  It was manned by two lifeguards who towed it by truck to various beach parks spanning from Kailua Beach, Waimanalo, Makapuu, Sandys and Hanauma Bay.  When asked whether he thought this one jet ski was sufficient to cover all these areas, Neves responded, "No way."  In this particular case, Neves opined that had the jet ski been on site, both men might have been saved.[36]

James Howe, the highest ranking water safety officer under Ralph Goto, said that even given all of the drownings that year, he did not ask for additional lifeguard support.[37]  Ralph Goto, the administrator for the Ocean Safety and Lifeguard Services, agreed that he had the authority to transfer lifeguards from other beaches to assist beach parks that need help, but has never done so.[38]  Goto agreed that the 12 drownings at Hanauma Bay in 2002 was significant.[39]  But when

---

[34] Exhibit "24":  Depo of Daniel Neves, pg. 48, li. 11-17.
[35] Exhibit "25":  Depo of Daniel Neves, pg. 89, li. 19-21; pg. 92, li. 14-17.
[36] Exhibit "26":  Id., pg. 109, li. 1-6.; pg. 110, li. 2-11.
[37] Exhibit "27":  Depo of James Howe, pg. 50, li. 8-11.
[38] Exhibit "28":  Depo of Ralph Goto, pg. 15, li. 6-25; pg. 16, li. 1-15.
[39] Exhibit "29":  Id., pg. 32, li. 7-9.

he considered the option of assigning a lifeguard to be in the water, he concluded "there wasn't enough justification for it."[40]  The lifeguards on duty never detected the swimmers venturing into the outer reef.  There were simply too few eyes on the 3,000+ swimmers.  This understaffing rendered a closure of the outer reef meaningless as there were no means to prevent swimmers from traveling out there.

### 3.  Buoys Sent Conflicting Signal to Swimmers

The buoys that marked the cable channel were misleading.[41]  The lifeguards did not have any formal protocol as to when the buoys would be placed in the water.  They claimed that the buoys helped them to identify where the cable channel or "slot" was located.  However, there was no way for the swimmers to know the purpose of the buoys.  Understandably, the swimmers, like the decedents in this case, used the buoys as a guide to lead them through the channel and into the outer reef.  These markers did not indicate that this was the entry to a dangerous swim area, but in fact invited the swimmers to venture out.

Lifeguard Moses said that the purpose of those four buoys was to mark the channel for the swimmers and the lifeguards.  He explained that "[e]verybody asks where the thing is, the channel.  And they always seem to miss

---

[40] Exhibit "30":  Id., pg. 26, li. 5-25; pg. 27, li. 1-5.
[41] Exhibit "3":  Photo showing placement of buoys. Depo of Ron Bregman, Photo Exhibit.

it."[42]  Acting supervisor Ron Bregman was asked if there were any markers in the

water:

> A:   round plastic orange buoys, which we would place at the inside of the channel to mark it where it was.
>
> Q.   What was the purpose of the buoy?
>
> A:   The purpose of the buoy was for identification, primarily.
>
> Q:   For you as a lifeguard or for the swimmers?
>
> A:   Both.
>
> Q:   To know where the channel started?
>
> A:   Yes.
>
> Q:   And were those up every day, or just certain days?
>
> A:   It was intermittent.  Some days -- sometimes they would be up for a period of time.  And then they would disappear or –
>
> Q:   Did you personally put them in in the daytime?
>
> A:   I did, on occasion.
>
> Q:   What prompted you to put them up?
>
> A:   Dangerous conditions.  Rough conditions.
>
> Q:   Why would having a buoy in the water in rough conditions assist you?
>
> A:   For one thing, if somebody approached the tower and asked where the channel was or, you know -- it would serve as like, the marker that I could point to.  So it would help warn them, but that was primarily it. It might help them when they are trying to return to shore outside the reef.  It may help them identify where they can swim through, rather than swim over the reef.[43]

---

[42] Exhibit "31":  Depo of Clarence Moses, pg. 54, li. 16-25; pg. 55, li. 1-6.
[43]Exhibit "32":  Depo of Ron Bregman, pg. 57, li. 1-10; pg. 58, li. 17-25.

As Katie testified, that she thought the buoys were a "pull line", based on what she was told at the visitors center.[44]  As the lifeguards confirmed, the purpose for the buoys was not clear.  The channel required more rescues than any other area in the Bay.  Yet buoys invited the swimmers to this area without any other warnings.

