GILL, Richard PhD (03-02-07).txt

00001
```
  1              IN THE UNITED STATES DISTRICT COURT
  2                 FOR THE DISTRICT OF HAWAII
  3   THE ESTATE OF ERIC A. POWELL,         )
      THROUGH PERSONAL REPRESENTATIVE   )CIVIL NO. CV04-00428
  4   MARK K. POWELL; THE ESTATE OF     )LEK
      JAMES D. LAUGHLIN, THROUGH        )
  5   PERSONAL REPRESENTATIVE REGINAE C.)
      LAUGHLIN; MARY K. POWELL,         )
  6   INDIVIDUALLY; RAGINAE C. LAUGHLIN,)
      INDIVIDUALLY; CHLOE LAUGHLIN, A   )
  7   MINOR, THROUGH HER NEXT FRIEND,   )
      REGINAE C. LAUGHLIN,              )
  8                                     )
                     Plaintiffs,        )
  9                                     )
                  vs.                   )
 10                                     )
      CITY AND COUNTY OF HONOLULU,      )
 11                                     )
                     Defendant,         )
 12                                     )
                  and                   )
 13                                     )
      CITY AND COUNTY OF HONOLULU,      )
 14                                     )
                  Third-Party           )
 15                  Plaintiff,         )
                                        )
 16               vs.                   )
                                        )
 17   UNIVERSITY OF HAWAII, a body      )
      corporation; JOHN DOES 1-10; JANE )
 18   DOES 1-10; DOE CORPORATIONS and   )
      DOE ENTITIES,                     )
 19                                     )
                  Third-Party           )
 20                  Defendants.        )
      _____  )
 21
 22
 23            DEPOSITION OF RICHARD T. GILL, Ph.D.
 24
 25
```
00002
```
  1
  2   Taken on behalf of the Defendant City and County of
  3   Honolulu at the Law Offices of Lyons, Brandt, Cook &
  4   Hiramatsu, 1800 Davies Pacific Center, 841 Bishop Street,
  5   Honolulu, Hawaii, commencing at 9:10 a.m. on March 2,
  6   2007, pursuant to the Federal Rules of Civil Procedure.
  7
  8
  9   BEFORE:     SHEILA BRITT LIPTON, CSR NO. 257
                  Notary Public, State of Hawaii
 10
 11
 12      H O N O L U L U   R E P O R T I N G   S E R V I C E S
 13            1000 Bishop Street, Suite 401
                  Honolulu, Hawaii 96813
 14
                     (808) 524-6288
 15
 16
 17
 18
 19
 20
 21
 22
```

GILL, Richard PhD (03-02-07).txt

```
23
24
25
00003
 1   APPEARANCES:
 2   For the Plaintiffs:    EMILY KAWASHIMA WATERS, ESQ.
                           Law Offices of Ian L. Mattoch
 3                         Suite 1835, Pacific Guardian Center
                           737 Bishop Street
 4                         Honolulu, Hawaii 96813
 5
     For Defendant City    STEFAN M. REINKE, ESQ.
 6   and County of         Lyons, Brandt, Cook & Hiramatsu
     Honolulu:             1800 Davies Pacific Center
 7                         841 Bishop Street
                           Honolulu, Hawaii 96813
 8
                                  and
 9
                           DEREK T. MAYESHIRO, ESQ.
10                         Deputy Corporation Counsel
                           City and County of Honolulu
11                         530 South King Street , Room 110
                           Honolulu, Hawaii 96813
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00004
 1
 2                      I N D E X
 3                                              Page
 4   EXAMINATION BY:
 5   Mr. Reinke                                 5,227
 6   Ms. Waters                                 221
 7
 8
 9
10
11
12
13
14
15
16   EXHIBITS MARKED FOR IDENTIFICATION:
17   Exhibit 1                                  5
18   Exhibit 2                                  5
19   Exhibit 3                                  5
20   Exhibit 4                                  149
21   Exhibit 5                                  149
22   Exhibit 6                                  215
23
24
25
00005
 1        (Whereupon the disclosure was presented to counsel.)
 2
 3                       RICHARD T. GILL, Ph.D.,
 4   called as a witness by and on behalf of Defendant City and
 5   County of Honolulu, having been first duly sworn, was
```

Page 2

GILL, Richard PhD (03-02-07).txt
```
 6  examined and testified as follows:
 7
 8          (Exhibits 1 - 3 were marked for identification.)
 9
10                       EXAMINATION
11  BY MR. REINKE:
12  Q.      Your name and business address, please.
13  A.      Richard Thomas Gill, G-i-l-l.  2104 West
14  Riverside, Spokane, Washington.  Rick would be fine.
15  Q.      And with respect to your current resume, that was
16  attached to your report; is that correct?
17  A.      I believe it was, yes, sir.
18  Q.      We've premarked as Exhibit 1 your report.  Do you
19  see that?
20  A.      There are two reports.
21  Q.      Your first report.
22  A.      Yes.  Yes, you did.
23  Q.      We premarked Exhibit 2, your rebuttal report,
24  correct?
25  A.      Correct.
00006
 1  Q.      I did not attach your case list or your resume to
 2  this exhibit, but you are familiar with both those
 3  documents?
 4  A.      I am.
 5  Q.      Anything you'd like to update since those were
 6  done?
 7  A.      Nothing of any real substance.  Obviously there's
 8  been some more grant or contract work.  There's been some
 9  more depositions and trials.  But the same general venue,
10  human factors and safety.
11  Q.      You've been retained as a witness since you
12  prepared that report?
13  A.      I have.
14  Q.      And let me ask this, with respect to the
15  retention since you prepared that report, any cases where
16  the general subject matter is ocean safety?
17  A.      Yes.
18  Q.      What case is that?
19  A.      One that comes to mind immediately is another
20  drowning at Hanauma Bay.
21  Q.      What's the name of that case?
22  A.      I don't recall the case name.
23  Q.      When did that drowning occur?
24  A.      I have not received any file material in the case
25  yet so I can't even tell you that.  My understanding is
00007
 1  it's relatively recent.
 2  Q.      What firm retained you in that case?
 3  A.      Shim & Chang.
 4  Q.      That case comes to mind, do you know what year
 5  that drowning occurred?
 6  A.      No, sir, I don't.
 7  Q.      Any other cases that come to mind?
 8  A.      I have looked at some other cases but then
 9  ultimately either declined to be involved or people had
10  decided not to pursue the case because it didn't look like
11  there was a basis for a case.
12  Q.      Now, we're speaking with regard to cases since
13  you prepared your report, correct?
14  A.      Correct.
15  Q.      Prior to preparing your report had you ever been
16  asked to testify with regard to ocean safety cases?
17  A.      In the broader sense of the term I would call it
18  safety and risk management, human factors in terms of
19  ocean safety, water safety.  And I have been retained in a
20  number of those.  In fact, I've testified in trial in
21  those.
22  Q.      I'd like to have my focus be right now first on
23  cases involving the ocean.  And I want to be specific on
```

GILL, Richard PhD (03-02-07).txt
```
24  cases that are dealing with the ocean.  It can be the
25  Pacific Ocean, the Atlantic ocean, any ocean that you
00008
 1  want, the Indian ocean, any one.  I'm not limiting you.
 2  A.      Well, I'll do the best I can.  I don't sort cases
 3  out in my mind by ocean versus fresh water because the
 4  safety principles are one in the same.
 5  Q.      Actually if you can I want to focus first on
 6  oceans.  Can you tell me the cases you've testified that
 7  have taken place involving the ocean or the beach leading
 8  up to the ocean or the ground leading up to the ocean?
 9  A.      By testifying are you talking about trials only
10  or trials and depositions?
11  Q.      Thank you.  Because I actually asked a different
12  question the first time.  You focused me better.  I want
13  to know the cases you've been actually asked to look at by
14  one side or the other, whether they retained you or not.
15  Let's take it that way.
16  A.      Oh, I don't even begin to remember all the ones
17  I've looked at.  I have a hard time remembering the ones
18  I've testified in.
19  Q.      Let's talk about then, if we can do it, how about
20  the ones you've actually been retained in where you've
21  actually been retained to give an opinion and you've been
22  willing to give an opinion.
23  A.      Ones that I can think of off the top of my head
24  would be, I believe Lee was the plaintiff, Cronin, Fried
25  was the firm.  Had to do with a surf lesson incident,
00009
 1  Kihei side, Maui.  I believe I gave a deposition in that
 2  case.  I'm certain I wrote a report in it.  But it did not
 3  go to trial.  That's one that I can think of off the top
 4  of my head.
 5  Two that I know that did go to trial was Went and
 6  Wang versus the federal government that was over at Oheo
 7  Pools.  And I believe that was Mike Livingston's group
 8  that had retained me on that.
 9  Another one was the Mink Kahan case with Ian
10  Mattoch's firm.
11  Q.      Can you say the name again?
12  A.      I believe it was Mink and Kahan.  And that was
13  against Volcano National Park.
14  Q.      Any other cases you can think of right now?
15  A.      There have been a number of them that I've been
16  retained on pertaining to jet skis on the ocean, para-
17  sailing on the ocean, shore breaks pertaining to the
18  ocean.  That's the only one I can think of right now.  If
19  others come to mind.  These are ones that involved, I
20  believe, reports and/or depositions.  And, you know, then
21  I've had sailing cases involving the ocean, scuba diving
22  cases involving the ocean.
23  Q.      So you've identified three specific cases and
24  four or five classes of cases, jet skis, sailing, shore
25  break, scuba cases; is that correct?
00010
 1  A.      Correct.
 2  Q.      Parasailing also?
 3  A.      Correct.
 4  Q.      With respect to the individual cases, the Lee
 5  case, the Wong case, and the Mink case, did any of those
 6  three cases involve lifeguarding, where you entered
 7  opinions with respect to lifeguarding services?
 8  A.      There was not lifeguarding literally per se.
 9  There was water rescue issues pertaining to the Went, Wang
10  case.
11  Q.      So with respect to Lee and with respect to the
12  Mink case, those did not involve lifeguards or water
13  safety officers; is that correct?  When I say not
14  involved, what I mean is your testimony did not involve
15  giving opinions with respect to any services they might
```
Page 4

GILL, Richard PhD (03-02-07).txt

16  have provided?
17  A.      That's correct.
18  Q.      With respect to the Went case, Went, Wong, did
19  you give opinions with respect to any services that were
20  provided for by either lifeguards or water safety
21  officers?
22  A.      Just so I can correct you, I think it's Wang, not
23  Wong.
24  Q.      Thank you very much.  I appreciate the
25  correction.
00011
1  A.      No, there were no literal lifeguards associated
2  with the attempted rescue.  It was a ranger that didn't
3  have adequate training.  It was not a ranger that would
4  have qualified as a lifeguard or a water safety officer.
5  Q.      With regard to the five classes of cases we
6  discussed earlier briefly, or identified earlier, the jet
7  ski cases, did any of those cases that you can think of
8  involve any opinion or testimony upon your part dealing
9  with lifeguard services or water safety officer services?
10  A.      Not that I recall.
11  Q.      The same question for the parasailing cases,
12  anything that involved lifeguarding services or water
13  safety officer services?
14  A.      I don't believe so.
15  Q.      With respect to the scuba cases, did any of those
16  cases involve lifeguards or water safety officers?
17  A.      No.  Not that I recall, no, sir.
18  Q.      And finally with respect to sailing cases, I
19  assume sailing means sailboats?
20  A.      Correct.
21  Q.      Did any of those cases have anything to do with
22  the water safety officers or lifeguards where you gave
23  opinions about their conduct?
24  A.      I don't believe so, no, sir.
25  Q.      The final was shore break on the ocean.  You
00012
1  indicated you had shore break cases?
2  A.      Correct.
3  Q.      Did any of those cases involve situations where
4  you rendered opinions with regard to the services provided
5  by lifeguards or water safety officers?
6  A.      I don't believe there were any on those beaches.
7  Q.      Were any of those beaches in Hawaii?
8  A.      Yes, they were.
9  Q.      What beaches?
10  A.      One that I can think of was Kaanapali Beach.  And
11  the other was down Wailea side.  I think it was out in
12  front of the Fairmont Orchid.
13  Q.      Have you ever been asked to provide testimony in
14  a case involving issues of lifeguard services or water
15  safety officer services?
16  A.      Yes, I have.
17  Q.      How many times?
18  A.      I couldn't give you a reasonable estimate.  It's
19  been a number.  I would say probably a half dozen over the
20  25 years would be my best estimate.  That's a rough
21  estimate.
22  Q.      I understand that.  Because I asked the big
23  question being asked.  That could include cases you've
24  taken and cases you turned down, correct?
25  A.      No.  I'm just thinking of cases that I literally
00013
1  was involved in as opposed to looked at and said no, I
2  can't help you, or I don't -- I prefer not to be involved.
3  Q.      So you've looked at about a half dozen.  How many
4  here in Hawaii?
5  MS. WATERS:  Objection.  Misstates his testimony.
6  Half a dozen refers to cases he's been involved in.  Isn't
7  that right?

GILL, Richard PhD (03-02-07).txt

8  THE WITNESS:  Cases that I've been involved in
9  with lifeguards, that would be my best estimate, yes.
10  BY MR. REINKE:
11  Q.       How many of those occurred in the state of
12  Hawaii?
13  A.       Well, we're talking literal lifeguards?
14  Q.       Explain yourself.  You're not going to confuse
15  me.
16  A.       Well, you're drawing arbitrary distinctions like
17  ocean water safety versus fresh water safety.  And I want
18  to be as accurate as I can for you in my answers.
19  Q.       I'm still dealing with oceans right now.  We're
20  going to get to the fresh water in just a moment.
21  A.       I understand.  But now when you say lifeguarding
22  do you literally formally mean a formalized lifeguard on a
23  stand that is a trained formal lifeguard, or are we
24  talking about like the Went, Wang case where it was a
25  ranger that was attempting lifeguarding services?
00014
1  Q.       I'm talking about your first example, where we
2  have trained lifeguards providing services to beach goers,
3  those types of cases.
4  A.       I misunderstood your question because I thought
5  you moved away from beaches and you were only on
6  lifeguards specific.
7  Q.       I appreciate the clarification.  I'm trying to be
8  as clear as I can, and sometimes I get caught up.
9  So with respect to the six cases you've
10  identified, rough number that we identified earlier that
11  involve lifeguards, not all of those involved in Hawaii,
12  not all of those involve oceans?
13  A.       No.
14  Q.       How many of those involve oceans of that half
15  dozen?
16  A.       Again, since I'm estimating that number I can't
17  tell you specific case, so it's hard for me to do that.
18  Obviously there's this case and Roy Chang's case that
19  involved lifeguards.  And there's a couple of swimming
20  pool cases back on the Mainland that involved
21  lifeguarding.  And the others I can't really tell you one
22  way or the other.  I know I've been involved in other
23  lifeguarding type situations, but I can't at this point
24  specifically go to the case in my mind.
25  Q.       So you can think of about half a dozen cases
00015
1  involving lifeguards, that's a rough number, it could be
2  plus or minus two or three, right?
3  A.       Correct.  I'd be surprised if it was as high as a
4  dozen.  I'd be surprised if it was only the four I just
5  mentioned.
6  Q.       So we're in that range there.  Of that range
7  you've been able to clearly identify two that involve
8  oceans, the case you're currently testifying about and the
9  one that you have been retained in?
10  A.       Right.
11  Q.       Any others that you can think about that involve
12  oceans and lifeguards?
13  A.       Specifically lifeguards and oceans, right now
14  those are the only ones I can think of.
15  Q.       That's every place you testified in the country,
16  I'm not just limiting it to Hawaii, correct?
17  A.       That's my understanding.
18  Q.       Have you rendered any opinions yet in the Chang
19  matter?
20  A.       No, I haven't.  I haven't even been given any
21  case material on it.
22  Q.       So you actually aren't even sure you're going to
23  give testimony in that case; is that correct?
24  A.       I've been retained to provide testimony as far as
25  analyze things and write a report, and if asked, give a

GILL, Richard PhD (03-02-07).txt
00016
1  deposition.
2  Q.        What do you know about that case?
3  A.        The general gist that I recall from the
4  discussions that I've had was that it was a female, I
5  believe she was mid-thirties, dry snorkel, was on the
6  inner reef, apparently ingested water, panicked.  And I
7  believe one or the other park visitors saw her struggling
8  and came to her aid and was trying to hold her out of the
9  water.  In the process he stood up on the reef and was
10 waving to try to get the lifeguard's attention.  Failed to
11 do so.  Another visitor that was in the area swimming and
12 snorkeling saw him, came to assist him in trying to assist
13 the person.  And the two of them were waving and yelling
14 for assistance.  And one of their companions that was with
15 him, wife or a friend or whatever, noticed them out on the
16 reef waving, trying to get the lifeguard's attention, and
17 went to the lifeguard stand and alerted the lifeguard that
18 it looked like somebody needed help.  And then the
19 lifeguard was dispatched.
20 Q.        Do you know what part of Hanauma Bay it occurred
21 in?
22 A.        My understanding it was the inner reef.  That's
23 all I can tell you.
24 Q.        You don't know if it was directly in front of the
25 stand, at the edge, no information?
00017
1  A.        Not at this point.
2  Q.        I know that you look at a lot of cases and
3  sometimes you take them, sometimes you don't.  Why did you
4  decide to take this case since you haven't seen any of the
5  materials yet?
6  A.        This case?
7  Q.        No.  The Roy Chang case.
8  A.        I've worked with Roy Chang over the years.  I
9  have a lot of respect for him.  I know that he would never
10 ask me to do anything other than give an open and honest
11 opinion.  If I get into the material and I say Roy, I
12 don't see anything here, he would accept that.  I would
13 honor that.  I would still be paid for my services.
14 Q.        So you have not formed an opinion in that case as
15 to the responsibility of any of the parties; is that
16 correct?
17 A.        No.  All I have is a verbal description.  So it
18 would be premature to form an opinion.
19 Q.        You said something about a dry snorkel.  I don't
20 know what that is.
21 A.        The traditional snorkel is one that is just an
22 open tube on top so when you go under the water it fills
23 with water and you have to blow the water back out.  The
24 dry snorkel is one at the top, through some mechanical
25 device, and there's a number of different ones, closes off
00018
1  to prohibit water from getting into the snorkel so you can
2  go under, a wave can wash over you.  In theory you don't
3  get water into the snorkel tube.
4  Q.        Have you been asked to render opinions with
5  regard to the duty and responsibility of the manufacturer
6  of that snorkel in that case?
7  A.        That's something that I will be looking at, yes,
8  sir.
9  Q.        Do you know if in that case that snorkel was
10 owned by the victim or whether it was rented from a
11 concessionaire?
12 A.        Again, it's early in the case.  My understanding
13 from the discussions is it appears that it was rented
14 there at Hanauma Bay.  But again I have no documentation
15 yet.  Just verbal discussions.
16 Q.        We've been talking for a little bit, and
17 sometimes your memory gets refreshed.  Any other ocean

GILL, Richard PhD (03-02-07).txt

```
18   cases you can think of?
19   A.        I appreciate you coming back to it.  If I think
20   of things I'll do my best to interject things as we go
21   along.  Nothing has come to mind.
22   Q.        Let's move to fresh water incidents.  You're from
23   Idaho, correct?
24   A.        Well, Washington.  But close.
25   Q.        You spent most your time on land, correct?
00019
1    A.        Correct.
2    Q.        You don't live on a beach front on the Mainland,
3    correct?
4    A.        No, sir, I don't.
5    Q.        There are lakes though up in that area, aren't
6    there?
7    A.        There are.
8    Q.        So you're familiar with lakes and people using
9    lakes for recreational purposes, correct?
10   A.        Very much so.
11   Q.        Have you rendered opinions with respect to
12   lifeguarding services on lakes?
13   A.        I don't believe so.
14   Q.        Have you ever been asked to or have you ever
15   rendered an opinion with respect to the need for a
16   facility to provide lifeguarding services?
17   A.        Other than obviously in this matter.
18   Q.        I'm sorry.  Let me make sure my question is
19   absolutely clear with respect to lakes.
20   Have you ever been asked to provide any opinion
21   with respect to the need for a facility to provide
22   lifeguarding services?
23   A.        I don't believe so.
24   Q.        Other than this case that we're in presently, the
25   one involving Mr. Powell and Mr. Laughlin, have you ever
00020
1    been asked to provide an opinion with respect to the need
2    for a facility to provide lifeguarding services?
3    A.        I don't know that was necessarily part of my
4    opinion.  I think it was a given that there was a need for
5    them to provide lifeguarding services because lifeguards
6    were provided.
7    Q.        In this case?
8    A.        In other cases that I've been involved in.
9    Q.        That's that roughly half dozen cases, correct?
10   A.        Correct.
11   Q.        You identified earlier pool cases?
12   A.        Correct.
13   Q.        Approximately how many pool cases can you recall
14   where you were asked to give opinions with respect to
15   lifeguarding services?
16   A.        Like I said, there's two in general that I can
17   think of on the Mainland.
18   Q.        What states?
19   A.        Washington and I believe -- That's one I'm
20   certain of.  I believe the other one was in Washington as
21   well, but it may have been Idaho.
22   Q.        The Washington case first as opposed to the
23   Washington, Idaho case.  In the Washington case was your
24   retention with respect to the providing of lifeguarding
25   services or the need to provide lifeguarding services?
00021
1    A.        Neither.  My retention was the same as it was in
2    this matter.  It was to evaluate the safety and risk
3    management principles, the human factors principles
4    associated with the incident.
5    Q.        Were lifeguards in the Washington case?
6    A.        Yes, there was.  At least one.  I think there
7    were two, but I'm not certain.  But I know there was at
8    least one.
9    Q.        With respect to the Washington, Idaho, the
```

GILL, Richard PhD (03-02-07).txt

```
10    second, was that a case where there were actually
11    lifeguards provided?
12    A.       Yes, there was.
13    Q.       How many lifeguards were there in that case?
14    A.       Since that case is vaguer, I can't remember.  But
15    I know again there was at least one that was provided and
16    there may have been multiple.
17    Q.       We covered fresh water, pools, and oceans.  Any
18    other kinds of body of water that you can think of that
19    you've provided testimony on with respect to lifeguarding
20    services?
21    A.       If you narrow it to lifeguarding services, not
22    that I can think of, no.  Again, that's not the focus of
23    what my testimony typically is in, nor is it in this case.
24    Q.       Have you ever rendered an opinion in any case
25    involving any type of body of water that a facility had an
00022
 1    obligation to provide lifeguarding services in a facility
 2    that did not have lifeguards present normally?
 3    A.       Not that I can recall.
 4    Q.       Have you ever been, in any type of body of water,
 5    asked to give an opinion that with regard to the number of
 6    lifeguards that were present in providing services at a
 7    facility, whether that number was adequate or inadequate?
 8    A.       In any body of water?
 9    Q.       Any body of water.
10    A.       So swimming pools and the like?
11    Q.       Swimming pools to ocean to fresh water.  I guess
12    the great Salt Lake, which would be another body of water.
13    A.       Well, I think I understand your question.  But
14    that's not typically the way my retention works where
15    somebody says I want you to provide an opinion about A.
16    It's the other way around.
17    What I'm retained to do is apply my training and
18    experience and expertise in human factors and risk
19    management to the facts of the case.  And that may
20    ultimately lead to that type of issue.  But I don't get
21    retained specific to the question that you're asking.  If
22    someone attempted to retain me specific to such a narrow
23    issue, whether it's lifeguarding or the lug nuts proper
24    for a wheel, I'm not sure I'd be willing to be involved in
25    the case because then that's not allowing me to apply my
00023
 1    expertise to the facts of the case.  I feel like I'm being
 2    told what I have to say, and I don't care to work in those
 3    conditions.
 4    Q.       Have you ever in the course of your career as a
 5    witness in providing expert witness services, have you
 6    ever rendered an opinion that there were inadequate number
 7    of lifeguards at a facility regardless of the type of body
 8    of water?
 9    A.       Other than this case?
10    Q.       Other than this case.
11    A.       I don't recall specifically having done so.  I
12    think the other cases that I was involved in, the general
13    ratio of lifeguards to swimmers, the general physical
14    space that they were required to monitor was such that I
15    think it was adequate.
16    Q.       Have you ever testified under oath that the ocean
17    is inherently dangerous?
18    A.       I can't tell you if I have or have not.
19    Q.       Do you have an opinion as to whether the ocean is
20    inherently dangerous?
21    A.       You'd have to be more specific.  That's such a
22    broad question.
23    Q.       Too broad to state?
24    A.       Just literally that question in and of itself,
25    yes, sir.
00024
 1    Q.       Do you believe that there are inherent dangers in
```

Page 9

GILL, Richard PhD (03-02-07).txt

2   the ocean?
3   MS. WATERS:  Objection.  Lacks foundation.
4   THE WITNESS:  Again, you're awful broad.
5   Certainly if you are scuba diving at 200 feet or if you're
6   out surfing on 50-foot waves, certainly there are inherent
7   dangers or risks associated with that.
8   BY MR. REINKE:
9   Q.       Have you ever testified under oath that people
10  entering the ocean assume the risk of inherent dangers?
11  A.       Again, that's so broad I couldn't begin to answer
12  that.
13  Q.       In those cases where you've determined that there
14  was an adequate number of lifeguards, how did you go about
15  making that determination?
16  A.       As best as I recall it was working with the water
17  safety officer type person by reviewing with them general
18  lifeguarding principles, ratios of people to lifeguards,
19  observing physical dimensions, observing the view space
20  that the lifeguards had.  Using basic human factors
21  principles to compute scan times.  And then from that
22  feeling comfortable that yes, from a human factors side of
23  things, not from a water safety officer side of things,
24  the tasks that the people were being asked to do was
25  reasonable and could be performed.
00025
1   Q.       You say you worked with water safety officer
2   types; is that correct?
3   A.       Correct.
4   Q.       What type of information did you get from them?
5   A.       Well, it would be things like basic, what I call,
6   I think I refer to it in my report as the 10 second, 30
7   second rule is one of the basic principles that I've heard
8   from a number of people in lifeguarding.  You should scan
9   the area that you are responsible for in its entirety
10  within a ten second interval.  You should be able to
11  respond to someone in a distress situation within 30
12  seconds.  Those are things that have been discussed with
13  me or I've reviewed in things that I've read over the
14  years.
15  Q.       Have you ever had any special training with
16  respect to water safety?
17  A.       Not any formalized courses.  Again, what happens
18  is my area is risk management.  I work with domain
19  specific people.  In cases like this it would be a water
20  safety person.  Consequently, there is an overlap in terms
21  of you always gain new information from these domain
22  specific people.  That would be the training that I've
23  had.  But it's not like I've been formally trained in
24  water safety or lifeguarding.
25  Q.       When we talk about water safety training, I'm
00026
1   intending to include lifeguarding within that.  Are you?
2   A.       I am.
3   Q.       So we're on the same wavelength.  When we have
4   water safety officers and they're trained how to be
5   lifeguards.  Are we on the same wavelength in that regard?
6   A.       I haven't seen anything that would lead me to
7   believe otherwise.
8   Q.       I want to make sure.  You know the deposition
9   process.  If you don't understand, you ask me to clear it
10  up.  Correct?
11  A.       If I'm aware of the fact that I have a
12  misunderstanding or potential misunderstanding, I'll
13  always ask.
14  Q.       Or if I have a misunderstanding, you'll clear it
15  up for me, right?
16  A.       I'll do my best.
17  Q.       You have no formal education with respect to
18  water safety issues; is that correct?
19  A.       Right.  There's no formalized training.  I

GILL, Richard PhD (03-02-07).txt

```
20  haven't gone and taken courses in it.  I've acquired some
21  of that basic knowledge over the years.  But again that's
22  not my area of focus of area of expertise.  It's in risk
23  management.
24  Q.        And have you ever attended any seminars with
25  respect to water safety?
00027
 1  A.        Not where that was the title of the seminar.
 2  Again, what would happen is there would be presentations
 3  of people that would be giving presentations, somebody
 4  such as Mr. Ebro, for example, where that may be the focus
 5  of their expertise, but not an entire seminar dedicated to
 6  that.
 7  Q.        So, for example, at a human factors symposium
 8  there may be someone speaking, correct?
 9  A.        Correct.
10  Q.        You attend those, correct?
11  A.        I do.
12  Q.        Do you present at those?
13  A.        I do.
14  Q.        Have you ever presented on an issue dealing with
15  water safety?
16  A.        Not specific to that.  I may have called up
17  examples from that in part of my presentation, such as
18  warning signs that are posted at swimming pools, as an
19  example.  And talking about the adequacy or inadequacy of
20  those signs.
21  Q.        How about with respect to issues involving
22  lifeguarding services, have you ever presented in any
23  seminar with respect to lifeguarding services?
24  A.        Not where that was the focus of the seminar, no.
25  Q.        Have you ever attended a seminar where that was
00028
 1  the focus of the seminar, lifeguarding services?
 2  A.        No, sir.
 3  Q.        Do you have any special training in identifying
 4  ocean conditions?
 5  A.        What do you mean by conditions?
 6  Q.        Waves, current, undertow, things along those
 7  lines.
 8  A.        I don't have any formalized training.  I have a
 9  lot of experience in that from 20 years of being around
10  the ocean and being involved in ocean type cases and in
11  safety.  But no formalized training.
12  Q.        Do you know how you estimate wave heights in the
13  state of Hawaii?
14  A.        Well, I know that up until a few years ago the
15  state of Hawaii was unique in that it estimates or reports
16  wave heights from the rear, if you will.  Whereas, most of
17  the rest of the world is peak to trough.
18  Q.        Do you know how it's reported today?
19  A.        I think it depends on the source where you get
20  your information.  My understanding is there's been a
21  movement afoot to try to bring Hawaii into the same
22  measurement scheme as the rest of the world, if you will.
23  Q.        Are you scuba certified?
24  A.        I am.
25  Q.        Are you snorkeling certified?
00029
 1  A.        I didn't know there was such a thing.
 2  Q.        I wasn't sure if there was either.  I was just
 3  checking.  So you're not?
 4  A.        No, I am not.
 5  Q.        Have you ever snorkeled?
 6  A.        Many, many times.
 7  Q.        Snorkeled at Hanauma Bay?
 8  A.        I have.
 9  Q.        About how many times?
10  A.        Half a dozen would be my best estimate.
11  Q.        Over what period of time, if you can tell me?
```