The law in Hawaii provides that the first prong of the test for the presence of legal causation "contemplates a <u>factual determination</u> that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of."  <u>Doe Parents No. 1 v. State, Dept. of Educ.</u>, 100 Hawai'i 34, 85, 58 P.3d 545, 596, (Haw. 2002), citing <u>Taylor-Rice v. State</u>, 91 Hawai'i at 74, 979 P.2d at 1100.  The failure of the City to provide an adequately safe area to swim or warn and prevent a deadly situation was the legal cause of the death of Erik Powell.  The fact that none of the lifeguards were able to detect two swimmers entering the channel which led to the closed outer reef was also a substantial factor in Erik Powell's death.  These failures by the City are all factual issues to be resolved by the jury in determining the legal cause of the death of Erik Powell and therefore the City is not entitled to summary adjudication on this issue.

---

[44] Exhibit "7":  Depo of Katie Powell, pg. 56, li. 24-25; pg. 57, li. 1-19.

**B.**     <u>**Warning Signs Are Inadequate**</u>

The City cites to Act 190 in support of its contention that the City's warnings signs on the date of the incident should be presumed to be legally adequate.  This argument must fail.  First, there is an issue of fact as to whether the Act applies to this situation as numerous conditions set forth in Act 190 have not been met.  Second, the City does not offer any admissible evidence to supports its argument either by production of documents or by affidavit as required under Fed. R. Civ. Pro. 56.

1.     <u>Act 190 Does Not Apply to Hanauma Bay</u>

Act 190 does provide a conclusive presumption relating to the duty of the County to warn of dangerous conditions at beach parks but only if certain requirements are met.  The City glosses over these requirements that are clearly stated in Act 190:

> [The] sign or signs warning of dangerous shorebreak or strong current shall be conclusively presumed to be legally adequate to warn of these dangerous conditions, if the State or county posts a sign or signs warning of the dangerous shorebreak or strong current <u>and the design and placement of the warning sign or signs has been approved by the chairperson of the board of land and natural resources</u>. The chairperson <u>shall consult the governor's task force</u> on beach and water safety prior to approving the design and placement of the warning sign or signs.
> (c) A sign or signs warning of other extremely dangerous natural conditions in the ocean adjacent to a public beach park shall be conclusively presumed to be legally

16

adequate to warn of the dangerous natural conditions, if the State or county posts a sign or signs warning of the extremely dangerous natural condition <u>and the design and placement of the sign or signs have been approved by the chairperson of the board of land and natural resources</u>. The chairperson <u>shall consult the task force</u> on beach and water safety prior to issuing an approval of the design and placement of a warning sign or signs pursuant to this section.

(d) The State or county operating a public beach park may submit a comprehensive plan for warning of dangerous natural conditions in the ocean adjacent to a public beach park to the chairperson of the board of land and natural resources who shall review the plan for adequacy of the warning as well as the design and placement of the warning signs, devices, or systems. The chairperson <u>shall consult with the task force on beach and water safety prior to issuing an approval of the plan</u>. The task force on beach and water safety may seek public comment on the plan. In the event that the chairperson approves the plan for the particular beach park after consulting with the task force and the State or county posts the warnings provided for in the approved plan, then the warning signs, devices, or systems shall be conclusively presumed to be legally adequate to warn for all dangerous natural conditions in the ocean adjacent to the public beach park.

…

(h) The chairperson <u>shall consider the needs of the public</u> to be warned of potentially dangerous conditions in the ocean adjacent to a public beach park prior to issuing an approval for the design and placement of a warning sign or comprehensive plan.

Haw. Sess. Laws, Act 190 §2 (emphases added)

The City has not offered any evidence that its signs at Hanauma Bay fully

complied with Act 190. In order to reap the benefit of the conclusive presumption,

the City was obligated to follow all of the requirements under the Act with regard

its warning signs.  The City has failed to follow those requirements.

The City has not produced any admissible evidence indicating that the

chairperson of the board of the land and natural resources made the above

approvals with regard to Hanauma Bay's signage as of the date of the incident.

The City has not produced any admissible evidence that the chairperson consulted

with the governor's task force on beach and waters safety prior to approved the

design and placement of the warning signs at Hanauma Bay on July 19, 2002.

Therefore, this lack of evidence creates a mixed issue of fact and law as to whether

the City complied with Act 190 and therefore summary judgment is improper.