GILL, Richard PhD (03-02-07).txt

```
12  A.        Oh, in the last 15 plus years.
13  Q.        Have you ever taught scuba courses?
14  A.        No, not to get someone licensed.  I've assisted
15  people in learning to scuba, but again not a formalized
16  teacher.
17  Q.        Have you ever taught any courses with respect to
18  lifeguarding services?
19  A.        No, sir.
20  Q.        How about with respect to water safety?
21  A.        Just to my kids and their friends.
22  Q.        You've never as part of an academic program
23  taught anything about water safety?
24  A.        No, sir, I have not.
25  Q.        Have you ever published any articles with respect
00030
 1  to lifeguarding, snorkeling, scuba diving, ocean
 2  conditions?
 3  A.        I don't believe so, no, sir.
 4  Q.        And with respect to your retention on these water
 5  cases, water and lifeguarding cases, any kind of water,
 6  lifeguarding, were you retained by the plaintiffs in those
 7  cases or the defendants in those cases?
 8  A.        Both.
 9  Q.        Which cases were you retained by the defendants?
10  A.        One that I can think of in particular was the
11  shore break case at the Fairmont in Wailea.
12  Q.        And who retained you?
13  A.        Steve Dwyer.  I'm sorry.  His name was right on
14  the top of my tongue.
15  Q.        Do you recall what year that was?
16  A.        If I had to estimate I would say within the last
17  three years.  Two years back.  Maybe three years back.
18  Q.        Did that case go to trial?
19  A.        I don't think it did.  I think it settled short
20  of trial.
21  Q.        Did you give a deposition in that case?
22  A.        I believe I did.
23  Q.        And what opinions were you asked to provide in
24  that case?
25  A.        The same as this case.  To apply my training and
00031
 1  experience and expertise in human factors, and more
 2  particular risk management.
 3  Q.        Do you recall any of the specific opinions you
 4  gave in that case?
 5  A.        No, I don't.  I know it was related to user
 6  knowledge and experience and adequacy or inadequacy of
 7  warnings.
 8  Q.        And who were the defendants in that case, do you
 9  recall?
10  A.        Well, obviously the Fairmont was.  I don't recall
11  if the city, county, state, if there was a governmental
12  agency involved or not.  I honestly don't remember.  I
13  don't believe there was.  At least not at the time of my
14  involvement.
15  Another case involving the defendant would have
16  been the swimming pool case in Washington, as we labeled
17  it.
18  Q.        The first one.  Was it a municipality?
19  A.        I believe it was.
20  Q.        Do you recall which municipality, state of
21  Washington?
22  A.        No.  I think it was city.  It would have either
23  been Spokane or Spokane Valley, as I recall.
24  Q.        How long ago did that case take place?
25  A.        My best estimate would be five or six years ago.
00032
 1  Q.        Do you recall the name of the law firm, the
 2  attorney that retained you?
 3  A.        Paul Kirkpatrick was the attorney.  And the firm
```

GILL, Richard PhD (03-02-07).txt

```
 4  currently is Kirkpatrick & Startzel.
 5  Q.        And did that case go to trial?
 6  A.        I don't believe so.
 7  Q.        Did you give a deposition?
 8  A.        I'm not certain one way or another.  I don't
 9  recall having given one, but I can't tell you with
10  confidence that I did not.
11  Q.        So you've identified those two defendants in
12  cases involving lifeguarding services?
13  A.        Correct.  If you limit it to lifeguarding
14  services, those are the only two that I can think of out
15  of the four that I could think of involving lifeguarding
16  type things.
17  Q.        The other two would be the Mattoch firm and the
18  Chang firm, correct?
19  A.        Correct.
20  Q.        Those are plaintiff's firms, right?
21  A.        That's correct.  I wouldn't call them plaintiff's
22  firms.  I would say that's what they specialize in.  I've
23  done defense work, for example, with Roy Chang.
24  Q.        Never involving pools or water safety, correct?
25  A.        I don't think any of the water cases I've had
00033
 1  with Mr. Chang's office have been defense related, no.
 2  Q.        How many drowning cases have you been involved in
 3  inclusive of this one?
 4  A.        If you bear with me, if I think of them out loud
 5  in terms of the cases it would help me.
 6  Q.        I will bear with you in that regard.
 7  A.        Certainly there was one on Guam that was
 8  literally a drowning case.  There was one in Oklahoma.
 9  Other than the cases we've mentioned so far, I know there
10  was at least one other swimming pool drowning case here in
11  Hawaii.  There was the drowning case in the Washington
12  pool that we talked about.  And, I believe, the other
13  Washington, Idaho pool case was a drowning.  There was one
14  in Oregon, Washington or Oregon, it was right on the
15  border, on the ocean.  And it was disputed whether it was
16  suffocation from a bench collapse of sand or drowning from
17  the water that was what the ultimate cause of death was.
18  But I believe it was drowning.  Those are the ones that I
19  can think of off the top of my head right now.
20  Q.        Would it be fair to say then that there could be
21  circumstances where there was lifeguards present and
22  drowning occurs and there's no fault of the municipality
23  or the person providing lifeguarding services for that
24  drowning?
25  A.        Again, it's a big broad statement.  But in
00034
 1  general I can conceive of that situation, yes.
 2  Q.        You've testified for defendants who were
 3  providing lifeguarding services, and I'm presuming you
 4  didn't testify that they did anything wrong in those
 5  cases?
 6  A.        I wouldn't draw that conclusion, no, sir.
 7  Q.        Well, let's go back and spend some time with that
 8  because I'd like to understand your testimony that you
 9  provided on behalf of defendants.  You indicated they did
10  something wrong in one of those cases?
11  A.        I wouldn't draw that conclusion either.  All I'm
12  saying is you've said since I was retained by the
13  defendant, therefore, I concluded they did nothing wrong.
14  I wouldn't draw that conclusion.
15  Q.        You actually went to court and provided
16  testimony.  In any of those cases did you conclude they
17  did anything wrong?
18  A.        Again, it's been so long I can't tell you whether
19  I did or I didn't.  All I can tell you is I don't agree
20  with the premises of the general questions that you posed,
21  since I had testified for a defendant, therefore, I
```

GILL, Richard PhD (03-02-07).txt
```
22   testified they did nothing wrong.  That doesn't follow in
23   my book.
24   Q.      In regards to the Fairmont case, that specific
25   case, did you find any fault with the defendant's conduct
00035
 1   in that case?
 2   A.      I believe I did in the sense of the issues
 3   pertaining to the warnings and the adequacy.
 4   Q.      There were no lifeguards provided in that case,
 5   correct?
 6   A.      I don't believe there were, but I can't say with
 7   certainty.  But I don't believe that's a lifeguarded
 8   beach.
 9   Q.      With respect to the Washington pool case, there
10   was a lifeguard present and there was a drowning, correct?
11   A.      Correct.
12   Q.      Did you find any fault with the lifeguarding
13   services provided by the municipality in connection with
14   that case?
15   A.      Again, it's been so long I can't tell you if I
16   did or did not.
17   Q.      So if you saw your opinion in that case that
18   would refresh your recollection?
19   A.      Yes.  Again, I don't know if I testified in a
20   deposition in that case or not.
21   Q.      Or if you saw your report in that case?
22   A.      That's correct.
23   Q.      You did prepare a report in that case?
24   A.      I can't tell you I did or did not.
25   Q.      Would you agree with me that having lifeguards
00036
 1   present does not ensure that a drowning won't occur?
 2   A.      In general I would agree with that.
 3   Q.      Would you agree with the principle that the fact
 4   that a drowning occurs does not necessarily mean that any
 5   party was negligent?
 6   A.      In a broad sense of the term, yes.
 7   Q.      That's consistent with Hawaii law, isn't it?
 8   A.      I have no idea.  I'm not here to offer legal
 9   opinions.
10   Q.      In fact, you are not an expert in legal issues;
11   is that correct?
12   A.      That's correct.
13   Q.      You defer to the lawyers for that?
14   A.      And the judge.
15   Q.      Have you ever been retained by any entity,
16   whether it's a municipality or a private landowner, to
17   design a water safety program for their facility, any type
18   of water facility?
19   A.      No, sir.
20   Q.      Have you ever provided testimony on any type of
21   case against the City and County of Honolulu?
22   A.      Yes, I have.
23   Q.      About how many occasions?
24   A.      Boy, over the last 20 years, I would say in
25   deposition or court testimony there's probably been 20 or
00037
 1   more at least.  Part of my problem is it's not always
 2   clear in my memory whether it's city, county or state.
 3   Because it's not relevant to my analysis.  But I know it's
 4   a governmental entity that is the defendant.
 5   Q.      Have you ever given an opinion or testimony that
 6   blamed the plaintiff for failure to exercise commonsense
 7   for assuming a risk or failing to exercise due care?
 8   MS. WATERS:  Objection.  Compound.  Vague and
 9   ambiguous.
10   THE WITNESS:  It's a pretty broad and sweeping
11   question.  But in general yes, I think I have.
12   BY MR. REINKE:
13   Q.      Let me break it down because I want to make sure
```

GILL, Richard PhD (03-02-07).txt

14  I get this one into evidence.  And that objection was
15  probably pretty good.
16  Have you ever blamed a plaintiff for failing to
17  exercise commonsense?
18  A.      I don't know that's literally the words that I
19  would have used.  But I would say I have found fault in
20  plaintiff's behavior for the actions in which they were
21  engaged.
22  Q.      Have you ever rendered an opinion that a
23  plaintiff was negligent for failing to exercise due care?
24  A.      I don't see a difference in my mind's eye between
25  those two questions.  There may be legal terminology that
00038
1  distinguishes those two.  But in my mind the questions
2  you're asking me, have I found fault with the behavior of
3  a plaintiff in the past, and the answer is yes, I have.
4  Q.      There is a reason I asked the question I asked.
5  I'm going to try it again and see whether you appreciate
6  the distinction or not in the circumstances.  I appreciate
7  you don't or may not.  But let me ask the question.
8  Have you ever rendered a opinion that a plaintiff
9  was negligent for failing to exercise due care?
10  A.      I can't give you any different answer than I did
11  before.  The best example I can give you is you as an
12  attorney, and I don't mean to take issue with it, have
13  specific definitions with terms.  And you operationally
14  define the word entirely different than the rest of the
15  planet.  So I know that words like negligent and due care
16  are terms of art used in the legal profession.  And I'm
17  not here to offer legal testimony.  So your two questions
18  to me as an expert in safety are indistinguishable.
19  They're the same question.
20  Q.      You use the word negligent in your reports?
21  A.      I may use them, but I would use them the way a
22  layperson would use them.  Not in the way an attorney or
23  judge would use them.  And that's why I'm saying in my
24  mind those two questions that you just read me are one in
25  the same.
00039
1  I can appreciate in the legal profession that you
2  operationally define certain words to mean certain things.
3  I don't want to get caught up in a game of semantics where
4  you're using the term in the legal sense, yet my answer in
5  the question is in the common layperson's everyday use of
6  the term.  That's why I'm saying to me those two questions
7  are the same.
8  Q.      So what is your answer to the question?
9  A.      The same as I gave you to the previous question.
10  That is, I have found in the past that the behavior of a
11  plaintiff was such that it was a contributing factor in
12  the accident.
13  Q.      Have you ever given an opinion that a plaintiff
14  failed to exercise due care?
15  A.      Same answer as the first question.
16  Q.      Have you ever opined in a case where you have
17  been retained by the plaintiff that the plaintiff did, in
18  fact, contribute to their own injuries?
19  A.      Many times, yes, sir.
20  Q.      In a generic sense when you have done that what
21  factors did you take into account in determining that the
22  plaintiff had, in fact, contributed to their own injuries?
23  A.      The same that I do in any analysis whether I do
24  or don't come to that conclusion and whether I'm retained
25  by the plaintiff or the defense.  And that is a standard
00040
1  human factors safety analysis.
2  Q.      Let's focus on the conduct of plaintiff in a
3  case.  What type of factors are those standard human
4  factors?
5  A.      Well, the things that you look at are you look
Page 15

GILL, Richard PhD (03-02-07).txt
```
 6  for two broad categories, errors of omission and errors of
 7  comission.  You look for things about their knowledge of
 8  the task that they were performing.  Their skill level
 9  with the task that they were performing.  Their knowledge
10  and/or awareness of the potential hazards that were
11  observed with what they were performing.  Whether or not
12  they had the skills, expertise, and physical ability to
13  engage in the tasks that they were performing.  Whether or
14  not they knowingly chose to assume a certain risk.  In
15  other words, somebody says boy, the ice is really thin,
16  and this area is closed, you should walk around it, and
17  they say no, I want to go across.  Then that is a
18  situation that you would obviously bring to bear.
19  So those are the kinds of things that you look
20  for, the physical ability to perceive the issues that are
21  relevant to the tasks that they were performing.
22  Q.      Anything else?
23  A.      I'm sure there's other things depending on case
24  specific, but in broad categories those are the things
25  that I can think of.
00041
 1  Q.      You've been retained and being paid to provide
 2  services in this case, correct?
 3  A.      Correct.
 4  Q.      To date up through this morning do you know how
 5  much you have charged for your services in this case?
 6  A.      I don't have any idea.
 7  Q.      Do you have your bills with you?
 8  A.      No, sir, I don't.
 9  Q.      So you can't even give me that estimate?
10  A.      It would be a pretty crude estimate.  I mean, I
11  can give you an estimate if you'd like one.  You got to
12  understand I've been involved in this case for several
13  years and I don't have any idea what it is.  I can only
14  look at the file and try to provide an estimate.
15  Q.      Your office could probably provide you an
16  estimate pretty easily?
17  A.      My billing manager could tell you precisely, yes.
18  Q.      Is your billing manager working today?
19  A.      I have no idea.
20  Q.      Have you talked to her?
21  A.      No.  I hardly ever talk to her.
22  Q.      Would it be possible on a break to try to contact
23  her so I can get an answer to that question where you are
24  to date in terms of your billing?
25  A.      I'd be happy to.
00042
 1  Q.      We know what your hourly fee is.  That hasn't
 2  changed since you started this case, has it?
 3  A.      It has.  But when I'm retained on a case I keep
 4  my fees fixed through the life of the case.
 5  Q.      She would be able to tell us what your costs are
 6  for your time and what your out-of-pocket expenses were?
 7  A.      She would have to go through each of the billings
 8  and segregate it out.  We just send the bill for the total
 9  amount.
10  Q.      How often do you bill?
11  A.      I think she bills every other month.
12  Q.      So she could provide us that information if she's
13  available today?
14  A.      Of course.
15  Q.      I'm going to ask you, if you wouldn't mind,
16  giving her a call and she can e-mail me the information.
17  A.      You just want it today and today only?  If she's
18  not available today or doesn't respond --
19  Q.      I'll take it later too.
20  A.      That's what I'm trying to find out.  I need to
21  know what my task is.  I'm happy to call her and have her
22  send things today.  But if she doesn't, do you want me to
23  get a copy of all the billings and send to the court
```

GILL, Richard PhD (03-02-07).txt
24  reporter or send to Emily and she can send on to you?
25  Q.       Yes.
00043
 1  A.       Can you make a decision here?
 2  Q.       You can send them to Emily and Emily can send
 3  them to me if you can't get the information today.  That
 4  would be great.
 5  Let me ask this question.  Excluding today, do
 6  you anticipate incurring any additional fees and costs in
 7  connection with this case?
 8  A.       The only thing I would envision doing would be
 9  reviewing any additional discovery material that's
10  relevant to my area of expertise.  In particular, should
11  the defendant decide to retain a safety risk management,
12  human factors type person, any additional work that might
13  be done by Major -- I can't think of his last name now.
14  MS. WATERS:  Maceo.
15  THE WITNESS:  Major Maceo.  And getting ready for
16  trial.
17  BY MR. REINKE:
18  Q.       Obviously you can't give me an estimate about
19  unknown discovery materials.  But how about trial prep,
20  can you give me an estimate of how long you think you'll
21  spend on trial prep?
22  A.       No.  Again, that varies widely depending on
23  whether Ms. Waters or the Ian Mattoch firm does most of
24  the legwork to outline what they anticipate the direct
25  testimony being, or whether they ask me to do that.
00044
 1  Q.       If they ask you to do it, you're talking about an
 2  hour, hour and a half?
 3  A.       No.  I think it would take more than that to go
 4  through a file of this magnitude and outline the
 5  testimony.
 6  Q.       Less than 30 hours?
 7  A.       Oh, yes.  Way less than that.
 8  Q.       Somewhere between an hour and a half and 30?
 9  A.       I think that's a good spread.
10  Q.       Can you get it closer?
11  A.       I think it would be half a day, certainly under a
12  day.
13  Q.       Less than eight hours?
14  A.       Yes.
15  MR. REINKE:  Why don't we take a short break.
16  Off the record.
17                  (Recess taken.)
18  MR. REINKE:  Back on the record.
19  Q.       Have you ever written a manual, guideline, or
20  specification for the training of lifeguards?
21  A.       No.
22  Q.       In connection with this case did you review any
23  manuals or guidelines with respect to the training of
24  lifeguards?
25  A.       I think there were some basic issues like that
00045
 1  that was provided.  But it's all in my file right here.
 2  Q.       At the lunch hour I'm going to go through your
 3  file, if you don't mind.
 4  A.       Not at all.
 5  Q.       Have you ever tried to calculate your percentage
 6  of plaintiff versus defense cases?
 7  A.       I've not tried to calculate it.  I've been asked
 8  that question many times.  And in the last five years,
 9  primarily because of my work in Hawaii, the overall total
10  is skewed a little bit towards the plaintiff's case more
11  than it was.  I would say 70, sometimes as high as
12  80 percent plaintiff.
13  Q.       Of your work now how much of it takes place in
14  Hawaii?
15  A.       Certainly a higher percent of the sworn testimony

GILL, Richard PhD (03-02-07).txt
```
16   takes place over here for some reason.  I think a lot of
17   that is just the CAP arb program.
18   Q.        Have you ever been disqualified by a court with
19   respect to the areas that you've claimed to be an expert?
20   A.        No, I have not.  There's been one time where I
21   was not permitted to testify, so to speak.  But that was
22   based on two separate issues.  And the judge's ruling, I
23   think, was right on on both of them.
24   Q.        When did that occur?
25   A.        Oh, I think it's been ten years or more now.
00046
 1   Q.        And I seem to recall reading something about two
 2   years ago where you weren't allowed to testify in a case
 3   involving the city and county.  Do you recall that?
 4   A.        I think it was a preservation deposition that was
 5   given.  And I think there was an issue about the
 6   preservation depo not being shown to the jury.
 7   Q.        Have you ever participated in what they call a
 8   Dalbert hearing?
 9   A.        Many times.
10   Q.        When was the last time?
11   A.        I don't recall.
12   Q.        Have you ever had to do that in Hawaii?
13   A.        I believe I did a number of times, particularly
14   on ones pertaining to what I would call risk management
15   issues pertaining to parks and recreation.  In other
16   words, the area of expertise that I'm offering in this
17   case.
18   So it would be like the Motu case would have been
19   one.  I don't know if there was or not.  For another one
20   that went to trial was either Howard or Louis, which was
21   another.  I don't think it was a drowning.  It was a
22   quadriplegic water accident case.  My testimony in safety
23   and risk management for parks and recreational areas was
24   the area of expertise.  I think there may have been one on
25   that.  I don't recall there being one in the federal case,
00047
 1   the Went, Wang case.  There may have been a motion that
 2   was filed and resolved itself without me even knowing
 3   about it.
 4   Q.        The Howard Louis case, what was that case about?
 5   A.        It's either Howard or Louis.  I don't recall
 6   which of the two it was.  It was an accident over on
 7   Kauai.  It was somebody that was, I believe, paralyzed or
 8   quadriplegic.  I think they were just paralyzed from a
 9   diving accident.
10   Q.        In fresh water?
11   A.        Fresh water.
12   Q.        The pools?
13   A.        No.  This was Kauai side.  It was a stream, river
14   bed where people had routinely damned up an area with
15   rocks to make it for a swimming pool.
16   Q.        Was that a warnings case?
17   A.        Warnings was part of the case.  The bigger issue
18   was the same as the facts in this case, safety and risk
19   management.
20   Q.        And you were representing the plaintiff or the
21   defendant in that case?
22   A.        Plaintiff.
23   Q.        Who was the retaining attorney?
24   A.        I'm not sure if it was John Rapp or if it was
25   somebody in Mike Green's office.  But it was Mike Green's
00048
 1   office that did the actual trying of the case.  I can't
 2   remember his name right now.  But it wasn't Mike Green.
 3   But it was one of his senior associates.  I would
 4   recognize the name, but I can't think of it off the top of
 5   my head.
 6   Q.        That case didn't involve lifeguarding services,
 7   did it?
```

GILL, Richard PhD (03-02-07).txt

```
 8  A.       NO.  It was just -- It involved the same issues
 9  as this case involved, risk management and park and
10  recreation area.
11  Q.       Do you know how many beaches there are in the
12  state of Hawaii?
13  A.       No, sir, I don't.
14  Q.       Do you know how many guarded beaches there are in
15  the state of Hawaii?
16  A.       Based on what I read in the discovery material,
17  there's 18 on Oahu is what I recall.  But I don't know
18  what it would be for the other islands.
19  Q.       Do you know who is responsible for providing
20  lifeguarding services on the island of Oahu?
21  A.       I don't know the official organization, no, sir.
22  Q.       Do you know who is responsible for providing
23  lifeguard services on the island of Hawaii?
24  A.       No, sir, I don't.
25  Q.       How about in the county of Maui?
00049
 1  A.       I don't.
 2  Q.       How about the county of Kauai?
 3  A.       I don't.
 4  Q.       Are you a member of any water safety
 5  associations?
 6  A.       No, sir.
 7  Q.       How about lifeguarding associations?
 8  A.       No, sir.
 9  Q.       Pool safety?
10  A.       Not specific to that, no, sir.
11  Q.       You are a member of some human factors societies,
12  correct?
13  A.       I am.
14  Q.       Do you serve on any committees for any of those
15  human factors organizations or associations that deal with
16  water safety?
17  A.       Not specific to that, no, sir.
18  Q.       Do you know if any of those organizations have
19  committees or working groups that deal with water safety
20  issues?
21  A.       That deal with, yes.  That that is the specific
22  title to which they focus their attention, no, there are
23  not to my knowledge.
24  Q.       which groups deal with water safety issues as
25  subcommittees or working groups?  I don't want to get
00050
 1  caught up in too much nomenclature because some
 2  associations will call it committee or working group or a
 3  task force.  We understand what we're talking about,
 4  correct?
 5  A.       We do.  At least I think I have a pretty good
 6  feel for what you are talking about.  I would say it would
 7  be the safety group and the forensic group would be the
 8  two most likely.
 9  Q.       But nobody that specifically breaks down and says
10  water safety, this is our focus?
11  A.       No.
12  Q.       Are you aware of any journals dealing with human
13  factors and water safety issues?
14  A.       As I understand your question, I'm aware of many
15  journals that have to do with human factors.  And within
16  those would be articles or topics pertaining to water
17  safety.  But I don't know of any that would be human
18  factors that is exclusive to water safety.
19  Q.       Dedicated to water safety?
20  A.       No.
21  Q.       You did understand my question, specifically both
22  parts of it, even though I only gave one question.
23  Have you in the course of your work on this case
24  reviewed any articles from any of those human factors
25  groups dealing with water safety?
```

Page 19

GILL, Richard PhD (03-02-07).txt

00051
1  A.      No.  I didn't feel I needed to for the purposes
2  of my involvement in this matter.
3  Q.      In connection with this case did you perform an
4  accident reconstruction?
5  A.      No, sir.
6  Q.      In connection with this case did you form any
7  opinions dealing with causation, that is, how this
8  accident was caused?
9  A.      Well, I think as I would use the term that's the
10  overall focus of my analysis in risk management.
11  Q.      Would you define human factors for me?
12  A.      Human factors is the science that combines two
13  seemingly disjointed sciences.  On the one hand you have
14  traditional engineering design, how do you design and
15  operate a structure, a facility, a product.  The problem
16  with traditional engineering is that it doesn't always
17  fully take into account humans, their limitations and how
18  they're likely to interact with the product, service, or
19  facility.  So you turn to the science of human behavior,
20  psychology.  And if you temper the design with an
21  understanding of human limitations and human expectations,
22  then you can end up with a design that's easier to use,
23  safer to use, less likely someone will get hurt.
24  Q.      In connection with this case you're presenting
25  expert opinions in the area of human factors; is that
00052
1  correct?
2  A.      I think that's the broadest arena in which my
3  work falls in, yes.
4  Q.      In connection with this case did you form any
5  expert opinions with respect to visibility issues?
6  MS. WATERS:  Objection.  Vague and ambiguous.
7  THE WITNESS:  As I understand your question, the
8  visibility issues that would be involved in this case in
9  terms of is it physically possible versus is it likely
10  perceived, yes, those are things that I took into account
11  in my analysis.  I think they're discussed in Exhibits 1
12  and 2.
13  BY MR. REINKE:
14  Q.      Did you perform any visibility analysis per se,
15  that is, did you conduct any tests of visibility in
16  different locations within Hanauma Bay?
17  A.      I did not conduct any tests.  I made observations
18  while I was at the site for the purposes of this case.
19  But I didn't conduct any literal tests.
20  Q.      In connection with this case are you claiming to
21  give any expert opinions with respect to lifeguard
22  services?
23  MS. WATERS:  Objection.  Vague and ambiguous.
24  Overbroad.
25  THE WITNESS:  I think the work that I'm doing in
00053
1  risk management overlaps into that area.  But that's not
2  the focus of what my testimony is.  I think when you start
3  to get into the focus of lifeguard services you are now
4  talking about the expertise of somebody like Mr. Ebro, at
5  which point I would defer to him.
6  BY MR. REINKE:
7  Q.      How about snorkeling, are you providing any
8  expert opinions with respect to snorkeling in connection
9  with this case?
10  A.      The only opinions I can think of would be the
11  ones that I discuss about the qualifications of Mr. Powell
12  and Mr. Laughlin.  That there was no evidence to indicate
13  they were inappropriate for attempting to be snorkeling in
14  the bay given their skill level of swimming and past
15  experiences.
16  Q.      Did you express any expert opinions in connection
17  with this case with respect to physical ocean conditions?

GILL, Richard PhD (03-02-07).txt
```
18  A.        Other than what's listed in my report, no, sir.
19  Q.        Have you ever had any formal training in
20  oceanography?
21  A.        Not in oceanography, no, sir.
22  Q.        How about in ocean sciences?
23  A.        No, sir.
24  Q.        Ever given any lectures?
25  A.        No, sir.
00054
 1  Q.        Written any materials?
 2  A.        No, sir.
 3  Q.        Have you ever attended any lectures with respect
 4  to ocean studies, that is, the current, waves, etcetera?
 5  A.        Not where that was the focus of the seminar.  But
 6  where that was included within the presentation, yes.
 7  Q.        You don't claim any specific expertise in that
 8  area, do you?
 9  A.        No.  I would defer to someone.  I think it's Mr.
10  Lukas.
11  Q.        Are you an expert with respect to the physical
12  causes of drowning?
13  A.        I have general knowledge in that area above and
14  beyond the lay person, but I'm not -- That's not again the
15  focus of my expertise.
16  Q.        Are you rendering any opinions in connection with
17  this case with respect to the drowning event and how it
18  occurred and why it occurred?
19  MS. WATERS:  Objection.  Vague and ambiguous.
20  Overbroad.
21  THE WITNESS:  The literal act of itself, whether
22  it's a wet drowning or a dry drowning, the exact mechanics
23  of that, no, sir.  But in terms of the broad picture of
24  the drowning, again that's the focus of my report.
25  BY MR. REINKE:
00055
 1  Q.        I appreciate you narrowing that for me.  That was
 2  my intent, to limit that question.  I understand the whole
 3  case is about this drowning, isn't it?
 4  A.        That's right.
 5  Q.        Do you have any expertise, particular expertise
 6  in municipal operations?
 7  A.        Other than safety and risk management, no, sir.
 8  Q.        When you say safety and risk management, what do
 9  you mean by that?
10  A.        I evaluated and reviewed many safety and risk
11  management programs for various municipal operations.
12  Q.        Do you have any specific training with respect to
13  the budgeting process in a municipality or any
14  governmental entity?
15  A.        No, sir.  No, sir.
16  Q.        So you don't claim any expertise in that area, do
17  you?
18  A.        No.
19  Q.        Are you familiar with the term resource
20  allocation?
21  A.        I am.
22  Q.        What do you understand it to mean?
23  A.        Same thing every one of us in everyday life
24  faces.  You have a limited set of resources and you have
25  to allocate those according to your needs.
00056
 1  Q.        In connection with your work in this case did you
 2  review any source materials that are not contained in your
 3  file?
 4  A.        No, sir.  Excuse me.  If I can correct that.  I
 5  think we mentioned at the beginning of the deposition I
 6  forgot to bring the videos that I reviewed.
 7  Q.        What were on those videos?
 8  A.        As I recall, there were two separate videos.  One
 9  was a compilation of news stories, I believe, was one of
```

GILL, Richard PhD (03-02-07).txt
```
10  them.  And the other one was a walk through of Hanauma Bay
11  that, I believe, was shot by Scott Suzuki Jones from Ian
12  Mattoch's firm.
13  Q.       I saw some reference to that Tom Ebro created
14  some type of a video.  Do you recall anything that he
15  might have prepared?
16  A.       I don't.
17  MR. REINKE:  I assume both of those videos have
18  been turned over as part of discovery?
19  MS. WATERS:  I assume too.  Do you know?  I don't
20  know.  I think we gave you everything.
21  MR. REINKE:  I'll look at lunch and see.
22  Q.       Are you able to tell me what you would consider
23  to be any authoritative sources with respect to, or
24  treatises regarding lifeguard services?
25  A.       No.  If you're going to talk about lifeguard
00057
1   services, that's somebody I would defer to would be Mr.
2   Ebro.  That's not the work I'm doing in this case.
3   Q.       The answer to my question is no, you don't know
4   of any?
5   A.       No, not off the top of my head.  Just if I can
6   fill in my answer to make sure I'm not leaving anything
7   out for you because I never want to play hide the ball.
8   Within that work I'm doing and lifeguarding
9   services, what I would refer you to is the textbook by
10  Peterson.  It's Risk Management in Parks and Recreation
11  Areas.  That would be applicable to the work that I'm
12  doing in this case, which obviously then begins that
13  overlap with the lifeguarding services, which is a domain
14  specific area that I would then defer to somebody like Mr.
15  Ebro.
16  Q.       Peterson?
17  A.       I believe that's the author.
18  Q.       Do you remember his first name?
19  A.       I sure don't.
20  Q.       You didn't refer to it in connection with this
21  case?
22  A.       I didn't pull my copy out and review it because
23  I've spent 30 years with risk management so I know it
24  inside and out.  If you are asking for an authoritative
25  text on how would you do risk management for something
00058
1   like lifeguarding services at Hanauma Bay, the starting
2   point is risk management.  And then I would turn to a book
3   like Peterson.
4   When you get to specifics of traffic management,
5   then you would go to a civil engineering type thing.
6   Specific lifeguarding services you'd go to somebody like
7   Mr. Ebro.
8   Q.       In forming any of your opinions with respect to
9   the number of lifeguards that you believe should have been
10  present at Hanauma Bay on the day of the incident, did you
11  perform any type of independent study of the lifeguarding
12  services where you actually went out and collected data
13  and then used that data to reach your opinions?
14  A.       No.  I just analyzed the data that I was
15  provided.
16  Q.       You didn't, for example, go to any of the beaches
17  on Oahu for purposes of observing the lifeguarding
18  services at those beaches?
19  A.       No.  Again, I just analyzed the data that I was
20  provided.
21  Q.       And are you a member of the Red Cross?
22  A.       I am not.
23  Q.       Have you ever been on a swim team?
24  A.       I don't think so.
25  Q.       You'd remember, honest.
00059
1   Have you been a member of any sports safety
```