2.    <u>No Admissible Evidence</u>

The only "evidence" that the City provides in support of its assertion

that Act 190 should apply to the subject warning signs is the Declaration of Ralph

S. Goto.[45]

> 5.    On July 19, 2002 ("Incident Date"), three warning
> signs that specified strong current were posted at
> Hanauma Bay pursuant to Act 190.
> 6.    On Incident Date, the design of these warning
> signs along with their placement was approved by the
> chairperson of the board of land and natural resources
> pursuant to Act 190.

---

[45] See Defendant's Separate and Concise Statement of Facts.

This is the extent of the evidence proffered by the City in support of its argument.
Rule 56(e) requires that affidavits filed in connection with motions for summary
judgment be made on <u>personal knowledge</u>.  <u>DePinto v. Provident Security Life Ins.</u>
<u>Co.</u>, 374 F.3d 50, 55 (9th Cir.1967) (emphasis added).  As such, hearsay testimony
and opinion testimony that would not be admissible if testified to at trial would not
be properly set forth in such an affidavit.  <u>Id.</u>

      Ralph Goto clearly lacks the ability to testify with personal knowledge
with respect to the City's compliance with Act 190.  He is a City employee, not
affiliated with the board of land and natural resources, nor is he a member of the
governor's task force.  Therefore, he cannot testify with personal knowledge as to
the requirements in Act 190 and his statement lacks foundation.  Fed. R. Evid. 602.
Therefore, his declaration as to this issue should be stricken.

      In addition, Mr. Goto's declaration constitutes inadmissible hearsay
and should be precluded under Fed. R. Evid. 802.  His statements regarding the
approval of the signage under Act 190, refers to an out of court statement offered
to prove the truth of the matter.  Fed. R. Evid. 801(c).

      In Plaintiffs' First Request for Production of Documents, we requsted
the production of "all documents or signage related to … the ocean, including any
warnings or instructions that were allegedly given to Plaintiffs."[46]  The City did not

---

[46] Exhibit "38":  Defendant's First Supplemental Response to Plaintiffs' first Request for Production of Documents to Defendant

produce any authenticated documents verifying that the DLNR or the Governor's Task Force on Ocean Safety approved the subject signs and their placement as required in order for Act 190 to apply.

Based on its lack of evidence, Defendant is not entitled to summary judgment on the presumption of adequacy of the warnings at Hanauma Bay on the date of the incident. Given the lack of immunity, it is clearly that the signage and warnings were grossly inadequate and failed to reach the decedents before they entered the water.[47]

Furthermore, it has been established through the testimony of the lifeguards on duty that the currents were strong on the day of the incident. Additionally, they distinguished "the slot" or the "cable channel" as the area where the most rescues took place due to the currents. Rather than marking the channel in a way that clearly indicated to swimmers that the outer reef was closed, the City installed buoys that invited swimmers through the channel to the outer reef.

### C.    Lifeguards Are Liable for Deaths of  Both Decedents

#### 1.    Gross Negligence Was Adequately Pleaded

The City next asserts that the lifeguards are entitled to summary judgment for allegations of simple negligence under 2002 Session Law Act 170 and that Plaintiffs failed to plead gross negligence or wanton acts or omissions. It

---

City& County of Honolulu Dated December 21, 2004.
[47] Exhibits"33", "33a" and "33b":  Declaration of Human Factors Expert Richard Gill, Ph.D., Exhibits 1-3.

is well-established that "T]he Federal Rules of Civil Procedure do not require a

claimant to set out in detail the facts upon which he bases his claim. To the

contrary, all the Rules require is a 'short and plain statement of the claim' that will

give the defendant fair notice of what the plaintiff's claim is and the grounds upon

which it rests." Conley v. Gibson, 355 U.S. 41, 47-48 (1957) (internal citation

omitted).