GILL, Richard PhD (03-02-07).txt

```
 2  associations?
 3  A.      No, sir.
 4  Q.      Are there such things as associations of
 5  individuals dealing with sports safety?
 6  A.      I believe there is, but I couldn't give you the
 7  name of one off the top of my head.
 8  Q.      How about parks and recreation safety, are there
 9  any associations dealing with that issue where you get a
10  group of people that are in that industry that form an
11  association or a group that come together to share common
12  experiences?
13  A.      I would have to refer to the Peterson book to
14  identify those.  I'm not familiar with those just off the
15  top of my head.
16  Q.      Certainly you are not a member of one then?
17  A.      No, sir.
18  Q.      You indicated earlier in this deposition you'd
19  been to Hanauma Bay about six times in the last 15 years?
20  A.      That would be my best estimate.
21  Q.      An estimate could be plus or minus a few,
22  correct?
23  A.      Correct.
24  Q.      You don't keep a diary of everything you do, do
25  you?
00060
 1  A.      No, sir, I sure don't.
 2  Q.      On those six occasions, I'm going to use the word
 3  six, we understand it's plus or minus a couple, on those
 4  six occasions did you go with other people?
 5  A.      Not every time, but I would say most of the
 6  times.
 7  Q.      Have you taken your family to Hanauma Bay?
 8  A.      I have.
 9  Q.      How long ago was that?
10  A.      Well, I took my children there, I would estimate,
11  around 1995.
12  Q.      How old were they at the time?
13  A.      They were born in 83 and 86.  So you can do the
14  math.
15  Q.      I can.
16  A.      So nine and 12 in round numbers.
17  Q.      And did you take them snorkeling?
18  A.      I did.
19  Q.      Did you go outside the inner reef?
20  A.      I believe the day that I was there with them we
21  did, yes.
22  Q.      Have you ever gone into the Toilet Bowl?
23  A.      I have not.
24  Q.      Have you ever gone out to Witch's Brew?
25  A.      I have not.
00061
 1  Q.      My question was the six trips that you were out
 2  there.
 3  A.      That's correct.
 4  Q.      Have you ever gone --
 5  A.      I couldn't have gone there if I wasn't there.
 6  Q.      What we didn't discuss was your work in this
 7  case.  I'm assuming you went out to Witch's Brew in this
 8  case?
 9  A.      No.  It was closed off.
10  Q.      You didn't walk out to the point?
11  A.      No, sir.  It was closed off.
12  Q.      Have you ever then physically as a person looked
13  down into Witch's Brew?
14  A.      Only from the approach that you come into Hanauma
15  Bay.
16  Q.      So the closest you've come to the Witch's Brew
17  area then is four or 500 yards?
18  A.      There's been a lot of estimates on the distance
19  from the shore.  And I would estimate it to be on the
```

GILL, Richard PhD (03-02-07).txt

```
20    order of a thousand feet if you are where the gate is or
21    less from where the gate is.
22    Q.      Let's defer the measurement until later.
23    Have you ever snorkeled out or swam out so you
24    were parallel to the Witch's Brew area?
25    A.      I can't tell you with certainty.  I know I've
00062
 1    gone well beyond the inner face of the outer reef, if that
 2    phraseology is meaningful to you.
 3    Q.      Well, it's meaningful to me, but it may not be
 4    meaningful to someone who may read this transcript.
 5    We've premarked before the deposition Exhibit 3.
 6    I want to make a couple of representations for the record.
 7    This is a photograph of Hanauma Bay.  I will admit I have
 8    no idea what year it was taken, what the weather
 9    conditions were like, or what the sea conditions were
10    like.
11    This exhibit has been used in prior depositions
12    in this case.  This specific exhibit actually came from
13    Mr. Dorr's March 17th, 2006 deposition.  Because it's from
14    somebody else's deposition, we have it with some marks
15    already on it.  I'm going to represent that on the top of
16    the exhibit, on the beach there's an X.  Do you see that
17    marked with black?
18    A.      I do.
19    Q.      You didn't make that, did you?
20    A.      No, sir.
21    Q.      Now, at the bottom on the left-hand side there's
22    a circle.  Do you see that?
23    A.      Out in the water.
24    Q.      You didn't make that?
25    A.      No, sir.
00063
 1    Q.      You don't know what those are intended to
 2    represent?
 3    A.      I could only speculate.
 4    Q.      Do you recall reading Mr. Dorr's deposition?
 5    A.      I do.
 6    Q.      At one time if you read the deposition -- And you
 7    had the exhibits present too, didn't you?
 8    A.      I'm not certain if I did or not.
 9    Q.      You may have been provided depositions without
10    exhibits?
11    A.      That often happens, yes, sir.
12    Q.      Really.  Okay.
13    You would have noted, in any event, in reading
14    through his deposition that he made marks on this diagram,
15    correct?
16    A.      I don't specifically recall that level of detail
17    from his deposition.  But that's typically what happens.
18    Q.      You would assume that that would be the case.  So
19    if you did read the deposition carefully and you had
20    looked at that you would then know whether or not, or
21    rather what those symbols represented, correct?
22    A.      That's correct.  That's why I said I could
23    speculate what they are.
24    Q.      Tell me what you think they are.
25    A.      I would speculate that the X represents the
00064
 1    lifeguarding tower, the one that most likely Mr. Moses was
 2    in, and Mr. Neves.
 3    MS. WATERS:  Neves.
 4    THE WITNESS:  I would speculate the circle is the
 5    location where, the general location where the second body
 6    was located.
 7    BY MR. REINKE:
 8    Q.      Whose body was that?
 9    A.      I don't recall the order that they were pulled
10    up.
11    Q.      I think it's fair to work with those two
```

GILL, Richard PhD (03-02-07).txt
12  assumptions that that's what those marks mean from Mr.
13  Dorr's deposition.
14  A.      Okay.
15  MR. REINKE:  Counsel, do you recall that being
16  the case?
17  MS. WATERS:  Vaguely.  It was a year ago.  But it
18  doesn't sound wrong.
19  BY MR. REINKE:
20  Q.      Do you recall what the designation was for the
21  lifeguard tower, what the lifeguards called it?
22  A.      You know, there was like a 3 1A and a 3B or
23  something.  Again, I didn't memorize which one was which.
24  Q.      Let's assume, I think it's a fair assumption,
25  that the X marked the lifeguard tower where Mr. Moses and
00065
1   Mr. Neves were.  Can you identify on this map with your
2   finger where the Witch's Brew point is?
3   A.      Yes.  That would be, if you connected the circle
4   and the X, the protruding point of land, that line would
5   intersect and would be the point of Witch's Brew.
6   Q.      Can you identify the Witch's Brew ledge for me?
7   A.      Well, if you start with that point and go
8   counterclockwise around you can see where there's some
9   shorelines.  But the shoreline going counterclockwise
10  around from that point would be where the ledge area is.
11  Q.      How about the Witch's Brew area, can you tell me
12  where that is on this map, or this photograph rather?
13  A.      I would say that the circle is kind of the
14  bull's-eye for it, if you will.  It would be radiating out
15  from that would be the general area.  You can see how the
16  shore starts to form an arch.
17  Q.      Now, with regard to this area from where the
18  beach ends right up here up to the Witch's Brew point, do
19  you know what that area is referred to as?
20  A.      Just so your record is clear, you pointed to the
21  exhibit and said the beach area here, you were pointing to
22  the beach that's on the left-hand side of the exhibit
23  where it terminates into the shore.
24  Q.      That's correct.
25  A.      I don't recall the name of that area, no.
00066
1   Q.      Let's use red so we can make sure that you've got
2   the red markings.  I'd like you to make a triangle where
3   Witch's Brew point is where you've identified that for me.
4   And then can you draw a line, a red line, along what
5   you've identified as the Witch's Brew ledge.
6   A.      Well, that would be the area --
7   Q.      You've drawn a dotted line?
8   A.      Correct.  It's within that general region.
9   Q.      Then the area that you are referring to as
10  Witch's Brew, then would that be that body of water where
11  the black mark at the bull's-eye and that body of water
12  radiating out from there, correct?
13  A.      Correct.  More or less it's kind of in an oval
14  shape as it appears on this photograph.
15  Q.      We're not going to mark that because I can
16  understand and it's pretty clear from your explanation.
17  If at any point it becomes unclear, that you think we're
18  talking about someplace else, please let me know.
19  The coastline, I'd like you to mark it with a
20  green marker, the area from where the beach terminates on
21  the left-hand side up to Witch's Brew point.  You're not
22  sure what that's referred to; is that correct?
23  A.      No.  I would call it the ledge that leads up to
24  the Witch's Brew.
25  Q.      Why don't you go ahead and draw a green line on
00067
1   that.  That's the ledge that leads up to Witch's Brew?
2   A.      Right.  There's a foot path or a trail along the
3   ledge that leads up there.

GILL, Richard PhD (03-02-07).txt

```
 4   Q.        When you went out there that was closed; is that
 5   correct?
 6   A.        That's correct.
 7   Q.        There was a physical barrier preventing you from
 8   going out there?
 9   A.        There was a gate with a fenced wing that hung out
10   over the water and multiple warning signs.
11   Q.        Now, on your snorkeling trips, now we're back to
12   snorkeling, I had asked you before whether you ever had
13   gone out to an area parallel to Witch's Brew so you could
14   look into Witch's Brew.
15   A.        Correct.
16   Q.        Now that we have the photograph, does it refresh
17   your recollection whether you ever went out into the area
18   parallel to Witch's Brew during any of your trips?
19   A.        I would say most likely that I was past a tangent
20   from Witch's Brew point on one or more occasions.
21   Q.        Is there a reef out there to look at?
22   A.        Well, it depends on what you want to call reef.
23   There is some area with some fish and some coral.  And if
24   you are snorkeling and you want to get away from the
25   crowds, along the side the Toilet Bowl is on there is some
00068
 1   areas.
 2   Q.        Are there any blank areas out there where there's
 3   nothing but sand?
 4   A.        I think you can see that in the photograph, yes.
 5   Q.        How about from your personal experience, do you
 6   recall that?
 7   A.        I do.
 8   Q.        On the six occasions that you were at Hanauma Bay
 9   prior to this case, had you ever walked out on the area of
10   the pathway you've marked with the green line?
11   A.        I don't believe so.  I don't have a specific
12   recollection of it.
13   Q.        On the right-hand side of the photograph is the
14   shoreline that leads out to Toilet Bowl, correct?
15   A.        Correct.
16   Q.        Had you ever been out on that path?
17   A.        I don't recall having done so.
18   Q.        On the days that you were at Hanauma Bay were
19   there lifeguards present?
20   A.        I never noticed one way or another.  I would
21   assume they would be.  But I can't say I physically
22   observed them other than the day I went there for the
23   purposes of this case.
24   Q.        On the days prior to that you didn't have any
25   opportunity to observe the lifeguards of what they were
00069
 1   doing; is that correct?
 2   A.        That's correct.
 3   Q.        Have you ever gone to a beach in Hawaii that is
 4   not guarded by lifeguards?
 5   A.        I would assume so, but again I don't really pay
 6   attention to whether there is or isn't a lifeguard there.
 7   Q.        Have you ever been to Hanauma Bay when you were
 8   told you could not go into certain sections of the bay?
 9   A.        Never.
10   Q.        So as far --
11   A.        Let me take that back.  Nobody told me that I
12   couldn't go to Witch's Brew.  But when I attempted to walk
13   around to the trail it was obvious that I was not
14   permitted to go there from all the warning signs and the
15   barricade that was set up.
16   Q.        Prior to your work on this case had you ever been
17   at Hanauma Bay where you were told you could not go to any
18   part of Hanauma Bay?
19   A.        Never.
20   Q.        Do you recall reading Mr. Bregman's deposition?
21   A.        I do.
```

Page 26

GILL, Richard PhD (03-02-07).txt
22  Q.        Do you ever recall reading in there he said
23  basically you could swim anyplace in the bay?
24  A.        I'm not disputing that.  But I don't recall that
25  specifically.
00070
1   Q.        Let me ask you with respect to deposition
2   testimony of -- Let's just start generally.  You've read a
3   number of depositions in this case, correct?
4   A.        Correct.
5   Q.        Did you give any particular weight to any
6   deposition greater than you might have given to another
7   deposition?  In other words, you said this one is
8   authoritative as compared to any of the rest of them?
9   A.        As I understand your question, what I would say
10  is certainly I would give more weight to policy and
11  procedures to a person that's higher up, such as Mr.
12  Bregman, for example, than I would to a person that is a
13  Water Safety Officer 1, in terms of policies, procedures
14  and so forth.
15  In terms of did I give more weight to people
16  because this person seems so grossly inconsistent with the
17  physical evidence and the rest of the testimony of all the
18  other eyewitnesses in this case, no.  I thought in general
19  the testimonies were pretty consistent.  The usual
20  variability that you would find.  But there was no one
21  person that stood out as being an out liar to the rest.
22  Q.        So you didn't make any credibility assessments in
23  connection with your review of these depositions?
24  A.        No.  Actually I'd say the other way around.  I
25  saw nothing to suggest that there was any individual that
00071
1   I would not believe to be credible.
2   Q.        Any discrepancies would be what you would
3   characterize as the normal, we all see an accident, we all
4   see it differently type of discrepancies?
5   A.        Correct.  For example, I know there was
6   testimony, I think it was Goodwin, that said whenever we
7   close area two or the outer area we post a sign at the
8   kiosk.  And Moses said no, we don't post a sign there.
9   That's policy procedure difference.  Somebody thinks they
10  do things one way and somebody thinks they do it another.
11  I think those kinds of issues become important in a case
12  like this.  But I can't resolve what the ultimate truth
13  is.
14  Q.        In formulating your opinions do you take into
15  account those discrepancies and the credibility of each of
16  those witnesses in terms of reaching your opinions?
17  A.        Yes, I do.
18  Q.        And in connection with this case did you find any
19  of the witnesses to be more credible in terms of assisting
20  you in forming your opinions than other witnesses?
21  A.        No.  Again, I could not see any witness that
22  appeared to be an out liar.  They all in my opinion were
23  reasonably credible witnesses.  It just points to in my
24  opinion those type of conflicting testimonies that point
25  to the inadequacies of the risk management program.  In
00072
1   other words, there appears to be some procedure that's in
2   place, but it must not be very structured or formalized
3   since some people know it and some people don't.  That's
4   what I would attribute those kind of differences to as
5   opposed to somebody that just wasn't credible.
6   Q.        I want to stay with the issue of closing of areas
7   and posting signs because you specifically referred to Mr.
8   Goodwin, WSO Goodwin, saying there would be posting up on
9   the kiosk when certain areas were closed; is that correct?
10  A.        I believe it was.
11  MS. WATERS:  Objection.  I think he said Bregman.
12  BY MR. REINKE:
13  Q.        Is it Goodwin or Bregman?

GILL, Richard PhD (03-02-07).txt

14  A.       I thought it was Goodwin that said signs were
15  posted on the kiosk.  I can look at my notes.  It should
16  be in my report.
17  Q.       It is in your report and it is Goodwin.  That's
18  why you got it right the first time.
19  Do you recall when WSO Goodwin stopped actively
20  working at Hanauma Bay?
21  A.       No, I do not.  I know he was not stationed at the
22  bay on the day of the accident because he brought the jet
23  ski around.
24  Q.       If he had been there several years before and
25  didn't remember what the policies and procedures were,
00073
1   your understanding of someone who is currently working
2   there, would you take that into account in formulating
3   your opinions?
4   A.       Well, yes.  I think that's what's so telling.
5   It's not that Goodwin is saying I don't remember us
6   putting signs.  It's the other way around.  It's Goodwin
7   saying when I was there a couple of years ago, when we
8   closed the area we did put signs up.  And now current day
9   Moses is saying no, we don't put signs up.  Well, in fact,
10  they used to and they no longer, that would be a serious
11  criticism of the risk management program, particularly
12  given the increase in drownings that are occurring.
13  Q.       Is there anything from your trips at Hanauma Bay
14  prior to the investigation you did in this case, anything
15  from those trips that you are utilizing in formulating
16  your opinions in connection with this case?
17  A.       Yes, I think there is.
18  Q.       Can you tell me what those facts or factors are?
19  A.       It's the general scheme type of things I
20  discussed in my report.  When you arrive there I think you
21  have a lowered subjective risk.  You start from being up
22  high on the bay and you look down and it appears that it's
23  placid and tranquil water, in part because the inner reef
24  is and in part because you are elevated up.
25  If you arrived down at the shore it is clearly a
00074
1   public beach.  Lifeguard stands are prominent.  You can
2   see them.  There's concessionaires that are there.  You
3   see people of all ages, elderly and young kids, all in the
4   water.  It's leads you to again a very lowered level of
5   vigilance.
6   You feel like you are in a safe place because of
7   the reef, the shore break is virtually non-existent, it's
8   just water lapping up on the beach.  So you truly do get a
9   sense that you are in a placid, tranquil park and there is
10  no need for a heightened level of vigilance.
11  The other thing that I recall distinctly all the
12  times that I was there was never any encounters from any
13  lifeguards, anybody advising me or warning me one way or
14  another.  Nobody telling me to go to the lifeguards.  No
15  signs directing me to the lifeguards.  There was never an
16  issue about where you would go and swim.
17  People were on the outer reef in large numbers
18  every time I've ever been there.  I've never seen it where
19  they've said don't go out there.  Yet there have been
20  times that I've been out there where there were pretty
21  heavy seas on the outer reef.  I'm a highly experienced
22  scuba diver and snorkeler and been around water all my
23  life.  And I felt that it was okay for me to be there.
24  But there are a lot of people that I saw there that
25  appeared to me to be first time snorkelers or very
00075
1   inexperienced that I would agree with the safety manual
2   that's given to the visitors' assistants that say the
3   majority of the people that are out in that area have no
4   business being there.  That was my observation.  I mean,
5   that doesn't mean that none of them should have been

GILL, Richard PhD (03-02-07).txt
 6    there.  There were people that were clearly very qualified
 7    and competent in their snorkeling ability.  But there were
 8    ones that I was concerned about.
 9    Q.        Anything else that you recall, any fact or factor
10    that you recall from your prior visits that you are taking
11    into account in this case?
12    A.        The huge number of people that were there.  If
13    you translate that into the number of functioning
14    lifeguards, and their task of trying to monitor that many
15    people, particularly when they're snorkeling, the
16    tremendous difficulty that poses.  You have one and a half
17    lifeguards for several thousand people that are snorkeling
18    at any given time.
19    Q.        Anything else?
20    A.        Not that I can think of, no.  Another one just
21    occurred to me.  I think I again talked about this in my
22    report.  Unlike any other beach I've ever been to, you are
23    surrounded by land.  In other words, normally when you are
24    snorkeling off of a beach you have land on one side and
25    it's all water going out from there.  Whereas, here at
00076
 1    Hanauma Bay, no matter how far out towards the ocean you
 2    go you still have land on both sides.  I think again that
 3    plays into that sense of security, that you are close to
 4    land.  You're not going to get caught up into a riptide
 5    and pulled down the shore because you are surrounded by
 6    land.
 7    Q.        Are there any riptides in Hanauma Bay?
 8    A.        I have not experienced any.  There are certainly
 9    what I recall experiencing the most is the huge surge
10    going through the channel or the slot.
11    Q.        That was a surge pulling you out, correct?
12    A.        It depends on the tide.  I'm trying to think.  I
13    believe most of the times that I can think of experiencing
14    it it's the difficulty getting back in.
15    Q.        The water is rushing out the slot, and getting
16    back in can be a bit of a challenge?
17    A.        Correct.
18    Q.        Are you a member of ANSI?
19    A.        I am not currently.  I was during the late
20    eighties when they were developing the Z 535 series.
21    Q.        That is the warning signs series, correct?
22    A.        That's correct.
23    Q.        Were you on any of those committees?
24    A.        I was an ad hoc member when the Z 535 series were
25    being developed.
00077
 1    Q.        Did you do any specific work on the 535 series?
 2    A.        As an ad hoc member I would review drafts of the
 3    standards.  But I was not in the active committee meetings
 4    that were generating them.
 5    Q.        You would give them back comments?
 6    A.        Correct.
 7    Q.        Were those comments published?
 8    A.        I don't think so.
 9    Q.        Who was the chair of the committee?
10    A.        I don't recall.  It's 20 years ago.
11    Q.        who was your contact?
12    A.        I don't even recall that.
13    Q.        Did you refer to the 535 series in preparation of
14    any of your opinions in this case?
15    A.        I think I might have referenced that in the
16    report, saying that the signs that were there were not Z
17    535 compliant.
18    Q.        Did you actually go back and reference the
19    standard though to come to that opinion?
20    A.        I didn't have to.  I know the standard well
21    enough that I can look at a sign and identify things that
22    don't comply if there are.  Sometimes it may get esoteric
23    and I would have to look up the standards.

GILL, Richard PhD (03-02-07).txt
```
24   Q.       ANSI is a voluntary standard, correct?
25   A.       Correct.
00078
 1   Q.       No entity is required to follow ANSI by any law
 2   that you are aware of?
 3   A.       I can't make an opinion of that one way or the
 4   other.
 5   Q.       How about the state of Hawaii, are you familiar
 6   with any statutes that mandate that entities comply with
 7   ANSI?
 8   A.       I'm not familiar with that one way or another.
 9   I've seen many government contracts that is required in
10   the state of Hawaii that requires compliance with ANSI and
11   ASTM, but not specifically the warning signs series.
12   Q.       Nothing specifically with respect to 535 Z?
13   A.       Not that I specifically recall.  But I've not
14   done a search of that.
15   Q.       Do you know which governmental entity is
16   responsible for providing lifeguards on the island of
17   Oahu?
18   A.       I think you asked me that earlier.  No, I don't.
19   I don't know the formal name.  I'm sure it's in the
20   discovery documents.
21   Q.       Do you know if there is any obligation on behalf
22   of the city and county or the state of Hawaii to provide
23   lifeguards at any beach?
24   A.       Are you asking me legally?
25   Q.       Right.
00079
 1   A.       I have no legal opinions to offer.
 2   Q.       Are you aware of any unguarded beaches in the
 3   state of California?
 4   A.       I never thought about it one way or another.
 5   Q.       Do you know if private entities are required to
 6   provide lifeguards at beaches in the state of Hawaii?
 7   A.       I have no knowledge.
 8   Q.       Do you know who owns the beach?
 9   A.       Which beach?
10   Q.       Well, any beach.  Let's start with Hanauma Bay.
11   Do you know who owns Hanauma Bay?
12   A.       I do not.
13   Q.       In connection with this case have you ever had
14   any interaction with any current or former WSO's?
15   A.       I have not.
16   Q.       Have you consulted with any lifeguarding expert
17   other than Mr. Ebro in connection with this case?
18   A.       I have not.
19   Since you're on a new page and it's been two
20   hours, can we take a short break?
21   MR. REINKE:  Absolutely.
22   Off the record.
23                 (Recess taken.)
24   MR. REINKE:  Back on the record.
25   Q.       When were you retained in this case?
00080
 1   A.       My billing records would reflect it.  I don't
 2   know.
 3   Q.       The ones I'll be getting later?
 4   A.       That's correct.
 5   Q.       When was your first site visit?
 6   A.       The billing records would reflect that.
 7   Q.       How about your notes, would they reflect that?
 8   A.       No, sir.
 9   Q.       How many times did you perform site visits in
10   connection with this specific litigation?
11   A.       Just once.
12   Q.       Do you recall how long you stayed at Hanauma Bay
13   during that?
14   A.       I was probably there, from when I pulled into the
15   parking lot until when I left, a couple of hours.  Maybe
```

GILL, Richard PhD (03-02-07).txt
16  less.  I'd be surprised if it was much more than that.
17  Q.      And were you alone or was anybody with you?
18  A.      I was alone.
19  Q.      What was the weather like on the day you were
20  there?
21  A.      Nice, blue sky.  May have sprinkled a little bit.
22  But I think it was just more mauka showers blowing in than
23  anything else.
24  Q.      Wind?
25  A.      Nothing of any substance.
00081
1  Q.      How about the water conditions, flat, choppy,
2  15-foot waves?
3  A.      It was consistent with my typical experience
4  there.  The inner reef side was pretty placid.  If you
5  looked out far enough you could see some shore break
6  splashing up hitting the rocks.
7  Q.      When you say if you looked out far enough, were
8  you referring to out in the area we marked with the red
9  line on Exhibit 3?
10  A.      Correct.  If you looked out on the Witch's Brew
11  side you could see the white spray coming out now and then
12  out in the direction of Toilet Bowl.  I don't recall one
13  way or another if they were open or closed.  I think it
14  should show in my photos that I took.  I think it may have
15  been that Witch's Brew was closed where the red ink is
16  written on the signs in the visitor center area.  I think
17  there is a photograph that showed that it was closed that
18  day.  The gate I distinctly remember being closed.
19  Q.      Do you recall if there was strong ocean current
20  on the day that you went to visit for your investigation?
21  A.      I don't recall.
22  Q.      Did you get in the water?
23  A.      I don't recall that either.  I didn't snorkel, I
24  know that.  I don't recall having gotten in the water.
25  Q.      If I looked at your billing records would it
00082
1  reflect the amount of time you spent doing research, data
2  collection and data analysis?
3  A.      Yes, I think it would in the sense it tells you
4  the general nature of what the task is that I did.
5  Q.      It would also reflect how much time you spent
6  preparing your report?
7  A.      It would.  I'm not going to use the same titles
8  that you do of analysis and so forth.  But it would tell
9  you that I reviewed such and such deposition or that I
10  generated summary notes from it or that I drafted a
11  report.
12  Q.      In terms of your formulating your opinions in
13  this case, you did not do any research from authoritative
14  source materials or any treatises or any articles; is that
15  correct?
16  A.      For the purposes of my work in this case I did
17  not need to look up those types of documents.  I was
18  familiar with them enough because I do this work so much.
19  If this had been the first case like this I've ever done,
20  then I would have gone to the Peterson reference or the
21  ANSI standards.  Again, I've done this for 20 some years.
22  Q.      Did you use any assistant in connection in this
23  case to do any work for you?
24  A.      No, sir.
25  Q.      Do you recall having any conversations with any
00083
1  of the other experts retained by the Mattoch firm in
2  connection with this case?
3  A.      I recall one.  I think that's all there was was
4  one.  It was a three-way phone conference, if you will.
5  Q.      Who was involved in that?
6  A.      Mr. Ebro.  And I believe it's Mr. Lukas, the
7  water current oceanography type person.

GILL, Richard PhD (03-02-07).txt

```
 8  Q.       And yourself?
 9  A.       And myself.
10  Q.       Any attorneys involved in that?
11  A.       I believe Ms. Waters was on the phone, but I'm
12  not certain of that.  I just remember the three of us
13  specifically.
14  Q.       How long did that conversation last?
15  A.       If I had to estimate, I'd say over a half hour.
16  I'd be surprised if it was an hour.
17  Q.       Did you make notes of that conversation?
18  A.       I did.
19  Q.       They would be contained in your file?
20  A.       They are.
21  Q.       Did you have that conversation before or after
22  you wrote your report?
23  A.       I don't have a specific recollection.  But my
24  best estimate would be that it was beforehand.  I think it
25  was early on in my involvement in the case.
00084
 1  Q.       Is there anything that you can recall from that
 2  conversation that assisted you in formulating your
 3  opinions that are reflected in your report?
 4  A.       Whatever it would have been would have been in my
 5  notes would be my best estimate.
 6  Q.       Do you anticipate doing any further work in terms
 7  of formulating your opinions in this case?
 8  A.       Nothing other than what we've already talked
 9  about.
10  Q.       Have you ever asked for any materials in
11  connection with this case that you've not been provided?
12  A.       Not that I recall.  Excuse me.  I do.  I think I
13  asked if there was any material on the fourth lifeguard,
14  and was told that the fourth lifeguard, I think Mr. Chun,
15  is in Iraq, and that there was no deposition for him.  But
16  other than that, that would have been it.
17  Q.       Are you familiar with Act 190?
18  A.       If that's the one that I would refer to as the
19  governor's task force on signs, is that in general what
20  you are talking about?
21  Q.       Act 190 is a law that dealt with signage at
22  beaches.  Are you familiar with that?
23  A.       Again, not when it comes to legal issues.  I'm
24  generally familiar with the governor's task force for
25  developing beach signs, but that's the extent of it.
00085
 1  Q.       Have you reviewed any materials relating to Act
 2  190?
 3  A.       I have over time, the governor's task force.  I
 4  can't specifically say yes or no about Act 190 because
 5  again I don't think of things in a legal sense.  I think
 6  of them in terms of a safety and risk management
 7  perspective.
 8  Q.       In connection with this work, this case, did you
 9  look at any materials relating to the governor's task
10  force regarding beach signage?
11  A.       No, I don't believe I did.  Again, I'm familiar
12  with them.
13  Q.       Did you make any effort to calculate any
14  distances at Hanauma Bay that were relevant to this case
15  while you were at your site investigation?
16  A.       No, I didn't measure them or try to triangulate
17  and compute.  I just simply noted the distances and the
18  level of visual acuity that you would have.
19  Q.       Based on your observations did you make any
20  estimates of what the distance was or is between the
21  lifeguard tower that's marked on Exhibit 3 with an X and
22  the triangle which you identified as the Witch's Brew
23  point?
24  A.       I would estimate it on the order of, in round
25  numbers, at a thousand feet.  Three football fields.
```

GILL, Richard PhD (03-02-07).txt

00086
1   Q.        And did you make any estimate of the distance
2   that it would take if you took a land route -- And that
3   was a straight line we're talking about via the ocean in
4   my last question.  If you took the ocean route, that would
5   be about three football fields; is that correct?
6   A.        Line of sight is about three football fields.  A
7   thousand feet.  Again, I didn't attempt to measure it.
8   Q.        How about if you were to take a land route, you
9   go from the X, you follow the beach to the point where the
10  green line starts here where the beach ends, and then you
11  go all the way out to the point, did you try to draw any
12  estimates of that distance?
13  A.        I would say just as an estimate if you look at
14  that it's basically a right triangle.  So knowing it's a
15  right triangle, I would say it's on the order of 35 to
16  40 percent greater if you went by land than line of sight.
17  Q.        That's that guy Pathagarus that taught us?
18  A.        You got it.
19  Q.        Have you reviewed Mr. Ebro's deposition?
20  A.        No, I have not.
21  Q.        Have you reviewed any of his notes?
22  A.        No, I have not.
23  Q.        Did you take any photographs when you went out
24  there?
25  A.        I did.
00087
1   Q.        Those are in your file?
2   A.        They're in the folder I gave you labeled notes.
3   They're printed in a thumbnail.  Then there's a CD that is
4   photos and MPEG-4 video.
5   Q.        Do you anticipate in connection with your
6   testimony in this case preparing any charts, diagrams or
7   other types of exhibits to help illustrate your testimony?
8   A.        I haven't thought that far ahead.
9   Q.        Do you typically prepare any diagrams or exhibits
10  to illustrate testimony?
11  A.        I don't think there's any typical when it comes
12  to trial.  I think it just depends on the facts of the
13  case and what you are trying to convey to the jury.
14  Q.        You have in the past prepared exhibits and
15  diagrams to illustrate your testimony?
16  A.        I have.
17  Q.        Has the work you've done to date been sufficient
18  for you to render final opinions in this case?
19  A.        It's sufficient to render the opinions that I've
20  done to date.  I can't say final because if something new
21  in discovery comes up that is directly relevant to my area
22  of expertise and unique to the facts that I already have,
23  then obviously I'd reserve the right to respond to that.
24  Q.        Absent that, your opinions, you've done enough
25  work to have final opinions?
00088
1   A.        I have.  And they're expressed in my two reports.
2   Q.        They're intended to be your final opinions; is
3   that correct?
4   A.        Based on the material that's available to date,
5   yes, sir.
6   Q.        What date did this accident occur?
7   A.        I think it was July 19th, 2002.
8   Q.        You weren't in Hawaii at that time, were you?
9   A.        I have no idea.
10  Q.        So you don't have any personal knowledge of the
11  conditions that day that you are relying upon in this
12  case; is that correct?
13  A.        That's correct.
14  Q.        Do you recall from your review of the materials
15  what the weather was like on the day of the accident?
16  A.        I think it was reported as being sunny.  I think
17  it was moderate winds with gusts of 20 something mile an