Although Defendant City only cites to one paragraph, Count II

incorporates by reference the facts set forth in ¶ 15. Plaintiffs additionally allege:

> 19.   Plaintiffs reallege and incorporate by reference all
> of the allegations contained in this Complaint as though
> fully set forth and repeated here.
> 20.   Defendant City acted in a grossly negligent and
> wanton manner because, among other reasons, a visitor
> center employee or agent of Defendant City directed
> decedents to swim at the southern edge of the bay
> without any warning or without adequate warning,
> although Defendant City and its employees an agents
> knew or should have known the southern edge of the bay
> was more dangerous compared to other parts of the bay,
> and was very dangerous on July 19, 2002, considering
> the ocean conditions that day, and was otherwise
> unstaffed or understaffed by water safety officers and
> lifeguards.
> 21.   As a direct and proximate result of the gross
> negligence and wanton acts of Defendant City, through
> its employees and agents, Decedent Powell and Decedent
> Laughlin drowned, and the two estates and their
> survivors are entitled to recover general, special and
> punitive damages including, but not limited to, pain and
> suffering, emotional distress, loss of future earnings,

> medical expenses, burial expenses, and all other damages
> allowed by law, in amounts to be proven at trial.
> (emphasis added)[48]

It is apparent from the complaint that the requirement under Fed. R. Civ. Proc. 8(a)

has been met.  Defendant cannot claim lack of notice simply because the

allegations are not framed with the utmost specificity.

### 2.    The City's Gross Negligence Is an Issue of Fact

Defendant cites the dissent in <u>Iddings v. Mee-Lee</u>, 82 Haw. 1, 919

P.2d 263 (1996) to define gross negligence:

> Although degrees of negligence are not considered in
> comparative negligence, it must be remembered that the
> <u>traditional concept of gross negligence visualized less
> culpable conduct than willful and wanton conduct</u>. Gross
> negligence has been defined as:
>
> <u>Indifference to present legal duty and to utter
> forgetfulness of legal obligations so far as other persons
> may be affected</u>. It is a heedless and palpable violation of
> legal duty respecting the rights of others. The element of
> culpability which characterizes all negligence is in gross
> negligence magnified to a high degree as compared with
> that present in ordinary negligence. Gross negligence is a
> manifestly smaller amounts of watchfulness and
> circumspection than the circumstances require of a
> person of ordinary prudence. But it is something less than
> the willful, wanton and reckless conduct.  <u>Mayflower
> Restaurant Co. v. Griego</u>, 741 P.2d 1106 (Wyo.1987)
> (emphasis added).

---

[48] Defendant's Concise statement Exhibit "A".

The same concept that gross negligence is an amount less than that of willful or wanton conduct was affirmed in <u>Pancakes of Hawaii, Inc. v. Pomare Properties Corp.,</u>  85 Hawai'i 286, 291, 944 P.2d 83, 88 (Haw. App., 1997).

In <u>Iddings</u>, the majority found there to be genuine issues of material fact with regard to whether the culpable party's actions amounted to gross negligence.  <u>Iddings</u> at 21, 283.  Similarly, there are issues of fact regarding whether the lifeguards and other City employees engaged in gross negligence or willful or wanton conduct.

As discussed above, the City and its employees were on notice that there was a shortage of lifeguards at Hanauma Bay.  Lifeguards Moses and Neves, as well as Jim Howe himself acknowledged that they were short staffed.[49]  Yet they failed to take any measures to improve this known deficiency.

Given the number of drownings that year, the City ignored its legal obligations with regard to improving the safety of the visitors to Hanauma Bay.  The likelihood that others would be affected by this inaction was high.  The fact that one jet ski patrolled a 15 mile span rendered it useless at the time of these drownings.  A jet ski that is at Kailua Beach when a call comes in from Hanauma Bay can hardly be called a safety device.[50]

---

[49] Exhibit "23": Deposition of Clarence Moses, pg. 62, li. 8-18; pg. 63, li. 11-12; Exhibit "24": Deposition of Daniel Neves, pg. 48, li. 11-17; Exhibit "25":  Depo of Daniel Neves, pg. 89, li. 19-21; pg. 92, li. 14-17; Exhibit "26":  Deposition of Daniel Neves, pg. 109, li. 1-6; and  Exhibit "27":  Depo of James Howe, pg. 50, li. 8-11.
[50] Exhibit "34": Depo of Robert Dorr pg. 24, li. 4-12.

Employing the reasoning articulated in <u>Kaczmarczyk v. City &</u>

<u>County of Honolulu</u>, "even where a municipality is under no duty to provide life

guard services, … if it voluntarily assumes the protective responsibility it has a

duty to perform those services with reasonable care." 65 Haw. 617, 617, 656 P.2d

89, 93 (1982). The lifeguards in this instance failed to use reasonable care. They

were understaffed which contributed to the lack of attention given to the dangerous

or closed areas of the Bay.[51] The City failed to take additional measures given the

significant number of drownings that year. Namely, they failed to transfer

additional lifeguards to assist at Hanauma Bay,[52] they failed to post a lifeguard at

the top of the hill which they do now,[53] they failed to have a lifeguard in the

water,[54] they failed to have any effective system of warning swimmers to stay out

of the cable channel where the current would take them to the dangerous outer

reef.[55]

Hanauma Bay is a public park which charges a fee for entry.