GILL, Richard PhD (03-02-07).txt

```
18   hour.  I think surf was one to four foot.
19   Q.      One to four foot in Hanauma Bay?
20   A.      I'm not saying literally in the bay itself, but
21   that was the conditions that were reported.
22   Q.      Where was that reported?
23   A.      It's in the discovery material in weather data
24   that was provided for that day.
25   Q.      Do you know what the water conditions were?
00089
1    A.      Wet.  I don't know what you mean by water
2    conditions.  It's pretty broad.
3    Q.      Do you recall what the underwater visibility was
4    that day?
5    A.      I don't recall that, no.
6    Q.      Do you recall from your own experiences at
7    Hanauma Bay the underwater visibility can be variable,
8    some areas are real clear and some areas are not as clear?
9    A.      In general the outer reef is usually pretty good.
10   The inner reef in my experience is generally pretty cloudy
11   relative to the kind of snorkeling that I like to do.
12   When the waters get a little heavier then even the outer
13   reef can get cloudy at times.
14   Q.      Do you have any idea what the water visibility
15   was on the date of the incident?
16   A.      Nothing other than just from the deposition
17   testimony.
18   Q.      Do you know what the tide was at the time of the
19   incident?
20   A.      I don't recall, no, sir.
21   Q.      Do you know if it was going in or coming out?
22   A.      I don't.
23   Q.      Is that a relevant factor what the tide was to
24   any of your analysis?
25   A.      Not to my analysis.  It might be to Mr. Ebro and
00090
1    Mr. Lukas.  But not to my work.
2    Q.      Do you know what the overall crowd was at Hanauma
3    Bay during the time that Powell and Laughlin were at
4    Hanauma Bay?
5    A.      I seem to recall the total attendance that day
6    was on the order of 3,700.  The accident, as I recall, was
7    right around noon, just before that.  That would have been
8    typically a pretty peak time out of that 3,700 people.
9    People come in the morning and leave.  People come later
10   in the day.  But I would say a reasonable estimate would
11   be 2,000.
12   Q.      That's an estimate, correct?
13   A.      It's an estimate based on factual data that we
14   have.  And there was testimony, I think Mr. Bregman
15   estimated it 1,500 to 2,000, I believe.
16   Q.      At what point in time did he estimate 1,500 to
17   2,000 people were there?
18   A.      During the general time of when the incident
19   occurred is what I recall.
20   Q.      Do you recall any facts about the crowds?
21   A.      I think various deponents said they were typical
22   crowds for a nice day.
23   Q.      Of that 1,500 to 2,000 people, how many were on
24   the beach?
25   A.      I wouldn't know.
00091
1    Q.      How many were in the water?
2    A.      I couldn't tell you.
3    Q.      Do you know how many people were in Zone 1
4    snorkeling or swimming?
5    A.      I do not.
6    Q.      Do you know how many people were in Zone 2
7    snorkeling or swimming?
8    A.      The only estimate I recall was Ms. Powell saying
9    it was upwards of 15 to 20 people at the time that the two
```

GILL, Richard PhD (03-02-07).txt
10   men went out.
11   Q.       And when Ms. Powell gave that estimate did you
12   have any understanding of what she was referring to as
13   being Zone 2?
14   A.       My understanding is she was referring to what I
15   call the outer reef area.  I think that's what she was
16   referring to in her deposition as opposed to the tidal
17   Zone 2.  So that's not counting people that are in the
18   slot, for example.
19   Q.       Do you know what Zone 3 is?
20   A.       My understanding from Bregman's deposition is
21   that's the deeper outermost area where you'd be scuba
22   diving.  There would be no reason to try to snorkel there
23   because it's so deep.
24   Q.       An area beyond Witch's Brew?
25   A.       I would say it's the area across from Witch's
00092
1    Brew and across from the point where Toilet Bowl is would
2    be my understanding from Bregman's deposition.
3    Q.       Do you know how many people were in Zone 3?
4    A.       I don't know.
5    Q.       Do you know where the lifeguards were located at
6    that time on the day of the accident?
7    MS. WATERS:  Objection.  Vague as to time.
8    BY MR. REINKE:
9    Q.       Let me ask the question a little differently.  Do
10   you know where the lifeguard stands were located on
11   July 19th, 2002?
12   A.       I don't know precisely, but I know the general
13   areas.
14   Q.       Do you know if they've changed their location
15   since the day of the accident?
16   A.       I do not.  I believe there's been another one
17   that may have been added.  But I don't know if they've
18   changed locations.
19   Q.       With respect to the location, physical location
20   of the lifeguards, can you identify who was in the
21   lifeguard tower closest to the Witch's Brew point at the
22   time of the incident?
23   A.       My understanding is that would have been Moses
24   and Neves.  That would have been on the Diamond Head side,
25   if you will, the side closest to Witch's Brew.
00093
1    Q.       Do you know where the other lifeguards were
2    located at the time of the incident?
3    A.       I don't know with certainty.  I believe that's
4    Dobbs and Chun.  And we haven't gotten Chun's deposition.
5    I don't recall Dobbs saying specifically that he was in
6    the stand or not.  I don't recall.
7    Q.       And do you know if Mr. Neves had been any place
8    in the slot on the day of the incident?
9    A.       According to the interview that Major Maceo, his
10   notes, the way I read those notes is that Mr. Neves had
11   been in the slot earlier on a surfboard telling people
12   that the outer area was closed and that they needed to
13   stay in the inner reef.
14   Q.       By the way, did you rely upon Major Maceo's
15   interview notes in formulating any of your opinions?
16   A.       Only the opinions that are expressed in my second
17   report or Exhibit 2 because obviously I didn't have those
18   at the time of my original report, or Exhibit 1.
19   Q.       Did reviewing any of the materials that were
20   contained in Mr. Maceo's report provide you with any
21   information that made you want to change any of the
22   opinions in your original report?
23   A.       No.  I'd say just the opposite.  It corroborated
24   those opinions.  Provided some more evidence for them.
25   Q.       Do you have any information that Mr. Powell or
00094
1    Mr. Laughlin were not advised by Mr. Neves not to go
Page 35

GILL, Richard PhD (03-02-07).txt
2  through the slot and out to the outer area?
3  A.      Were not advised?
4  Q.      Yes, were not advised.
5  A.      I have no evidence about that one way or another.
6  Q.      You couldn't testify in court that they weren't
7  actually told that they should stay inside the reef on the
8  day of the incident?
9  A.      I have no evidence one way or the other.
10  Q.      If they had been told they shouldn't go outside
11  the reef and they chose to go out there anyway, would that
12  impact on your opinions in this case?
13  A.      Yes.  If there was evidence that they had been
14  verbally warned in the setting that you are describing,
15  yes, I think that would.
16  Q.      Now, let's talk just for a second about closing
17  the ocean.  Do you know if the WSO's have the authority to
18  close any portion of the ocean?
19  A.      You're asking me a legal opinion?
20  Q.      Yes.  I'm asking if you have any understanding of
21  whether they have the authority to do that?
22  A.      I don't know one way or another.  As I recall in
23  their depositions, it seems to me what they were saying is
24  they could advise the manager of Hanauma Bay and that was
25  the extent of their powers.
00095
1  Q.      Do you know if they had any authority to detain
2  individuals, that is, to stop them from going outside to
3  the outer reef or to Witch's Brew or to Toilet Bowl?
4  A.      I have no knowledge one way or another.
5  Q.      Is it important to your opinions with respect to
6  the activities of the WSO's to have an understanding of
7  the limits of their authority in terms of addressing or
8  preventing people from going into the areas of the ocean?
9  A.      Not in relationship to the questions that you've
10  asked so far, no, sir.
11  Q.      How about in terms of your opinions in this case?
12  A.      No.  The opinions I think you see in Exhibit 1
13  and Exhibit 2 are independent of those issues.
14  Q.      You've indicated throughout the report, your
15  reports, that certain areas of the ocean were closed; is
16  that correct?
17  A.      Certain sections of the waters in Hanauma Bay
18  were closed, that's my understanding.
19  Q.      Do you have any understanding of whether or not
20  anybody had the authority to close sections of the water
21  at Hanauma Bay?
22  A.      Well, I don't know how you are using the phrase
23  authority.  But my understanding is if the water safety
24  officers deem the ocean conditions to be unsafe, that they
25  advise the manager and that the manager closes those
00096
1  areas, that the water safety officers are to dissuade
2  people from going into those areas.  I don't know if they
3  can literally physically prevent them from doing that.
4  I've seen on other beaches, such as Waimea for example,
5  when big waves are coming in, when the water safety
6  officers are going back and forth on their ATV's and
7  repeatedly on loudspeakers and PA systems getting people
8  away from the shore break and back off the ocean.  I don't
9  know if someone said no, I'm still going in.  If they have
10  the authority to take further actions or not, I don't
11  know.  They were obviously making a concerted effort to
12  restrict people from being exposed to a hazard.
13  I think that's what Mr. Neves was doing,
14  according to the interview with Major Maceo.  Being out on
15  the surfboard, the place where people have access to get
16  out to the hazard, he was stationed out there warning
17  people no, don't come out here.  But obviously not very
18  effectively since the three of them went out and snorkeled
19  earlier in the day, and the other two gentlemen went out,

GILL, Richard PhD (03-02-07).txt
20  and there were multiple people out there snorkeling.
21  Q.       When you say not effectively, you mean his
22  persuasion control was not that good, they didn't listen
23  to him?
24  A.       No.  I think more likely the case is he wasn't
25  there through the duration of the day.
00097
1   Q.       Do you have any understanding of how long he was
2   out there?
3   A.       I do not.
4   Q.       Once again we're both in agreement, you are not
5   in a position to testify one way or another about whether
6   Mr. Powell or Mr. Laughlin may have been told not to go
7   out there and chose to go out there anyway, correct?
8   A.       On the time when the two went out by themselves,
9   that's correct.  According to Ms. Powell's deposition
10  there was no intervention prior.  In fact, just to the
11  contrary, according to her deposition, they specifically
12  asked a park employee or someone they thought was a park
13  employee how do we get out to a certain area, and they
14  were told to go through the slot in the channel.  So
15  whatever evidence we do have is just the opposite of what
16  you are proposing.
17  Q.       Ms. Powell never went out through the slot?
18  A.       She did go through the slot.  She went out to the
19  outer reef area.  My understanding, initially all three of
20  them were on the outer reef, the inner face of the outer
21  reef.
22  Q.       That would be, if we were to draw a line to
23  bisect the bay from Witch's Brew point all the way across,
24  the outer portion of the inner reef would then be the
25  portion towards the top of the page?
00098
1   A.       I would be even more specific than that.
2   Q.       How much more specific would you be?
3   A.       If you take what you just described, you can see
4   the distinct breaking of a wave coming across the white
5   water.  You can see the distinct top line of the reef.
6   That is the boundary between what I'm referring to as the
7   inner reef.  Anything from that point more mauka, anything
8   from that line that we're talking about just slightly more
9   makai is the inner face of the outer reef.  That's where
10  people like to go to snorkel because it's shallower, you
11  can see lots of fish.  There's live coral.  If you go out
12  much further than that, as you can see, you get big
13  splotches of sand.  It gets deeper.  There's less things
14  to see.
15  Q.       Did you make any effort in connection with your
16  evaluation of this case to determine what path Mr. Powell
17  and Mr. Laughlin traveled on the day of the accident when
18  they went out for their second snorkel?
19  A.       I reviewed all the discovery material and came to
20  the conclusion that I don't think anyone can say exactly
21  which path.  There's some testimony that suggests, I
22  believe it was Neves that I believe suggested this,
23  perhaps they had gone to Toilet Bowl and then came across
24  to Witch's Brew.  There's other testimony that, I believe
25  it was from Moses and/or Neves, that said yeah, we saw
00099
1   them approaching the area.  But they didn't say
2   approaching specifically from what direction.
3   So all the evidence suggests it's by water.  But
4   the exact path by water other than they went through the
5   channel and the slot to go out, other than that I think
6   it's an unknown.
7   Q.       You indicated you thought there was testimony
8   that someone said they saw both Powell and Laughlin
9   approaching Witch's Brew point, do you recall that?
10  A.       Maybe they weren't that specific of seeing both.
11  Maybe they just said yes, they saw someone may be more

GILL, Richard PhD (03-02-07).txt

12  accurate.
13  Q.      Do you recall if they saw them approaching it
14  from what angle Witch's Brew point?
15  A.      Again, I don't think that level of detail was
16  provided.
17  Q.      Do you recall Mr. Moses, WSO Moses testifying
18  that the first time he recalls seeing either of those
19  gentlemen was when one of them was swimming around Witch's
20  Brew point from Witch's Brew?
21  A.      I don't recall it being from Witch's Brew, no,
22  sir.
23  Q.      Where do you recall it being from?
24  A.      I recall something in general about around
25  Witch's Brew point.  But I don't recall it, as I
00100
1   understood your question, coming back from Witch's Brew
2   towards the beach.  I don't recall somebody describing it
3   in that manner.
4   Q.      How about coming around Witch's Brew point and
5   coming along the ledge you marked with a green line, do
6   you recall that testimony?
7   A.      I don't recall it being that specific, no.
8   Q.      So based on your recollection you don't recall
9   whether WSO Moses saw a swimmer going into Witch's Brew or
10  coming out of Witch's Brew, correct?
11  A.      I don't recall him saying coming out of Witch's
12  Brew.
13  Q.      Was it your impression then he saw the swimmer
14  going into Witch's Brew?
15  A.      I don't know that I formed an impression one way
16  or the other.
17  Q.      Is that relevant to your analysis, whether the
18  swimmer is going into Witch's Brew or coming out of
19  Witch's Brew?
20  A.      No, sir, it's not.  They never have been that far
21  out to start with.  The question in my mind is if you know
22  this is such a dangerous area, it's been closed for
23  several days, you've gone to such great lengths to
24  barricade it by land, why are you letting people swim
25  these huge distances to go over there.
00101
1   Q.      The barrier, do you know if that barrier is
2   permanent now or not permanent?
3   MS. WATERS:  Objection.  Vague.
4   THE WITNESS:  There's a gate on the barrier.  I
5   don't know the extent to when the gate is or is not open.
6   BY MR. REINKE:
7   Q.      Was there a gate there on the day of the
8   accident?
9   A.      I don't know that there was a gate.  I know Neves
10  described something about nylon fencing was the phrasing
11  that I believe he used for it, that he had just gotten to
12  the fencing when he last observed the individual falling
13  back into the water.  I think he described it as seeing
14  fear in his eyes or something.
15  Q.      Can you tell me on the day of the incident what
16  buoys were present in Hanauma Bay?
17  A.      No.  Again, the record is not real clear on that.
18  My understanding was in general that there were buoys in
19  the slot.  But beyond that the word again is cloudy.
20  Q.      Do you know what standard is used to close
21  Witch's Brew?
22  A.      Standard or criteria?
23  Q.      Criteria, certainly.
24  A.      I know there's a number of things.  In general
25  the water safety officers observe the ocean conditions and
00102
1   make a determination whether or not they think it's safe
2   for individuals to be out there.  Obviously the size of
3   the waves and the amount of water that's coming up over

GILL, Richard PhD (03-02-07).txt

4  the ledges, current conditions would all go into that.
5  Q.        Do you recall reading that anyplace?
6  A.        I don't recall a formalized protocol by which
7  they arrive at that conclusion, no.
8  Q.        Do you recall ever anybody asking the WSO's under
9  which conditions they would determine it's appropriate to
10 close Witch's Brew?
11 A.        I don't recall that specific question, no, sir.
12 I'm not saying it's not there.  I'm just saying I don't
13 specifically recall it.
14 Q.        You don't have any evidence or data from which to
15 base an opinion as to whether or not there were sufficient
16 conditions to close Witch's Brew point on the day of the
17 incident?
18 A.        No, I would disagree with that.  The record is, I
19 think, absolutely clear that Witch's Brew area was closed
20 on the date of the incident.  Bregman makes that
21 absolutely clear.  And I think that's clear in Moses'
22 deposition.  I didn't see any water safety officer that
23 contradicted that and said no, the area was open.  Every
24 single one of them said it was closed, to my knowledge.
25 Q.        The question is a little different.  I'm talking
00103
1  about the criteria for closing Witch's Brew.  No evidence
2  to show those criteria were met on that day, is there?
3  A.        Again I would respectfully disagree with that.  I
4  don't think every one of these water safety officers,
5  management level people would close Witch's Brew if the
6  conditions were such that it was warranted to be closed.
7  That, therefore, leads to the conclusion that there was
8  physical conditions that they used and observed to say
9  it's unsafe, we're going to close it.
10 Q.        What does it mean to close Witch's Brew?
11 A.        As I understand it, what that means is you're to
12 restrict access by land and restrict access by water.
13 That it's deemed to be dangerous and unsafe, and people
14 shouldn't be there.
15 Q.        We've already discussed they didn't have the
16 authority to keep people from going out there; is that
17 correct?
18 A.        No.  I have no opinion on that one way or
19 another.  I don't have legal opinions.  I don't know what
20 their legal restrictions were or were not.
21 Q.        I'd like you to assume for purposes of this
22 question that they did not have the authority to
23 physically restrict people from going to that part of the
24 ocean.
25 A.        Okay.
00104
1  Q.        Making that assumption, can you tell me what they
2  could have done to prevent Powell and Laughlin from going
3  over there?
4  A.        Yes.  I think exactly what Neves did, according
5  to his interview with Major Maceo, you station a figure of
6  authority in a position to warn people that it's a
7  dangerous condition.  We're not talking about drunk
8  teenagers here.  We're talking about responsible 30 some
9  year old adults that are there with their sister and wife.
10 I believe if you had informed them of the hazards, that
11 would have been sufficient.  Now, had you done that and
12 then they still chose to go, that's a different issue.  I
13 don't know what you can do in that situation.
14 Q.        If when Mr. Powell and Laughlin, Mr. Laughlin had
15 walked into Hanauma Bay there had been a sign posted that
16 said Witch's Brew closed, and they had seen that sign, and
17 they knew where Witch's Brew was, would you then agree
18 that they assumed the risk of going into Witch's Brew?
19 A.        Boy, those are some big assumptions.
20 MS. WATERS:  Objection.  Incomplete hypothetical.
21 THE WITNESS:  You are assuming they would have
                        Page 39

GILL, Richard PhD (03-02-07).txt
22  seen the sign, would have read it, and somehow would know
23  where Witch's Brew was, you are going to assume all of
24  those things?
25  BY MR. REINKE:
00105
1   Q.       I don't think it's a miracle to assume where
2   Witch's Brew was since there's signs on the way down there
3   that point it out pretty clearly.  I would like you to
4   make those three assumptions, there was a sign up there
5   that it was closed, that they walked by that sign and had
6   the ability to perceive it, whether they read it or not,
7   they had the ability to perceive it, and they then chose
8   to go out to Witch's Brew, whether they received a verbal
9   warning or not.  Would you agree that they assumed that
10  risk of going into Witch's Brew?
11  A.       First of all, you started with the signs are
12  there and obvious.  I've been to Hanauma Bay at least half
13  a dozen times and I never once saw a sign that said
14  Witch's Brew.  I never once knew that there was a place
15  called Witch's Brew.  First of all, I disagree with that
16  part of your statement.
17  Secondly, it doesn't tell what the hazards are.
18  Simply saying this is Witch's Brew and it's closed does
19  not mean it's closed for danger.  It doesn't mean it's
20  closed because it's unsafe.  It doesn't mean it's closed
21  because you can drown.  It may mean it's closed like they
22  do with Hanauma Bay, close it one day a week for the
23  safety of the marine life.
24  So just simply that sign does not therefore lead
25  to they assumed the risk.  To then go further to say oh,
00106
1   they saw the sign and then they perceived and then they
2   processed it.  Your own expert produced studies that say
3   16 percent in some studies of beach goers even see a sign.
4   Your own expert says you could put millions of signs on
5   this beach and it wouldn't have changed the outcome.
6   No, I don't think they assumed the risk if you
7   assume all the things you put in your hypothetical.
8   There's just no basis for that.
9   Q.       Do you think there's any set of conditions that
10  would exist that would allow Witch's Brew to be open?
11  MS. WATERS:  Objection.  Vague.
12  THE WITNESS:  That's beyond the scope of anything
13  that I've been asked to do.
14  BY MR. REINKE:
15  Q.       Do you think from your human factors perspective
16  that if a person sees white water breaking against a
17  ledge, that that puts them on notice that there is rough
18  ocean conditions near that white water?
19  MS. WATERS:  Objection.  Lacks foundation.
20  THE WITNESS:  What do you define by rough ocean
21  conditions?  Waves splashing?  Well, of course.  Something
22  that there's a hazard or danger, my goodness, no.
23  All you have to do is spend a little time here in
24  Hawaii and you can appreciate the extent tourists
25  unknowingly go out and say oh, photo opportunities, stand
00107
1   here and I'll get the spray behind you.  They have no idea
2   about waves coming in sets and about variability in the
3   ocean.  I've seen it repeatedly where you see the
4   lifeguards warning people of get back, get away, get out
5   because it's dangerous.  And they don't appreciate that.
6   BY MR. REINKE:
7   Q.       You used the word hazardous ocean conditions in
8   your report frequently.  Would you tell me what you mean
9   by hazardous conditions at Hanauma Bay?
10  A.       At Hanauma Bay in general?
11  Q.       Yes.
12  A.       Well, that's a pretty broad question.
13  Q.       It goes to the heart of this case.  Since you've

GILL, Richard PhD (03-02-07).txt

14  used the term I want to know what you mean by it.
15  A.      What I mean by the heart of this case, the fact
16  the water safety officers knew the conditions were such is
17  that it was unsafe for people to be out in the outer reef
18  area, much less Witch's Brew.  That's what I mean by
19  hazardous conditions.
20  Q.      What were the ocean conditions that were
21  hazardous?
22  A.      You'd have to talk to the water safety officer.
23  I wasn't there.  But I understand it was a combination of
24  swell, waves, and currents that made it hazardous to be in
25  that outer reef area.
00108
1   Q.      Do you have any understanding what makes Witch's
2   Brew hazardous?
3   A.      Several things.  One is you are so far removed
4   from a guarded area in terms of the lifeguards having
5   ready access.  Another reason is the topography of
6   shoreline and the bottom and the ocean currents and waves.
7   I think one of the water safety officers described it as a
8   washing machine effect.  Water has vertical rises and
9   falls, kind of what you get in a toilet bowl.  Even for a
10  good, experienced swimmer, once you get in it it's a
11  struggle.  As I think Lukas indicated, even if you are on
12  a surfboard you can be in there and it's dangerous and
13  hard to get out.
14  Q.      What makes it dangerous?
15  A.      The potential for drowning.  The potential for
16  being thrown up against the rock shore.  The difficulty of
17  a lifeguard coming to your aid.  The fact that it doesn't
18  appear to be dangerous until you get into the situation
19  and then you realize once you're there, too late, you're
20  in a dangerous condition.  In other words, it's what we
21  call a hidden hazard.
22  Q.      You say in your opinion it's a dangerous
23  condition.  What's dangerous about it?  From a physical
24  point of view what makes that area of the ocean dangerous?
25  A.      I've described to you as best as I can.  I would
00109
1   say beyond that you are now starting to get into an area
2   that would be more appropriate to talk to somebody about
3   in terms of water safety or oceanography.  I'm here to
4   talk about safety and risk management.
5   Q.      In terms of hazardous conditions, it's only
6   hazardous in this instance because of your belief that the
7   outer reef was closed that day; is that correct?
8   A.      No.  I think it's the other way around.  The fact
9   that it is unanimous from the water safety officers that
10  Zone 2 and Witch's Brew was closed and it was closed
11  because it was dangerous conditions, they talked about it
12  being rough, about it being choppy, they talked about
13  people shouldn't be out there.  They overtly tried to warn
14  people not to go out there, at least at one point in time.
15  Those are the things that have led to my opinion
16  okay, it's been established that this is a hazardous
17  condition and they don't want people there.  Now, did they
18  do proper safety protocol in light of all the drownings
19  they had and in light of those conditions, that's where my
20  opinion starts to pick up.
21  Q.      I'm still a little hung up on the hazardous
22  condition though because all I heard you say is because
23  they thought it was unsafe, it was a hazardous condition.
24  I still can't figure out is it the current that's
25  hazardous, is it the sharks, is it the choppy water that's
00110
1   hazardous?
2   MS. WATERS:  Objection.  Asked and answered.
3   THE WITNESS:  I would say two things.  One, I've
4   done the best I can to answer it.  And two, it's not
5   relevant to my opinions.  I don't know why I can't seem to

GILL, Richard PhD (03-02-07).txt
6  communicate that issue to you.  I'm happy to sit here and
7  talk with you all day, but it's not relevant to my
8  opinions.  Your people, the defendants, have said we
9  closed the area, it was dangerous.  It's not up to me to
10  go through and analyze all the reasons why it was
11  dangerous.  That's an accepted fact.
12  BY MR. REINKE:
13  Q.      Are there levels of danger in any situation?
14  A.      Yes, there are.
15  Q.      Do you know what level of danger was assigned to
16  that specific day at Hanauma Bay?
17  MS. WATERS:  Objection.  Lacks foundation.  Vague
18  and ambiguous.
19  THE WITNESS:  I don't know that I read anywhere
20  where they had levels of danger.  They didn't quantify it.
21  From a safety perspective the level of danger is extreme
22  because the potential risk is death and because the
23  potential hazard is relatively hidden.  So from a safety
24  risk perspective this is an extraordinary high level of
25  danger.
00111
1  BY MR. REINKE:
2  Q.      When you say the conditions are hidden, what do
3  you mean?
4  A.      That to the typical tourist that was there about
5  to engage in the activities that were intended it's not
6  open and obvious that they're exposing themselves to a
7  life threatening risk.  I think that that was clear in
8  Mrs. Powell's deposition when she said they didn't
9  perceive they were in any danger at all when they were out
10  there snorkeling, and when they come back in and when the
11  two men went back out there then again they didn't
12  perceive them to be in any danger.
13  When you arrive at the top it's a placid looking
14  area, the water is calm along by the shore.  You got old
15  people, you got little kids in diapers that are swimming.
16  You got lifeguard stands.  There's nothing there that
17  speaks to danger.  What white spray you see if you happen
18  to perceive it is estimated on the order of a thousand
19  feet away.  It's not going to look very big or significant
20  to you at all.
21  Q.      If you are snorkeling parallel to Witch's Brew,
22  do you think the ocean conditions, the rockiness, the
23  choppiness is something that would put you on notice that
24  you are getting into an area where the conditions are
25  going to be different than they are outside the Witch's
00112
1  Brew area?
2  A.      Puts you on notice as being so salient that you
3  can't help but notice it, no, not necessarily.  Even if
4  it's different, that doesn't mean it's unsafe.
5  Q.      Would it be safe or unsafe for people, different
6  people of different skill levels?
7  A.      What is your question again?
8  Q.      Would it be safe or unsafe based upon your skill
9  level as a swimmer or snorkeler?
10  A.      Based on what I understand the conditions of that
11  day, it would not be safe to be snorkeling there no matter
12  how good you were.
13  Q.      How about swimming there?
14  A.      I think you're better off with snorkeling with
15  having fins on than just swimming.
16  Q.      Would you say it's unsafe and potentially a
17  dangerous hazard for anybody to be in the Witch's Brew
18  area on days when the conditions are like or worse, would
19  that be your opinion?
20  A.      Based on what I understand the conditions to be
21  that day, yes, I would say it would be unsafe to be
22  swimming in the immediate vicinity of Witch's Brew within
23  that area that we've talked about the bull's-eye being.
Page 42

GILL, Richard PhD (03-02-07).txt
24  Q.      If the lifeguards did not close Witch's Brew that
25  day would your opinions be different?
00113
1   A.      I can't tell you they'd be different.  I would
2   tell you I have to do more work in order to determine
3   whether or not there was a dangerous condition that
4   existed and they just failed to close it.  But I don't
5   have to do that analysis because the lifeguards have done
6   that analysis for me.
7   MR. REINKE:  Let's take lunch.
8   Off the record.
9                   (Lunch recess taken.)
10  (Mr. Mayeshiro leaves deposition proceedings.)
11  MR. REINKE:  Back on the record.
12  Q.      I want to pick up where we were before talking
13  about the waves and talking about Hanauma Bay.  With
14  respect to Zone 2 of Hanauma Bay, do you know under what
15  conditions that zone would be closed to the public?
16  A.      No.  I just have the general description.  I
17  would defer to the lifeguards again.
18  Q.      In terms of wave height, visibility or wind
19  speed, you don't know at what point they make the decision
20  that that zone should be closed, correct?
21  A.      That's correct.
22  Q.      You are not aware of any specific protocol for
23  the closing of Zone 2; is that correct?
24  A.      I didn't see anything that was a quantified
25  protocol that said if this criteria is met we close.  That
00114
1   is correct.
2   Q.      You don't know or you're not aware there are
3   levels of closure, that is to say could be closed for some
4   purposes and not for others; is that correct?
5   A.      Well, I know they close the entire bay, for
6   example, to let it rest.  But beyond that, no.  I just
7   know the state that it was in on the day of the accident.
8   Q.      Have you ever heard of closure as a means of
9   persuasion control?
10  A.      I would say the process by which one closes may
11  be persuasion control.  But I would say closure would be
12  more safety by design because you are eliminating the
13  person from the event of the hazard.
14  Q.      You base some of your opinions in this case in
15  your report on the fact that the outer reef was closed,
16  correct?
17  A.      That was my understanding.
18  Q.      You based your understanding of the outer reef as
19  everything past the slot?
20  A.      That's not the phraseology I've been using.  I
21  wouldn't call Witch's Brew, for example, the outer reef.
22  When I have been referring to the outer reef, it is the
23  description that we went through on Exhibit 3, with the
24  breaking waves and the reef line and everything just makai
25  of that as the inner face of the outer reef.
00115
1   Q.      So everything that is towards the bottom of this
2   exhibit after the break line, would that be inner reef or
3   outer reef?
4   A.      Everything that is beyond the breaking waves at
5   the bottom of the picture on Exhibit 3 is outwards.  But I
6   wouldn't call, for example, the black circle on Exhibit 3
7   outer reef because there's really not a reef there.  It's
8   just when I use the term outer reef I think I've always
9   been trying to use it with regards to the area where there
10  is a reef where people do snorkel.
11  Q.      I think we're on the same wavelength.  So part of
12  your opinion is based upon the closure of the outer reef
13  on the day of the incident, correct?
14  A.      Everything from the outer reef and beyond was
15  closed.