Therefore, its lifeguards should be held to a higher standard of care than those at a

public beach park open to the public.[56] The City affirmatively took action to

induce its visitors including the decedents to engage in snorkeling in the outer reef

---

[51] Exhibit "12": Depo of Daniel Neves, pg.42, li. 4-18.
[52] Exhibit "28": Depo of Ralph Goto, pg. 15, li. 6-25; pg. 16, li. 1-15.
[53] Exhibit "23": Depo of Clarence Moses, pg. 62, li. 8-18.
[54] Exhibits "35", "35a", "35b" and "35c": Declaration of Water Safety Expert Thomas Ebro, Exhibits 1 – 3.
[55] Exhibits "36", "36a" and "36b": Declaration of Oceanographer Roger Lukas. Ph.D., Exhibits 1-2.
[56] See H.R.S. §520-1 et seq.

area.  They put buoys in the channel marking the entry to the outer reef and did

nothing to indicate that it was an area of closure.  And the City created a false

appearance of safety by providing lifeguards, and by failing to give adequate

instructions or warnings to stay out of the channel.  See Geremia v. State, 58 Haw.

502, 573 P.2d 107 (1977).  Clearly, there are issues for the trier of fact with regard

to whether the City's employees were grossly negligent in their actions and

inaction.

> **D.     City Employee Failed to Warn Plaintiffs Regarding the Outer Reef**

The City requests summary judgment as to Count II, see page 18,

*supra*, because it asserts that it was not a City employee or Agent who directed

decedents to swim at the southern edge of the bay.  The City states that the

volunteers who staff the Hanauma Bay visitor center were not City employees.

However, the City fails to produce any admissible evidence that identifies the

individual who assisted Ms. Powell on the date of the incident.  Alan Hong simply

states "[t]he person referenced in Paragraphs 11 and 20 of the Complaint is not a

City and County of Honolulu employee."  It is difficult to rely on this statement

when Ms. Powell did not describe or identify the person with whom she spoke on

the date of the incident.  Alan Hong seems to be stating that all the individuals in

the visitor center on the date of the incident were University of Hawaii volunteers.

The City did not produce a log of volunteers that would establish this.

The individual responded to Ms. Powell's inquiry about how to get to the outer reef.[57]  Ms. Powell was directed to the buoys and the "pull line."  Again, as discussed above, there was a clear lack of communication with regard to the purpose of the buoys at the mouth of the channel.  Through this conversation, Plaintiffs were directed to use the buoys as markers to enter the channel.  At no time were they informed that the outer reef was closed or that there was a strong current through the channel.  This failure of the City to provide such crucial information to the visitors had fatal consequences.

Furthermore, the allegations as set forth in Count II do not limit the gross negligence to the conduct of the individual at the visitor center.  The allegations state that the City was grossly negligent and that given the dangerous area of the outer reef and the conditions on the date of the incident, the City was unstaffed or understaffed by water safety officers or lifeguards.

The cause of action also incorporates all of the previous allegations in the complaint as set forth in ¶ 19.  These allegations have been discussed in great detail *supra* and are sufficient to defeat summary judgment as to the gross negligence of the City and its employees.

---

[57] Exhibit "9":  Depo of Katie Powell, pg. 57, li. 1-2, 12-19.

E.    **Punitive Damages**

As Plaintiffs did not name any City employees individually, we concede that punitive damages are not available under <u>Lauer v. YMCA of Honolulu</u>, 57 Haw. 390, 557 P.2d 1334 (1976).

IV.    **CONCLUSION**

For the reasons set forth above, Defendant City is not entitled to partial summary judgment on any of the causes of actions cited other than punitive damages.  Plaintiffs respectfully request this Court to deny the City's motion except as to punitive damages.

DATED:  Honolulu, Hawai`i, January 18, 2007.


/s/ Emily Kawashima Waters
IAN L. MATTOCH
EMILY KAWASHIMA WATERS
Attorneys for Plaintiffs