GILL, Richard PhD (03-02-07).txt

```
16  Q.        In your own mind did you question why there would
17  be 15 to 20 people out in the outer reef at that point in
18  time when Mrs. Powell testified that Mr. Powell and Mr.
19  Laughlin went out?
20  A.        Yes.
21  Q.        What conclusions did you draw?
22  A.        My conclusion is that's consistent with the
23  inconsistencies of the defective risk management program.
24  Let's face it, if you take the testimony of the water
25  safety officers, it's dangerous to be out there.  The
00116
1   conditions are dangerous.  People shouldn't be there, and
2   yet they're there.
3   In my 20 years of experience being here in Hawaii
4   I have never once seen a person refuse to obey the
5   instructions from a figure of authority, like a lifeguard.
6   I mean, you have led me to believe that perhaps they don't
7   have the authority to arrest or detain or enforce.  But I
8   got to tell you the average tourist doesn't know that.  I
9   don't even know that as much as I've been here.  So if the
10  lifeguard says get back, it's dangerous, it's closed, you
11  can't go in, I got to tell you I'm hard pressed to believe
12  that 15 people would say the heck with you, I'm going out
13  anyway.
14  Q.        Does it lead you to believe that maybe the outer
15  reef wasn't closed that day?
16  A.        Given the testimony of all the water safety
17  officers in this case, no, sir, it doesn't lead me to
18  believe that at all.
19  Q.        Do you recall if it was recorded anyplace, not in
20  testimony, but recorded in any document that Zone 2 was
21  closed?
22  A.        I don't know if it's ever documented period.
23  Q.        Is it documented anywhere that Witch's Brew was
24  closed?
25  A.        I don't know if it was or not.
00117
1   Q.        Have you ever heard anybody state that what was
2   really closed was Witch's Brew ledge, and not the Witch's
3   Brew area?
4   A.        I don't recall having read that either.
5   Q.        Do you draw any distinction between those, the
6   Witch's Brew ledge and the Witch's Brew area?
7   A.        I think the ledge is a subset of area.
8   Q.        You don't have any opinion today as you sit here
9   today about whether the currents that were present at
10  Hanauma Bay on the day of the incident were unusually
11  strong, do you?
12  A.        I have no opinions one way or the other.
13  Q.        Do you know if the current had any impact on this
14  accident?
15  A.        I would defer to Mr. Lukas' testimony on that.
16  Q.        Do you have any opinion as to whether or not the
17  washing machine effect in the Witch's Brew area that's
18  been described by at least one of the witnesses would have
19  been an open and obvious condition to anybody that was
20  approaching Witch's Brew?
21  A.        Yes, I have an opinion on that.
22  Q.        What is your opinion?
23  A.        I think if one is approaching it by water and is
24  swimming and is snorkeling and has their face down most of
25  the time, and they're in an area that has got thousands of
00118
1   people around, I do not believe it would be open and
2   obvious.
3   Q.        Well, how about if they're out in Zone 2 where
4   there's at most 20 people around, and presumably not
5   anywhere near them, would it be open and obvious at that
6   point?
7   A.        No.  The reason I said thousands of people around
```

Page 44

GILL, Richard PhD (03-02-07).txt

8   is that, as we talked about earlier in the deposition, it
9   lowers your sense of risk of the area when you see so many
10  people of all ages, you believe yourself to be, if you are
11  a 30 some year old fit adult that is a very experienced
12  swimmer and snorkeler you don't perceive yourself to be in
13  an area that you are exposed to any risk.  It's not that
14  there's a thousand people all around you.  You're in a bay
15  where there's thousands of people swimming and snorkeling.
16  Q.       When you leave Zone 1 and go into Zone 2 does
17  your schema change at all?
18  A.       No.  You and I know there's a Zone 1 and Zone 2.
19  Water safety officers know there's a Zone 1 and Zone 2.
20  But the typical tourist that's there doesn't know.  I
21  didn't and I've been there a half dozen times until this
22  case.
23  Q.       Does the typical tourist know there's a place
24  where most of the people snorkel and there's a place
25  outside?
00119
1   A.       I don't think they would necessarily categorize
2   it as places.  What happens is you show up at the beach to
3   go snorkeling, and you see, as you typically see on any
4   beach, the densely populated area is closer to the shore,
5   the further out you go the less denser it becomes.  I
6   don't think they would distinguish it as areas.
7   Q.       Would a typical snorkeler realize that when they
8   went outside the reef there would be less people there?
9   A.       I don't think they would view it as outside.
10  Again, they haven't been there before.  What they view it
11  as is a bay.  It's a flat entity to go snorkel.  And they
12  would just happen to notice, as typical on a beach, the
13  further out you go the fewer people.
14  Q.       Didn't they ask how to get outside to the outer
15  reef?
16  A.       After they came back in they asked how to get
17  out, yes.
18  Q.       At that point they drew a distinction between the
19  inner portion and outer portion?
20  A.       That's correct.
21  Q.       After they came back in they asked to get out to
22  the outside.  Did that raise a question in your mind
23  whether they had gone to the outside during the first
24  snorkel session?
25  A.       I think there's mixed testimony on that in terms
00120
1   of whether they're inside or outside.  I think part of
2   this nomenclature of Zone 2.  They may not have been on
3   the outside as I've referred to it as the outside.
4   Q.       So they said to somebody how do I get out through
5   that slot to go to that other area to snorkel, correct?
6   MS. WATERS:  Objection.  Misstates the testimony.
7   THE WITNESS:  I don't think they said slot.  I
8   don't think they knew there was a slot.  If they knew
9   there was a slot I don't think they'd be asking that
10  question.
11  BY MR. REINKE:
12  Q.       They said how can I get to this outer area?
13  A.       That was my understanding from Ms. Powell's
14  deposition.
15  Q.       Once again, a person then would be able to
16  realize there was more than one area to snorkel?
17  MS. WATERS:  Objection.  Calls for speculation.
18  THE WITNESS:  I think again I wouldn't say --
19  We're taking phraseology that we're paraphrasing.  I don't
20  know they said outer area.  They may have said we've heard
21  there's turtles.  Where can we go to get them or how do we
22  get to here.  I don't know that they're in their mind's
23  eye phrasing it as areas.  It's more location.
24  BY MR. REINKE:
25  Q.       When they leave the inner reef and they get to

GILL, Richard PhD (03-02-07).txt

00121
1   the outer reef on the day in question, there was more
2   water turbulence; is that correct?
3   A.        I would expect there would be, yes.
4   Q.        Does that put the snorkeler on notice that the
5   conditions are different from the inner reef to the outer
6   reef?
7   A.        Different in what respect?  Different as in
8   there's more turbulence, yes.  Different as in safe and
9   unsafe, no.
10  Q.        If there's a current that's pulling them out
11  through this slot, does that put them on notice that
12  there's strong current in the bay?
13  A.        It may or may not.  It depends on their level of
14  perception and what they're doing as they're going
15  through.  I know the first time I went out I didn't
16  appreciate the strength of the current until I tried to
17  return.
18  Q.        As a snorkeler do you have any obligation to look
19  where you're going?
20  A.        Define what you mean by look where you're going.
21  Not run your head into an exposed rock or a piece of
22  coral, yes.
23  Q.        How about in the bay itself, do you want to be
24  aware of where you are in the whole bay as a snorkeler?
25  A.        Generally speaking, yes.
00122
1   Q.        Because a person has to know their limits,
2   correct?
3   A.        Well, yes.  But if you know that your limits are
4   well beyond anything that you are in, then you don't have
5   to be as vigilant with what you are doing as opposed to
6   somebody who is a weaker swimmer.
7   Q.        So a stronger swimmer could go out in those
8   conditions and not be as aware than a weaker swimmer; is
9   that correct?
10  A.        Absolutely.
11  Q.        Everybody, strong or weak, knows that the farther
12  you go from the beach the farther you are from the
13  lifeguards; is that correct?
14  MS. WATERS:  Objection.  Calls for speculation
15  and overbroad.
16  THE WITNESS:  If you consciously stop and think
17  about that you would come to that conclusion, that's
18  correct.
19  BY MR. REINKE:
20  Q.        There's no two ways about it, if you are farther
21  from the beach you are farther from the lifeguard, right?
22  A.        But you have to stop and consciously think about
23  it.
24  Q.        I'm just talking about in reality.  You go
25  farther from the beach you're farther from the lifeguards;
00123
1   is that correct?
2   A.        No.  If there's lifeguards that are stationed out
3   on the outer reef, no, that's not true.
4   Q.        There's no lifeguards on the outer reef.  Only
5   lifeguards in the towers.  The farther you are from the
6   beach the farther you are from the lifeguards, correct?
7   A.        That's a given from the nature of your question.
8   Q.        And so either consciously or subconsciously if
9   you are farther away from the beach you know you are
10  farther from the lifeguards, right?
11  A.        Only if you assume there's no lifeguard stationed
12  out in the water.  Again, that may be something that's
13  physically true, but it doesn't mean that it's something
14  you are conscious of.
15  Q.        Do you know what kind of equipment Mr. Powell and
16  Mr. Laughlin were using on the day of the incident?
17  A.        I don't know the details of it.  I just know that

Page 46

GILL, Richard PhD (03-02-07).txt
18  they were using face masks, fins and snorkels.
19  Q.      Do you know where they obtained those face masks,
20  fins and snorkels from?
21  A.      I do not.  I believe they brought it with them,
22  but I'm not certain on that.
23  Q.      Do you know if they had ever taken any courses in
24  snorkeling?
25  A.      I don't know about courses.  I know that they've
00124
1   done snorkeling on multiple times in the past.  But I
2   don't know about courses.
3   Q.      How many times had they snorkeled in the past?
4   A.      I don't recall.  I think Mrs. Powell said her
5   brother had been a competitive swimmer growing up, and
6   snorkeled a number of times.  And I think she said she and
7   her husband had snorkeled at least a couple of times in
8   Mexico.  And there may have been another time as well.
9   Q.      So they had substantial experience?
10  A.      Let's just say they were experienced snorkelers.
11  Certainly nothing that would suggest that they shouldn't
12  have been snorkeling in Hanauma Bay.
13  Q.      Her brother was Mr. Laughlin, right?
14  A.      That's correct.
15  Q.      And when she said her brother had been a
16  competitive swimmer, what did you take that to mean?
17  A.      I took that mean that he was a good swimmer.
18  Somebody that was comfortable and used to being in the
19  water.
20  Q.      With respect to the lifeguards in the use of the
21  scanning technique for looking at the ocean, how does that
22  work?  Can you explain the scanning technique to me?
23  A.      As I understand the general strategy for
24  lifeguarding is you should attempt to scan the entire area
25  that you are responsible for in a ten second interval is
00125
1   the goal to try to achieve.  What you are looking for
2   ideally are signs of a person before they get into a life
3   and death situation.  You are looking for somebody that's
4   showing signs of being tired or anxious or nervous or
5   potentially at risk.  I read various things about what you
6   look for in terms of the motion of the head and the body.
7   And now you are starting to get beyond the
8   expertise in risk management and getting into water
9   safety, which would be more Mr. Ebro's area.  There are
10  certain cues that lifeguards are trained to look for.
11  Q.      The 10/30 that you referred to today and in your
12  report, where did that come from?
13  A.      It's just general knowledge I had from work that
14  I've done in the past.  I don't know specifically if that
15  was included in the phone conference with Mr. Ebro, for
16  example, or if it was also included within the
17  depositions.  But that's just a general understanding of
18  what I have of lifeguarding that's a general rule of
19  thumb.
20  Q.      Do you know if that's for oceans or pools?
21  A.      It's for humans.  Humans have the same drowning
22  risks and phenomenon whether it's in fresh water, salt
23  water, rivers, lakes, oceans.
24  Q.      Do you think lifeguarding in a pool is the same
25  as lifeguarding in the ocean?
00126
1   A.      No.  Lifeguarding tasks may be different, but the
2   symptoms and signs and survival of a person is still going
3   to be the same.
4   Q.      But would you apply the same standards for both
5   scanning and for rescue efforts in a pool as you would in
6   the ocean?
7   A.      If you are talking about water safety and
8   lifeguarding, Mr. Ebro is the one you should be discussing
9   this with.

GILL, Richard PhD (03-02-07).txt

```
10  Q.        With respect to your 10/30 rule, you don't know
11  exactly where that comes from, and you don't know what
12  it's intended to apply to in terms of lifeguarding; is
13  that correct.
14  A.        No.  I don't think that's an accurate
15  representation of what we just talked about in the last
16  few moments.
17  Q.        Is that Mr. Ebro's area of testimony?
18  A.        That is correct.
19  Q.        So if it's Mr. Ebro's area of testimony, wouldn't
20  it be best to look at what he has to say about the 10/30
21  rule as opposed to what you have to say?
22  A.        If you are looking about specific details of
23  scanning strategies, lifeguarding issues and water safety
24  issues, Mr. Ebro is the person to turn to.
25  Q.        The 10/30 rule, you don't know where it came
00127
1  from.  You think it's general knowledge you have.  But you
2  can't point me to a specific source in connection with
3  this case.  You never looked at any source material,
4  research material to verify that information?
5  A.        I did not look anything up, that is correct.
6  What I'm telling you is, as I think most people can
7  appreciate, if you have a piece of knowledge you can't say
8  necessarily it exclusively came from this source or this
9  source if it's knowledge that you had.
10  I believe I read, I think it might have been Mr.
11  Goodwin in his deposition said that their goal is to be at
12  a person's side that needs aid within 30 seconds.  That
13  would be consistent with my general understanding of 10
14  second, 30 second rule.
15  where all the possible sources are that I've
16  arrived at that knowledge I can't tell you.  I would defer
17  to Mr. Ebro in that area.  The point to be made is you got
18  effectively one and a half lifeguards and 2,000 people
19  snorkeling, you're not going to come anywhere close to
20  achieving those types of goals.
21  Q.        So you would defer to Mr. Ebro on the exact time
22  period; is that correct?
23  A.        That is correct.
24  Q.        If Mr. Ebro were to testify he never heard of the
25  10/30 rule, would that surprise you?
00128
1  A.        I have no opinion on what Mr. Ebro knows or
2  doesn't know.  He may have it under a different name.
3  Q.        Is it a name or a standard?
4  A.        I never represented it as a standard.
5  Q.        This is a concept, whether it's 10 seconds,
6  30 seconds, 10 minutes, 30 minutes, you can't say, right?
7  A.        No, sir.  I can tell you with confidence that a
8  lifeguard should not scan the area once every 10 minutes,
9  and he should not respond within 30 minutes.
10  Q.        I think I can safely agree with you on that
11  point.  In terms of it being a 10/30 rule, it's really not
12  a rule because we don't know those are exact numbers, and
13  we don't know if it applies in the ocean.  You can't show
14  me where the source material is for that?  You can't point
15  me to it that it's verified that it's accurate?
16  A.        That's a compound question.  If you'd like to
17  separate it out a piece at a time I'd be happy to address
18  each of the pieces with you.
19  Q.        I will.  You can't tell me the source of the
20  10/30 rule, can you?
21  A.        No, sir.  I believe that's not an accurate
22  representation of what we testified to earlier.  For
23  example, I told you that I thought the 30 second aspect of
24  the rule was iterated in one of the water safety officer's
25  deposition.  I believe it was Mr. Goodwin's.  So to say I
00129
1  can't tell you that is not an accurate representation of
```

GILL, Richard PhD (03-02-07).txt

```
 2  what I've been saying.
 3  Q.        If Mr. Goodwin uses 30 seconds, if someone
 4  remains motionless 30 seconds, just because he uses that
 5  30 seconds coincidentally doesn't necessarily mean he's
 6  referring to a 10/30 standard or rule?
 7  A.        Again, I haven't called it a standard.
 8  Q.        You called it a rule?
 9  A.        I didn't say rule as in formalized rule.  It's my
10  understanding that the general goal in lifeguarding is you
11  scan your area within a certain interval of time, and you
12  be able to respond to a person in distress within a
13  interval of time.  And as best I can recall from all of my
14  knowledge those general numbers are on the order of 10
15  seconds and 30 seconds.  Now, whether there is some
16  formalized document that has it in it or it has some other
17  name, again Mr. Ebro would be the one to turn to.
18  Q.        With the exception of a lifeguard testimony, you
19  can't point to me where the 10/30 concept comes from,
20  where you derived it from; is that correct?
21  A.        Other than from my prior involvement with other
22  water safety people in other cases that we talked about.
23  Q.        So, therefore, unless I go back to look there to
24  see if you knew where you got it from then, there's no way
25  for me to tell or a jury to tell or a judge to tell what
00130
 1  application that 10/30 concept is intended to apply; is
 2  that correct?
 3  A.        That is correct.
 4  Q.        You haven't read Mr. Ebro's deposition; is that
 5  correct?
 6  A.        I still haven't.
 7  Q.        You also discuss a 50 to one ratio for the USLA;
 8  is that correct?
 9  A.        I recall the 50 to one ratio.
10  Q.        As I understand it, you took that from testimony
11  of some of the lifeguards?
12  A.        I believe that was the source.
13  Q.        Did you make any effort to confirm that 50 to one
14  ratio?
15  A.        No, sir, I didn't.
16  Q.        Were you aware that Mr. Ebro disagreed with your
17  ratio?
18  A.        It's not my ratio.
19  Q.        He disagrees with that ratio?
20  A.        I don't know if he does or not.
21  Q.        With respect to any ratio or concept of staffing
22  based on attendance, would you defer to Mr. Ebro's
23  judgment?
24  A.        Yes, I would.
25  Q.        You also talk in your report or opine in your
00131
 1  report about various staffing solutions or potential
 2  solutions for staffing at Hanauma Bay; is that correct?
 3  A.        I do.
 4  Q.        You talk about using additional lifeguards, jet
 5  skis, where the WSO's should be stationed, the use of
 6  buoys?
 7  A.        General concepts, that is correct.
 8  Q.        Are you intending for those to be actual
 9  solutions to be presented to a jury as to how to make or
10  implement a safety plan?
11  A.        I would say that those are examples of the kinds
12  of things that can be done to enhance safety.  I have not
13  been asked to, nor would I be qualified to design a
14  comprehensive lifeguarding plan for such a facility.  That
15  would be somebody like Mr. Ebro that would be able to do
16  that.  Not me.
17  Q.        Would you agree that with the terms of the
18  staffing, it would have to be a reasonable number of
19  lifeguards?
```

Page 49

GILL, Richard PhD (03-02-07).txt

```
20  A.       Well, what do you mean by reasonable?
21  Q.       Well, I'm not sure.  Would you just agree with
22  the concept you want to have a reasonable number?
23  A.       I think you need to have a reasonable number to
24  make it safe.  I think you have to have a reasonable
25  number in terms of allocation of resources.  For example,
00132
 1  the lifeguard saying it should be 50 to one, I can look at
 2  that and say okay, you have 5,000 people here on a busy
 3  day.  Should you have a hundred lifeguards?  That's
 4  probably not feasible.  If you have 5,000 people there and
 5  you have effectively one and a half lifeguards, no, I
 6  don't think that's reasonable either.
 7  What is the exact number?  Again, now you are
 8  starting to get into an area that's outside my expertise
 9  that I don't have an opinion on.  I can certainly tell you
10  that one and a half functional lifeguards for several
11  thousand people in a snorkeling situation based on the
12  limitations of scan rate and human perception make it an
13  impossible feat.
14  Q.       If it's impossible, has it just been lucky then
15  in the years leading up to 2002 that there was a few
16  drownings at Hanauma Bay?
17  A.       I think if you look at the number of people that
18  have drown there relative to all the beaches, I wouldn't
19  constitute it a few.
20  Q.       If you exclude 2002?
21  A.       Again, if you have seven on all 18 lifeguarded
22  beaches and you have two in Hanauma Bay in a given year,
23  that's disproportionately high.
24  Q.       Did you attempt to undertake any analysis of
25  drownings on Oahu and the causes of drownings on Oahu at
00133
 1  the various beaches?
 2  A.       Nothing other than just the raw data that was
 3  provided to look at it in comparison.
 4  Q.       Did you perform any statistical analysis of that?
 5  A.       Nothing other than what we've discussed of
 6  looking at percentages and ratios.
 7  Q.       At Hanauma Bay would it be your opinion that
 8  warning signs without lifeguards would be safer because it
 9  would put people on notice that there are no lifeguards?
10  A.       No, I would not testify to that.
11  Q.       Can you explain why warning signs create a schema
12  that the beach is safe?
13  A.       Well, I think in part what it does is that it
14  alerts you to the fact that if there are hazards
15  associated with this vicinity, that efforts have been made
16  to inform you, the beach goer, of them, and here's the
17  sign putting up telling you what the hazard is.
18  Therefore, you discount the need to search out other
19  hazards because you anticipate they would have been warned
20  about it as well.  So it lowers your subjective risk.
21  Q.       If you saw wave action would that impact on
22  schema?
23  A.       What do you mean wave action?
24  Q.       Waves breaking, waves smashing against the rocks.
25  A.       If it's literally something up close and personal
00134
 1  where you can see it, yes.  Something a thousand feet
 2  away, at that distance you're not going to appreciate the
 3  size of the waves.
 4  Q.       Unless you have experience with waves?
 5  A.       Unless you are an experienced ocean type person,
 6  then you might begin to appreciate it.
 7  Q.       You call the presence of lifeguard towers a false
 8  sense of security; is that correct?
 9  A.       Correct.
10  Q.       Why false?
11  A.       Well, I think when one sees a lifeguard tower or
```

GILL, Richard PhD (03-02-07).txt
```
12   towers and you have lifeguards in the area, that you have
13   this sense of security of well, if I get in distress, they
14   will notice me and they'll come to my rescue.
15   If you look at the numbers, what you find out is
16   there really is effectively one and a half lifeguards for
17   a beach of several thousand people.  There's been ten to
18   12 drownings reported in the 2002 year.  I think it's
19   pretty clear that the level of security that the
20   lifeguards offer is far different than what the typical
21   tourist is going to anticipate.
22   Q.        Would you agree that in order for a lifeguard to
23   see distress in a swimmer, that the swimmer would have to
24   be in a position where they could actually also see the
25   lifeguard or the lifeguard tower?
00135
1    A.        No, sir.  If I got my back to a lifeguard I can't
2    see the tower, but the lifeguard can sure see me.
3    Q.        How about if you are facing the lifeguard, you
4    are facing the beach, would you agree that you would have
5    to be in a position where you face the beach and see the
6    lifeguard tower so the lifeguard could see you?
7    A.        That sounds like something I would agree with.
8    Q.        If a swimmer went inside the Witch's Brew point
9    would a lifeguard be able to see them inside the point?
10   A.        Depending where the lifeguard is stationed, they
11   might.  From the lifeguard towers, I don't believe they
12   can.
13   Q.        The rocks are in the way, correct?
14   A.        Correct.
15   Q.        How about if you were in the slot, would you be
16   able to see into Witch's Brew?
17   A.        If you are literally in the slot you could see
18   into part of Witch's Brew, but not all of it.
19   Q.        How about if you are on the inside of the slot,
20   could you see into Witch's Brew?
21   A.        I think the answer to your question is point to a
22   place on Exhibit 3, and we can draw a line across the
23   point of Witch's Brew, and anything to the right of that
24   line as you are looking out would be occluded, and
25   anything to the left would not be.
00136
1    Q.        You think it's that simple geometry?
2    A.        The only thing that is occluded would be the rock
3    point that sticks out.
4    Q.        Wouldn't it matter how high you were in the
5    water?
6    A.        You're going to bob up and down.  You're not
7    going to be in sight 100 percent of the time.  The
8    question was would it be within sight, the answer is yes.
9    There's not enough curvature of the earth over that
10   distance to cause any occlusion.
11   Q.        You didn't go out there to the slot to try and
12   take a visual perception of Witch's Brew, did you?
13   A.        No, I did not.
14   Q.        You've never done that?
15   A.        I have not.
16   Q.        What were Mr. Powell and Mr. Laughlin wearing on
17   the date of the incident?
18   A.        I believe bathing suits, face masks, fins and
19   snorkels.
20   Q.        What color were the bathing suits?
21   A.        I don't recall.
22   Q.        Did you do any analysis of the visibility of
23   swimmers in the water?
24   A.        Other than to say that you can certainly see them
25   from the lifeguard towers as they go out the slot.  You
00137
1    can certainly see them on the outer portion of the reef.
2    And you can certainly see them swimming towards Witch's
3    Brew or across from Toilet Bowl.
```

GILL, Richard PhD (03-02-07).txt

```
 4  Q.        Does it matter what they're wearing?
 5  A.        No, I don't think so.
 6  Q.        If you could see someone swimming in the outer
 7  reef area or snorkeling without any apparent distress,
 8  would you believe that as a lifeguard you had an
 9  obligation to go out there and rescue them?
10  A.        In general or on the facts of this case?
11  Q.        In general.
12  A.        In general it would depend on whether or not the
13  area was closed and whether or not the lifeguards had
14  reason to believe the area was unsafe to be in.  If it was
15  such as on the facts of this case, then absolutely they
16  had a reason to go out there.  You close the area for the
17  tourists, not for the lifeguards.  If the tourists are in
18  an area that's closed, they need to be informed of that.
19  Q.        In your report, Exhibit 1, page 9, you indicate
20  that Moses testified he saw a swimmer, we're not sure who
21  it is, swim around Witch's Brew point, yet he took no
22  action to intervene.  Do you recall that Mr. Moses took no
23  action to intervene until he saw that swimmer attempt to
24  climb up on the rocks?
25  A.        That's correct.
00138
 1  Q.        So he actually saw him coming in a continuous
 2  fashion, saw that swimmer, once he saw him and saw him
 3  trying to come out on the rocks, correct?
 4  A.        No, sir.  I don't recall him saying that in his
 5  deposition.
 6  Q.        What do you recall in terms of the sequencing?
 7  A.        What I recall was he said nothing about observing
 8  a swimmer in a continuous fashion from the beginning until
 9  he was up against the rocks.  He talked about two
10  different points in time.  That he saw a swimmer out
11  there.  And ultimately he saw the swimmer in distress.
12  And that's when he sent somebody else out.
13  Q.        What did you assume was the time lag between the
14  time he saw the swimmer and the time he saw the swimmer in
15  distress?
16  A.        I made no assumptions.  I don't believe that was
17  specified in his deposition.
18  Q.        Isn't that an important issue?
19  A.        It would be nice to have that data.  But if you
20  don't have the data there's nothing you can do.
21  Q.        Assume that Mr. Moses will testify that he
22  observed someone swimming around the point and then
23  shortly thereafter observed that person trying to climb
24  out.  Does that affect your opinion with respect to the
25  attentiveness of the lifeguards?
00139
 1  A.        If I take your entire question, yes, it does.
 2  Q.        How does it affect?
 3  A.        The first thing it affects is you have to tell me
 4  whether or not the area is closed.  The second thing you
 5  have to tell me is whether or not you accept the testimony
 6  that's done by Major Maceo, who says they're not supposed
 7  to monitor that area out there.  The third thing you have
 8  to tell me is what do you mean by shortly thereafter.  A
 9  tenth of a second, five seconds, 30 seconds, five minutes.
10  Q.        Let me ask you a question and follow-up to your
11  questions to me.
12  A.        There's lots of incompletes there.
13  Q.        You raised some questions.  With respect to Major
14  Maceo, when he says that area is not supposed to be
15  guarded, what area do you understand he's referring to?
16  A.        My understanding of what he's referring to is any
17  of the area in the vicinity to and on the approach to
18  Witch's Brew is not an area that's supposed to be
19  monitored by the lifeguards.  If you are not supposed to
20  be monitoring something way out here, why is it that
21  you're observing somebody swimming around the point.
```

GILL, Richard PhD (03-02-07).txt
22  Q.        So it's your understanding that Major Maceo's
23  opinions with regard to Witch's Brew include not just the
24  Witch's Brew area that we've identified, but also the area
25  around Witch's Brew point and the area leading out to
00140
1   Witch's Brew point; is that correct?
2   A.        As I've just indicated and as you've just
3   indicated pointing at points on the map, yes, sir.  That
4   doesn't mean if I move way in closer to the reef you're
5   not supposed to monitor that area.  But the testimony, as
6   I understand Major Maceo, is that if he had seen men
7   swimming, such as Mr. Powell and Mr. Laughlin, he wouldn't
8   have perceived them as being at risk.  I strongly disagree
9   with that.
10  Q.        Why do you perceive them at being at risk?
11  A.        They're in an area hundreds of feet beyond the
12  area that's closed.  An area that they should never have
13  been in.  They're clearly in an area that the lifeguards
14  have identified as dangerous and closed.  And the only way
15  to get out there is to swim through a long distance of an
16  area that's dangerous and close.  Of course you have to do
17  something to respond to that.
18  (Mr. Kodish enters deposition proceedings.)
19  Q.        The area that's closed according to your
20  understanding is the area beyond Witch's Brew point,
21  correct?
22  A.        That's not the only area that's closed.
23  Q.        What other area is closed?
24  A.        My understanding is the outer reef.  When you
25  come through the slot, the slot on the outer reef is
00141
1   closed.
2   Q.        It's critical to your testimony, in fact, all of
3   your opinions turn on the fact that area is closed?
4   A.        No.  I would not make that broad and over-
5   sweeping of a statement.
6   Q.        If the areas are not closed, let's assume they're
7   not closed as of that time, if a swimmer was swimming out
8   towards Witch's Brew point, would it be acceptable for a
9   lifeguard to observe them swimming, observe they're not in
10  distress, and not take any action to intervene, wouldn't
11  it?
12  A.        No.  You are getting into a vicinity of an area
13  that's dangerous.  How close do you let somebody get to
14  the fire before you finally pull them out?
15  Q.        It depends on how hot the fire is.
16  A.        If it's hot enough to close Witch's Brew, it's
17  pretty hot.
18  Q.        We don't know under what standards they close
19  Witch's Brew, do we?
20  A.        No.  The issue is every single one of the water
21  safety officers said this area was closed.  So it's not a
22  matter of dispute, at least in my opinion.  I've accepted
23  that as fact that it was dangerous and that's why they
24  closed it.
25  Q.        At what point does a WSO have an obligation to
00142
1   intervene with a swimmer who is not in distress as they
2   approach an area that's closed?
3   A.        That's such a broad question I couldn't begin to
4   answer it.
5   Q.        Under the facts of this case, making the
6   assumption that Zone 2 is not closed.
7   A.        That's inconsistent with the facts of the case.
8   So you can't ask me that question.
9   Q.        Sure I can.  You've been an expert witness for
10  thousands of cases, and you've dealt with hypotheticals
11  before, haven't you?
12  A.        That's not the facts of the case then.  It's a
13  hypothetical.

GILL, Richard PhD (03-02-07).txt
14  Q.      I've asked you to make an assumption.  You
15  understand that, right?  You understand the concept of
16  hypothetical questions.  I've watched you answer thousands
17  of them, it seems like, from my colleague, Mr. Louie.
18  I'm going to follow-up on this.  Hypothetically,
19  using the assumption that Zone 2 is not closed, assuming
20  that Witch's Brew is closed, how far from Witch's Brew
21  point should a lifeguard intervene when two swimmers are
22  swimming towards Witch's Brew point and in no apparent
23  distress?
24  MS. WATERS:  Objection.  Lacks foundation.
25  THE WITNESS:  I can't give you a quantitative
00143
1   answer.  But I would tell you from my experience and
2   knowledge of what's in the area, the desired areas to
3   snorkel are in close to this line as we referred to as
4   being the outer reef.  If you see somebody there
5   snorkeling and they started leaving an area where there's
6   quality snorkeling, they're headed towards an area that's
7   dangerous, certainly you need to start attending them and
8   observing them to determine is there intended path taking
9   them to a zone of danger.  You have to be able to
10  intercede and intercept before they get to the point of
11  danger.
12  BY MR. REINKE:
13  Q.      Do you know whether or not there's any good
14  snorkeling from Witch's Brew point all the way along the
15  line to the beach?
16  A.      If it's a calm day and you don't have rough
17  swells breaking and tearing up the water and making it
18  dangerous, there may be some along the shore.  But that
19  means the way you would get there is to come across and
20  over if you are going to stay in good snorkeling.  If I
21  accept your hypothetical that Witch's Brew was closed,
22  then likely you're going to have some heavy surf along the
23  edge where the green line is.  If you see somebody coming
24  in that direction you would need to intercede before they
25  would arrive at the zone of danger.
00144
1   Q.      You'd be able to see it, correct?
2   A.      If you directed your visual attention to that
3   with the purposes of making that determination you would
4   do that.
5   Q.      So if an individual decided that they want to go
6   over to that ledge to snorkel because they want to see
7   what it was like, they would have the opportunity to see
8   white water against that ledge, correct?
9   A.      The opportunity.  That didn't mean that they
10  will.  We talked about this earlier.  If you are face down
11  snorkeling, you are following a turtle, you're not going
12  to have the physical opportunity to make those
13  observations.
14  Q.      If you are face down in the water and you're
15  snorkeling along and you are following that turtle, moving
16  towards the ledge, you may or may not know you are coming
17  close to the ledge because your face is down.  Is the
18  water activity, based on your experience as a snorkeler,
19  going to change or be different as you get closer to the
20  ledge?
21  A.      It depends on the direction the swells are coming
22  and how big they are.  Sometimes they will, sometimes they
23  don't.
24  Q.      On the day in question, given everything you know
25  about that day, would you imagine that there would be
00145
1   enough water activity to put you on notice that you were
2   coming close to a ledge?
3   A.      I can't offer an opinion on that one way or
4   another.
5   Q.      In your rebuttal to Major Maceo's report, which
Page 54

GILL, Richard PhD (03-02-07).txt

```
 6    we attached as Exhibit 2, you discuss the warning signs
 7    being grossly deficient.  Can you just explain to me what
 8    it is about the warning signs that is grossly deficient?
 9    A.      I'd say the simplest and most important point is
10    that the warning signs have nothing to do with the hazards
11    at hand.  They don't tell you an area is closed and it's
12    unsafe to enter.  They only tell you there's a current.
13    The current appears, as the signs suggest to indicate, are
14    parallel to the beach.
15    Q.      In your original report you never mention any
16    problem or deficiency with the signs; is that correct?
17    A.      The original report is 10 or 12 pages long.  I
18    don't know if I say anything about the signs or not.
19    Q.      You read that report last night getting ready for
20    this deposition, didn't you?
21    A.      I read lots of things.  I can't tell you the
22    sources of my knowledge.  I can tell you what I know.
23    Q.      Last night you read that report, didn't you?
24    A.      I did, yes, sir.
25    Q.      Just like I did.
00146
 1    A.      I don't know if you did.
 2    Q.      I did.
 3    So within 24 hours of your reading it, in the
 4    original report did you mention deficiencies in the
 5    warning signs?
 6    A.      I can tell you the same answer I just told you.
 7    I don't remember if I did or not.  If you can point me to
 8    the page, that would be great.  If not, I'll take time and
 9    skim through it.
10    Q.      Take time to skim through it.
11    (Mr. Kodish leaves deposition proceedings.)
12    Q.      I appreciate you going through the report just
13    then.  My question was bad.  I want to restate my
14    question.
15    In your first report you didn't mention any
16    deficiencies based on ANSI, compliance with ANSI; is that
17    correct?
18    A.      I don't think I used the phrase ANSI in the first
19    report, having just skimmed through things.  I wasn't
20    looking for ANSI.  I was looking for warnings.
21    Q.      In the second report you say, that is the
22    rebuttal report, you say the ANSI signs are grossly
23    deficient?
24    A.      No.  The ANSI signs aren't grossly deficient.
25    The subject signs are grossly deficient.
00147
 1    Q.      Page 4, Exhibit 2, opinion number five, you say
 2    under A, but these warnings were grossly defective; they
 3    were not consistent with requirements as set forth by the
 4    American National Standards Institute (i.e. ANSI Z 535.1
 5    through Z 535.5.  Did I read that correctly?
 6    A.      You did.
 7    Q.      In your first report you don't make any reference
 8    to ANSI that I saw.  And you just skimmed through it.  You
 9    didn't see any reference to ANSI when you skimmed through
10    it looking for warning sign issues, correct?
11    A.      I don't recall having seen any, no.
12    Q.      Did something change between the time you did
13    your original report and the time you did your rebuttal
14    report with respect to the ANSI standards?
15    A.      No.
16    Q.      Is there a reason in your original report you did
17    not reference any inconsistency with the requirements of
18    ANSI?
19    A.      I didn't reference them specifically because I
20    thought that the warning signs were not the primary issue
21    here in terms of ANSI compliance or non-compliance.  But
22    when Major Maceo offered his report, I thought it was
23    important to at least note that the signs that he was
```

Page 55

GILL, Richard PhD (03-02-07).txt
```
24  claiming were there, that people should at least know were
25  grossly defective, one, and two, were not consistent with
00148
1   ANSI.
2   Q.      Those are two separate criticisms?
3   A.      Well, they are two sentences.  It's a sentence
4   and a semicolon and a sentence.
5   Q.      I thought the semicolon was explaining what you
6   meant by the first sentence.
7   A.      No.
8   Q.      First off, how are they grossly defective?
9   A.      Grossly defective is that Witch's Brew area is
10  closed.  Zone 2 is closed.  The signs just simply tell you
11  strong current.  They have nothing to do with what the
12  hazard is.  That's the grossly defective part.
13  Q.      The hazard is Witch's Brew?
14  A.      The hazard is Witch's Brew and the outer area,
15  Zone 2, being closed.  You should not be in that area.
16  It's off limits.  It's unsafe.  There's no sign to give
17  you any of that information.
18  Q.      Is that based on what you mean by grossly
19  defective because there's no signage?
20  A.      Correct.  You don't have any signage for the
21  hazard.
22  Q.      The second part of that sentence is the
23  inconsistency with the requirements of ANSI.  Can you
24  explain that?
25  A.      In order to be thorough I'd have to look at a
00149
1   color photo of the signs, if you have one handy.
2   Q.      You know, oddly enough I do.  Let's go ahead and
3   mark this as Exhibit 5.  Three color photocopies of signs
4   at Hanauma Bay.  We'll mark those as 5.
5   (Exhibit 5 was marked for identification.)
6   A.      I don't suppose you have one that's big enough I
7   can read.
8   Q.      Actually I do.  If you would look at the
9   Exhibit 4, they're not color, but they are the diagrams.
10  A.      Well, what I would say is the primary thing,
11  without having the standards in front of me to read, is
12  that you're supposed to have a single word panel, which it
13  does.  You are supposed to have a separate message word
14  panel which it does, but it's not separated as it's
15  supposed to be.  You are allowed to have a pictogram.  I'm
16  not certain you are allowed to have the pictogram in the
17  middle.  I know you are allowed to have them on the side.
18  The size of the lettering is not consistent with the
19  height lettering that it's supposed to be.  Those are some
20  of the things that strike me off the top of my head.
21  Q.      When you wrote your rebuttal report you didn't
22  have the standards in front of you either, did you?
23  A.      No.  I didn't pull them out for purposes of that.
24  I just looked at the sign and knew it didn't comply with
25  ANSI.  The key issue with the sign is the fact that you
00150
1   don't have a sign relevant to the hazard.
2   Q.      Anything else with respect to ANSI in these
3   signs?
4   A.      No.  Again, I don't think that's -- The reason I
5   brought it out is the testimony that was offered by your
6   expert.  And I just thought it was worth noting that it
7   doesn't comply.  The main point on the warnings is you
8   don't have one.
9   Q.      With respect to the ANSI standards, are you aware
10  of whether or not the Act 190 task force considered the
11  ANSI requirements in coming up with approved signs?
12  A.      Again, I can't speak to the phrase Act 190.  I
13  can speak to the phrase governor's task force.  And my
14  review of the work that the governor's task force was that
15  they did consider ANSI.  And they, the committee, made a
```

GILL, Richard PhD (03-02-07).txt

16  decision to not comply fully with ANSI is what I recall
17  having read.
18  Q.      And so in terms of the state of Hawaii for
19  whether signs are acceptable or not, the ANSI standard has
20  not been adopted, is that correct, with respect to these
21  beach warning signs?
22  A.      They did not fully adopt it, that is correct.
23  Q.      So your criticism of them is not consistent with
24  Hawaii law, which allows for these types of signs,
25  correct?
00151
1   A.      No, sir, that's not true.  First of all, I'm not
2   hear to offer testimony about legal things, whether it's
3   safe or unsafe, as my testimony.  Secondly, no law says
4   nothing about the fact that you can post a sign about
5   shore breaks and current and that excuses you for not
6   warning the area is closed and don't go into it.  That's
7   really the heart again of my testimony.  It's not whether
8   the sign is the right size, shape, color, or lettering.
9   It's that an area is closed, it's dangerous, and you don't
10  have a sign for that.
11  Q.      If the area is intermittently open and closed,
12  you wouldn't have a permanent sign, would you?
13  A.      I'm not proposing a permanent sign, no, sir.  I'm
14  proposing what you do, for example, on the North Shore.
15  You don't permanently put signs up that say high surf,
16  beach closed.  You evaluate it.  When it is you put up a
17  temporary sign.
18  Q.      The closure of the beach is not a natural
19  condition, it's a manmade condition, whether you close it
20  or open it?
21  A.      Nature doesn't close the beach.  Nature creates
22  conditions that causes man to decide it's dangerous and
23  therefore man takes action to close beach.
24  Q.      Exactly.  The hazard is man created it in this
25  instance because under your definition until the beach is
00152
1   closed there's no hazard, correct?
2   A.      No, no.  The hazard is not manmade.  The hazard
3   is nature made.  Man has the ability to control that
4   hazard by closing the beach or closing access to the
5   hazardous area.
6   Q.      You're not in a position, you form no opinion
7   about what the natural condition was that created this
8   hazard?
9   A.      No, sir.  I think that's a misrepresentation of
10  what we talked about before.  I gave you my general
11  understanding of the physical conditions that create the
12  hazards.  But the heart of my testimony was I
13  accepted the sworn testimony of all the water safety
14  officers that the area was dangerous and closed.
15  Q.      What are the natural conditions that you
16  considered to have created the hazardous condition out
17  there?
18  A.      The conditions that create the hazard are a
19  combination of things.  The waves, the current, the
20  swells, the choppy water, the rock bluffs, the distance
21  that you are from the lifeguard.  There's a number of
22  things that coalesce together.
23  Q.      Distance from lifeguards isn't a natural
24  condition, is it?
25  A.      Well, the physical space is a natural condition,
00153
1   yes.
2   Q.      It's an apparent condition, it's obvious, isn't
3   it?
4   A.      Again, we had that discussion.  If you ask
5   somebody to stop and look where you are relative to the
6   shore, you can arrive at an estimate of that.  But I don't
7   think that's something that's in the conscious mind of a

GILL, Richard PhD (03-02-07).txt
8   snorkeler in Hanauma Bay when they have land on both sides
9   of them.  From a safety perspective the question you are
10  asking is not a question that is relevant to a safety
11  analysis.
12  Q.       I'm looking at the natural conditions that form
13  the hazard.  The condition where the lifeguard tower is
14  and where Witch's Brew is a constant, isn't it?
15  A.       That's correct.
16  Q.       So it's not a natural condition, is it?
17  A.       It's most definitely a natural condition.
18  Witch's Brew point was not manmade.  The beach was not
19  manmade.  The spacing between there is not manmade.
20  That's a physical condition.  It's a natural condition
21  that existed and we built a path down there and said let's
22  come down and swim and snorkel.
23  Q.       What's the difference between waves and swell and
24  choppy water?
25  A.       First I would tell you I would defer to an expert
00154
1   in oceanography.  In general I think of swells as being
2   non-surface breaking, not white water that propagated over
3   long distances.  I think waves of being more wind
4   generated, oftentimes resulting in white water on surface.
5   White caps they're often referred to.  That would be my
6   use of the terminology.
7   Q.       What's choppy water?
8   A.       Choppy water is where you see white water.  Water
9   varying in elevation.
10  Q.       Same as waves?
11  A.       No.  I think of a wave as being more propagating
12  in a linear fashion.  Where choppy can be more of a
13  washing machine effect.  Water is undulating, changing in
14  elevation, but not in a linear fashion such as waves or
15  swells.
16  Q.       One of the suggestions you have is you put buoys
17  to mark dangerous areas and restrict or warn swimmers.  Do
18  you recall that?
19  A.       I think that's something the water safety
20  officers talk about.
21  Q.       Do you know if Mr. Ebro talked about that?
22  A.       No.
23  Q.       Do you know if buoys create a natural attraction
24  for people to want to swim to?
25  A.       That would not surprise me as a potential.
00155
1   Q.       So if you have a buoy out by Witch's Brew do you
2   think it might attract people to swim out there?
3   A.       It depends on the nature of the buoy.  If you
4   design it big enough with a warning symbol on it as
5   opposed to something as being an attraction, then no, I
6   don't think it would.
7   Q.       Is a person responsible for knowing their own
8   physical limitations?
9   MS. WATERS:  Objection.  Overbroad.
10  THE WITNESS:  To the extent that we are capable
11  of that, yes.  Obviously we are limited in our ability to
12  perceive things.
13  BY MR. REINKE:
14  Q.       By the way, do you know what the limits of the
15  lifeguard's jurisdiction are at Hanauma Bay, where they
16  stop having guarded areas and not guarded areas?  Is it
17  outside the bay, do you know?
18  A.       I do not.
19  Q.       Do you know if lifeguards do have any
20  limitations?
21  A.       I don't know.  All I would say is if there's a
22  limited range to which they are supposed to have
23  authority, control, and observations over that, that
24  should be communicated to the visiting public.
25  MR. REINKE:  Off the record.
                        Page 58

GILL, Richard PhD (03-02-07).txt
00156
1                        (Recess taken.)
2  (Mr. Mayeshiro enters deposition proceedings.)
3  MR. REINKE:  Back on the record.
4  Q.        Dr. Gill, I want to make sure I ask this question
5  so that I don't get in trouble later on.  But with respect
6  to your opinions in this case, are all of the opinions you
7  plan on offering at trial contained in your report and
8  rebuttal report?
9  A.        Based on the discovery material available to
10 date, yes, sir, they are.
11 Q.        Would you tell me, if you can, generally what
12 your opinions are with respect to the accident in this
13 case?
14 A.        Can you be more specific in what you are looking
15 for?
16 Q.        I would like to get your summary of what you
17 believe you are going to opine about at trial in this
18 case.
19 A.        I would simply say the short answer to that is if
20 you follow the major heading outlines that are on Exhibit
21 No. 1 of my report, that would be the general outline of
22 my anticipated testimony.
23 Q.        So with respect to this report then, there's
24 nothing you anticipate testifying about that I would find
25 outside of this report?
00157
1  A.        No.  Because then I would also anticipate
2  testifying about what's in report number two, or
3  Exhibit 2.
4  Q.        Anything else?
5  A.        Based on the discovery that's available to date,
6  no, sir, that would be it.  I don't believe in playing
7  hide the ball.  I tried to tell you everything that I have
8  an opinion on in those two reports.
9  Q.        Did you make any effort to determine how long it
10 would take to get from the lifeguard tower where WSO Moses
11 was located and Witch's Brew, how long it would take to
12 get there?
13 A.        I didn't attempt to do that by either land or
14 water.
15 Q.        Do you have any information about how long it
16 would take?
17 A.        Well, I can certainly go through and make
18 estimates.  I haven't attempted to do that.
19 Q.        Is it not important to your opinions?
20 A.        No, no.  What's important to my opinions is as
21 the experts and professionals there, that they do what's
22 necessary to intercept people before they reach that zone
23 of danger.
24 Q.        We haven't agreed upon where they should begin
25 their interception, have we?
00158
1  A.        No.  You had asked me that question and we got
2  started down that path.  And I said at a minimum you have
3  to intercept before they get to the dangerous point.
4  Beyond that, again if the area is closed, and somebody is
5  deliberately swimming away from the snorkeling area
6  towards the dangerous area, that alerts the lifeguard to
7  the need to be more vigilant in watching them so that they
8  can make that interception with a margin of safety.
9  Q.        Are you able with this red pen to mark for me
10 where you believe the last time under the conditions that
11 day a person should have been intercepted before they
12 reached Witch's Brew?
13 A.        No, I couldn't do that.
14 Q.        The reason you can't do that is because?
15 A.        There's too many unknown parameters.
16 Q.        And you don't know how long it would take for
17 someone to snorkel from the slot or the general area of
Page 59

GILL, Richard PhD (03-02-07).txt

18  the slot to Witch's Brew; is that correct?
19  A.      No.  Again, you could put boundaries on it if you
20  want to estimate the distance in swimming speeds and
21  assume somebody went in a deliberate straight line path,
22  you could certainly put boundaries on it.  But I haven't
23  attempted to do that.
24  Q.      Do you have any understanding of how long Mr.
25  Powell and Mr. Laughlin had been snorkeling prior to the
00159
1   drowning?
2   A.      I think the general estimates, as I understand
3   all the discovery we have, it's on the order of an hour to
4   hour and a half.  Mrs. Powell talked about the fact that
5   they had been out for about that long.  And she started
6   getting a little anxious.  And then there's discussions
7   about what time they came back in from the first one and
8   then they ate lunch and went back out.  An estimate of
9   that point of the time versus the time when the bodies were
10  recovered seem to be in that general range, an hour to
11  hour and a half.
12  Q.      In an hour you could go from end to end of the
13  bay snorkeling?
14  A.      Depending on the rate you snorkel you could.
15  Q.      You could stay inside the inner reef in an hour?
16  A.      Correct.
17  Q.      Would it be fair to say based upon the distances
18  that I've estimated, about 300 yards to Witch's Brew, that
19  you could make it from the slot to Witch's Brew in less
20  than five minutes snorkeling?
21  A.      Boy, snorkeling, no.  Swimming and swimming
22  deliberately, maybe.  But that's a long distance to
23  snorkel in five minutes.  That's a long distance to swim
24  in five minutes.
25  Q.      For a good competitive swimmer?
00160
1   A.      They're not out there swimming races for speed.
2   They're out there snorkeling.  Most people that snorkel
3   don't bring their arms up over their shoulder and swim in
4   a crawl like fashion.  Their arms are at their side.  And
5   they're casually using their flippers to maneuver.  I very
6   rarely see a snorkel swim with a freestyle swim stroke.
7   Q.      We don't know and nobody is ever going to know
8   what Mr. Laughlin and Mr. Powell were out there doing?
9   A.      I don't have any evidence to answer that
10  question.
11  Q.      Lifeguards don't continuously observe someone, do
12  they?
13  A.      Well, it depends on the nature of what's going
14  on.  In general, no.  They have to continually switch
15  their gaze to pick up any potential foreseeable hazards.
16  But if you see somebody that is thrashing about or looks
17  like they may be at risk, then yes, you do stay focused on
18  them until you identify one of two things, they're not at
19  risk or they need your immediate attention.
20  Q.      How do you make the determination they're not at
21  risk?
22  A.      Now you are starting to get into areas that I
23  recommend you talk to Mr. Ebro.  I read various signs of
24  what you look for that shows the pre-drowning phase when a
25  person is at risk.  I just don't recall what all those
00161
1   are.
2   Q.      Would you turn to page 4, paragraph six.
3   A.      Report one or report two?
4   Q.      Report one.  I apologize.  Exhibit 1.
5   A.      Page 4?
6   Q.      Paragraph six.
7   A.      Okay.
8   Q.      You note that the city and county was on notice
9   of hazardous conditions that were not being effectively

Page 60

GILL, Richard PhD (03-02-07).txt

10  mitigated.
11  In the context of that paragraph what do you mean
12  by hazardous conditions?
13  A.      The overall potential hazards associated with
14  drownings at Hanauma Bay.
15  Q.      Can you be more specific than that?
16  A.      No.  You would have to have detailed reports of
17  each of the drownings and go into an analysis to determine
18  what the contributing factors were in each individual one.
19  Q.      Suppose someone did review those and determine
20  that in the cases of each of those drownings they were
21  caused by conditions that couldn't have been prevented?
22  A.      I guess that's possible.  I'd be hard pressed to
23  believe that given the facts that we know.  One and a half
24  lifeguards with several thousand people snorkeling that
25  are known to be mostly tourists that are not familiar with
00162
1   ocean hazards, I find it hard pressed to arrive at that
2   conclusion.
3   Q.      I guess I'm still confused.  You are putting on
4   notice of a hazardous condition.  When you say we're on
5   notice of that hazardous condition, what do you mean by
6   hazardous condition in that context?
7   A.      If you have 18 lifeguarded beaches in Oahu and in
8   an entire 12 months you have seven drownings on 17 of
9   those beaches, and in four months you have six drownings
10  on one beach, wouldn't that put you on notice that there's
11  a potential hazard or hazards associated with this beach?
12  It has such a huge rate of drownings relative to all the
13  other beaches.  I don't know what that factor or factors
14  are.  But the point of notice is you know there's
15  something going on here that warrants immediate
16  investigation and attention.
17  Q.      My focus is on the hazardous conditions.  Because
18  you are making an assumption that the notice is being
19  caused by some sort of condition at Hanauma Bay, correct?
20  A.      No.  The notice is that you had six or seven
21  people drown in a matter of a few months.  That's notice
22  that there's an unsafe condition here.
23  Q.      Is an unsafe condition necessarily a hazardous
24  condition?
25  A.      Yes.  I believe a condition that leads to death
00163
1   of six people is a hazardous condition.
2   Q.      What is the condition?
3   A.      Well, I don't know the answer to that because A,
4   I didn't analyze it, and B, as I understand it, nor did
5   Hanauma Bay.
6   Q.      You didn't analyze what the hazardous condition
7   was with respect to any of the other drownings; is that
8   correct?
9   A.      Not at the level of the detail I understand your
10  question to be, no, sir.
11  Q.      Well, do you analyze even where those drownings
12  took place?
13  A.      I don't recall that information being presented
14  in discovery.  I think I saw some data, a scatter map, if
15  you will, of where some of the drownings were.  I think
16  there was testimony, I believe it was Mr. Bregman, that
17  said ten of the 12 drownings in 2002 were within 75 yards
18  of shore.  I think that's the only information I can
19  recall in answer to your question.
20  Q.      Do you know prior to this incident that there had
21  ever been a drowning at Witch's Brew?
22  A.      I don't recall having read any evidence that
23  there was.  I'm not saying there wasn't.  I don't recall.
24  Q.      Because you don't recall anything, you are not
25  aware of any evidence, you can't assume that there has
00164
1   been, can you?

Page 61

GILL, Richard PhD (03-02-07).txt

```
 2   A.       No, I'm not assuming there was.
 3   Q.       So with respect to the hazardous conditions at
 4   Hanauma Bay that were put on notice by the drowning, those
 5   must be different hazardous conditions that exist out at
 6   Witch's Brew?
 7   A.       No, sir.  There's no connection between those two
 8   at all.
 9   Q.       There's no connection between the seven drownings
10   on the inner reef and Witch's Brew?
11   A.       No, that is absolutely not true.
12   Q.       How is it not true?
13   A.       Just an example, one of the points that I keep
14   driving home is if you got 2,000 people that are terrible
15   swimmers in general that are mostly tourists that come
16   there thinking they don't have to swim, they're snorkeling
17   face down, and one and a half lifeguards, I think you can
18   see that if you have drownings associated with that
19   condition it doesn't matter whether it's in, excuse the
20   analogy, aisle one that somebody slips and falls or aisle
21   two.  It's the same hazard.
22   Q.       Haven't we agreed that staffing is an aquatic
23   issue?
24   A.       No, sir.  You've agreed to that.  I haven't.
25   Q.       Is your position as a safety person to determine
00165
 1   how many WSO's should be there?
 2   A.       No, sir.  There's a difference between those two
 3   extremes.  I have no opinion and I can't tell you the
 4   number.  I think we've talked about that multiple times.
 5   Q.       Your opinion is there should be more; is that
 6   correct?
 7   A.       Absolutely.  To ask one and a half lifeguards to
 8   monitor over 2,000 people that have minimal swimming
 9   skills and minimal knowledge of the ocean face down
10   snorkeling is an absurd thing to try to do.
11   Q.       That requires you to draw upon someone else's
12   expertise as a lifeguard in terms of scanning techniques
13   and what lifeguards do in order to give that opinion?
14   A.       No, sir, it does not.
15   Q.       Why not?
16   A.       Because I understand basic human factors and the
17   rate people can scan visually, how long it takes to fixate
18   on target.  I understand the physical range of space that
19   they're trying to monitor.  I know that that's well beyond
20   the capability of one and a half people to do that.  You
21   can't come anywhere close to doing that.
22   Now, how many people do you need and where is the
23   trade off point for allocation of resources and so forth,
24   now you better bring in somebody that has water safety
25   expertise as opposed to safety and risk management
00166
 1   expertise.
 2   From basic psychological perceptual principles
 3   and human factors principles, the concept of one and a
 4   half people being able to monitor this expanse with that
 5   many people under these conditions clearly can't be
 6   accomplished.
 7   Q.       You keep using the phrase one and a half
 8   lifeguards.  I know you don't necessarily mean there's a
 9   half person out there.  What do you mean by one and a half
10   lifeguards?
11   A.       Well, you have four staff lifeguards whose
12   position description say 42 percent of their time they're
13   to spend in the towers monitoring the water.  So four
14   times 42 percent is 1.6.  So effectively averaged across
15   the period of time that the bay is open on any given day
16   you average 1.6 lifeguards that are monitoring the water.
17   It's never any higher than four, but your average coverage
18   rate is 1.6.  So about one and a half people.
19   Q.       Where did the 42 percent come from?
```

GILL, Richard PhD (03-02-07).txt
20   A.        The position descriptions for the water safety
21   officers that were provided in discovery.
22   Q.        Is that in your file?
23   A.        It is.
24   Q.        Can you locate that for me?
25   A.        I'll do the best I can.
00167
1    Q.        I'm sure that if it's there you'll locate it.
2    A.        Well, I know it's not in the deposition, if that
3    helps.
4    Q.        I know that too.
5    A.        So it's in either the discovery documents here or
6    here.
7    Q.        Take just a moment, if you would.
8    A.        I'm looking at Defendant's City and County of
9    Honolulu's Response to Plaintiffs' First Request for
10   Answers to Interrogatories to Defendant City and County of
11   Honolulu, dated December 21, 2004.
12   One of those documents includes Department of
13   Personnel, City and County of Honolulu, position
14   description.  Water Safety Officer 2.  Item number one,
15   man lifeguard tower and/or patrols beach on foot by ATV or
16   rescue craft as assigned and keeps alert on all beach
17   activities 42 percent.  Then if you read the rest of their
18   position descriptions, and I won't read all of them into
19   the record, is supervise Water Safety Officer 1, is
20   12 percent, evaluate ocean conditions and perform
21   preventive measures is 20 percent.  15 percent is
22   maintains the ability to perform his duties in an
23   efficient manner.  Four percent, rescue people in
24   distress.  Four percent, ensure that supplies are
25   maintained.  Assist evacuating people, one percent.
00168
1    Operate vehicles, one percent.  Perform other related
2    duties, one percent.
3    Q.        So you took that 42 percent figure and did an
4    arithmatic calculation and said there's only 1.6 people
5    watching the beach at any time?
6    A.        On the average.
7    Q.        In fact, on the day of the incident there's
8    almost twice as much coverage, right?  No.  There's more
9    than that.  More than twice the coverage because we have
10   multiple lifeguards there on duty watching the beach.  Is
11   that correct?
12   A.        No, sir.  I guess I must not be clear on that.
13   If you have four people there.  This is not what's really
14   going on.  But to illustrate my point.  When you're there,
15   40 percent of the time you are to be in the tower watching
16   the ocean.  And 60 percent of the time you are to be up in
17   the parking lot collecting fees.  I'm using that to
18   illustrate the example.  Only 40 percent of your time is
19   spent monitoring the water to search for potential people
20   in stress, for people that might be in distress, for
21   people that might need rescue.
22   So on the average at any given moment in time you
23   have on the average 1.6 people watching the ocean to see
24   if there's someone that's at risk.  Because 58 percent of
25   their time is dedicated towards things other than watching
00169
1    the water.  That doesn't count restroom breaks, lunch
2    breaks and so forth.
3    Q.        I hear what you're saying.  The four percent of
4    performing rescues, that doesn't count either, does it?
5    A.        If you are running along the shore with rescue
6    equipment, or you are paddling with a board you are not
7    watching the other people around you, or at least you
8    shouldn't be.
9    Q.        On those days when you are not performing rescues
10   do you think that four percent migrates into watching?
11   A.        No.  I think what happens is if you are

GILL, Richard PhD (03-02-07).txt

12  performing a rescue it takes more than four percent of
13  your day.  And so what these officials are saying is if
14  you average it out over time, four percent of your time we
15  expect you to be doing rescues.  There were 285 rescues
16  that year.  That's almost one a day.  When you figure that
17  they're only open six days a week, that's really close to
18  one a day.  So yeah, I think four percent is probably a
19  reasonable number.  Now, you can quibble over the number
20  all you want.  Are you going to get much more than 1.6?  I
21  don't know.
22  Q.      At the time of this incident there were two
23  people scanning the water?
24  A.      No.  I believe there should have been four.
25  Q.      That's higher than average?
00170
1   A.      No, sir.  Because we don't know for sure at that
2   literal time of the incident, starting from when they
3   leave the slot and go into the areas that they're not
4   supposed to be, what all four lifeguards are doing.
5   Q.      Were any of them performing rescues?
6   A.      I don't know.
7   Q.      So you're making an assumption based on a
8   statistical analysis they were only spending 42 percent of
9   their time during that time period?
10  A.      I'm not making an assumption.  I'm using physical
11  data and the laws of statistics to do an analysis.
12  Q.      Are the laws of statistics borne out by the facts
13  of this case?
14  A.      Yes, I believe they are.  If you've only got on
15  the average only 1.6 people, that explains how two
16  individuals can swim so far into harm's way and not be
17  detected.
18  Q.      Is there any testimony that would suggest that at
19  the time of the incident all of the lifeguards were not on
20  duty?
21  A.      No, I'm not saying they were.  I don't know of
22  any.  I'm not making such claims.
23  Q.      Is there any evidence that all of the lifeguards
24  on duty were not monitoring the bay during the time period
25  when Mr. Powell and Mr. Laughlin were on their second
00171
1   snorkel out that day?
2   A.      The laws of statistics would argue against that,
3   yes, sir.
4   Q.      The laws of statistics aren't evidence in this
5   case, are they?
6   A.      The laws of statistics apply to the evidence that
7   we have, that you have no relief lifeguards.  That you
8   have only four on duty lifeguards, and they are required
9   by their position description to do various things.  If
10  you apply the laws of statistics to that evidence you
11  would conclude on a more probable than not basis there was
12  not four people monitoring the water for people in
13  distress during that entire time frame.
14  Q.      There's no evidence that you are aware of that's
15  been presented in this case by way of testimony that all
16  of the lifeguards on duty were not monitoring the water;
17  is that correct?
18  A.      No, sir, I would disagree.
19  Q.      Would you point the testimony out to me that you
20  are aware of that suggests that all of the lifeguards on
21  duty were not monitoring the water at the time of the
22  second Powell, Laughlin snorkeling outing?
23  A.      I understood your first question to use the word
24  evidence, not testimony.
25  Q.      Okay.  Let's limit it to testimony.  Is there any
00172
1   testimony in that regard?
2   A.      There's no testimony one way or another that one
3   can draw on that.  I don't recall any of the lifeguards

GILL, Richard PhD (03-02-07).txt
4    being asked what you were doing second by second with your
5    time.
6    Q.      Is that an important question?
7    A.      No, I don't think it is.  Because I don't think
8    someone can answer that.
9    Q.      Why wouldn't they be able to answer that?
10   A.      Describe for me what you've done the last hour of
11   your time second by second, which chair you were in, where
12   your arms were, were you in this room, how long you were
13   out of this room.  You can't begin to do that.
14   Q.      Okay.  Is that different second by second by
15   saying I've been watching the beach, I've been watching
16   the lifeguards, I've been watching the water, I've been on
17   duty?
18   A.      Yes, I think it's different than that.  But still
19   the point to be made is I don't think that you can ask
20   someone a year or more after an event what did you do for
21   an hour before a catastrophic event occurred.  I don't
22   think somebody can tell you with that level of accuracy.
23   Q.      Did you do any analysis or study at Hanauma Bay
24   to verify your statistical conclusion regarding 1.6, did
25   you do that?
00173
1    A.      No.  I don't believe that was necessary.
2    Q.      Did you have an opportunity to spend an hour, two
3    hours, three hours at Hanauma Bay observing lifeguards on
4    duty to see what lifeguards did for an hour or two or
5    three hours?
6    A.      Yes, I had that opportunity.  I did not do that
7    opportunity for two reasons.  One, it was not necessary.
8    And two, even if I had it wouldn't be, I don't think,
9    admissible because things have changed over time.  And
10   what I observed for a simple hour cannot be extrapolated
11   to apply to the specific hour that this event occurred,
12   which is another reason for not doing it.
13   The point is not what happened in the hour that
14   led up to this accident.  The point is do you have a
15   reasonable risk management program.  For that, if you look
16   at the big picture and you say you have four individuals
17   at most who are told to allocate 42 percent of their time
18   to the task of monitoring the water, the laws of
19   statistics are going to tell you you have less than two
20   lifeguards monitoring the water on the average any given
21   point in time.  That's not safe.
22   Q.      Doesn't that make an assumption that the entire
23   day is spent divided up into eight hours when the general
24   public is there?
25   A.      No, sir.
00174
1    Q.      Because, for example, instead of eight hours in a
2    day, it was seven hours in a day when the public was there
3    that the lifeguards were on duty.  So they could take one
4    hour of everyday and spend it doing the non-lifeguarding
5    duties that may come up.
6    A.      I take that as a hypothetical.  That's one hour
7    out of eight.  We've just increased it by 12 percent.  So
8    now rather than 1.6 we're up to 1.8.  You are still far
9    short.  In other words, you can tweak the numbers all you
10   want.  The bottom line is with four people, and them
11   supposed to spend 40 percent of their time monitoring, you
12   are not anywhere close to having enough eyes watching,
13   given the complexity of this task.
14   Q.      How many eyes do you need for the complexity of
15   the task?
16   A.      I think we've been over this a lot.  You know who
17   I'm going to defer to.  I wasn't asked to design a water
18   safety program for here.  And I'm not qualified to design
19   one.  My expertise is in safety and risk management.
20   Q.      Surely using this analysis and your knowledge of
21   scanning, focusing, number of people on average, you can
Page 65

GILL, Richard PhD (03-02-07).txt
22   come up with a number that would meet your criteria?
23   A.       No, sir, I cannot do that.
24   MS. WATERS:  Objection.  Asked and answered.
25   THE WITNESS:  I'm not qualified to do that.  I
00175
1    would need to have domain specific expertise in
2    lifeguarding, which is not the area that I'm offering
3    testimony here.  It's in safety and human factors.
4    BY MR. REINKE:
5    Q.       In your report number one, Exhibit 1, page 4, the
6    very bottom of page 4, under Lifeguard Goodwin, you
7    indicate that the city and county failed to close the
8    outer reef on the day of the incident.  Do you see that?
9    A.       Okay.
10   Q.       What do you mean they failed to close it?
11   A.       What I mean is my understanding is there were
12   multiple people that were out in that outer reef area, an
13   area that was closed, that should not have been there.
14   Q.       On page 5, under Lifeguard Dorr, you noted that
15   if a swimmer or snorkeler remains motionless for
16   30 seconds, then a rescue is initiated.  Do you see that?
17   A.       I do.
18   Q.       What's the relevance of that to this case?
19   A.       The relevance to that in this case is go back to
20   the numbers that we were just talking about.  You got
21   2,000 people you are trying to monitor.  Let's have all
22   four lifeguards 100 percent of the time doing nothing but
23   monitoring.  That's 500 people per lifeguard.  If you have
24   to watch somebody for 30 seconds before you decide to go,
25   that's 250 minutes before you can complete your cycle to
00176
1    get back to the first person.  That's over four hours.  I
2    think it illustrates the absurdity of having 1.6 people
3    trying to monitor this situation.
4    Q.       We went over numbers at the beach that day.
5    There were about 1,000, 2,000 people at Hanauma Bay; is
6    that correct?
7    A.       No, sir.  I believe there were 3,700 paid
8    visitors that day.
9    Q.       How many would have been there at any specific
10   time during that day, do you have any information on that?
11   A.       No.  This would have been a prime time in the
12   sense it's in the peak part of the day, around the hot
13   part of the day, but not too hot, 11 o'clock.
14   Q.       Did you happen to find in your review of the
15   testimony any evidence as to how many people were in the
16   water at or around the time of the incident?
17   A.       I don't specifically recall that.  There might be
18   some, but I don't recall it.
19   Q.       So you actually have no way of knowing how many
20   people were in the water at that time, do you?
21   A.       No, sir.  That conclusion does not follow my
22   previous answer at all.
23   Q.       Actually you are right.  You know of at least 20
24   people, from Mrs. Powell's testimony, correct?
25   A.       No, sir.
00177
1    MS. WATERS:  Objection.  Misstates his testimony.
2    THE WITNESS:  I know there was at least 15 to 20
3    in the outer reef.  I know that if you have 3,700
4    registered paying guests there for the day and it's
5    11 o'clock in the afternoon, that at that period of time
6    you will have multiple hundreds of people in the water.
7    BY MR. REINKE:
8    Q.       Multiple hundreds?
9    A.       Correct.
10   Q.       Someplace between 200 and 900?
11   A.       I would be shocked if there was only 200 people
12   in the water at 11 o'clock on a warm, blue, sunny day when
13   there were 3,700 paid guests.

GILL, Richard PhD (03-02-07).txt

14  Q.        So 200 would be the low end that would be
15  shocking.  Would 3,700 on the high end be shocking?
16  A.        I don't believe you would ever have 3,700 in the
17  water at the same time on a day when there was 3,700
18  people paid.
19  Q.        You can't tell me within a hundred how many
20  people were in the water during the Powell, Laughlin
21  second snorkel trip, can you?
22  A.        No.  But you don't need to.  If you take a
23  conservative low number and say 200, and say 100 percent
24  of your lifeguards are 100 percent of their time
25  monitoring, you still got 50 people that each lifeguard is
00178
 1  watching.  According to Goodwin, you have to make sure
 2  that within 30 seconds they've moved.  You can't possibly
 3  get through those people in that length of time.  That's
 4  at 200.  We know there's going to be more than 200 people
 5  in the water, for goodness' sake.
 6  Q.        Once again you are still not able, using that
 7  statistical analysis, to tell me the minimum number of
 8  guards in the water, guards you need to protect the people
 9  in the water?
10  A.        No.  That's not been my goal and task.  If you do
11  something that fails, a steel cable breaks, you can
12  calculate the strength of that cable and you can calculate
13  the weight it was on and show that it's guaranteed to
14  fail.  That's an entirely different question than saying
15  well, what size cable should I have had.
16  Q.        Paragraph six on page 4 you talk about mitigating
17  the hazardous conditions.
18  A.        Page 4?
19  Q.        Page 4 of Exhibit 1, paragraph six.  When you say
20  effectively mitigating, what do you mean, preventing?
21  A.        You can't prevent 100 percent of accidents.  You
22  can't make something 100 percent safe.
23  Q.        Paragraph nine you refer to Mrs. Powell's
24  subjective perception of the dangers or hazards; is that
25  correct?
00179
 1  A.        Correct.
 2  Q.        Did you ever speak with Mrs. Powell about this?
 3  A.        No, I did not speak to her.  I just read her
 4  deposition.
 5  Q.        You were never able to explore this issue with
 6  her, were you?
 7  A.        I thought it was self-explanatory in her
 8  deposition.
 9  Q.        Did you attempt to verify your hypothesis that
10  the hazards associated with Hanauma Bay are hidden from
11  the novice user?
12  A.        Verify in what manner?  It's stated in somebody's
13  sworn statement.  It's been my own experience from having
14  been there multiple times.  It's based on my analysis of
15  people's ability to perceive a hazard.  There's several
16  things that go into that.
17  Q.        Mrs. Powell talks about dangers associated with
18  Hanauma Bay.  What dangers are associated with Hanauma
19  Bay?
20  A.        I didn't do an exhaustive analysis of all of
21  those.  The danger that's most relevant here is the danger
22  of death by drowning.
23  Q.        Isn't it true that all waters pose the danger of
24  death by drowning?
25  A.        There is a potential with all water that's deep
00180
 1  enough for that to have occurred.  But the potential is
 2  greatly different in certain settings.  And the data
 3  speaks volumes about how high the potential is here when
 4  you have seven drownings in the three to four months
 5  leading up to the Powell, Laughlin drowning.

GILL, Richard PhD (03-02-07).txt
```
 6  Q.       Who is Captain Tsue?
 7  A.       Somebody that was referred to in the discovery
 8  material.  I think it may have been either a news
 9  broadcast or one of the newspaper articles.  But I can
10  look at my notes and tell you.
11  Q.       Do you know what position Captain Tsue holds?
12  A.       No, sir, I don't.
13  Q.       Do you know if he has any specific knowledge with
14  regards to Witch's Brew?
15  A.       I would have to look to see who he is before I
16  can provide an answer to that.
17  Q.       You cited to him?
18  A.       I did.  I just don't have memorized off the top
19  of my head his position or where that information came
20  from.  But I can locate it for you easily enough.
21  Q.       How about Captain Crone, do you know who he is?
22  A.       Again, I believe he was one that was interviewed
23  on the news.  Beyond that I'm not certain.
24  Q.       You aren't able to tell me whether he has any
25  specialized knowledge or information with regard to
00181
 1  Hanauma Bay or Witch's Brew; is that correct?
 2  A.       I can tell you what his knowledge is if you let
 3  me go to my file notes and look it up.  I just don't have
 4  it memorized.
 5  Q.       Would you turn to page 1 of your report.  This is
 6  number one.  You list in paragraphs one, and continuing on
 7  to page two, 29, the documents and things and activities
 8  you conducted in reaching your opinion; is that correct?
 9  A.       I did.
10  Q.       Is that an inclusive list of everything?
11  A.       I did the best that I could at the time I wrote
12  this report to identify them, yes, sir.  Subsequent to
13  that I obviously reviewed additional information.
14  Q.       You also reviewed the Maceo report?
15  A.       Correct.
16  Q.       We would add the Maceo report to this list?
17  A.       Correct.
18  Q.       What else would you add to this list?
19  A.       His report and the associated exhibits.  I don't
20  recall anything else off the top of my head.
21  Mrs. Powell's deposition is on here.  I don't recall
22  anything off the top of my head.
23  Q.       Page 3 of your report, Exhibit 1.
24  (Mr. Mayeshiro leaves deposition proceedings.)
25  Q.       You talk about what is known or unknown to most
00182
 1  of the visitors in paragraph three.
 2  A.       Yes, sir.
 3  Q.       How did you arrive at that conclusion?
 4  A.       Several things.  One is the observations that you
 5  make when you stand at the top of the hill and look down.
 6  Second is through my experience over the years here in
 7  Hawaii and other cases that I've been involved with here
 8  in Hawaii, that the typical Mainland tourist does not
 9  appreciate and understand the complexities of the ocean,
10  oceanography issues and so forth.  So the combination of
11  those things would be the two primary things.
12  MR. REINKE:  Off the record.
13                    (Recess taken.)
14  MR. REINKE:  Back on the record.
15  Q.       On page 8 of your report.
16  MS. WATERS:  Still on the first report?
17  MR. REINKE:  First report, yes.
18  Q.       Under implementation, paragraph one, you refer to
19  Hanauma Bay protocol for closing the outer reef Witch's
20  Brew area.  What are you referring to?
21  A.       The items that we've talked about earlier where
22  there was a process by which the water safety officers
23  made a decision to close certain areas.
```

GILL, Richard PhD (03-02-07).txt

24  Q.        You seem to suggest that rough is the standard in
25  your first portion of that paragraph.  It was noted as
00183
1   rough and therefore or according to the protocol should
2   have been closed.
3   A.        If you let me look at my notes I can tell you
4   which water safety officer said when it's rough conditions
5   it should be closed.
6   Q.        Was there any explanation what those water safety
7   officers meant by rough?
8   A.        I don't recall them being asked that.  I know the
9   form that they have for the incident report as normal,
10  choppy, rough, and other.  Some of the water safety
11  officer marked choppy and some marked rough.
12  Q.        On that same day?
13  A.        That's correct.
14  Q.        You're suggesting that there's an automatic, if
15  it's rough it's shut down?
16  A.        No, sir.
17  Q.        You don't intend to suggest that?
18  A.        What I am reading as I read what's written here,
19  that the incident notes said that it was rough.  And that
20  according to the depositions that I believe that I read,
21  that when the conditions are rough the outer area is to be
22  closed down.  Now, how they arrive at those determinations
23  of what's rough or not I can't tell you.
24  Q.        Would that make a difference in terms of at least
25  paragraph one as to whether or not under the Hanauma Bay
00184
1   protocols it should have been closed down, how that rough
2   is defined?
3   A.        I don't care how it's defined.  All I care about
4   is that a water safety officer tells me under oath in his
5   deposition when it's rough such as it was on the date of
6   the accident, this area should have been closed.  Then
7   that's sufficient for me to conclude it should have been
8   closed.  Again, as I recall, there's no dispute amongst
9   the officers that it was supposed to be closed.
10  Q.        We haven't defined what closed means yet, have
11  we?
12  A.        Well, I don't know that we set out a verbal
13  description.  My understanding of closed is that people
14  are not permitted to be in the area.  That it's unsafe.
15  It's dangerous.  They shouldn't be there.
16  Q.        And would you look at your notes with respect to
17  the Bregman deposition and tell me where you found the
18  information regarding buoys to mark rough dangerous areas
19  that's marked on paragraph seven on page 9.
20  A.        I just was finding it in my notes first.  It's
21  between pages 56 and 60.  I would refer you to the
22  discussions on page 57.
23  Q.        May I see that real quick?
24  A.        Sure.
25  Q.        May I see page 58?
00185
1   Isn't it true that the buoys you were talking
2   about were ones in the channel?
3   A.        I think that's correct.  When he was around the
4   only ones that they would place at the inside of the
5   channel to mark where it was, and then indicating I don't
6   know where that was.
7   Q.        Did you take from that testimony that they use
8   buoys to mark rough and dangerous areas throughout the
9   bay?
10  A.        I wouldn't draw that extreme an interpretation.
11  Q.        You also indicate that he testified that they
12  were not up on the day of the Powell, Laughlin incident?
13  A.        I believe I said that also, yes, sir.
14  Q.        Those were the channel buoys, correct, that were
15  not up on the day of the incident, correct?

GILL, Richard PhD (03-02-07).txt
16  A.        I would not draw that conclusion necessarily.
17  That would certainly be a reasonable inference from this
18  passage.
19  Q.        You are not trying to suggest in your paragraph
20  seven that there were buoys at Witch's Brew to mark as a
21  rough or dangerous area at any time, but that they weren't
22  up on the day of the incident?
23  A.        No, no, I did not mean to infer that.
24  Q.        We're done with that area then.
25  Paragraph nine on the same page, 9, Moses
00186
1   testified that, then on B, he saw either Powell or
2   Laughlin swim around Witch's Brew point, yet he took no
3   actions to intervene.
4   we've discussed that before, correct?
5   A.        We have.
6   Q.        We discussed the direction he saw them swim, and
7   we don't know from his testimony, correct?
8   A.        I would draw that conclusion.
9   Q.        The following sentence, particularly disturbing,
10  that wasn't Moses' testimony, was it?
11  A.        No.  That's why I said it is noted at the
12  beginning of the sentence.
13  Q.        Then when you go on to say clearly Lifeguard
14  Moses, then you talk about him and his duties?
15  A.        Correct.
16  Q.        Would this area, talking about what the
17  lifeguards did or didn't do in response to the incident,
18  would that be more in lines of a WSO's expert area of
19  expertise as opposed to your expertise as a human factors
20  expert looking at the whole system?
21  A.        No.  I think it's one of those areas that you
22  have overlap.  I think a domain specific expert can talk
23  about the training, skills, and protocol that they would
24  have gone through, the kinds of behaviors that he would
25  expect to have happen and so forth.  But from a pure
00187
1   safety point of view, I believe I can make the statements
2   that I've made there.
3   Q.        Of course you can make them.  You did.
4   A.        I believe I have the expertise to make the
5   statements that are made there.
6   Q.        How quickly should WSO Moses have acted in order
7   to perform his duties, how quickly after he noted them
8   swimming around Witch's Brew point?
9   A.        I would say it was before then.  He should have
10  noticed them before they ever got there, well before they
11  ever got there.  That's where we talked about before where
12  you have to be able to intercept before they get to the
13  zone of danger.  They're already there.
14  Q.        If he hadn't seen them before they got there?
15  A.        We're allowing that mistake to have already
16  occurred.
17  Q.        Whether that's a mistake or not.  If he hadn't
18  seen them before they got there, and then he saw them for
19  the first time when they were swimming in or out of
20  Witch's Brew point, how long did he have between the time
21  he first saw them before he was required to take action?
22  A.        The first part of your question was whether it
23  was a mistake or not.  It was a mistake to have not seen
24  them get there.  Notwithstanding, immediately upon
25  recognition that they are where they are at, he should
00188
1   have responded.  Because you already have somebody in the
2   position that they are inside your buffer or margin of
3   safety for responding.  You can't get there in time at
4   this point.  So why are you waiting to see -- It's already
5   a bad situation.  Waiting is only making it worse.
6   Q.        So there's no margin of time, immediately
7   respond?

GILL, Richard PhD (03-02-07).txt

```
 8  A.        Absolutely.  They're already inside that buffer
 9  of safety.  You can't get there in time.  So you need
10  to -- Seconds are precious.  You need to respond now.
11  Q.        If he had responded immediately is it your
12  opinion that this accident wouldn't have occurred?
13  MS. WATERS:  Objection.  Vague and ambiguous to
14  accident, which victim.
15  THE WITNESS:  I don't think I have sufficient
16  information to be able to answer that question.
17  BY MR. REINKE:
18  Q.        You can't say then whether this failure played
19  any role in causing this accident, can you?
20  A.        Which failure are you talking about?
21  Q.        The one you are discussing here specifically in
22  9 B.
23  A.        The one I'm discussing in 9 B is meant to cover
24  the whole intervention from the moment that the Powell,
25  Laughlin team left the zone of safety and proceeded
00189
 1  towards the zone of danger.  That's the part of the
 2  question you threw out in the beginning.
 3  Q.        Isn't the problem you are not able to identify
 4  where the zone of safety begins and ends?
 5  A.        You mean an exact precise line?
 6  Q.        Correct.
 7  A.        I can't give you an exact precise line.  My
 8  understanding is you are not supposed to be out in the
 9  outer reef, which means through the slot.  Neves'
10  testimony, he was there supposedly there earlier in the
11  day on a surfboard telling people it's not safe.
12  Q.        Urging people not to go out there?
13  A.        That's right.
14  Q.        We've been through that pretty carefully with
15  respect to Mr. Powell and Mr. Laughlin.  Is it your
16  opinion then once someone got outside the slot, that the
17  WSO should have responded and immediately initiated a
18  rescue attempt?
19  A.        No.  I think we've talked about that at length.
20  Once they've gotten outside the slot they're already in a
21  place they shouldn't be.  Which means you need to warn
22  them.
23  Secondly, if you see them outside the slot and
24  they are proceeding in a direction away from desirable
25  snorkeling, towards an area that you know is even more
00190
 1  dangerous and closed, that heightens the sense of urgency
 2  in which you've got to respond.
 3  Q.        If they're swimming or snorkeling competently
 4  with no sign of distress, does that lessen your duty?
 5  A.        No, sir, it doesn't.  Again, they're in an area
 6  that they're not supposed to be in to start off with, and
 7  they're proceeding into a more dangerous area.
 8  Q.        Aren't all these 15 to 20 people in an area
 9  they're not supposed to be?
10  A.        That's my understanding.
11  Q.        If they're all in an area they're not supposed to
12  be, under your view of the facts of this case, shouldn't
13  the WSO's initiate rescue attempts for all those people?
14  A.        Yes.  Which is why I'm faulting the whole system
15  because you let people out in a zone of danger.  You choke
16  it off at the choke point.  You provide information to
17  them when they come in and pay their fees.  That's your
18  first choke point.  You provide information at the
19  channel, at the slot.  But you don't just let them go in
20  an area that you know is dangerous and just ignore it and
21  hope for the best.
22  Q.        Page 7 of the report.
23  A.        I'm sorry if I sent the report to you out of
24  order so bad.
25  Q.        You didn't.  I got it page after page.  I just
```

Page 71

GILL, Richard PhD (03-02-07).txt

00191
1  approach it more logically than you did.
2  A.      I knew I'd find what I did wrong somehow.
3  Q.      Paragraph six, sub-section B, you once again give
4  what appears to be some type of summary of what Mr.
5  Bregman says and then you editorialize; is that correct?
6  A.      Yes.  I apology for that.  I try to always say
7  note or put in parentheses when it's my comment and not
8  theirs.  And I did not do that apparently in this
9  paragraph.
10 Q.      Or in this whole report?
11 A.      It looks like there's a couple of times I haven't
12 done that, that's correct.
13 Q.      I want to make clear there's times when you do
14 give your review or comments upon your summary of their
15 testimony.  So we can go through this report and do this
16 item by item.  But if you say noted or clearly, what
17 you're trying to do is set off the fact that that is not
18 testimony, correct?
19 A.      Correct.
20 Q.      It's your interpretation or your analysis,
21 correct?
22 A.      More often than not it's my comment about why
23 that's relevant to the facts of the case.
24 Q.      On page 8, paragraph ten, the water side of
25 Witch's Brew point.  I just want to make sure whether or
00192
1  not you're referring to the area we've identified as
2  Witch's Brew that they can't see or this side that's
3  inside the bay with that comment on paragraph ten?
4  A.      I understood him to mean the black circle on
5  Exhibit 3 and the surrounding rings.
6  Q.      So up to Witch's Brew point, that water you could
7  see, correct?
8  A.      Correct.
9  Q.      Under evaluation, page 10, paragraph one, you
10 give a daily visitor count of 1,500 to 2,000.  Where did
11 that number come from?
12 A.      I think that was the estimates that were provided
13 in the deposition testimony by the various water safety
14 officers.
15 Q.      Paragraph three, your review of Dr. Lukas'
16 report, you state that Dr. Lukas notes there are no
17 natural flows or currents from the reef area of Hanauma
18 Bay to directly in front of Witch's Brew.  Is that
19 correct?
20 A.      I don't believe I refer to his report.  I think
21 it was a phone conference with him.
22 Q.      What was the importance of that to you?
23 A.      The length of time that it would take for someone
24 to get from the inner reef to where the bodies were
25 located and found, where Mr. Laughlin was spotted coming
00193
1  around the point.
2  Q.      Is it also important because it shows that the
3  water didn't necessarily push them over to Witch's Brew,
4  but they consciously or unconsciously snorkeled in that
5  direction?
6  A.      I appreciate the correction to your question.  I
7  don't think they consciously did it.  I think you could
8  conclude they were swimming, and through their swimming
9  that that was the primary mode of transportation that got
10 them there as opposed to being blown there strictly or
11 drawn there by current strictly.
12 Q.      We don't know whether they consciously or
13 unconsciously chose to go there; is that correct?
14 A.      I would agree with that.
15 Q.      I want to go to your documentation section again.
16 You discuss documentation being important for controlling
17 risks; is that correct?

Page 72

GILL, Richard PhD (03-02-07).txt
18   A.       Correct.
19   Q.       With respect to this section on documentation,
20   whether any of these circumstances were actually
21   occurring, that is, whether there were evaluations,
22   whether there was training or strategies or protocols, in
23   this section you're not necessarily saying those things
24   don't exist, but in fact they should be documented,
25   whether they exist or not, correct?
00194
1    A.       They can't be documented if they don't exist.
2    But they need to be documented is what I'm saying.  And
3    these are things that I saw that there was not
4    documentation for.
5    Q.       You're not necessarily saying that each one of
6    these things didn't occur?
7    A.       I'm saying there's no documented evidence that
8    they occurred.  And there should have been.
9    Q.       With respect to the training issue, you're not
10   trying to discuss what training that the WSO's should
11   have, are you?
12   A.       No.  You're starting to get into area of somebody
13   like Mr. Ebro.
14   Q.       You are not going to get up at trial and say
15   these people should have been trained the following way?
16   A.       No, no.  If you are going to hire somebody that
17   is a water safety officer you should have documentation
18   that they are certified, licensed, and properly trained.
19   If you are going to require them to have site specific
20   training, which I think is appropriate for the unique
21   characteristics of something like Hanauma Bay, that you
22   should document two things, what that training was and the
23   fact they were, in fact, given that training.  You see
24   that in OSHA, for example, all the time for something as
25   simple as using a ladder.
00195
1    Q.       Hypothetical situation.  If in connection with
2    the location of Hanauma Bay known as Witch's Brew there's
3    been no documented drownings prior to the two that are in
4    this case, would you expect to see any post-doc
5    investigations of drowning incidents in Witch's Brew?
6    A.       Of course not.  If you don't have any
7    investigated accidents you can't have documentation of an
8    investigated accident.
9    Q.       In connection with this case with respect to the
10   drownings of Mr. Powell and Mr. Laughlin, would the fact
11   that it hasn't been documented in this case, as you say
12   there's no documentation regarding that, would that fact
13   have done anything to change the outcome of the second
14   snorkeling trip of Mr. Powell and Mr. Laughlin?
15   A.       The no documentation on their drownings?
16   Q.       Right.
17   A.       No.  It's after the fact.  The reason I brought
18   that out is it's evident that they don't document
19   drownings properly when they occur.  And, therefore, they
20   don't afford themselves the opportunity to do a proper
21   post-doc analysis.  And, therefore, they don't afford
22   themselves the opportunity to learn from somebody else's
23   death what kind of preventive measures may make it safer
24   to prevent a future death.  So that's the relevance that
25   this kind of information has.
00196
1    Q.       Have you done any analysis of any of the other
2    drowning incidents?
3    A.       Again, I can't because they're not documented by
4    the city and county.  I can't analyze something that's not
5    there.
6    Q.       You've not seen an incident report for any of the
7    other drowning incidents?
8    A.       There's not sufficient documentation.
9    Q.       Have you seen a drowning report of any of the
Page 73

GILL, Richard PhD (03-02-07).txt

10  other incidents.
11  A.      I'm not certain.  I think there may have been one
12  or two, but certainly not all the incident reports for all
13  the drownings that were reported.
14  Q.      Did you ask your attorneys to request the
15  post-doc investigations for any of the other drownings in
16  2002?
17  A.      I don't believe I did.
18  Q.      Would that be important to determine if there was
19  any documentation on post-doc investigations?
20  A.      Well, as I read the interrogatories and request
21  for production of documents, that would have been
22  provided.  That's all I can tell you.
23  Q.      Was there a specific request for the
24  investigations that you can recall?
25  A.      I believe they asked for all documentations and
00197
1   reports of prior drownings.  I'm paraphrasing it
2   obviously.
3   Q.      Do you know if it would have been more effective
4   in order to conclude that there was no post-doc
5   investigations if you'd ask for post-doc reports?
6   A.      The question is how far does one proceed before
7   you feel you've exhausted all possibilities.  If there's
8   post-doc accident investigation reports I hopefully will
9   see them.  If not soon, then by the time of trial.
10  Q.      In the conclusion section you discuss, if you
11  look at your second full paragraph -- why don't you just
12  read that to yourself real quickly.
13  A.      The one that starts it is particularly?
14  Q.      Yes.
15  A.      Okay.
16  Q.      You have series there.  Did you mean serious
17  there on the second line?
18  A.      No.  Let me read it again.
19  Q.      Read it again.
20  A.      Serious, right.  There were a series of drownings
21  but it was a serious hazard.  Thank you.
22  Q.      The next sentence which goes on for quite some
23  time, did you discuss the failure of the city to control
24  such a deadly hidden hazard?
25  A.      Yes, sir.
00198
1   Q.      Was that a reference back to the drowning hazard?
2   A.      Yes.
3   Q.      Other than the fact that there was a drowning as
4   a cause of death, can you tell me what the other
5   relationship is between the other drownings and the
6   drownings that are at issue in this case?
7   A.      As far as I understood they were at a point in
8   time when the bay was open and people were there, paid
9   patrons, to go snorkeling.  There were lifeguards on duty.
10  That the protocols were in place.  And the drownings still
11  occurred.  So whatever safety protocols there are, from
12  the moment the patron arrives at the parking lot until the
13  time of death, something needs to be improved in order to
14  reduce this risk of drowning.
15  Q.      You indicate that Mr. Laughlin and Mr. Powell did
16  do nothing to negligently contribute to their deaths.  Do
17  you see that?
18  A.      I do.
19  Q.      How do you reach that conclusion?
20  A.      Well, all the evidence that I've had.  And we
21  went through it a lot.  They're not guilty of errors of
22  omissions or errors of comission.  They were certainly
23  physically qualified to do what they are doing.  They had
24  snorkeling experience ad infinitum.  We have no evidence
25  to suggest anyone intervened and told them not to go where
00199
1   they were.  We have no evidence to believe that or suggest

GILL, Richard PhD (03-02-07).txt
2  that they're the type of individuals that if a position of
3  authority and authority figure said this is dangerous,
4  don't go out here, that they would have chosen to engage
5  in that kind of activity.
6  Q.       Isn't it true we don't know what happened out
7  there?
8  A.       Well, we don't know in detail what happened.  But
9  I believe we know enough to draw the conclusion on a more
10 probable than not basis that they didn't do anything to
11 contribute to their accident.
12 Q.       How can you say that not knowing what happened
13 out there?
14 A.       Because it's not what happened out there.  It's
15 the fact that they got out there.  Everything they did
16 leading up to the moment of whatever ultimately happened,
17 in my opinion they didn't do anything wrong.  There's no
18 evidence to suggest that.  One can speculate that water
19 safety officer Neves was on his surfboard and stopped them
20 and said don't go and they both blew him off and swam out.
21 I don't think there's any basis for such wild speculation.
22 Certainly inconsistent with the type of people that I
23 understood them to be.  So I see no basis to conclude that
24 they did something wrong.
25 Q.       You don't know what happened once they were out
00200
1  of everybody's sight, do you?
2  A.       No.  I can't imagine that they did something
3  intentionally and deliberately to put themselves at risk.
4  There's no basis for that.
5  Q.       In your rebuttal report you take exception to
6  Major Maceo's claims that Witch's Brew was not an area
7  that was monitored by the WSO's.  Do you see that?
8  A.       I do.
9  Q.       Haven't we made it clear in this deposition you
10 can't even see into Witch's Brew from the tower?
11 A.       No, sir, I don't think we have.  There are
12 portions you can't see into, but not the entire area.
13 Again, all you need to do is take the second lifeguard
14 stand that I believe you can see on this photograph, and
15 draw a straight line from it and across, and the black
16 circle is, in fact, within sight, or at least a portion of
17 it.
18 Q.       Have you tried to go and look into Witch's Brew
19 from either of those towers?
20 A.       No.  I don't have to.
21 Q.       Did you stand next to those towers and try to
22 look into Witch's Brew?
23 A.       I don't have to.  We have a photograph right in
24 front of us.  You can draw a line on the photograph and
25 see exactly the limitations of where you can and can't
00201
1  see.
2  Q.       So that's what you base your opinion on?
3  A.       No.  I think there's also testimony from the
4  water safety officers that disagree with the major.
5  Q.       How about from the tower where WSO Moses was,
6  draw the line from there and what do you get?
7  A.       You can see a portion of Witch's Brew, but not as
8  well as you can from the other side.  Even from that tower
9  you can almost see the edge of the black circle.  That's
10 just the center of it, center of Witch's Brew.  So
11 certainly even from the tower in the worst location you
12 can still see a portion of it.
13 Q.       Where does the dangerous condition in Witch's
14 Brew begin?
15 A.       It's the entire area.
16 Q.       Why is the entire area dangerous?
17 A.       Because of the chop.  I think again it was
18 Goodwin that testified it was like a washing machine in
19 there where the surface of the water is chop.  I think Dr.
Page 75

GILL, Richard PhD (03-02-07).txt
20    Lukas testified about how dangerous the area was.  And he
21    didn't even want to go into it on a surfboard.
22    Q.         You talk about WSO wasting valuable surveillance
23    time by watching an area to which he was not assigned to
24    monitor?
25    A.         Right.
00202
1     Q.         What do you mean by that?
2     A.         Major Maceo can't seem to make up his mind.  On
3     one hand he says nobody is supposed to monitor this area.
4     And then on the other hand he's saying well, Officer Moses
5     was doing an excellent job at surveying the water and
6     fulfilling his duties because he identified the person.
7     What are you doing spending your time looking in an area
8     that you're not supposed to look when you got 2,000
9     swimmers and an average of 1.6 lifeguards?  He ought to
10    make up his mind which side of the fence he's on here.  If
11    you're not supposed to be monitoring that area you don't
12    give somebody an atta boy for monitoring.
13    Q.         WSO Moses ever state that he was monitoring
14    inside Witch's Brew point?
15    A.         No.
16    Q.         He was monitoring on the side, the beach side of
17    Witch's Brew point, wasn't he?
18    A.         No.  I don't believe he states that either.  I
19    think he states all we can say is that he saw a swimmer
20    coming around the point.  Look where the point is relative
21    to where the swimmers are supposed to be inside the inner
22    reef.  What in the world are you doing looking way out
23    here when you are assigned the job of looking in where the
24    people are?
25    Q.         People snorkeling where they're not supposed to
00203
1     go, wouldn't that be a reasonable explanation?
2     A.         I don't believe it would.  I believe a reasonable
3     explanation, if he was doing his job, is identifying the
4     people heading in that direction and cutting them off
5     then.  Not waiting until they're already in harm's way and
6     then saying, oh, we'll give you an atta boy for finding
7     them.  You don't praise somebody for doing a great job at
8     surveillance if, A, it's a closed area, and B, they're all
9     the way out where they shouldn't be.
10    Q.         So he didn't do a good job of seeing them all the
11    way out there?
12    A.         No, I'm not saying that at all.  I'm saying the
13    major ought to make up his mind.  Is that an area you are
14    supposed to survey or not.  If it's an area you are not
15    supposed to survey, you don't give somebody a kudo for
16    good job of surveying there.  They're supposed to spend
17    their time looking in certain areas.
18    Secondly, if it is a job that he's supposed to be
19    surveying, you don't give him a kudo for saying oh, good
20    boy, you found him.  You raise the question of why did you
21    not see these two individuals until they're already all
22    the way out here.  He's got it completely out of phase.
23    Q.         When Powell and Laughlin, this is hypothetical,
24    when they went through the slot, if they had gone straight
25    out, at some point they would not have been visible to the
00204
1     lifeguards; is that correct?
2     A.         That's correct.
3     Q.         Did the lifeguards have any obligation if someone
4     goes straight out towards the ocean to intervene?
5     A.         In my opinion as soon as they come down the slot,
6     on the conditions of that day and the conditions that the
7     water safety officers have described, that the slot was
8     closed and you are not supposed to be in the outer reef,
9     yes, they should have intercepted.
10    Q.         We don't know how they entered the Witch's Brew
11    area?

GILL, Richard PhD (03-02-07).txt
12   A.       Other than to say it's reasonable to conclude it
13   was by water and not by land.
14   Q.       We don't know which part of the water they
15   entered that, do we?
16   A.       No, sir.
17   Q.       We don't know what efforts they made to leave
18   Witch's Brew, do we?
19   A.       No, sir.
20   Q.       Did you read Mr. Ebro's rebuttal report?
21   A.       I don't believe I read either of his reports.
22   Q.       Do you agree or disagree that lifeguard towers
23   send a message that say swim near a lifeguard?
24   A.       I have no opinion on that one way or another.
25   Q.       How do you mitigate ocean conditions?
00205
1    A.       The conditions themselves you have very little
2    control over, so you control the hazards that those
3    conditions present to people.
4    Q.       Do you believe that the agency has made a
5    conscious decision to put beach patrons in danger?
6    A.       No.  I don't believe they consciously said we're
7    going to try to kill people on this beach.  I don't think
8    that's what they did.
9    Q.       Do you have any information with respect to the
10   activities of WSO Moses on the date of the incident that
11   would suggest that he wasn't being attentive?
12   A.       Well, if I assume the hypotheticals that you've
13   given me before --
14   Q.       Do you have any information that he wasn't being
15   attentive on the date of the incident?
16   A.       If he was at his lifeguard stand in the hour
17   leading up to this accident, yes, I believe he was not
18   being attentive in allowing two people to get where they
19   were.  If he was on break and he just came up, then
20   obviously it's a different situation.
21   Q.       Earlier in the deposition you testified that the
22   system required you to look at various people, the other
23   998 folks that may have been in the water, to look at
24   those folks.  So perhaps he was doing that and he didn't
25   see them.  Would he have been inattentive to his duties if
00206
1    he was doing, as you suggested, monitoring the folks in
2    Zone 1, and didn't get to scan up in that area?
3    A.       Yes.  If he went for an hour and never scanned
4    out in that area, yes, I believe it's inattentive, and not
5    responsible to his duties.
6    Q.       Would it be negligent?
7    MS. WATERS:  Objection.  Calls for a legal
8    conclusion.
9    MR. REINKE:  I'll withdraw the question.
10   Q.       Would it be a conscious disregard of his duties
11   not to have seen them?
12   MS. WATERS:  Same objection.
13   THE WITNESS:  I think it's a conscious disregard
14   of his duties to have not scanned well enough to have not
15   seen two people to have gone that far and never detected
16   them.
17   BY MR. REINKE:
18   Q.       What fact other than the fact that they weren't
19   detected leads you to believe it was a conscious disregard
20   of his duties?
21   A.       Because under the scenario that we have you are
22   looking at a significant window of time that it would take
23   for two individuals to get from where they left the zone
24   of safety to the zone of danger.  I don't know how
25   somebody that was consciously performing their duties in a
00207
1    responsible manner could allow that to happen.
2    Q.       Earlier in the deposition I tried to get you to
3    give me an estimate of time.  You said you couldn't do it.
                              Page 77

GILL, Richard PhD (03-02-07).txt

4   You suddenly come up with a significant period of time.
5   What is significant?
6   A.       Again, I can't quantify it for you.  But you
7   asked me couldn't it have been five minutes.  I said no,
8   it had to be well over five minutes.  Even just to
9   deliberately and intentionally swim that distance you'd be
10  hard pressed to do it in five minutes.  You are telling me
11  that a lifeguard that is supposed to be monitoring this
12  area and scanning for potential hazards in five minutes
13  time never once looks between the slot and Witch's Brew.
14  That's clearly somebody that's not consciously performing
15  their duties.  And it has to be more than five minutes.
16  Q.       Say it's ten minutes.  Suppose he looks up, looks
17  in that area and simply misses them.  Is that possible?
18  A.       For a trained professional lifeguard to be
19  intentionally looking for someone for ten minutes time to
20  not be able to see them, no.
21  Q.       You've twisted my question.  Now you have him
22  looking in that area for a specific person for ten
23  minutes.  I said during ten minutes.  Is it possible that
24  they looked in that area, scanned that area, and simply
25  didn't see them?
00208
1   A.       No.  I don't believe if he was performing his
2   duties that that's likely.
3   Q.       It's not likely.  Could have happened though,
4   couldn't it?
5   A.       Yeah.  It's like a meteorite.  It can hit.  It's
6   not likely.  It's not a probable explanation.
7   Q.       It was choppy out there, wasn't it?
8   A.       Out in the Witch's Brew area it was, yes.
9   Q.       It wasn't choppy out in Zone 2?
10  A.       Well, based on the wind conditions I would say
11  that there wouldn't be a significant chop.
12  Q.       It's rough out there in Zone 2?
13  A.       In Witch's Brew or in the area between the slot
14  and Witch's Brew point?
15  Q.       The slot and Witch's Brew point.
16  A.       Water is going up and down.  That's not the same
17  as splashing and somebody swimming.
18  Q.       Water is going up and down.  Are there any white
19  caps out there?
20  A.       There may be some.
21  Q.       Hasn't it been described by people as being
22  choppy out there?
23  A.       Definitely in the Witch's Brew area.
24  Q.       We're talking about the Zone 2 between the slot
25  and Witch's Brew.
00209
1   A.       There was some testimony in that area, yes.
2   Q.       Couldn't a snorkeler be down in the trough when
3   you look up?
4   A.       It could happen at a glance.  Over that length of
5   time, no.  What you are asking me to say is that a
6   snorkeler could be out in an area of a zone of danger for
7   ten minutes time and a lifeguard would never even see
8   them.  Clearly, four lifeguards can't monitor 2,000 people
9   if a single lifeguard over ten minute span can't see
10  somebody in an area that he's supposed to be watching.
11  Q.       Isn't it possible that a person could be scanning
12  an area and not see a swimmer?
13  A.       On a single scan across, yes.  To be actively
14  responsibly scanning that area for ten minutes and never
15  once see two swimmers?
16  Q.       You are assuming that the two were together,
17  correct?
18  A.       Well, I'm assuming the two somehow got from the
19  slot to Witch's Brew point.  Whether they were together or
20  not makes no difference.  They both went by water.  So you
21  have two swimmers in the water.
                              Page 78

GILL, Richard PhD (03-02-07).txt
```
22  Q.       Two snorkelers?
23  A.       Correct.
24  Q.       Not making any splash?
25  A.       No.
00210
 1  MS. WATERS:  Objection.  Calls for speculation.
 2  THE WITNESS:  I've never seen snorkelers be able
 3  to swim that distance and never splash.
 4  BY MR. REINKE:
 5  Q.       So they're making splashes with fins, right?
 6  A.       Well, with their fins, if they stick their heads
 7  up out of the water, blowing water out of their snorkel.
 8  To go that distance and say that they are stealth, never
 9  break the surface of the water, no, that's not likely.
10  Q.       So you're saying he didn't performance his duties
11  at that time because he didn't spot them, correct?
12  A.       Correct.
13  Q.       Is that a leap from saying he's consciously
14  disregarding his duty as opposed to not performing it
15  competently?
16  A.       My belief is in order for that to have transpired
17  over that length of time is he's not surveying that area.
18  I don't believe it can be an accidental failure to detect.
19  He's simply just not surveying the area.
20  Q.       You don't have any fact to back that up other
21  than the occurrence of the incident; is that correct?
22  A.       No.  The occurrence of the incident, the knowing
23  of the distances that are involved, the fact that people
24  shouldn't have been there, which should have made them
25  very salient to someone that is surveying the area.
00211
 1  Q.       There's no testimony that WSO Moses was not
 2  scanning the area that would have included the lead up to
 3  Witch's Brew point on the date of the incident, is there?
 4  A.       There's evidence that he wasn't in a sense that
 5  two people went undetected for such a long period of time.
 6  Q.       Is that the only evidence?
 7  A.       Well, I keep answering that question by
 8  correcting you and saying no, it's not the only evidence,
 9  and I add in all the other things, the distance involved,
10  the starkness of the cue, the fact that you shouldn't have
11  people in the area.  You are not trying to pick out
12  somebody in danger out of the sea of 2,000.  You're just
13  simply trying to identify somebody that shouldn't even be
14  there.
15  Q.       It's your opinion that you could not
16  inadvertently miss two snorkelers in a ten minute period
17  when you are doing your job, is that your opinion?
18  A.       At least a ten minute period under those
19  conditions.
20  Q.       Couldn't inadvertently do that?
21  A.       No.
22  Q.       It was a conscious disregard of his job?
23  A.       I believe it was a conscious disregard for
24  surveying the area.
25  Q.       Your testimony is it's your opinion that he
00212
 1  wasn't surveying that area?
 2  A.       I think that's the most likely explanation, yes,
 3  sir.
 4  Q.       How about Mr. Neves?
 5  A.       It would apply to all of the lifeguards that were
 6  on duty.  I can't believe if they're going to see somebody
 7  swimming in harm's way and do nothing.  Either way it's a
 8  conscious disregard.
 9  Q.       It's your opinion that all the lifeguards on duty
10  on that day and all the parking attendants and everybody
11  else failed to notice these people?
12  A.       Either A, failed to notice them, or B, they
13  noticed them and didn't do anything.  I can't tell you
```

GILL, Richard PhD (03-02-07).txt

```
14  which it is.
15  Q.        Well, does that make a difference?
16  A.        In terms of the overall opinion that it was such
17  a dereliction of duty to allow these two men to get where
18  they did, no.
19  Q.        Do you have any opinion with respect to the
20  training of WSO Nevis or WSO Moses?
21  A.        No, sir, I don't.  I would defer to Mr. Ebro on
22  that.
23  Q.        Any opinions with respect to their physical
24  condition on the date of the accident?
25  A.        No, sir.
00213
 1  Q.        Are you aware of any distractions that may have
 2  prevented them from doing their duties on the date of the
 3  accident?
 4  A.        No, sir.
 5  Q.        Other than that area we just discussed, you're
 6  not aware of anything other than that area which would
 7  have prevented them from doing their duties on the date of
 8  the accident, correct?
 9  A.        That's correct.  Well, no.  Excuse me.  The
10  evidence that we have of multiple people in an area that
11  was closed and still nothing was done.
12  Q.        With respect to the institution of a megaphone or
13  a loudspeaker at Hanauma Bay, would you defer to the water
14  safety expert with respect to the effectiveness of that
15  type of a device to warn people?
16  A.        No.  That's a basic human factors issue that I
17  would offer testimony.
18  Q.        Tell me what you would do, tell me what system
19  you would put in place with respect to loudspeakers or
20  megaphones.
21  A.        That's beyond the scope of what I was asked to
22  do.
23  Q.        What testimony would you give with respect to
24  loudspeakers or megaphones?
25  A.        The testimony that I would offer is that given
00214
 1  the large expanse that you need to cover and the limited
 2  staffing that you got, one of the ways you can improve the
 3  effectiveness of that staffing is to be able to provide
 4  what we call just in time warnings.  As a person begins to
 5  approach an area where they need correction, if you can
 6  call attention to that fact, I believe in a setting like
 7  this that would be an effective warning.  It's much more
 8  effective than what we call passive warning, such as a
 9  warning sign.
10  Q.        Do you need environmental assessment per those
11  types of devices for loudspeakers and megaphones?
12  A.        I don't know that.
13  Q.        You've also mentioned the use of jet skis?
14  A.        Correct.
15  Q.        How would you use a jet ski at Hanauma Bay?
16  A.        Again, that's beyond the scope of what I've been
17  asked to do.  But I can tell you some of the concepts
18  behind which you would use them.
19  Q.        But it's beyond the scope of what you've been
20  asked to do?
21  A.        I've not been asked to design a jet ski program.
22  But I've identified that as a means to enhance safety.
23  Q.        Do you know if it's even viable at Hanauma Bay?
24  A.        Yes, I believe it is.  They brought one around
25  for the rescue.
00215
 1  Q.        On an ongoing regular basis do you know if it's
 2  viable to have a jet ski at Hanauma Bay?
 3  A.        I don't see any reason why it would not be.
 4  Q.        You've done no investigation in that regard
 5  though, have you?
```

GILL, Richard PhD (03-02-07).txt
6   A.       I don't believe an investigation is necessary.
7   You have road access that you can bring supplies and
8   equipment down to it.  You have an easy means of pulling
9   it out of the water to protect it when it's not in use.
10  There are a number of things you can use a jet ski for to
11  enhance your water safety program.
12  Q.       Do you believe that if there aren't enough WSO's
13  available to effectively lifeguard the beach the beach
14  should be shut down?
15  A.       That would be an alternative.  I'm not proposing
16  that.
17  Q.       By the way, you are assuming that WSO Moses never
18  saw Mr. Powell or Mr. Laughlin as they swam towards
19  Witch's Brew point, correct?
20  A.       No.  I think we just talked about that a few
21  minutes ago.  There's one of two alternatives, either he
22  failed to see them, or he saw them and failed to respond.
23  Either way I'm critical.
24  Q.       I want to mark this as Exhibit 6.
25  (Exhibit 6 was marked for identification.)
00216
1   Q.       On Exhibit 6, which is identical to Exhibit 3,
2   without any of your markings though, I'd like you to with
3   this red pen draw a line in the area where you believe
4   Zone 2 begins.
5   A.       I'll do the best I can with the descriptions.  I
6   believe Zone 2 also includes part of the slot.  And if I'm
7   not mistaken, I think it also includes part of what's
8   called the back door area, which is not relevant to the
9   issues in this case.  But as I understand it, on Exhibit 6
10  it would be towards the right-hand side.
11  Q.       So with the red line you marked the commencement
12  of Zone 2.  Could you put a 1 in the area of Zone 1.
13  A.       Zone 1 would be what is -- I'm putting dashed
14  lines in the general area where I understand Zone 1 to be.
15  It's the makai side of the dotted line that I put.
16  Q.       Could you put a 1 in there.  With a different
17  colored pen, so we don't get too confused here, can you
18  draw what you believe to be the outer extent of Zone 2.
19  A.       I can't tell you the outer extent.  I can only
20  begin to with green dashed lines show you the areas that
21  are most relevant to the issues in this case of Zone 2
22  starts on the outside of the red line.  I don't know how
23  far makai it goes before it then becomes Zone 3.
24  MR. REINKE:  Off the record.
25                    (Recess taken.)
00217
1   MR. REINKE:  Back on the record.
2   Q.       Typically speaking through the course of your
3   role as a consultant and expert witness in connection with
4   ocean cases have you found that there's a higher than
5   normal risk for ocean activities that's a risk of harm to
6   a person?
7   A.       No, I wouldn't say so.
8   Q.       In performing your analysis have you used any
9   particular standards for review for the staffing of
10  beaches?
11  A.       No.  I would leave something like that to Mr.
12  Ebro.
13  Q.       How about regarding the duty to preventing a
14  hazard from occurring?
15  A.       That would be the basic standard of risk
16  management and a particular fundamental principle of
17  safety.  I utilized both of those in my analysis.
18  Q.       Are you aware of any national consensus with
19  respect to ocean beach facilities and risk safety
20  management?
21  A.       The only one I can think of would be what we
22  talked about earlier.  The Peterson text is a nationally
23  recognized text for management of parks and recreational

GILL, Richard PhD (03-02-07).txt

24   areas.
25   Q.        Are you aware of any states that have codes or
00218
1    standards for lifeguarding facilities or water safety
2    operations at beaches?
3    A.        That's really beyond the scope of what I was
4    asked to do.
5    Q.        Do you know how long a person can tread water?
6    A.        It depends on the individual.
7    Q.        Do you have any notion of an average time for
8    treading water?
9    A.        No, sir.
10   Q.        Do you know how fast a person can snorkel
11   100 meters if they are snorkeling constantly and steadily
12   for that hundred meters?
13   A.        No.  I could estimate.  Again, most people that
14   snorkel are not snorkeling with the intent of going to a
15   destination.  They are just simply floating and observing
16   and moving as they desire.
17   Q.        You're not, by the way, suggesting that they put
18   signs under water, are you, in any of your opinions?
19   A.        No, sir.
20   Q.        When you are talking about putting signs out on
21   in the water towards people that are approaching Witch's
22   Brew by water what did you mean?
23   A.        For example, on the shoreline.  So if you
24   approach by water rather than by land you at least know to
25   get out of there.
00219
1    Q.        You're not suggesting any water based signs, are
2    you?
3    A.        I haven't suggested it.  I haven't ruled it out.
4    Again, it was beyond the scope of my analysis to lay out
5    the entire design.  I was just illustrating the examples
6    within the report.
7    Q.        With respect to those examples, you didn't try
8    and do a thorough analysis of whether or not any of those
9    examples were viable for Hanauma Bay?
10   A.        I didn't do a comprehensive thorough analysis to
11   rule one out.  But I believe all of them are viable.
12   Q.        They're all possible at least?
13   A.        Yeah.  I think they are reasonable possibilities
14   that warrant further investigation that need some pretty
15   hard data to say no, this is not physically feasible or
16   economically feasible.
17   Q.        Or environmentally feasible?
18   A.        Or environmentally feasible.
19   Q.        Those are all factors that you would have to take
20   into account in determining what you do to control the
21   hazard?
22   A.        In designing the overall safety plan, that is
23   correct.
24   Q.        Did you keep your children out of the water after
25   they ate?
00220
1    A.        No.  I've grown up around the water and I've
2    never done that personally.  No one in my family has ever
3    done that.
4    Q.        I brought this up a little bit earlier.  With
5    respect to the equipment that Mr. Powell and Mr. Laughlin
6    had, you haven't made any effort to determine what kind of
7    equipment they had, what kind of fins, for example?
8    A.        No.
9    Q.        Does it make a difference in terms of their
10   mobility as well as their ability to escape from Witch's
11   Brew once they got into Witch's Brew?
12   A.        Well, it would potentially be a factor in terms
13   of the types of fins, the size of the fins and so forth.
14   That's not really the issue at hand here.
15   Q.        Were you aware of whether Mr. Powell or Mr.

GILL, Richard PhD (03-02-07).txt
```
16  Laughlin ever approached a lifeguard for information?
17  A.      I'm not aware of any evidence that they did.
18  Q.      And would you agree that Mr. Powell's drowning
19  occurred outside the view of the WSO's?
20  A.      No.  That's where the body was found.  I can't
21  say that's where the drowning occurred.
22  Q.      You don't know if Mr. Powell drown before or
23  after Mr. Laughlin?
24  A.      I have no evidence to be able to allow me to
25  conclude one way or another.  It's not really something
00221
 1  that I was asked to do.
 2  Q.      You looked at the autopsy reports, didn't you?
 3  A.      I did.
 4  Q.      Do the autopsy reports have any bearing at all on
 5  your opinions?
 6  A.      To the extent that they were both drownings.
 7  Q.      Do they have any bearing whatsoever on your
 8  opinions?
 9  A.      No, I don't think so.
10  MR. REINKE:  I don't think I have any additional
11  questions to ask you right now.  Thank you for your time.
12  I appreciate it.
13  MS. WATERS:  I have a little bit of cross.
14  EXAMINATION
15  BY MS. WATERS:
16  Q.      Dr. Gill, we've been talking about your areas of
17  expertise.  And just so it's very clear, you were retained
18  in this case by the plaintiffs as an expert in the area of
19  human factors and risk management; is that right?
20  A.      That's correct.
21  Q.      And you have how many years of expertise in this
22  area?
23  A.      Oh, boy.  Age is telling now.  Going on 30 years.
24  Q.      And in the areas of that expertise that you have
25  been retained for in this case, are the opinions that you
00222
 1  have rendered based upon facts and data that were provided
 2  to you?
 3  A.      That's part of the basis of my opinions, yes,
 4  ma'am.
 5  Q.      And you note the data and facts that you rely
 6  upon in the reports that you have submitted; is that
 7  right?
 8  A.      That's correct.
 9  Q.      Those would include deposition reviews, site
10  visits, other document reviews, as well as your personal
11  knowledge and experience; is that right?
12  A.      That's correct.
13  Q.      What principles and methods have you used in
14  rendering your opinions in this case?
15  A.      I'd say if I started with the broadest umbrella,
16  it would be human factors.  More specifically it would be
17  risk management, which has been around for 70, 80 years
18  now.  More specifically to that would be the fundamental
19  principle of safety which the National Safety Council
20  first promulgated in the early 1900's.  I'd say the most
21  specific thing would be something as specific as the
22  Peterson textbook on Risk Management For Parks and
23  Recreational Areas.  Something I've utilized in my
24  testimony many times.
25  Q.      Are these principles and methods that you just
00223
 1  referred to reliable in your opinion?
 2  A.      Very.
 3  MR. REINKE:  Let me object.  Vague and ambiguous.
 4  Lacks foundation.
 5  BY MS. WATERS:
 6  Q.      Can you explain, please?
 7  A.      Again, they've been around in the scientific
```

GILL, Richard PhD (03-02-07).txt
```
 8  community for 70, 80 years.  Experts rely on them.
 9  There's entire professions that are developed around risk
10  management.  People can actually specialize strictly in
11  risk management as a degree.  The reason for that is
12  because it works.
13  Q.      In laymen's terms risk management would be ways
14  to make a facility or procedure safer?
15  MR. REINKE:  Let me object.  Vague and ambiguous.
16  Lacks foundation.
17  THE WITNESS:  The whole purpose of risk
18  management is first and foremost to be a proactive safety
19  plan to identify potential hazards and having a systematic
20  way to minimize exposure to the hazards.  The second leg
21  of risk management is react and the post-doc phase.
22  Again, the notion is to minimize the potential risk of
23  harm to individuals.
24  Q.      The principles and methods that you referred to
25  earlier you did apply to the facts in this case?
00224
 1  A.      Yes, ma'am, I sure did.  That was the basis by
 2  which my analysis and report was done.
 3  Q.      The theories that you applied, have they been
 4  tested?
 5  A.      Yes, ma'am, they have.
 6  Q.      And in which particular manner?
 7  A.      They've been tested over the last 70, 80 years
 8  where people implemented risk management programs such as
 9  the five basic steps that I talked about in my report, and
10  seen a reduction in accidents.
11  Q.      You also referred to the Peterson book that
12  pertains to risk management in relation to park
13  management?
14  A.      Yes.  It's what I call a domain specific risk
15  management textbook.  It's risk management specific to
16  parks and recreational areas.
17  Q.      Again, you would apply that to the beach park in
18  this case?
19  A.      Absolutely.
20  Q.      Are the theories that you mentioned earlier
21  subject to either peer review or publications?
22  A.      Yes.  There's countless publications and peer
23  reviews in risk management and in fundamental principles
24  of safety or human factors overall.
25  Q.      would you agree that the theories that you apply
00225
 1  have general acceptance in the scientific community or the
 2  human factors community?
 3  MR. REINKE:  Let me object.  It's vague and
 4  ambiguous.  Calls for speculation.
 5  THE WITNESS:  Not only general acceptance, I'd
 6  say broad acceptance, which is why you can get an entire
 7  degree in risk management now.
 8  BY MS. WATERS:
 9  Q.      That's an actual bachelor's degree in human
10  factors?
11  A.      You can get a bachelor's, master's and Ph.D. in
12  human factors.  At minimum you can get a bachelor's degree
13  in risk management.  I don't know if they offer advanced
14  degrees in it or not.
15  Q.      Is the National Safety Council part of this
16  community, scientific community?
17  A.      Yes.  It's supported by the federal government.
18  Again, it's been around almost a century.
19  Q.      In addition to the Peterson book and ANSI, I
20  think you mentioned, are there any other treatises,
21  publications, data that you relied on in forming your
22  opinions for this case?
23  A.      I didn't specifically go pull the references.
24  But I would tell you there are literally hundreds of books
25  on risk management that are what I call generic risk
```

GILL, Richard PhD (03-02-07).txt

00226
1    management, they're not specific to any given topic or
2    domain.  You could take any one of those textbooks on risk
3    management and arrive at the same basic analysis that's in
4    Exhibit 1.
5    Q.       Going to this case specifically.  If you received
6    a daily log that lifeguards had kept that indicated the
7    specific conditions of the day of the incident, and these
8    were provided to you, would that have assisted you in your
9    understanding of what a rough condition constituted?
10   A.       That would be one of the things that would help
11   in understanding what they're defining to be rough, yes.
12   Q.       As you stated earlier, it's the water safety
13   officers who determine when the conditions were rough
14   enough to warrant closure of Zone 2?
15   MR. REINKE:  Let me object.  Assumes a fact not
16   in evidence.  Calls for speculation.
17   THE WITNESS:  My understanding is that the water
18   safety officers view the conditions and make a
19   determination of the safety or lack thereof, and then they
20   make the recommendation to the park manager and the park
21   manager is the one that ultimately can make the decision
22   to close.
23   BY MS. WATERS:
24   Q.       From your review of the evidence in this case was
25   there any mechanism or procedure for the park manager or
00227
1    ranger to announce the closure of the Zone 2 area on the
2    date of the incident?
3    A.       Not to my knowledge.
4    Q.       Do you recall WSO Bregman testifying or stating
5    that 80 to 90 percent of all rescues occurred in the slot
6    or cable channel?
7    A.       I don't recall the specific number, but I know it
8    was a vast majority, yes, ma'am.
9    Q.       And also does the evidence that you reviewed
10   establish to you that Eric Powell and Jim Laughlin entered
11   Zone 2 through the cable channel?
12   A.       That's my understanding.
13   Q.       By swimming through the cable channel?
14   A.       Right.  They came from the beach side through the
15   channel to get into the area.
16   MS. WATERS:  Thank you.  I have nothing else.
17   MR. REINKE:  I have a few questions for you, Dr.
18   Gill.
19   EXAMINATION
20   BY MR. REINKE:
21   Q.       Are you planning to come to trial to testify in
22   April?
23   A.       Yes, I am.
24   Q.       You're not planning to be out of the country or
25   some other location besides Hawaii?
00228
1    A.       No.  Unfortunately my associate is covering that
2    for me, so I plan on being here.
3    Q.       You have an associate now?
4    A.       I've had for several years.
5    Q.       Who is that?
6    A.       Joellen, J-o-e-l-l-e-n, last name Gill.
7    Q.       Relation of yours?
8    A.       Sister.
9    Q.       She hasn't assisted you with this particular
10   case, has she?
11   A.       She has not.
12   Q.       You indicated the slot was part of Zone 2.  Where
13   did you gather that information?
14   A.       I believe it was from Bregman's deposition.
15   MR. REINKE:  I have no further questions.  Thank
16   you.
17   MS. WATERS:  Thank you.
                           Page 85

GILL, Richard PhD (03-02-07).txt

```
18            (The deposition was concluded at 5:35 p.m.)
19
20
21
22
23
24
25
00229
 1            I, RICHARD T. GILL, Ph.D., do hereby certify that
 2    I have read the foregoing typewritten pages 1 through 228,
 3    inclusive, and corrections, if any, were noted by me and
 4    the same is now a true and correct transcript of my
 5    testimony.
 6            Dated:                              .
 7
 8
 9
10                          RICHARD T. GILL, Ph.D.
11    Signed before me this
12    day of              2007.
13    _____
14
15
16
17
18
19
20
21
22
23
24
25
00230
 1    STATE OF HAWAII            )
                                 )  SS.
 2    CITY AND COUNTY OF HONOLULU )
 3            I, SHEILA BRITT LIPTON, CSR NO. 257, Notary Public
 4    in and for the State of Hawaii, do hereby certify:
 5            That on March 2, 2007, 9:10 a.m. appeared before me
 6    RICHARD T. GILL, Ph.D., the witness whose deposition is
 7    contained herein; that prior to being examined, the
 8    deponent was by me duly sworn; that the deposition was
 9    taken in machine shorthand by me and was thereafter
10    reduced to typewriting under my supervision; that the
11    foregoing represents, to the best of my ability, a correct
12    transcript of the deposition had at that time;
13            That the deponent was notified through counsel, by
14    mail or by telephone to appear and sign; that if the
15    deposition is filed without signature, either the reading
16    and signing of the deposition were waived by stipulation
17    of all parties or the deponent has failed to appear, and
18    the deposition is therefore filed pursuant to Rule 30(e),
19    Hawaii Rules of Civil Procedure.
20
21            Date:
22
23
                          SHEILA BRITT LIPTON, CSR NO. 257
24                        Notary Public, State of Hawaii
                          My Commission Expires: 5-9-2009
25
00029
```